KEKER, VAN NEST & PETERS LLP
ROBERT A. VAN NEST - # 84065
rvannest@keker.com
LEO L. LAM - # 181861
llam@keker.com
TRAVIS SILVA - # 295856
tsilva@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Plaintiff SVB FINANCIAL TRUST

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SVB FINANCIAL TRUST, | Case No. |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| v. | **JURY TRIAL REQUESTED** |
| FIRST-CITIZENS BANK & TRUST COMPANY, | |
| Defendant. | |

2882205.v8

## I.    INTRODUCTION

1.    First Citizens Bank is infringing upon, and has converted, trademarks owned by SVB Financial Trust, which is the successor-in-interest to SVB Financial Group, the former parent company of Silicon Valley Bank.[1]

2.    The original Silicon Valley Bank was founded in 1983.  It was a unique bank.  It catered to Silicon Valley innovators and the venture capital firms that backed them.  Through over 30 years of hard work, Silicon Valley Bank built up a reputation as the go-to banking institution for such firms and ultimately served over half of Silicon Valley start-ups.  The Bank's focus on serving start-ups yielded tremendous profits.  Between 2019 and 2022, Silicon Valley Bank earned more than $1 billion annually in profits, which is a remarkable amount of profit for a bank that operated fewer than 20 branches.

3.    Given the Bank's unique reputation, the people ultimately responsible for the Bank were careful to register its trademarks, including the service mark in its name, the "SVB" abbreviation, its famous chevron logo, and its principal slogan "Make Next Happen Now." But the Marks' registered owner wasn't Silicon Valley Bank.[2]  Rather, its parent company, SVB Financial Group, owned the Marks.  SVB Financial Group owned the Marks because, in addition to the Bank, SVB Financial Group owned other related businesses, including an asset-management firm and an investment bank.  Along with the Bank, these businesses also used the Marks, with the related entities all operating under a common brand that appeared seamless to Silicon Valley Bank customers.

4.    On March 10, 2023, government regulators seized Silicon Valley Bank.  Ultimately, the Federal Deposit Insurance Corporation ("FDIC") received Silicon Valley Bank,

---

[1] Throughout this Complaint, Plaintiff SVB Financial Trust is called "SVB Financial Trust" or "Plaintiff."  Plaintiff's predecessor-in-interest SVB Financial Group is called "SVB Financial Group."  SVB Financial Group's former subsidiary Silicon Valley Bank is called "Silicon Valley Bank" or "the Bank."  Those two terms refer to the pre-seizure Bank.  Defendant First-Citizens Bank & Trust Company is called "First Citizens Bank" or "Defendant."  Other terms are defined elsewhere in the Complaint.

[2] The marks-in-suit are listed in the Appendix and are referred to in this Complaint as "the Marks."  All but one are registered, and the registered trademarks are called the "Registered Marks."  The unregistered trademark was allowed by the U.S. Patent and Trademark Office on December 20, 2022, but the registration process was interrupted by the March 10, 2023 seizure.

which it then sold to First Citizens Bank, a North Carolina bank that had no significant California business in the sectors served by First Citizens Bank.  At the time, the FDIC stated that the "transaction included the purchase of about $72 billion of Silicon Valley Bridge Bank, National Association's assets at a discount of $16.5 billion."  In other words, First Citizens Bank paid $55.5 billion to obtain $72 billion in assets.

5.     However, First Citizens Bank did not acquire the Marks, which were owned by SVB Financial Group.  The only entity that any regulator ever seized was Silicon Valley Bank, and it never owned the Marks.  So, when regulators seized Silicon Valley Bank, they seized the Bank's business, including its deposits and loan portfolio, without seizing the Marks. Consequently, when First Citizens Bank acquired Silicon Valley Bank from the FDIC, it did not acquire the Marks.

6.     Similarly, SVB Financial Group also owned the "svb.com" domain name (the "Domain").  SVB Financial Group, not Silicon Valley Bank, registered the Domain with Corporation Service Company ("CSC").  Before March 10, 2023, the Bank and another SVB Financial Group subsidiary, SVB Capital, used the Domain.  SVB Capital was not seized by regulators, nor was it a part of the FDIC/First Citizens Bank transaction.  Plaintiff continues to own the Domain.

7.     Yet, since it acquired Silicon Valley Bank, First Citizens Bank has continued to operate the Silicon Valley Bank business using the "Silicon Valley Bank" name, its chevron logo, its slogan, its website, and, more generally, the Marks.  It also uses the Domain.  It has done so without permission from either SVB Financial Group or Plaintiff, and in fact, both SVB Financial Group and Plaintiff have notified First Citizens Bank that its continuing use of the Marks is unauthorized and demanded that First Citizens Bank either desist from using the Marks or otherwise obtain permission to do so.  First Citizens Bank's infringement and conversion nevertheless continues unabated.

8.     First Citizens Bank's use of the Marks and the Domain is not incidental or accidental.  Not all banks that acquire distressed banks sold by the FDIC continue to operate under the distressed bank's brand name.  In many such circumstances, the acquiring bank has no

COMPLAINT
Case No.

2882205.v8

incentive to continue using a failed bank's brand because consumers view the brand negatively. Even where consumers retain their confidence in a failed bank brand, the acquiring bank may have a stronger brand, and so in those instances, the acquiring bank may still change the failed bank's branding to match the acquiring bank. For example, First Republic Bank, another California-centric bank that catered to Silicon Valley businesses, failed in the same 2023 financial crisis that led to the seizure of Silicon Valley Bank. It was also seized by regulators, and the FDIC sold it to JPMorgan Chase. JPMorgan Chase retired the First Republic Bank brand almost immediately and integrated the former First Republic Bank into JPMorgan Chase's existing operation. By contrast, before it acquired Silicon Valley Bank, First Citizens Bank was a regional bank that did not do any significant business with California start-ups or venture capital firms. On information and belief, one of the factors that motivated First Citizens Bank to buy Silicon Valley Bank from the FDIC was its desire to grow its California presence, and its executives believed that acquiring and using the Silicon Valley Bank brand—not just the underlying business—as an important part of that transaction. But First Citizens Bank failed to acquire the Marks or the Domain, and—instead—just started using the Marks and the Domain without having any entitlement to them at all.

9. Plaintiff, the rightful owner of the Marks and the Domain, brings this action to vindicate its rights and to satisfy, to the maximum extent possible, the creditors of the former SVB Financial Group.

## II. PARTIES

10. Plaintiff SVB Financial Trust is the successor-in-interest and liquidating trust for SVB Financial Group, which filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on March 17, 2023. It is a Delaware statutory trust. Its principal place of business is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201.

11. Defendant First-Citizens Bank & Trust Company is a corporation organized under the laws of the state of North Carolina, with its principal place of business located at 4300 Six Forks Road, Raleigh, North Carolina 27609. It acquired the Bank on March 27, 2023.

### III.   JURISDICTION AND VENUE

12.   This Court has original subject matter jurisdiction under 28 U.S.C. § 1332.  As an alternative to diversity jurisdiction, this Court has original subject matter jurisdiction over Plaintiff's Lanham Act claims under 15 U.S.C. § 1051, *et seq*., 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331, over Plaintiff's declaratory judgment claim under 28 U.S.C. § 2201, and over Plaintiffs' state-law claims under 28 U.S.C. § 1367 because the state-law claims are so related to Plaintiff's federal claims, which are within this Court's original jurisdiction, that such state law claims are part of the same case or controversy.

13.   Venue is proper in this District under 28 U.S.C. § 1391.  A substantial part of the events or omissions giving rise to the claims occurred, and continue to take place, in this judicial district, including Defendant's continued operation of brick-and-mortar banks and offices using the Silicon Valley Bank trademark in the Counties of Sonoma, Napa, San Francisco, Santa Clara, and San Mateo, all of which are in this District.  Further, on March 10, 2023, SVB Financial Group was headquartered in Santa Clara, California.

### IV.   INTRA-DIVISIONAL ASSIGNMENT

14.   Because this action involves intellectual property rights within the meaning of Civil Local Rule 3-2(c), the action is to be assigned on a district-wide basis.

### V.   FACTUAL ALLEGATIONS

#### A.   Silicon Valley Bank and its corporate affiliates

15.   Beginning in 1983, Silicon Valley Bank offered commercial and private banking products to clients in California and throughout the United States.  Headquartered in Santa Clara, the Bank's success stemmed from its reputation among California start-ups and innovators, especially in the technology and life science industries, as the go-to financial partner for companies in the innovation economy.  Silicon Valley Bank was also a recognized leader in providing financing and banking solutions to clients in the premium wine industry, including many of California's most celebrated vineyards and wineries.

16.   Silicon Valley Bank's focus on the technology and startup sector was unique among American banks.  The Bank offered a range of banking services tailored to meet the needs

2882205.v8

of startups and other commercial clients at all stages of growth, including various credit solutions to account for limited early-stage revenues for some companies. Startup founders, entrepreneurs, and the venture capital and private equity communities that invest in innovative companies came to associate the Marks with the unique type of banking services and products offered by the Bank and its affiliated entities.

17. Silicon Valley Bank offered its technology and life science/healthcare commercial clients a full range of credit products that were adapted to needs of early-stage companies. These products included traditional term loans, growth capital term loans, equipment loans, asset-based loans, revolving lines of credit, warehouse facilities, recurring revenue facilities, mezzanine lending, acquisition finance facilities, corporate working capital facilities standby and commercial letters of credit, project finance loans, and credit card programs. The Bank was able to tailor these products to the unique needs of its clients because of its deep experience serving and advising early-stage companies.

18. To further serve the Bank's clients, SVB Financial Group owned SVB Securities, an investment bank, and SVB Capital, an asset-management firm. These Silicon Valley Bank-branded firms served the Bank's clients by offering products and services tailored to the innovation ecosystem. These businesses operating under the SVB Financial Group umbrella worked together to accelerate the growth of venture-backed and private equity-owned companies.

19. During its 40-year pre-seizure history, Silicon Valley Bank cultivated strong relationships within the private equity and venture capital communities and attracted a significant venture capital and private equity clientele. Many of these clients were also investors in the companies that used Silicon Valley Bank for their banking services. As a result, Silicon Valley Bank was well-positioned to facilitate deal opportunities between these private equity and venture capital firms and its commercial clients, which could in turn stimulate faster growth for these companies—and profits for the Bank.

20. Silicon Valley Bank's tailored product offerings, valuable network of clients, and demonstrated commitment to supporting startups helped Silicon Valley Bank build a strong, brand-name reputation as the preferred bank for innovators and entrepreneurs. Indeed, by 2023,

1    Silicon Valley Bank was the go-to bank for almost half of all venture-backed tech startups and
2    was one of the largest banks by deposit volume.

3         **B.**     **Collapse of Silicon Valley Bank and First Citizens Bank's acquisition**

4         21.     On March 10, 2023, following a run on deposits, California's Department of
5    Financial Protection and Innovation closed Silicon Valley Bank and appointed the Federal
6    Deposit Insurance Corporation as receiver of the Bank.  All assets and liabilities of Silicon Valley
7    Bank were transferred to the Deposit Insurance National Bank of Santa Clara ("DINB").  As
8    Silicon Valley Bank did not own the Marks or the Domain, which were then owned by SVB
9    Financial Group, neither the Marks nor the Domain were among the assets transferred to DINB.

10         22.     On March 13, 2023, the FDIC transferred all deposits and substantially all assets
11    of DINB to a newly created, full-service FDIC-operated "bridge bank" called Silicon Valley
12    Bridge Bank, N.A. ("SVBB").   Silicon Valley Bank employees became SVBB employees, and
13    Silicon Valley Bank's deposits were available at SVBB.  The purpose of establishing SVBB was
14    to allow time for the FDIC to stabilize and market the institution.  The Marks and Domain were
15    not, and could not have been, included in the transfer of assets to SVBB because neither Silicon
16    Valley Bank nor, later, DINB ever owned them.

17         23.     Following a two-week auction held by the FDIC, on or about March 26, 2023,
18    SVBB sold a substantial portion of the U.S. assets formerly belonging to Silicon Valley Bank to
19    First Citizens Bank.  First Citizens Bank simultaneously assumed substantially all of SVBB's
20    deposit liabilities and certain operating liabilities.  As of March 27, 2023, relevantly, the
21    employees of the former Silicon Valley Bank's IT team that managed the Domain, specifically
22    svb.com, became employees of First Citizens Bank.

23         24.     First Citizens Bank did not acquire ownership of the Marks, Domain, or any other
24    intellectual property owned by SVB Financial Group through this transaction.  SVBB could not
25    have sold the Marks to FCB because the Marks were never subject to the receivership to begin
26    with.

27         25.     In fact, this is how First Citizens Bank described the transaction in a press release
28    it issued on March 27, 2023:

COMPLAINT
Case No.

As part of the agreement, First Citizens Bank will assume Silicon Valley Bridge Bank, N.A. assets of $110 billion, deposits of $56 billion and loans of $72 billion, based on latest information provided by the FDIC. First Citizens Bank will additionally receive an available line of credit from the FDIC for contingent liquidity purposes. In addition, First Citizens Bank has entered into a loss share agreement with the FDIC to provide further downside protection against potential credit losses. **First Citizens Bank will not acquire any of the assets**, common stock, preferred stock, debt or assume any other obligations **of SVB Financial Group**, the former holding company of Silicon Valley Bank ("SVB").[3]

26.     On March 17, 2023, SVB Financial Group filed a voluntary petition for Chapter 11 relief in the United States Bankruptcy Court for the Southern District of New York.  On August 2, 2024, the Bankruptcy Court entered an order (the "Confirmation Order") confirming SVB Financial Group's Chapter 11 plan of reorganization (the "Confirmed Plan").[4]  Pursuant to the Confirmed Plan, which became effective on November 7, 2024, SVB Financial Group transferred substantially all of its assets, including the Marks and Domain, to the SVB Financial Trust. Accordingly, SVB Financial Trust, as successor-in-interest to SVB Financial Group, is the exclusive owner of the Marks and Domain, and it has the right to their exclusive use.

**C.     First Citizens Bank's continued use of the Marks and the Domain**

27.     In operating the business of the former Silicon Valley Bank, First Citizens Bank continues to use the Marks, including "Silicon Valley Bank," "svb," and the chevron mark used previously by Silicon Valley Bank.  It displays the Marks on the webpage First Citizens Bank uses to promote its Silicon Valley Bank "division."  That webpage is housed on the Domain: www.svb.com.

28.     For instance, on its webpage First Citizens Bank displays the Marks almost identically to how the pre-seizure Bank displayed the same Marks at the same URL:

---

[3] Emphasis added.  The press release is available at https://newsroom.firstcitizens.com/2023-03-27-First-Citizens-Bank-Enters-into-Whole-Bank-Purchase-of-Silicon-Valley-Bridge-Bank,-N-A?_gl=1*1ikg12k*_gcl_au*NzkyOTM2MzcyLjE3NDA5ODI4Mzc.*_ga*MTc5NzE1NTQyNC4xNzQwNzI3OTQy*_ga_ZLJSNLKT9D*MTc0MDczNDg0MS4xLjAuMTc0MDczNDg0MS42MC4wLjA.*_ga_GHPE53GVHX*MTc0MDk4MjgzNy4zLjAuMTc0MDk4MjgzOC41OS4wLjA

[4] The Confirmation Order is Exhibit A to this Complaint, and the order regarding the irrevocable transfer is at pages 37-39.

| Silicon Valley Bank [5] | First Citizens Bank [6] |
|---|---|
| ![svb Silicon Valley Bank] | ![svb Silicon Valley Bank A Division of First Citizens Bank] |

29.     First Citizen Bank also displays the Marks on promotional materials and at brick-and-mortar offices and bank branches.  First Citizens Bank operates an SVB-branded "Experience Center" in the heart of downtown San Francisco.  This photograph shows the signage outside this office as of February 2025:



First Citizens Bank is using the registered svb Mark and the registered chevron Mark at this facility, without the "A Division of First Citizens Bank" language.

30.     As a further example, First Citizens Bank uses the Marks in its promotional materials, such as the excerpt below from its Q1 2025 Fact Sheet, which demonstrates how First Citizens Bank uses the Marks:[7]

---

[5] https://web.archive.org/web/20221222215414/https://www.svb.com/
[6] https://www.svb.com/
[7] https://www.svb.com/globalassets/content/corporate/svb-fact-sheet-q1-2005.pdf

COMPLAINT
Case No.

2882205.v8

**svb > Silicon Valley Bank**
A Division of First Citizens Bank

## Silicon Valley Bank Fact Sheet
Q1 2025

Silicon Valley Bank, a division of First Citizens Bank ("SVB"),
is the bank of innovative companies and investors.

With 40 years of dedication to this sector, SVB is more experienced serving investors and innovation clients than any other financial services provider. Our entire business – from our solutions and technology to our credit policy and beyond – was purpose-built for high-growth companies and investors, and delivered at the speed they require.

31.    First Citizens Bank acquired the former assets of Silicon Valley Bank to expand into new and profitable banking sectors that previously had not been a focus of its operations.

32.    As a Raleigh-based bank offering traditional banking services, FCB had no experience running a business like Silicon Valley Bank's, nor did it have Silicon Valley Bank's reputation as the go-to bank for start-ups, private equity, and venture capital.  To short-circuit the long and difficult process of expanding organically into these sectors, First Citizens Bank chose to tap into Silicon Valley Bank's historic position as the industry leader for banking services in the innovation economy.  As its Chairman and CEO, Frank B. Holding, Jr., explained shortly after the acquisition, First Citizens Bank believed it could "leverag[e] Silicon Valley Bank's strength in serving the private equity, venture capital and technology sectors" and "accelerate [First Citizens Bank's] expansion in California."[8]

33.    On March 27, 2023, FCB began using the Marks and operating the legacy Silicon Valley Bank business, including its 17 former branches.[9]  Since then, First Citizens Bank has continuously used the Marks in the operation of the former Silicon Valley Bank's banking

---

[8] https://newsroom.firstcitizens.com/2023-03-27-First-Citizens-Bank-Enters-into-Whole-Bank-Purchase-of-Silicon-Valley-Bridge-Bank,-N-A

[9] *Id.*

COMPLAINT
Case No.

operations without the consent of SVB Financial Group or the SVB Financial Trust and without providing any compensation for the use of this valuable intellectual property.

34.　　Upon information and belief, First Citizens Bank's decision to continue using the Marks was part of a concerted strategy to capitalize on the former Silicon Valley Bank's brand despite the change in ownership.　Such branding inaccurately implies to consumers that First Citizens Bank has the same management, the same personnel, the same expertise, and the same product offerings in place as the Bank had before it was seized by regulators, when in fact much of the prior Bank's management, personnel, expertise, and product offerings are no longer at First Citizens Bank.　For example, on its website First Citizens Bank tells its customers "SVB is running as SVB" and "SVB is still here" and "here to serve you as we always have":[10]

> **Why should we consider staying with SVB?**　∧
>
> SVB is open and here to serve you as we always have – focused and specialized in the innovation economy. As a division of First Citizens, SVB is running as SVB, and our clients do not need to change anything to receive the services they know and expect from the team with the deepest bench of innovation economy expertise and a team that serves the innovation economy better than any other financial institution. What our clients in every sector, segment and life stage of the innovation economy need and expect from SVB is still here – dedicated and knowledgeable teams, comprehensive products and services, exceptional service and a deep understanding of our clients' unique businesses. We remain dedicated to the success of the investors and innovators who are literally inventing the future, and now we have the full backing, credit appetite, authority to serve our clients and financial support of 125-year old First Citizens Bank to continue to pursue that mission.

35.　　By all accounts, First Citizens Bank's efforts to capitalize on Silicon Valley Bank's reputation and brand recognition have been successful and highly profitable.　Shortly after the acquisition, First Citizens Bank's stock "soared by more than 50%."[11]　As an analyst for J.P. Morgan explained, Silicon Valley Bank was "the bank of the innovation economy."[12]　Thus, "FCB [stood] to benefit from its strong foothold in the start-up world."[13]　This optimism was

---

[10] https://www.svb.com/about-svb/svb-client-faqs/
[11] https://www.barrons.com/articles/first-citizens-stock-svb-merger-5bed2f83
[12] *Id*.
[13] *Id.*

COMPLAINT
Case No.

2882205.v8

1  warranted.  "By the start of 2024, the stock traded for $1,420, a 250% gain from pre-SVB

2  days."[14]  Today, First Citizens Bank's stock trades for almost 4 times its pre-acquisition value.

3      36.    First Citizens Bank's use of the Marks and the Domain has continued unabated,

4  even though SVB Financial Group have asserted their rights to First Citizens Bank.  On October

5  26, 2023, SVB Financial Group informed First Citizens Bank in written correspondence that First

6  Citizens Bank had no right to use the Marks (or other intellectual property owned by SVB

7  Financial Group).  SVB Financial Group's October 26, 2023 letter also asserted ownership over

8  the Domain.  SVB Financial Group offered to engage in commercial discussions for either a

9  license or a sale of the trademarks.  SVB Financial Group and First Citizens Bank never entered

10  into any such arrangement.  Later, after it acquired the Marks through the bankruptcy proceeding,

11  the Trust continued to demand that First Citizens Bank cease its unauthorized use of the Marks or

12  pay adequate compensation.  First Citizens Bank has refused to do either, while continuing to

13  reap the benefits of its infringement and misappropriation.

14      37.    As a result of First Citizens Bank's continued wrongful use of the svb.com

15  domain, SVB Financial Group was forced to create standalone domains for itself ("svbfg.com")

16  and its other subsidiaries (for example, "svbcapital.com").  Although SVB Financial Trust could

17  shut down svb.com at any time, as the rightful owner of the domain name, it has not done so in an

18  effort to maintain an open line of communication between First Citizens Bank in an effort to

19  facilitate a lawful purchase or license of the Domain.

20      **D.    Plaintiff's post-seizure use of, and efforts to use, the Marks**

21      38.    At the time the Bank failed in March 2023, SVB Financial Group owned an

22  investment bank called SVB Securities.  SVB Financial Group operated SVB Securities until

23  October 2023, when SVB Financial Group spun off SVB Securities and sold it.  Neither the

24  Marks nor the Domain nor any related license was included under the terms of the sale of SVB

25  Securities.

26

27

28  [14] https://businessnc.com/first-citizens-bold-conquest-raised-the-stakes-and-profile-of-the-family-controlled-bank/

2882205.v8

39.    At the time the Bank failed in March 2023, SVB Financial Group owned an asset-management business called SVB Capital.  SVB Capital continued to operate as a subsidiary under SVB Financial Group's control until SVB Financial Group sold it in September 2024.  Neither the Marks nor the Domain nor any related license was included under the terms of the sale of SVB Capital.

40.    Since the Bank's seizure, Plaintiff (and, previously, SVB Financial Group) has received inquiries regarding its willingness to license the SVB brand and the Marks.  However, First Citizens Bank's unauthorized use of the Marks has impeded Plaintiff's ability to enjoy its rights in the Marks.

## VI.    CAUSES OF ACTION

### Count One—Trademark Infringement (15 U.S.C. §§ 1114, 1116)

41.    SVB Financial Trust realleges and incorporates its prior allegations as if fully set forth herein.

42.    The Registered Marks are valid, protectable, and federally registered with the United States Patent and Trademark Office.  Plaintiff is the beneficial and legal owner of the Registered Marks.

43.    First Citizens Bank uses the Registered Marks, including "Silicon Valley Bank," "svb," and the chevron logo, to identify its offerings of a suite of banking services and products targeted toward the startup and technology sectors.  Defendant has affixed the Registered Marks to its physical office and branch locations, and it uses the Registered Marks on its website, www.svb.com, and on marketing and promotional materials.

44.    First Citizens Bank never purchased the Registered Marks, received a license to use the Registered Marks, or was otherwise authorized by SVB Financial Group or SVB Financial Trust to use the Registered Marks.

45.    First Citizens Bank's use of the Registered Marks is likely to cause consumer and marketplace confusion.  The Registered Marks are strong and highly distinctive, and the Registered Marks have gained recognition and secondary meaning in the marketplace as a result of the decades of work that SVB Financial Group and its subsidiaries invested in building the

Bank's reputation in the technology and venture capital industries.  First Citizens Bank uses the Registered Marks as they are registered, without modification, on products and services that are substantially similar to products and services offered by SVB Financial Group and its subsidiaries.  Under the Registered Marks, First Citizens Bank continues physical operations, including consumer-facing operations, in some storefronts occupied by the pre-seizure Bank. First Citizens Bank continues to operate the www.svb.com website and markets its products and services to the same consumers, through the same marketing channels, as SVB Financial Group and its subsidiaries.  First Citizen Bank uses the Registered Marks to trade on the brand strength that SVB Financial Group and its subsidiaries built prior to the Bank's seizure.  First Citizens Bank's use of the Registered Marks inaccurately implies to consumers that the prior Bank's personnel and services remain available to consumers at First Citizens Bank.  Plaintiff continues to seek markets in which it can enjoy use of the Registered Marks, and, on information and belief, Defendant intends to expand its operations under the Silicon Valley Bank brand, including through continued use of the Registered Marks.

46.    Proper monetary relief for First Citizens Bank's infringement of the Registered Marks includes disgorgement of First Citizens Bank's profits, actual damages, reasonable royalties, and/or other damages to be proven at trial.

47.    First Citizens Bank's actions as described herein also constitute counterfeiting under 15 U.S.C. §§ 1114 and 1116. As a result, Plaintiff should be awarded statutory damages pursuant to 15 U.S.C. § 1117(c), and treble profits or actual damages, whichever is higher, pursuant to 15 U.S.C. § 1117(b).

48.    First Citizens Bank is willfully infringing the Registered Marks in violation of 15 U.S.C. § 1114.  Plaintiff and its predecessor-in-interest have demanded that First Citizens Bank desist from its infringing conduct, yet it refuses to do so.

49.    This is an "exceptional case" within the meaning of 15 U.S.C. § 1117(a), for which SVB Financial Trust should be awarded attorneys' fees.

50.    Unless First Citizens Bank is enjoined from engaging in the conduct as alleged herein, SVB Financial Trust will sustain, and is threatened with continuing to sustain, irreparable injury for which damages and other remedies at law are inadequate.

**Count Two—False Designation of Origin (15 U.S.C. § 1125(a))**

51.    SVB Financial Trust realleges and incorporates its prior allegations as if fully set forth herein.

52.    By its acts alleged herein, First Citizens Bank has violated 15 U.S.C. § 1125(a).

53.    First Citizens Bank has used and continues to use the Marks in commerce to falsely designate its products and services as being affiliated with or originating from SVB Financial Group and its subsidiaries.

54.    As alleged herein, First Citizens Bank's false designation of the origin of its products is likely to have caused and to continue causing confusion in the marketplace, and it misrepresents the characteristics of First Citizens Bank's products and services as being backed by and affiliated with SVB Financial Group and its prior subsidiaries' and business's specialized banking expertise.  For the reasons previously alleged, a reasonably prudent consumer in the marketplace is likely to be confused or deceived about the source or origin of First Citizens Bank's falsely designated products and services that bear the Marks.

55.    First Citizens Bank's actions as described herein constitute willful false designation of origin in violation of 15 U.S.C. §1125(a).  As a result, this is an "exceptional case" within the meaning of 15 U.S.C. § 1117(a), and SVB Financial Trust may recover (1) First Citizens Bank's profits, (2) any damages sustained by SVB Financial Trust, (3) the costs of the action, and (4) attorneys' fees.

56.    Unless First Citizens Bank is enjoined from engaging in the conduct as alleged herein, SVB Financial Trust will sustain, and is threatened with continuing to sustain, irreparable injury for which damages and other remedies at law are inadequate.

**Count Three—Trademark Dilution (15 U.S.C. § 1125(c))**

57.    SVB Financial Trust realleges and incorporates its prior allegations as if fully set forth herein.

58.

59.    By its acts alleged herein, First Citizens Bank has engaged in trademark dilution under 15 U.S.C. § 1125(c).

60.    As alleged herein, the Marks are famous and distinctive.  SVB Financial Group used the Marks extensively in commerce by offering a range of banking products and services tailored to startups, the tech industry, and other innovative commercial, private equity, and venture capital clients under the Marks.  As a result, the Marks are widely recognized by the general consuming public as associated with SVB Financial Group's products and specialized banking expertise.  SVB Financial Group used all of the Marks prior to March 10, 2023.

61.    First Citizens Bank began using the Marks in interstate commerce in 2023.  First Citizens Bank's use of identical Marks began after the Marks became famous and distinctive.

62.    First Citizens Bank's use of the Marks is likely to cause dilution by either (a) blurring, in that First Citizens Bank's use of the Marks has impaired and will continue to impair the distinctiveness of the Marks; and/or (b) tarnishment, in that First Citizens Bank's use of the Marks has harmed and will continue to harm the reputation of the Marks.

63.    First Citizens Bank's actions as described herein constitute willful trademark dilution in violation of 15 U.S.C. §1125(c).  As a result, this is an "exceptional case" within the meaning of 15 U.S.C. § 1117(a), and SVB Financial Trust may recover (1) First Citizens Bank's profits, (2) any damages sustained by SVB Financial Trust, (3) the costs of the action, and (4) attorneys' fees.

64.    Unless First Citizens Bank is enjoined from engaging in the conduct as alleged herein, SVB Financial Trust will sustain, and is threatened with continuing to sustain, irreparable injury for which damages and other remedies at law are inadequate.

### Count Four—Cybersquatting (15 U.S.C. § 1125(d))

65.    SVB Financial Trust realleges and incorporates by reference paragraphs 1 through 62, inclusive, as if fully set forth herein.

66.    First Citizens Bank uses the Domain, svb.com.

2882205.v8

67.     The Domain is owned by SVB Financial Trust and registered with CSC.  No First Citizens Bank employee has the right to modify or alter access to the Domain or to direct CSC to take any actions with regard to the Domain.  On information and belief, First Citizens Bank employees have contacted CSC as part of First Citizen Bank's effort to establish control over the Domain.

68.     The Domain is identical to or confusingly similar to a mark or marks owned by SVB Financial Trust.

69.     SVB Financial Trust's marks are distinctive and were distinctive throughout First Citizen Bank's use and/or conversion of the Domain.

70.     First Citizens Bank has engaged in cybersquatting and/or cyberpiracy under 15 U.S.C. § 1125(d) with bad faith intent to profit from the marks owned by SVB Financial Trust. At least since October 23, 2023, First Citizens Bank has been on notice of SVB Financial Group's assertion of its rights to the Marks and the Domain.

71.     Unless First Citizens Bank is enjoined from engaging in the conduct as alleged herein, SVB Financial Trust will sustain, and is threatened with continuing to sustain, irreparable injury for which damages and other remedies at law are inadequate.

### Count Five—California Trademark Counterfeiting and Infringement

72.     SVB Financial Trust realleges and incorporates its prior allegations as if fully set forth herein.

73.     First Citizens Bank has engaged in trademark infringement under the common law of the State of California and Cal. Bus. & Prof. Code § 14245.

74.     The Marks are highly distinctive and are widely recognized in the relevant marketplace in California as associated with products and specialized banking expertise previously offered by SVB Financial Group and its former subsidiaries.  California consumers recognize the Marks as designating SVB Financial Group and, by association, SVB Financial Trust as the source of products and services bearing those Marks.  SVB Financial Trust has common law trademark rights in the Marks under California law.

2882205.v8

75.     First Citizens Bank has used and continues to use the Marks in commerce in California.

76.     First Citizens Bank's use of the Marks in California is junior to SVB Financial Group's, as First Citizens Bank began using the Marks nearly 40 years after SVB Financial Group.

77.     First Citizens Bank's use of the Marks on its products in California is likely to have caused and to continue causing confusion in the marketplace.  For the reasons previously alleged, a reasonably prudent consumer in the marketplace likely has been, and is likely to be, confused or deceived about the source or origin of First Citizens Bank's products and services that bear the Marks.

78.     First Citizens Bank's is willfully infringing the Marks in California.

79.     Proper monetary relief for First Citizens Bank's infringement of the Marks includes disgorgement of First Citizens Bank's profits, actual damages, costs of suit, and/or other damages to be proven at trial.

80.     First Citizens Bank's actions as described herein also constitute the display and sale of counterfeit goods.  As a result, SVB Financial Trust further should be awarded treble profits or actual damages pursuant to Cal. Bus. & Prof. Code § 14250.

81.     Unless First Citizens Bank is enjoined from engaging in the conduct in California as alleged herein, SVB Financial Trust will sustain, and is threatened with continuing to sustain, irreparable injury for which damages and other remedies at law are inadequate.

## **Count Six—California Trademark Dilution**

82.      SVB Financial Trust realleges and incorporates its prior allegations as if fully set forth herein.

83.     First Citizens Bank has engaged in trademark dilution under the common law of the State of California and Cal. Bus. & Prof. Code § 14247.

84.     Marks are famous and distinctive in the State of California, and the Marks are widely recognized by California consumers as designating SVB Financial Group and its former

2882205.v8

subsidiaries as the source of products and services bearing the Marks.  SVB Financial Trust has common law trademark rights in the Marks under California law.

85.    First Citizens Bank has used and continues to use the Marks in commerce in California.

86.    First Citizens Bank began using the Marks in commerce after the Marks acquired fame and distinction.

87.    First Citizens Bank's use of the Marks in California is likely to cause dilution by either (a) blurring, in that First Citizens Bank's use of the Marks has impaired and will continue to impair the distinctiveness of the Marks; and/or (b) tarnishment, in that First Citizens Bank's use of the Marks has harmed and will continue to harm the reputation of the Marks.

88.    Proper monetary relief for First Citizens Bank's dilution of the Marks includes disgorgement of First Citizens Bank's profits, actual damages, costs of suit, and/or other damages to be proven at trial.

89.    First Citizens Bank's actions as described herein also constitute willful trademark dilution in violation of Cal. Bus. & Prof. Code § 14247(b).  As a result, SVB Financial Trust should be awarded treble profits or actual damages pursuant to Cal. Bus. & Prof. Code §§ 14247 and 14250.

90.    Unless First Citizens Bank is enjoined from engaging in the conduct as alleged herein, SVB Financial Trust will sustain, and is threatened with continuing to sustain, irreparable injury for which damages and other remedies at law are inadequate.

## Count Seven—Conversion

91.    SVB Financial Trust realleges and incorporates its prior allegations as if fully set forth herein.

92.    SVB Financial Group owned, controlled, and had the right to use, including to license, the Marks and Domain.  As the successor-in-interest to SVB Financial Group, SVB Financial Trust owns the Marks and Domain.

93.    Plaintiff has not consented to Defendant's wrongful use and disposition of the Marks and Domain.

COMPLAINT
Case No.

94.     First Citizens Bank's conversion of the Marks and Domain has caused damage to Plaintiff.

95.     First Citizens Bank's use and disposition of the Marks and the Domain is wrongful.  First Citizens Bank claims to own the Marks and the Domain when it does not.  First Citizens Bank claims an unfettered right to use the Marks and Domain.  First Citizens Bank has persisted in using the Marks and the Domain even after October 23, 2023, when SVB Financial Group asserted its rights in the Marks and the Domain.  First Citizens Bank's continued use of the Marks and Domain thus constitute oppression, fraud, and/or malice under section 3294 of the California Civil Code.

### **Count Eight—California common law misappropriation**

96.     SVB Financial Trust realleges and incorporates its prior allegations as if fully set forth herein.

97.     SVB Financial Group invested four decades worth of effort into building the Silicon Valley Bank brand.  It positioned the Silicon Valley Bank brand as the go-to financial services institution for start-up companies and venture capital firms, including through the provision of banking services provided by the Bank, investment banking services provided by SVB Securities (a firm that SVB Financial Group purchased a few years before the Bank's failure), and asset-management services provided by SVB Capital.  SVB Financial Group's investment in developing the Silicon Valley Bank brand included registering and protecting the Marks and maintaining the Domain.

98.     First Citizens Bank has appropriated the Marks and the Domain without paying SVB Financial Group or Plaintiff for its use of the Marks and Domain, or obtaining SVB Financial Group or Plaintiff's consent, thus constituting appropriation.

99.     First Citizen Bank's misappropriation has injured Plaintiff.

100.    First Citizens Bank's continued misappropriation of the Marks and the Domain constitutes oppression, fraud, and/or malice under section 3294 of the California Civil Code.

## Count Nine—California Business & Professions Code § 17200

101.    SVB Financial Trust realleges and incorporates its prior allegations as if fully set forth herein.

102.    California's Unfair Competition Law ("UCL"), Business & Professions Code sections 17200, *et seq.*, prohibits businesses from engaging in unlawful, fraudulent, or unfair business practices.

103.    First Citizens Bank has been, and is, engaged in unlawful business acts or practices because it has infringed the Marks under federal and California law, because it is cybersquatting on the Domain, and because it has converted and/or misappropriated the Marks and the Domain. Further, First Citizens Bank's use of the Marks in California is an unfair and/or fraudulent business practice because it is likely to confuse consumers as to the source, origin, or affiliation of First Citizens Bank's products, to misrepresent the nature, characteristic, and qualities of First Citizens Bank's products and/or to deceive or have a tendency to deceive or mislead the public into engaging with First Citizens Bank's product under the impression that the product was sponsored or endorsed by SVB Financial Trust.  First Citizens Bank's use of the Marks and Domain prevent or impede SVB Financial Trust from licensing, selling, or otherwise disposing of the Marks and the Domain.

104.    As a proximate result of First Citizens Bank's actions, as set forth above, SVB Financial Trust has suffered injury in fact, including without limitation, deprivation of its property, had its property and the value of its Marks and Domain diluted and diminished, suffered economic and/or financial loss, loss of money or property, and diminution in the value of the Marks.  SVB Financial Trust therefore has standing to assert this claim to California Business & Professions Code § 17200.

105.    Pursuant to Cal. Bus. & Prof. Code § 17203, SVB Financial Trust seeks an order of this Court enjoining First Citizens Bank from continuing to engage in unlawful, unfair, fraudulent, and/or deceptive business practices and any other act prohibited by law, including those acts set forth in this complaint, along with all other relief allowable under Cal. Bus. & Prof. Code § 17200, *et seq.*

## Count Ten—Declaratory Judgment

106. SVB Financial Trust realleges and incorporates its prior allegations as if fully set forth herein.

107. This claim for declaratory relief is made pursuant to 28 U.S.C. § 2201.

108. An actual controversy has arisen and now exists between SVB Financial Trust and First Citizens Bank over the lawful ownerships of the intellectual property and other assets of the Silicon Valley Bank brand, and the attendant right to use, control, and license the assets.

109. SVB Financial Trust owns and has the right to use and license the Marks and Domain. First Citizens Bank has nonetheless unlawfully interfered with these rights.

110. SVB Financial Trust desires a judicial determination and declaration of its rights and obligations, specifically, a determination of the ownership of the Marks and Domain.

111. Such a declaration of the above rights is necessary and proper at this time so that SVB Financial Trust may ascertain its rights and obligations with regard to future licensing of the Marks and Domain.

## VII.    PRAYER FOR RELIEF

Wherefore, SVB Financial Trust demands judgment in its favor, together with the following relief:

    A.    An injunction prohibiting Defendant from infringing upon or otherwise using the Marks or the Domain and requiring Defendant to take all steps necessary to convey Plaintiff's property back to Plaintiff;

    B.    Plaintiff's actual damages incurred;

    C.    Disgorgement of Defendant's profits relating to the use of the Marks or the Domain;

    D.    An accounting of Defendant's profits;

    E.    An award of reasonable royalties;

    F.    Punitive damages under section 3294 of the California Civil Code;

    G.    Declaratory relief;

    H.    Interest, costs, and attorneys' fees

## VIII.   JURY DEMAND

SVB Financial Trust requests a trial by jury on all issues that are alleged and asserted that are so triable.

Dated:                                        KEKER, VAN NEST & PETERS LLP


By:   */s/ Robert A. Van Nest*
ROBERT A. VAN NEST
LEO L. LAM
TRAVIS SILVA

Attorneys for Plaintiff SVB FINANCIAL TRUST

22
COMPLAINT
Case No.

2882205.v8

| Mark | Status | Reg. No. | Reg. Date |
|------|--------|----------|
| > (CHEVRON) | Registered | 5918268 \| Nov 26, 2019 |
| CHEVRON DESIGN | Registered | 4651257 \| Dec 9, 2014 |
| MAKE NEXT HAPPEN NOW | Registered | 5918270 \| Nov 26, 2019 |
| SILICON VALLEY BANK | Registered | 2943396 \| Apr 26, 2005 <br><br> 5918269 \| Nov 26, 2019 |
| SVB | Registered | 5918075 \| Nov 26, 2019 |
| SVB & CHEVRON DESIGN | Allowed | |
| SVB (CHEVRON) SILICON VALLEY BANK (4651258) OFFSET | Registered | 4651258 \| Dec 9, 2014 |
| SVB > (CHEVRON) BOX DESIGN | Registered | 6016343 \| Mar 24, 2020 |
| SVB > SILICON VALLEY BANK (BOX) | Registered | 6056175 \| May 19, 2020 |

2883086.v1

| Mark | Status | Reg. No. | Reg. Date |
|------|--------|-----------|
| SVB > SILICON VALLEY BANK (OFFSET)<br> | Registered | 6056174 | May 19, 2020 |
| SVB AND CHEVRON DESIGN<br> | Registered | 4651259 | Dec 9, 2014 |
| SVB SILICON VALLEY BANK (BOX)<br> | Registered | 5800927 | Jul 9, 2019 |
| SVB SILICON VALLEY BANK (OFFSET)<br> | Registered | 5800928 | Jul 9, 2019 |

2883086.v1

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
In re:                                              :          Chapter 11
:
:          Case No. 23-10367 (MG)
SVB FINANCIAL GROUP,[1]                             :
:
Debtor.             :
:
:
---------------------------------------------------------------x

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING THE DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

SVB Financial Group, as debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor"), having:[2]

a.   commenced, on March 17, 2023, this chapter 11 case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court");

b.   continued to operate its businesses and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c.   filed, on April 27, 2023, the *Debtor's Motion for Entry of Orders (I)(A) Approving Bid Procedures and the Form and Manner of Notices for the Sale of SVB Securities and (B) Scheduling Auction(s) and Sale Hearing(s), (II) Approving the Sale(s) Free and Clear of Liens, Claims, Interests and Encumbrances and (III) Granting Related Relief* [D.I. 137] (the "SVB Securities Bidding Procedures Motion");

d.   filed, on January 9, 2024, the *Notice of Entry into Restructuring Support Agreement* [D.I. 798], attaching the Restructuring Support Agreement thereto as Exhibit A;

e.   filed, on January 26, 2024, the *Debtor's Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [D.I. 826] (as may be further amended, supplemented or modified from time to time, including the Plan Supplement and all other exhibits and schedules thereto,

---

[1]     The last four digits of SVB Financial Group's tax identification number are 2278.

[2]     Capitalized terms used but not otherwise defined in this order (this "Confirmation Order") shall have the meanings ascribed to such terms in the Plan, attached hereto as Exhibit A.  The rules of interpretation set forth in Section 2.2 of the Plan shall apply to this Confirmation Order.

in each case, as they may be further amended, modified or supplemented from time to time, the "Plan");

f.    filed, on February 7, 2024, the *Disclosure Statement for Debtor's Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [D.I. 845] (including all exhibits and schedules thereto and as may be amended, modified or supplemented from time to time, the "Disclosure Statement");

g.    filed, on February 9, 2024, the *Debtor's Motion for Entry of an Order (I) Approving the Disclosure Statement; (II) Establishing a Voting Record Date; (III) Approving Solicitation Packages and Solicitation Procedures; (IV) Approving the Forms of Ballots; (V) Establishing Voting and Tabulation Procedures; and (VI) Establishing Notice and Objection Procedures for the Confirmation of the Plan* [D.I. 847] (the "Solicitation Procedures Motion");

h.    filed, on March 3, 2024, the *Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Sell SVB India by (A) Selling Partnership Interests in SVB India Free and Clear of All Liens, Claims, Interests and Encumbrances and (B) Causing Non-Debtor Subsidiary to Sell Partnership Interests in SVB India; (II) Approving the Debtor's Entry Into, and Performance Under, the Purchase and Sale Agreement; (III) Authorizing Assumption and Assignment of Certain Contracts; and (IV) Granting Related Relief* [D.I. 929] (the "SVB India Sale Motion");

i.    filed, on May 2, 2024, the *Debtor's Motion for Entry of Orders (I)(A) Approving Buyer Protections, (B) Scheduling a Sale Hearing, (C) Approving Form and Manner of Notices for Sale of the SVB Capital Business, (D) Approving the Assumption and Assignment Procedures, and (E) Granting Related Relief, and (II)(A) Approving the SVB Capital Purchase Agreement, (B) Approving the Sale of the SVB Capital Business Free and Clear of Liens, Claims, Interests and Encumbrances, (C) Authorizing the Assumption and Assignment of Executory Contracts and (D) Granting Related Relief* [D.I. 1082] (the "SVB Capital Sale Motion");

j.    filed, between May 3, 2024 and May 30, 2024, multiple revised versions of the Plan [D.I. 1086 and 1143] and Disclosure Statement [D.I. 1087 and 1144];

k.    filed, on May 30, 2024, the solicitation versions of the Plan [D.I. 1178] and Disclosure Statement [D.I. 1179];

l.    caused to be distributed solicitation materials by June 9, 2024 (the "Solicitation Mailing Deadline"), consistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and the *Order (I) Approving the Disclosure Statement; (II) Establishing a Voting Record Date; (III) Approving Solicitation Packages and Solicitation Procedures; (IV) Approving the Forms of Ballots; (V) Establishing Voting and Tabulation Procedures; and (VI) Establishing Notice and Objection Procedures for the Confirmation of the Plan* [D.I. 1172] (the "Solicitation Procedures Order"), which approved, among other things, solicitation and tabulation procedures (the "Solicitation and Tabulation Procedures") and related materials, notices, forms and ballots to be provided to each Class (collectively, the

"Solicitation Packages"), as evidenced by the *Affidavit of Service of Craig E. Johnson* [D.I. 1258] (the "Kroll Affidavit of Service");

m.    caused to be published, on June 5, 2024, the Confirmation Hearing Notice in each of (i) the *San Francisco Chronicle* and (ii) *The Wall Street Journal* (national edition) as evidenced by the *Certification of Publication* [D.I. 1197] (collectively, the "Publication Certification");

n.    filed, on July 1, 2024, the Plan Supplement [D.I. 1246] (as amended and supplemented from time to time, the "Plan Supplement") in accordance with the Solicitation Procedures Order, containing the following documents:

    I.    the NewCo Governance Term Sheet (Exhibit A to the Plan Supplement);

    II.    the Liquidating Trust Governance Term Sheet (Exhibit B to the Plan Supplement);

    III.    the Schedule of Assumed Executory Contracts and Unexpired Leases (Exhibit C to the Plan Supplement);

    IV.    the Restructuring Transactions Memorandum (Exhibit D to the Plan Supplement);

    V.    the Shared Services Agreement (Exhibit E to the Plan Supplement); and

    VI.    the Schedule of Retained Causes of Action (Exhibit F to the Plan Supplement);

o.    filed, on July 3, 2024 the *Notice of Plan Settlement Agreement* [D.I. 1259], attaching the Plan Settlement Agreement thereto as Exhibit A;

p.    filed, on July 9, 2024, a revised Plan [D.I. 1276];

q.    filed, on July 9, 2024, the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtor's Second Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [D.I. 1272] (the "Initial Voting Certification");

r.    filed, on July 18, 2024, a further revised Plan [D.I. 1303];

s.    filed, on July 18, 2024 the *Debtor's Memorandum of Law (I) in support of Confirmation of the Second Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and (II) in Response to Objections Thereto* [D.I. 1307] (the "Plan Confirmation Brief");

t.    filed, on July 18, 2024 the *Declaration of William C. Kosturos in Support of Confirmation of the Chapter 11 Plan of Reorganization of SVB Financial Group* [D.I. 1308] (the "Kosturos Declaration");

u.  filed, on July 23, 2024, the *Supplemental Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtor's Second Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [D.I. 1331] (the "Supplemental Voting Certification", and together with the Initial Voting Certification, the "Voting Certifications"); and

v.  filed, on July 24, 2024, a further revised Plan [D.I. 1332].

This Court having:

a.  entered, on May 17, 2023, the *Order (A) Approving Bid Procedures and the Form and Manner of Notices for the Sale of SVB Securities, (B) Scheduling Auction(s) and Sale Hearing(s) and (C) Granting Related Relief* [D.I. 250], approving the SVB Securities Bidding Procedures Motion;

b.  entered, on April 10, 2024, the *Order (I) Authorizing the Debtor to Sell SVB India by (A) Selling Partnership Interests in SVB India Free and Clear of All Liens, Claims, Interests and Encumbrances and (B) Causing Non-Debtor Subsidiary to Sell Partnership Interests in SVB India; (II) Approving the Debtor's Entry Into, and Performance Under, the Purchase and Sale Agreement; (III) Authorizing Assumption and Assignment of Certain Contracts; and (IV) Granting Related Relief* [D.I. 1028] (the "SVB India Sale Order"), approving the SVB India Sale Motion;

c.  entered, on May 30, 2024, the *Order (I) Approving the SVB Capital Purchase Agreement, (II) Approving the Sale of the SVB Capital Business Free and Clear of All Liens, Claims, Interests and Encumbrances, (III) Authorizing Assumption and Assignment of Certain Executory Contracts and (IV) Granting Related Relief* [D.I. 1170], approving the sale of SVB Capital to the Buyer (each as defined in the order);

d.  entered, on May 30, 2024, the Solicitation Procedures Order;

e.  reviewed the Plan, the Plan Supplement, the Plan Confirmation Brief, the Kosturos Declaration, the Voting Certifications and all pleadings, exhibits, statements, responses and comments regarding Confirmation, including all objections, statements and reservations of rights made with respect thereto;

f.  heard the statements, arguments and objections made by counsel in respect of Confirmation;

g.  considered all oral representations, documents, filings and other evidence regarding Confirmation; and

h.  overruled, including for the reasons stated on the record of the Confirmation Hearing, any and all objections to the Plan and Confirmation and all statements and reservations of rights not consensually resolved, waived, settled or withdrawn unless otherwise indicated.

**NOW, THEREFORE, THE COURT MAKES THE FOLLOWING**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED ON THE PLEADINGS,**

**THE REPRESENTATIONS OF THE PARTIES, AND THE RECORD ESTABLISHED**

**AND EVIDENCE PRESENTED AT THE HEARING**:

## I.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A.    Findings and Conclusions**

    1.    The findings and conclusions set forth herein and on the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**B.    Jurisdiction and Venue**

    2.    The Court has jurisdiction to consider confirmation of the Plan pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are section 1125, 1126, 1127, 1128 and 1129 of the Bankruptcy Code and Bankruptcy Rules 2002, 3016, 3017, 3018 and 3020.

**C.    Eligibility for Relief**

    3.    The Debtor is an entity eligible for relief under section 109 of the Bankruptcy Code.

**D.    Commencement of the Chapter 11 Case**

    4.    On March 17, 2023 (the "Petition Date"), the Debtor filed with the Court a voluntary petition for relief under title 11 of the Bankruptcy Code. The Debtor continues to

operate its businesses and manage its assets as a debtor-in-possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

**E.    Judicial Notice**

5.    This Court takes judicial notice of all orders entered, and all testimony,

documents and arguments made, proffered or adduced at and accepted into evidence at the

hearings held before this Court during the pendency of the Chapter 11 Case and at the

Confirmation Hearing.

**F.    Appointment of the UCC**

6.    On March 28, 2023, William K. Harrington, the United States Trustee for

Region 2 (the "U.S. Trustee"), appointed an official committee of unsecured creditors (the

"UCC") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured

creditors in this Chapter 11 Case [D.I. 72].[3]

**G.    Solicitation Procedures Order**

7.    On May 30, 2024, the Court entered the Solicitation Procedures Order,

which, among other things:  (a) approved the Disclosure Statement as containing adequate

information within the meaning of section 1125 of the Bankruptcy Code; (b) fixed May 14, 2024

as the Voting Record Date (as defined in the Solicitation Procedures Order); (c) fixed 4:00 p.m.

(Prevailing Eastern Time) on July 8, 2024 as the Confirmation Objection Deadline (as defined in

the Solicitation Procedures Order); (d) fixed 5:00 p.m. (Prevailing Eastern Time) on July 3, 2024

as the Voting Deadline (as defined in the Solicitation Procedures Order); (e) fixed 9:00 a.m.

(Prevailing Eastern Time) on July 15, 2024 as the date and time for the commencement of the

---

[3]    The UCC currently comprises the following members: (i) U.S. Bank National Association, as Indenture Trustee; (ii) Wilmington Trust Company, as Indenture Trustee; (iii) Mr. Satagopan Rajagopalan; and (iv) Cousins Fund II Phoenix I, LLC.

Confirmation Hearing; and (f) approved the Solicitation and Tabulation Procedures and the

Solicitation Packages and other materials relating to solicitation that were attached as exhibits to

the Solicitation Procedures Motion.

8.  On July 2, 2024, the Debtor filed a *Notice of Adjournment of Confirmation*

*Hearing and Scheduling of Status Conference* [D.I. 1248], which adjourned the Confirmation

Hearing to commence at 9:00 a.m. (Prevailing Eastern Time) on July 22, 2024.

9.  On July 19, 2024, the Debtor filed a *Notice of Adjournment of*

*Confirmation Hearing* [D.I. 1321], which adjourned the Confirmation Hearing to commence at

9:00 a.m. (Prevailing Eastern Time) on July 24, 2024.

**H.  Transmittal and Mailing of Materials; Notice**

10.  As evidenced by the Kroll Affidavit of Service, due, adequate and

sufficient notice of the Plan, the Disclosure Statement, the Solicitation Procedures Order, the

ballots, the election forms with respect to the third-party releases contained in the Plan (the

"Third-Party Release Election Forms"), the GUC Cash-Out, the Plan Supplement, the

Confirmation Hearing, the Confirmation Objection Deadline and the Voting Deadline has been

given to:  (a) counsel to the U.S. Trustee, U.S. Department of Justice, Office of the U.S. Trustee,

Alexander Hamilton U.S. Custom House, One Bowling Green, Room 534, New York, New

York 10004, Attn: Andrea B. Schwartz, Esq. (andrea.b.schwartz@usdoj.gov), Annie Wells, Esq.

(annie.wells@usdoj.gov) and Rachael E. Siegel, Esq. (rachael.e.siegel@usdoj.gov); (b) all

known creditors; (c) all equity security holders; (d) the Internal Revenue Service; (e) counsel to

the UCC, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn:

Ira S. Dizengoff (idizengoff@akingump.com) and Brad M. Kahn (bkahn@akingump.com) and

2001 K Street NW, Washington, DC 20006, Attn: James R. Savin (jsavin@akingump.com); (f)

counsel to the Ad Hoc Noteholder Group, Davis Polk & Wardwell LLP, 450 Lexington Avenue,

New York, NY 10017, Attn: Marshall S. Huebner (marshall.huebner@davispolk.com), Elliot

Moskowitz (elliot.moskowitz@davispolk.com), Angela M. Libby

(angela.libby@davispolk.com), David Schiff (david.schiff@davispolk.com) and Aryeh Ethan

Falk (aryeh.falk@davispolk.com); (g) counsel to the Ad Hoc Cross-Holder Group (as defined in

the Verified Statement Pursuant to Bankruptcy Rule 2019 [D.I. 142]); (h) the Securities and

Exchange Commission; (i) the United States Department of Justice; (j) the United States

Attorney for the Southern District of New York; (k) the Federal Deposit Insurance Corporation;

(l) the Federal Reserve Board of Governors; (m) the parties identified on the Debtor's list of 30

largest unsecured creditors; and (n) to the extent not listed herein, those parties requesting notice

pursuant to Bankruptcy Rule 2002, in each case only to the extent such parties have not

otherwise been served with the Confirmation Hearing Notice.

11.     As evidenced by the Publication Certification, the Confirmation Hearing

Notice was published in (i) the *San Francisco Chronicle* and (ii) *The Wall Street Journal*, in each

case, on June 5, 2024.

12.     Adequate and sufficient notice of the Confirmation Hearing, and all

applicable dates, deadlines and hearings described in the Solicitation Procedures Order, was

given in compliance with the Bankruptcy Rules, the Local Rules and the Solicitation Procedures

Order as evidenced by the Kroll Affidavit of Service and the Publication Certification, and no

other or further notice is or shall be required.

**I.     Solicitation**

13.     As evidenced by the Kroll Affidavit of Service, votes for acceptance and

rejection of the Plan were solicited in good faith and in compliance with the Disclosure

Statement, the Solicitation Procedures Order, sections 1125 and 1126 of the Bankruptcy Code,

Bankruptcy Rules 3017 and 3018, all other applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Rules and any other applicable rules, laws and regulations.

14. Specifically, as evidenced by the Kroll Affidavit of Service, the Solicitation Packages approved by this Court in the Solicitation Procedures Order were transmitted to and served on all Holders in Classes that were entitled to vote to accept or reject the Plan. Non-voting notices, including Third-Party Release Election Forms, were transmitted to and served on Holders in Classes that were not entitled to vote to accept or reject the Plan, and relevant portions of the Solicitation Packages and other materials approved by the Solicitation Procedures Order were transmitted to and served on other parties-in-interest in this Chapter 11 Case, all in compliance with section 1125 of the Bankruptcy Code, the Solicitation Procedures Order, the Solicitation and Tabulation Procedures, the Bankruptcy Rules and the Local Rules. Transmittal and service of such documents was adequate and sufficient, and no other or further notice is or shall be required.

**J.    Voting Certifications**

15. The Debtor filed the Initial Voting Certification on July 8, 2024 and the Supplemental Voting Certification on July 23, 2024, consistent with the Solicitation Procedures Order. As evidenced by the Voting Certifications, all procedures used to tabulate ballots received in connection with the solicitation of votes to accept or reject the Plan were fair and conducted in accordance with the Solicitation Procedures Order, subject to reasonable adjustments to tabulation methodologies described in the Voting Certifications in light of the ballots received from Holders of Interests in Class 5.

16. As set forth in the Plan, the Solicitation and Tabulation Procedures, and the Disclosure Statement, Holders of Claims in Class 3(a), Class 3(b) and Class 4 and Holders of Interests in Class 5 were eligible to vote on the Plan. Holders of Claims in Class 1 and Class 2

are deemed to accept the Plan and, therefore, were not entitled to vote to accept or reject the

Plan. Holders of Claims or Interests in Class 6 and Class 7 are deemed to reject the Plan and,

therefore, were not entitled to vote to accept or reject the Plan. The Debtor did not solicit votes

from Holders of Claims or Interests in Class 8, which consist of Intercompany Claims and

Intercompany Interests. Such Claims or Interests are deemed to either accept or reject the Plan.

17. As evidenced by the Voting Certifications, Holders of Claims in Classes

3(a) and 3(b) and Holders of Interests in Class 5 voted to accept the Plan (collectively, the

"Impaired Accepting Classes"). Holders of Claims in Class 4 voted to reject the Plan (together

with Holders of Claims or Interests in Class 6 and Class 7, the "Impaired Rejecting Classes").

18. Based on the foregoing, and as evidenced by the Voting Certifications, at

least one Impaired Class of Claims has voted to accept the Plan (excluding the acceptance by any

insiders of the Debtor) in accordance with the requirements of sections 1124 and 1126 of the

Bankruptcy Code.

**K.     Plan Modifications**

19. Subsequent to the commencement of solicitation of votes to accept or

reject the Plan, the Debtor made certain modifications to the Plan reflecting necessary clarifying

updates, including incorporating the terms of a settlement reached with the Ad Hoc Cross-Holder

Group, as described in the *Notice of Agreed Plan Modifications* [D.I. 1178]. All modifications to

the Plan since the entry of the Solicitation Procedures Order are consistent with all of the

provisions of the Bankruptcy Code, including sections 1122, 1123, 1125, and 1127 of the

Bankruptcy Code. None of the aforementioned modifications adversely affects the treatment of

any Holder of a Claim or Interest under the Plan. Accordingly, pursuant to section 1127(a) of

the Bankruptcy Code, none of the modifications require additional disclosure under section 1125

of the Bankruptcy Code or re-solicitation of votes under section 1126 of the Bankruptcy Code.

Notice regarding the substance of any modifications to the Plan, together with the filing with the

Court of the Plan as modified, and the disclosure of the Plan modifications on the record at or

prior to the Confirmation Hearing constitute due and sufficient notice of any and all such

modifications.  Further, in accordance with section 1127 of the Bankruptcy Code and

Bankruptcy Rule 3019, all Holders of Claims and Interests who voted to accept the Plan or who

are conclusively presumed to have accepted the Plan are deemed to have accepted the Plan as

modified by the Plan modifications.  No Holder of a Claim or Interest shall be permitted to

change its vote as a consequence of the Plan modifications unless otherwise agreed to by the

Holder of the Claim or Interest and the Debtor and such change is approved by the Court in

accordance with Bankruptcy Rule 3018(a).  The modifications to the Plan are hereby approved,

pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  The Plan as

modified shall constitute the Plan submitted for Confirmation.

**L.      Plan Supplement**

20.      On July 1, 2024, the Debtor filed the Plan Supplement with this Court.

The documents contained in the Plan Supplement are integral to, part of and incorporated by

reference into the Plan.  The Plan Supplement (including as subsequently modified,

supplemented, or otherwise amended pursuant to a filing with the Court) complies with the terms

of the Plan, and the filing and notice of all documents contained in the Plan Supplement

constitute good and proper notice in accordance with the Bankruptcy Code, the Bankruptcy

Rules, the Local Rules and the Solicitation Procedures Order, and no other or further notice is or

shall be required.  Pursuant to the Plan, the Debtor may file additional documents as amendments

to the Plan Supplement on or prior to the Effective Date in a manner consistent with and

contemplated by the Plan or this Confirmation Order. The transmittal and notice of the Plan

Supplement (and all documents identified therein) were appropriate and satisfactory based upon

the circumstances of this Chapter 11 Case and were conducted in good faith. No other or further notice with respect to the Plan Supplement (and all documents identified therein) is necessary or shall be required.

**M.     Bankruptcy Rule 3016**

21.     The Plan is dated and identifies the entity submitting it, thereby satisfying Bankruptcy Rule 3016(a). The filing of the Disclosure Statement with the Clerk of this Court satisfied Bankruptcy Rule 3016(b).

**N.     Burden of Proof**

22.     The Debtor, as proponent of the Plan, has met its burden of proving that the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code are satisfied. Each witness who testified or submitted a declaration on behalf of the Debtor or any other party that was accepted into evidence, in support of the Plan and Confirmation, in connection with the Confirmation Hearing was credible, reliable, and qualified to testify as to the topics addressed in their testimony.

**O.     Compliance with the Requirements of Section 1129 of the Bankruptcy Code**

23.     The Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code as follows:

**i.     Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code**

24.     The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123 thereof.

a.    **Sections 1122 and 1123(a)(1)—Proper Classification**

25.    The classification of Claims and Interests under the Plan is proper under

the Bankruptcy Code.  Pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, Article

4 of the Plan provides for the separate classification of Claims and Interests into nine (9) Classes,

based on differences in the legal nature or priority of such Claims and Interests (other than

Administrative Claims (including Professional Fee Claims), 503(b)(9) Claims or Priority Tax

Claims, which are addressed in Article 3 of the Plan and which are not required to be designated

as separate Classes of Claims pursuant to section 1123(a)(1) of the Bankruptcy Code).  Valid

business, factual and legal reasons exist for the separate classification of the various Classes of

Claims and Interests created under the Plan, the classifications were not created for any improper

purpose, and the creation of such Classes does not unfairly discriminate among Holders of

Claims or Interests.

26.    The testimony and documents supporting Confirmation of the Plan

proffered or adduced by the Debtor at, or prior to, or in declarations filed in connection with, the

Confirmation Hearing regarding the Debtor's classification and treatment of Claims and Interests

which has been accepted into evidence in support of Confirmation, (a) is reasonable, persuasive,

credible and accurate, (b) utilizes reasonable and appropriate methodologies and assumptions

and (c) has not been controverted by other credible evidence.

27.    As required by section 1122(a) of the Bankruptcy Code, each Class of

Claims and Interests contains only Claims or Interests that are substantially similar to the other

Claims or Interests within that Class.  Accordingly, the requirements of sections 1122, 1122(b)

and 1123(a)(1) of the Bankruptcy Code are satisfied.

**b.**      <u>Section 1123(a)(2)—Specification of Unimpaired Classes</u>

28.      Section 4.2 of the Plan specifies that Claims in Class 1, Class 2 and certain

Claims or Interests in Class 8 are Unimpaired under the Plan. Administrative Claims (including

Professional Fee Claims), 503(b)(9) Claims and Priority Tax Claims also are Unimpaired under

the Plan, although these Claims are not classified under the Plan. Accordingly, the requirements

of section 1123(a)(2) of the Bankruptcy Code are satisfied.

**c.**      <u>Section 1123(a)(3)—Specification of Treatment of Impaired Classes</u>

29.      Section 4.2 of the Plan specifies that Claims and Interests, as applicable, in

Class 3(a), Class 3(b), Class 4, Class 5, Class 6, Class 7 and certain Claims or Interests in Class 8

are Impaired under the Plan and the treatment for each such Impaired Class. Accordingly, the

requirements of section 1123(a)(3) of the Bankruptcy Code are satisfied.

**d.**      <u>Section 1123(a)(4)—No Discrimination</u>

30.      Pursuant to section 1123(a)(4) of the Bankruptcy Code, Article 4 of the

Plan uniformly provides for the same treatment of each Claim or Interest, as the case may be, in

a particular Class, unless the Holder of a particular Claim or Interest has agreed to a less

favorable treatment with respect to such Claim or Interest. Accordingly, the requirements of

section 1123(a)(4) of the Bankruptcy Code are satisfied.

**e.**      <u>Section 1123(a)(5)—Adequate Means for Plan Implementation</u>

31.      Pursuant to section 1123(a)(5) of the Bankruptcy Code, Article 5 and

various other provisions of the Plan, along with various agreements set forth in the Plan

Supplement, provide adequate and proper means for the Plan's implementation. Accordingly,

the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

f.      **Section 1123(a)(6)—Voting Power of Equity Securities**

32.      To the extent required under section 1123(a)(6) of the Bankruptcy Code, the NewCo certificate of incorporation will prohibit the issuance of non-voting equity securities and provides, as to the classes of securities possessing voting power, an appropriate distribution of such power among such classes.  Accordingly, the requirements of section 1123(a)(6) of the Bankruptcy Code are satisfied.

g.      **Section 1123(a)(7)—Directors and Officers**

33.      The Plan Supplement properly and adequately discloses the manner of selection of any officer or director of NewCo, or, to the extent not yet disclosed, will be determined in accordance with section 8.1 of the Plan and the NewCo Organizational Documents.  Additionally, Section 5.4 of the Plan and the Plan Supplement each provide for the appointment of a Liquidating Trust Board, a Liquidating Trust manager and any officers of the Liquidating Trust in each case pursuant to the Liquidating Trust Agreement.  Pursuant to the terms of the Liquidating Trust Agreement, the Liquidating Trust will be empowered to, to the extent such powers, duties, and authorities do not affect the status of the Liquidating Trust as a liquidating trust for United States federal income tax purposes, among other things, (i) hold, manage, convert to Cash, and distribute the Liquidating Trust Assets to holders of Liquidating Trust Interests, including (x) prosecuting post-Effective Date claims and resolving the Retained Causes of Action belonging to the Liquidating Trust and (y) reducing, from time to time, the amount of Liquidating Trust Assets held in the Disputed Claims Reserves and returning such amounts to the Liquidating Trust, (ii) sell, transfer, lease, encumber, or otherwise dispose of the Liquidating Trust Assets, (iii) investigate, prosecute, settle and/or abandon rights, causes of action, or litigation of the Liquidating Trust, including Avoidance Actions, (iv) disburse funds in the Professional Fee Reserve, the Liquidating Trust Disputed Claims Reserve, and the

Liquidating Trust Disputed GUC Cash-Out Claims Reserve in accordance with the Liquidating

Trust Agreement, which shall be consistent with the Plan, (v) distribute Liquidating Trust

Interests from the Liquidating Trust Disputed Interests Reserve in accordance with the

Liquidating Trust Agreement, which shall be consistent with the Plan, (vi) distribute NewCo

Common Stock from the NewCo Disputed Claims Reserve in accordance with the Shared

Services Agreement and the Liquidating Trust Agreement, as applicable, which shall be

consistent with the Plan, (vii) file all Tax Returns and tax and regulatory forms, returns, reports,

and other documents required with respect to the Liquidating Trust and any Disputed Claims

Reserve, (viii) object to Claims, and manage, control, prosecute, and/or settle on behalf of the

Liquidating Trust, objections to Claims on account of which the Distribution Agents will be

responsible (if Allowed) for making distributions under the Plan, (ix) take all actions necessary

or appropriate and create any document necessary or appropriate to implement the Plan, (x) act

as a signatory to the Debtor for all purposes, including those associated with the novation of

contracts or other obligations arising out of the sales of the Debtor's assets, and (xi) take all

necessary actions and file all appropriate motions to obtain an order closing the Chapter 11 Case.

The foregoing is consistent with the interests of the beneficiaries of the Liquidating Trust and

public policy.  Accordingly, the requirements of section 1123(a)(7) of the Bankruptcy Code are

satisfied.

    **h.**  **Section 1123(b)—Discretionary Contents of the Plan**

   34.  The Plan contains various provisions that may be construed as

discretionary and are not required for Confirmation under the Bankruptcy Code.  As set forth

below, such discretionary provisions comply with section 1123(b) of the Bankruptcy Code and

are not inconsistent with the applicable provisions of the Bankruptcy Code.  Thus, section

1123(b) of the Bankruptcy Code is satisfied.

i. <u>**Section 1123(b)(1)-(2)—Claims and Executory Contracts**</u>

35.    Pursuant to sections 1123(b)(1) and 1123(b)(2) of the Bankruptcy Code,

Article 4 of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and

Interests.  Article 9 of the Plan provides for the rejection of all Executory Contracts and

Unexpired Leases of the Debtor, other than (a) Executory Contracts or Unexpired Leases that, as

of the Effective Date, are the subject of a pending motion to assume, motion to assume and

assign, or for which a notice of assumption has been filed pursuant to the assumption and

assignment procedures approved by the Court, (b) Executory Contracts or Unexpired Leases

listed in the Schedule of Assumed Executory Contracts and Unexpired Leases or, (c) Executory

Contracts or Unexpired Leases that have been previously assumed, assumed and assigned or

rejected by the Debtor, (d) Executory Contracts related to investment securities held by the

Debtor, including the Debtor's direct investment and warrant portfolios and its synthetic equity

instrument in Leerink Partners LLC or (e) any Insurance Policy that is an Executory Contract,

including, for the avoidance of doubt, the Insurance Policies listed in the Schedule of Assumed

Executory Contracts and Unexpired Leases.

j. <u>**Section 1123(b)(3)—Settlement, Releases, Exculpation, Injunction and
Preservation of Causes of Action and Defenses**</u>

36.    **Compromise and Settlement.**  The Plan settles issues in this Chapter 11

Case pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code.  These

settlements are in consideration for the Distributions and other benefits provided under the Plan

and any other compromise and settlement provisions of the Plan.  The Plan itself constitutes a

compromise of all Claims, Interests and Causes of Action and Defenses relating to the

contractual, legal and subordination rights that any Holder may have with respect to any Allowed

Claim or Allowed Interest or any Distribution to be made on account of such Allowed Claim or

Allowed Interest. The compromises and settlements embodied in the Plan are in the best interests of the Debtor, its Estate and all Holders, are fair, equitable and reasonable and fall above the lowest point in the range of reasonableness.

37. Section 3.6 of the Plan incorporates a settlement with the Ad Hoc Cross-Holder Group pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. Approval of such compromise and settlement under Bankruptcy Rule 9019 is fair, equitable, reasonable, in the best interests of the Debtor and its Estate and falls above the lowest point in the range of reasonableness.

38. **Releases by the Debtor.** The releases and discharges by the Debtor described in Section 12.7 of the Plan (the "Debtor Release") pursuant to section 1123(b)(3)(A) of the Bankruptcy Code represent a valid exercise of the Debtor's business judgment.

39. **Voluntary Release by Holders of Claims and Interests.** The voluntary release by certain Holders of Claims and Interests described in Section 12.9 of the Plan (the "Voluntary Release by Holders of Claims and Interests") is appropriate because it was voluntary. The Voluntary Release by Holders of Claims and Interests is provided only by (i) the Debtor, (ii) NewCo (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor), (iii) the Liquidating Trust (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor), (iv) the UCC and its members, (v) the Ad Hoc Noteholder Group, (vi) the Consenting Noteholders, (vii) the Ad Hoc Cross-Holder Group, (viii) the Indenture Trustees, (ix) all holders of Claims or Interests who affirmatively opt in to the releases provided by the Plan by checking the box on the applicable Ballot or Third-Party Release Election Form indicating that they opt in to grant the

releases provided in the Plan to the Released Parties and (x) each Related Party of each Person or

Entity in clauses (i) through (ix) for which such Person or Entity is legally entitled to bind.

40.     The Voluntary Release by Holders of Claims and Interests is sufficiently

voluntary and can be considered to be (a) given in exchange for the good, valuable and

significant consideration provided by the Released Parties; (b) a good faith settlement and

compromise of the claims released by Holders of Claims and Interests electing to provide such

release; (c) in the best interests of the Debtor and all Holders; (d) fair, equitable and reasonable;

(e) given and made after notice and opportunity for hearing; (f) given at arm's-length and in

good faith; (g) appropriately narrow in scope; and (h) a bar to any Releasing Party asserting any

and all claims, obligations, rights, suits, damages, Causes of Action and Defenses, remedies and

liabilities whatsoever, released by the Voluntary Release by Holders of Claims and Interests

against any of the Released Parties to the fullest extent permitted by applicable law and is hereby

approved.

41.     **Exculpation**.  The exculpation provisions set forth in Section 12.8 of the

Plan are essential to the Plan.  The record in this Chapter 11 Case fully supports the exculpation,

and the exculpation provisions set forth in Section 12.8 of the Plan are appropriately tailored to

protect the Exculpated Parties from inappropriate litigation related to acts or omissions up to and

including the Effective Date and are hereby approved.  The exculpation provisions in the Plan

(including the definition of "Exculpated Parties") are the result of a settlement among the parties

in this Chapter 11 Case and may not be used as precedent in future cases.

42.     **Injunction.**  The injunction provisions set forth in Section 12.10 of the

Plan are essential to the Plan and are (a) necessary to preserve and enforce the Debtor Release,

the Voluntary Release by Holders of Claims and Interests and the exculpation provisions set

forth in Section 12.8 of the Plan, (b) fair and reasonable and (c) narrowly tailored to achieve their purpose.

43. Each of the Debtor Release, the Voluntary Release by Holders of Claims and Interests, the exculpation provisions and the injunction provisions are: (a) within the jurisdiction of this Court; (b) an essential means of implementing the Plan; (c) an integral and non-severable element of the settlements and transactions incorporated into the Plan; (d) in the best interests of the Debtor, its Estate and all stakeholders in this Chapter 11 Case; and (e) narrowly tailored and consistent with sections 105, 1123 and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code and other applicable law. The record of the Confirmation Hearing and this Chapter 11 Case is sufficient to support the Debtor Release, the Voluntary Release by Holders of Claims and Interests, the exculpation provisions and the injunction provisions contained in Article 12 of the Plan, and failure to give effect to the foregoing would impair the Debtor's ability to confirm and implement the Plan.

44. **Preservation of Causes of Action and Defenses**. Unless any Causes of Action and Defenses against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, including pursuant to Article 12 of the Plan or a Final Order, the Debtor, NewCo (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor) and the Liquidating Trust (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor), as applicable, expressly reserve and may enforce all rights to commence and pursue, as appropriate, all Retained Causes of Action, and no preclusion doctrine, including the doctrines of res judicata (or claim preclusion), collateral estoppel (or issue preclusion), estoppel (judicial, equitable or otherwise), or laches shall apply to such Retained Causes of Action upon, after, or as a

consequence of the Confirmation or occurrence of the Effective Date. The provisions regarding

the Retained Causes of Action in the Plan are appropriate, fair, equitable and reasonable and are

in the best interests of the Debtor, its Estate and all Holders.

45.     **Section 1123(d)—Cure of Defaults.** The Plan satisfies section 1123(d)

of the Bankruptcy Code. Section 9.2 of the Plan provides for the satisfaction of any monetary

defaults (if any) under each Executory Contract and Unexpired Lease assumed or assumed and

assigned pursuant to the Plan in accordance with section 365 of the Bankruptcy Code. The

Debtor will serve Cure Notices (as defined in the Solicitation Procedures Order) to all applicable

counterparties, which notices shall include procedures for objecting to, and resolving, proposed

assumptions of Executory Contracts and Unexpired Leases and the Cure Costs, if any, to be paid

in connection therewith.

### ii.     Section 1129(a)(2)—Compliance of the Debtor with the Applicable Provisions of the Bankruptcy Code

46.     The Debtor, as proponent of the Plan, has complied with all applicable

provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code,

including sections 1122, 1123, 1124, 1125, 1126 and 1128 of the Bankruptcy Code and

Bankruptcy Rules 3017, 3018 and 3019.

47.     Votes to accept or reject the Plan were solicited by the Debtor in

accordance with the Solicitation Procedures Order after this Court approved the adequacy of the

Disclosure Statement.

48.     The Debtor and the Solicitation Agent (including each of its respective

directors, officers, employees, members, partners, agents or representatives (including attorneys,

accountants, financial advisors and investment bankers), each solely in their capacity as such and

solely to the extent such persons or entities solicit votes on the Plan) have solicited and tabulated

votes on the Plan and have participated in the activities described in section 1125 of the

Bankruptcy Code in good faith within the meaning of section 1125(e) of the Bankruptcy Code

and in a manner consistent with the applicable provisions of the Disclosure Statement, the

Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules and all other

applicable rules, laws and regulations, and are entitled to the protections afforded by section

1125(e) of the Bankruptcy Code.

49.     The Debtor and other Exculpated Parties have participated in good faith

and in compliance with the applicable provisions of the Bankruptcy Code with regard to the

Distributions under the Plan and, therefore, are not, and will not be, liable at any time for the

violation of any applicable law, rule or regulation governing (a) the solicitation of acceptances or

rejections of the Plan and (b) Distributions made pursuant to the Plan so long as such

Distributions are made consistent with and pursuant to the Plan.  Accordingly, the requirements

of section 1129(a)(2) of the Bankruptcy Code are satisfied.

### iii.     Section 1129(a)(3)—Proposal of Plan in Good Faith

50.     The Debtor has proposed the Plan in good faith and not by any means

forbidden by law.  This Court has examined the totality of the circumstances surrounding the

filing of this Chapter 11 Case, the Plan itself and the process leading to its formulation.  The

Debtor's good faith is evident from the record of this Chapter 11 Case, the Disclosure Statement

and the hearing thereon, the record of the Confirmation Hearing and other proceedings held in

this Chapter 11 Case.

51.     The Plan is the product of extensive, good faith, arm's-length negotiations

among the Debtor and certain of its principal constituencies.  The Plan itself and the process

leading to its formulation provide independent evidence of the Debtor's good faith, serve the

public interest and assure fair treatment of Holders.  Accordingly, the requirements of section
1129(a)(3) of the Bankruptcy Code are satisfied.

### iv.     Section 1129(a)(4)—Court Approval of Certain Payments as Reasonable

52.     The procedures set forth in the Plan for payment of, and/or this Court's
review and ultimate determination of, the fees and expenses to be paid by the Debtor in
connection with this Chapter 11 Case, or in connection with the Plan and incidental to this
Chapter 11 Case, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the
Bankruptcy Code.  Accordingly, the requirements of section 1129(a)(4) of the Bankruptcy Code
are satisfied.

### v.      Section 1129(a)(5)—Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy

53.     The identity of, and the terms of the proposed compensation to be paid to,
the directors or officers of NewCo is consistent with the interests of Holders of Claims and
Interests and with public policy.  Moreover, the identity of the NewCo Board is consistent with
the interests of Holders of Claims and Interests and with public policy.  Accordingly, the
requirements of section 1129(a)(5) of the Bankruptcy Code are satisfied.

### vi.     Section 1129(a)(6)—Approval of Rate Changes

54.     The Plan does not contain any rate changes subject to the jurisdiction of
any governmental regulatory commission.  Therefore, section 1129(a)(6) of the Bankruptcy
Code is inapplicable to this Chapter 11 Case.

### vii.    Section 1129(a)(7)—Best Interests of Holders of Claims and Interests

55.     Each Holder of an Impaired Claim or Impaired Interest either has accepted
the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of

a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

56.     The liquidation analysis attached as Appendix B to the Disclosure Statement and the other evidence related thereto in support of the Plan that was proffered or adduced at or prior to, or in declarations in connection with, the Confirmation Hearing, which has been accepted into evidence in support of Confirmation:  (a) are reasonable, persuasive, credible and accurate as of the dates such analysis or evidence was prepared, presented or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that recoveries for Holders of Allowed Claims and Allowed Interests in every Class under the Plan on account of such Claim or Interest, as of the Effective Date, will have a value equal to or greater than the amount such Holder would receive if the Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  Accordingly, the requirements of section 1129(a)(7) of the Bankruptcy Code are satisfied.

**viii.    Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Certain Impaired Classes**

57.     Class 1 and Class 2 are Unimpaired Classes of Claims and are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Classes 3 through 7 are Impaired by the Plan.  As set forth in the Voting Certifications, Class 3(a), Class 3(b), and Class 5 have voted to accept the Plan.  As set forth below, pursuant to section 1129(b)(1) of the Bankruptcy Code, the Plan may be confirmed notwithstanding that the Impaired Rejecting Classes, and potentially Holders of Claims or Interests in Class 8, are either deemed to reject, or voted not to accept, the Plan.

58.     Because the Plan has not been accepted by the Rejecting Impaired Classes and potentially Holders of Claims or Interests in Class 8, the Debtor seeks Confirmation under

section 1129(b), rather than section 1129(a)(8), of the Bankruptcy Code. Thus, although section

1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to the rejecting Classes,

the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable

with respect to the rejecting Classes and thus satisfies the requirements of section 1129(b) of the

Bankruptcy Code with respect to the Rejecting Impaired Classes as described further below.

ix.    **Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code**

59.    The treatment of Administrative Claims (including Professional Fee

Claims), 503(b)(9) Claims and Priority Tax Claims under Article 3 of the Plan satisfies the

requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

x.    **Section 1129(a)(10)—Acceptance by At Least One Impaired Class**

60.    As set forth in the Voting Certifications, the Impaired Accepting Classes

have voted to accept the Plan. Specifically, Holders of Claims in Class 3(a) and Class 3(b) have

voted to accept the Plan. As such, there is at least one Class of Claims that is Impaired under the

Plan and has accepted the Plan, determined without including any acceptance of the Plan by any

insider (as defined by the Bankruptcy Code). Accordingly, the requirements of section

1129(a)(10) of the Bankruptcy Code are satisfied.

xi.    **Section 1129(a)(11)—Feasibility of the Plan**

61.    The Plan satisfies section 1129(a)(11) of the Bankruptcy Code. The

evidence supporting the Plan proffered or adduced by the Debtor at, or prior to, or in declarations

filed in connection with, the Confirmation Hearing, which has been accepted into evidence in

support of Confirmation: (a) is reasonable, persuasive, credible and accurate as of the dates such

analysis or evidence was prepared, presented or proffered; (b) utilizes reasonable and appropriate

methodologies and assumptions; (c) has not been controverted by other evidence; and

25

(d) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed

by the need for further liquidation or financial reorganization of the Debtor or any successor to

the Debtor under the Plan except as provided in the Plan. Accordingly, the requirements of

section 1129(a)(11) of the Bankruptcy Code have been satisfied.

> xii. **Section 1129(a)(12)—Payment of Fees**

62. Section 3.5 of the Plan provides that all fees payable pursuant to 28 U.S.C.

§ 1930, including interest, if any, pursuant to 31 U.S.C. § 3717, shall be paid when due and

payable (including any fraction thereof) until this Chapter 11 Case is converted, dismissed, or

closed, whichever occurs first. Accordingly, the Debtor has satisfied the requirements of section

1129(a)(12) of the Bankruptcy Code.

> xiii. **Section 1129(a)(13), (14), (15) and (16)—Non-Applicability of Certain Sections**

63. The Debtor does not owe any "retiree benefits" (as defined in section 1114

of the Bankruptcy Code) or domestic support obligations and is not a non-profit entity.

Therefore, sections 1129(a)(13), 1129(a)(14), 1129(a)(15) and 1129(a)(16) of the Bankruptcy

Code do not apply to this Chapter 11 Case.

> xiv. **Section 1129(b)—Confirmation of Plan Over Non-Acceptance of Impaired Class**

64. The Plan may be confirmed pursuant to section 1129(b) of the Bankruptcy

Code notwithstanding that the requirements of section 1129(a)(8) have not been met because the

Debtor has demonstrated by a preponderance of the evidence that the Plan (a) satisfies all of the

other requirements of section 1129(a) of the Bankruptcy Code, (b) no Holder of a Claim or

Interest in a Class senior to each such Class is receiving more than payment in full on account of

its Claim or Interest; and (c) does not "discriminate unfairly" and is "fair and equitable" with

respect to the Impaired Rejecting Classes and Holders of Claims or Interests in Class 8, as applicable.

65.     The Plan does not "discriminate unfairly" with respect to the Impaired Rejecting Classes and Holders of Claims or Interests in Class 8, as applicable, because there is no discrimination in treatment between Holders in such Classes and there are no other Classes comprised of Holders with similar or comparable legal rights.  Hildene Collateral Management Company, LLC ("Hildene" and its objection, the "Hildene Objection," ECF Doc. # 1269)— collateral manager to certain Holders of Claims in Class 4[4]—objected to confirmation on grounds that the Plan unfairly discriminates against Holders of Claims in Class 4 as the Plan precludes such Holders from receiving any shares in NewCo that Holders of Claims in Class 3(a) and Class 3(b) are receiving.  (Hildene Objection ¶ 14.)

66.     However, the Plan does not unfairly discriminate against Holders of Claims in Class 4.  *First*, Hildene acknowledges that Claims in Class 4, comprised of Subordinated Note Claims, are contractually subordinated to Claims in Class 3(a), which is comprised of Senior Note Claims.  (Hildene Objection ¶ 3 ("The Trust Preferred Securities are subordinated to the Senior Notes pursuant to the BP Trust II Indenture."); *see also* July 24, 2024 Hr'g Tr. at 42:22–25 (conceding that Class 3(a) relates to different securities than Class 4).) Therefore, Class 3(a) and Class 4 are legally distinct such that their disparate treatment under the Plan is justified.

67.     *Second*, the differing treatment between Claims in Class 3(b), comprised of Other General Unsecured Claims, and Claims in Class 4 is also justified notwithstanding their

---

[4]     These holders are comprised of Alesco Preferred Funding X, Ltd., Alesco Preferred Funding XI, Ltd., Trapeza CDO IX, Ltd., Trapeza CDO X, Ltd., and Trapeza CDO XI, Ltd.

similar unsecured status. The Subordinated Note Indentures contain provisions that expressly provide that Holders of Subordinated Note Claims cannot receive any recovery until Holders of Senior Note Claims have been satisfied in full. (*See, e.g.*, Kosturos Declaration, Ex. B § 15.01 ("The payment by the Company of the payments due on all Debt Securities issued hereunder and under any Additional Provisions shall, to the extent and in the manner hereinafter set forth, be subordinated and junior in right of payment to the prior payment in full of all Senior Indebtedness of the Company . . . .").) It is this subordination that provides a reasonable basis for their differing treatment and also renders Claims in Class 3(b) sufficiently dissimilar from Claims in Class 4. *See, e.g.*, *Matter of Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (finding no unfair discrimination where the interests of common shareholders "are not similar or comparable to those of any other class"). *Compare with In re Breitburn Energy Partners LP*, 582 B.R. 321 (Bankr. S.D.N.Y. 2018) (concluding that there was unfair discrimination since the debtors failed to demonstrate why the proposed disparate treatment was reasonable or necessary).

68. Hildene's reliance on section 15.03 of the BP Trust II Indenture to support its position is also misplaced. While section 15.03 includes a carve-out for equity securities issued by the reorganized Debtor, it is nonetheless subject to a proviso that that renders it applicable only when the Senior Notes are being assumed by the Debtor with all rights unimpaired. (*See* Kosturos Declaration, Ex. B § 15.03 ("[P]rovided, that (a) such Senior Indebtedness is assumed by the new corporation, if any, resulting from any such reorganization or readjustment, and (b) the rights of the holders of such Senior Indebtedness are not, without the consent of such holders, altered by such reorganization or readjustment.").) Here, Class 3(a) is an Impaired Class, and the Senior Notes are being cancelled on the Effective Date and not reinstated. Indeed, Hildene acknowledges that the Plan "does not provide for a reinstatement of debt, nor does Article XV require one."

(Hildene Objection at 10 n.10.)  Thus, section 15.03, by its own plain language, does not apply.[5]
Accordingly, the Plan does not unfairly discriminate against Holders of Claims in Class 4 and the
Hildene Objection is **OVERRULED**.

69.     The Plan is "fair and equitable" with respect to Holders of Claims in Class
6 and Class 7, and Holders of Claims or Interests in Class 8, as applicable, because no junior Class
of Claims or Interests will receive or retain any property under the Plan on account of such Claims
or Interests.  The Plan is also "fair and equitable" with respect to Holders of Claims in Class 4,
because no Class 5 Interest will receive a distribution on account of its Class C Liquidating Trust
Units until the Claims in Class 4 have been satisfied in full, plus an 11% accrued interest on the
Class 4 Liquidating Trust Units.  There is no unfair discrimination with respect to the Impaired
Rejecting Classes and Holders of Claims or Interests in Class 8, as applicable, as there are no other
similarly situated Classes that are receiving disparate treatment and Claims in Class 4 are not
similar or comparable to those of any other Class.  Additionally, to the extent Claims or Interests
in Class 8 are reinstated or converted to equity, such treatment is provided for administrative
convenience and efficiency, and not on account of such Claims or Interests, and will not alter the
treatment provided for any other Holder of any Claim or Interest.

70.     The Plan therefore satisfies the requirements of section 1129(b) of the
Bankruptcy Code and may be confirmed, notwithstanding the Impaired Rejecting Classes.

---

[5]      At the Confirmation Hearing, counsel to Hildene cited to *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir.
2000), *Matter of Envirodyne Indus., Inc.*, 29 F.3d 301 (7th Cir. 1994), and *Deutsche Bank AG v. Metromedia Fiber
Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005) in support of the proposition that
provisions similar to section 15.03 (commonly referred to as "X Clauses") are intended to avoid the unnecessary
turnover of equity by junior creditors to senior creditors only to receive it back once senior creditors are paid in full.
(*See* July 24, 2024 Hr'g Tr. at 46:17–47:19, 48:5–49:1.)  However, while that may very well also be the case here, the
plain language of the proviso in section 15.03 nonetheless renders it inapplicable.

### xv. Section 1129(c)—Only One Plan

71.     Other than the Plan, no other plan has been filed in this Chapter 11 Case.

Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

### xvi. Section 1129(d)—Principal Purpose of the Plan Is Not Avoidance of Taxes or Application of Securities Laws

72.     No party (including any governmental unit) has requested that this Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933 (as amended, the "Securities Act"), and the principal purpose of the Plan is not such avoidance. Accordingly, the requirements of section 1129(d) of the Bankruptcy Code are satisfied.

### P. Section 1129(e)—Small Business Case

73.     This Chapter 11 Case is not a "small business case," as that term is defined in the Bankruptcy Code, and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

### Q. Satisfaction of Confirmation Requirements

74.     Based upon the foregoing, all other pleadings, documents, exhibits, statements, declarations, certificates and affidavits filed in connection with Confirmation of the Plan and all evidence and arguments made, proffered or adduced at the Confirmation Hearing which has been accepted into evidence in support of Confirmation, the Plan satisfies all requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

### R. Likelihood of Satisfaction of Conditions Precedent to the Effective Date

75.     Each of the conditions precedent to the Effective Date, as set forth in Section 13.1 of the Plan, and without affecting the rights of any party to enforce such condition,

has been satisfied in accordance with the provisions of the Plan, or is reasonably likely to be satisfied or waived in accordance with Section 13.1 on or prior to the Effective Date.

**S.      Implementation**

76.      All documents and agreements necessary or appropriate to implement the Plan, including those contained in the Plan Supplement, and all other relevant and necessary documents, instruments and certificates (collectively, and as each may be amended, supplemented, or modified on or before the date of this Confirmation Order, the "Plan Documents") are essential elements of the Plan and entry into and consummation of the transactions contemplated by each Plan Document is in the best interests of the Debtor, its Estate and Holders of Claims and Interests.  The Debtor has exercised reasonable business judgment in determining to enter into the Plan Documents and has provided sufficient and adequate notice of the Plan Documents (if notice was required).  The terms and conditions of the Plan Documents are fair and reasonable and were negotiated in good faith and at arm's-length.  The Debtor and, after the Effective Date, the Liquidating Trust and NewCo are authorized, without further approval of this Court, to execute and deliver all documents and agreements, including those contained in the Plan Supplement, and all other relevant and necessary documents, agreements, instruments and certificates relating to the transactions contemplated by the Plan and necessary or appropriate to implement the Plan, and perform their obligations thereunder.

77.      On the Effective Date, the Liquidating Trust Agreement, any other organizational document of the Liquidating Trust and the NewCo Organizational Documents shall become effective and deemed binding without further action from any Person or Entity (other than the relevant consents required by under the Restructuring Support Agreement) and shall be binding and enforceable upon each of the parties thereto.

**T.    Valuation**

78.    The valuation analysis attached as Appendix F of the Disclosure Statement (the "Valuation Analysis") and the evidence adduced and admitted at the Confirmation Hearing, including in the Kosturos Declaration, are reasonable and credible.  All parties in interest have been given a fair and reasonable opportunity to challenge the Valuation Analysis.  The Valuation Analysis (a) is reasonable, persuasive, and credible as of the date such analysis was prepared, presented, or proffered and (b) uses reasonable and appropriate methodologies and assumptions.

**U.    Good Faith**

79.    Based on the record in this Chapter 11 Case, the Exculpated Parties have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all their respective activities relating to the Plan, including any action or inaction in connection with their participation in the activities described in section 1125 of the Bankruptcy Code.  Accordingly, the Exculpated Parties are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Section 10.9 of the Plan.  The Exculpated Parties, up to and including the Effective Date, will continue to act in good faith, if they proceed to (a) consummate the Plan and the agreements, settlements, transactions and transfers contemplated thereby regardless of whether such agreements, settlements, transactions, transfers, and other actions are expressly authorized by this Confirmation Order and (b) take the actions authorized and directed or contemplated by this Confirmation Order.

**V.    Corporate Action**

80.    Upon the Effective Date, all actions contemplated by and set forth in the Plan shall be deemed authorized and approved.  All matters provided for in the Plan involving

the corporate structure of the Debtor, NewCo or the Liquidating Trust and any corporate action required by the Debtor, NewCo or the Liquidating Trust in connection with implementation of the Plan shall be deemed to have occurred and shall be in effect upon the Effective Date, without any requirement of further action by the directors or officers of the Debtor.

**W.     Executory Contracts and Unexpired Leases**

81.     The Debtor has exercised reasonable business judgment in determining to reject by the Plan all Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy other than (a) Executory Contracts or Unexpired Leases that, as of the Effective Date, are the subject of a pending motion to assume or motion to assume and assign, or for which a notice of assumption has been filed pursuant to the assumption and assignment procedures approved by the Court, (b) Executory Contracts or Unexpired Leases listed in the Schedule of Assumed Executory Contracts and Unexpired Leases or (c) Executory Contracts or Unexpired Leases that have been previously assumed, assumed and assigned or rejected.  Each rejection of an Executory Contract or Unexpired Lease in accordance with the Plan, this Confirmation Order, other orders of this Court or otherwise shall be legal, valid and binding upon all non-debtor parties to such Executory Contract or Unexpired Lease, all to the same extent as if such rejection had been authorized and effectuated pursuant to a separate order of this Court that was entered pursuant to section 365 of the Bankruptcy Code before Confirmation. The Debtor has provided sufficient and adequate notice to any Entity whose Executory Contract or Unexpired Lease is rejected solely by virtue of the fact that the Plan rejects all such contracts.

**X.     Retention of Jurisdiction**

82.     Except as otherwise provided in the Plan, this Confirmation Order or the Plan Documents, this Court shall retain jurisdiction over the matters set forth in Section 15 of the Plan and other applicable provisions of the Plan.

## II.    ORDER

**BASED ON THE FOREGOING FINDINGS OF FACT AND
CONCLUSIONS OF LAW, IT IS HEREBY ORDERED, ADJUDGED AND DECREED
THAT**:

**A.    Order**

83.    The Plan and all of its provisions are confirmed.  A copy of the Plan is attached hereto as Exhibit A.

**B.    Objections**

84.    To the extent that any objections, reservations of rights, statements, or joinders to Confirmation have not been withdrawn, waived, resolved or settled before entry of this Confirmation Order, overruled or resolved by the relief granted or as set forth herein, or otherwise resolved as stated on the record of the Confirmation Hearing, such objections, reservations of rights, statements and joinders are hereby overruled on the merits.

**C.    Confirmation of the Plan**

85.    The Plan and the Plan Documents shall be, and hereby are, confirmed under section 1129 of the Bankruptcy Code.  The documents contained in the Plan Documents and all documents and agreements related thereto in existence as of the date of this Confirmation Order, and the execution, delivery and performance thereof by the Debtor, NewCo or the Liquidating Trust are authorized and approved as executed and delivered.  The Debtor, the Liquidating Trust and NewCo, as applicable, are authorized to amend, modify and/or supplement the Plan Documents after the date of this Confirmation Order without further approval of the Court to the extent necessary or appropriate to implement the Plan; *provided* that the Debtor, the Liquidating Trust or NewCo, as applicable, shall not be authorized to amend, modify and/or supplement Exhibit A to the Plan after the date of this Confirmation Order without a further

34

order of the Court. The Debtor and, after the Effective Date, the Liquidating Trust and NewCo are authorized, without further approval of this Court, to execute and deliver all documents and agreements, including those contained in the Plan Supplement, and all other relevant and necessary documents, agreements, instruments and certificates relating to the transactions contemplated by the Plan and necessary or appropriate to implement the Plan, and perform their obligations thereunder. As set forth in the Plan, once finalized and executed, upon the occurrence of the Effective Date, the documents comprising the Plan Documents shall constitute legal, valid, binding and authorized obligations of the respective parties thereto, enforceable in accordance with their terms.

## D.      Findings of Fact and Conclusions of Law

86.      The findings of fact and the conclusions of law set forth herein shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the proceeding by Bankruptcy Rule 9014. To the extent any of the following articles, sections or provisions constitute findings of fact or conclusions of law, they are adopted as such.

## E.      General Settlement of Claims and Interests

87.      Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions, releases and other benefits provided pursuant to the Plan, the Plan constitutes a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of an Allowed Claim or Interest may have against the Debtor, or any Distribution to be made on account of such Allowed Claim or Interest. Approval of such compromise or settlement of all such Claims, Interests or controversies, as well as such compromise or settlement, is in the best interests of the Debtor and its Estate, is fair, equitable and reasonable and falls above the lowest point in the range of

reasonableness. Subject to Article 7 of the Plan, all Distributions made to Holders of Allowed Claims or Interests in any Class are intended to be and shall be final.

## F. Implementation of the Liquidating Trust

88. (A) The creation and implementation of the Liquidating Trust in accordance with the terms of this Confirmation Order, the Plan and the Liquidating Trust Agreement, and (B) the appointment of the Liquidating Trust Board and Liquidating Trust manager to accomplish the purposes of the Liquidating Trust, as set forth in the Liquidating Trust Agreement, are each hereby authorized. Subject to Article 5 of the Plan, the Liquidating Trust shall be established on or prior to the Effective Date. After the Effective Date, the Liquidating Trust, to the extent a successor to the Debtor, and each member of its board and management shall have no liability other than as set forth in the Liquidating Trust Agreement and the Plan, and shall have no other obligations other than to carry out the purpose and obligations of the Liquidating Trust in accordance with the Plan Documents.

89. The Debtor, the Liquidating Trust, and their respective members, directors, officers, representatives and agents are hereby authorized to enter into, execute, deliver, file and/or implement any documents and instruments substantially consistent with or incidental to the Plan, and any amendments, supplements or modifications thereto as may be appropriate, and to take such other steps and perform such other acts as may be necessary, useful or appropriate to implement and effectuate the Plan and all other related instruments and documents and this Confirmation Order, and to satisfy all other conditions precedent to the implementation and effectiveness of the Plan. The Liquidating Trust is hereby authorized to make distributions and other payments in accordance with the Plan and the Liquidating Trust Agreement, regardless of whether any appeal of this Confirmation Order has been filed, except where a stay pending appeal has been granted.

90.    The Liquidating Trust shall be deemed a successor-in-interest of the Debtor to the maximum extent necessary for the Liquidating Trust to execute its purpose, and shall not otherwise be deemed a successor-in-interest to the Debtor for any purpose other than as specifically set forth in the Plan or in the Liquidating Trust Agreement.

91.    The Plan Supplement discloses the method of selection for directors of NewCo and the members of the Liquidating Trust Board.  The appointment of the Liquidating Trust Board and the directors of NewCo is consistent with the interests of Holders, the Estate and public policy.

92.    No Holder of a Claim or Interest or any other party in interest shall have, or otherwise pursue, any Cause of Action and Defense against the Liquidating Trust Board, the Liquidating Trust, or the consultants or professionals thereof (for each of the foregoing, solely in the performance of their duties in connection with making payments and distributions under the Plan) for making payments and distributions in accordance with the Plan and the Liquidating Trust Agreement or for fulfilling any functions incidental to implementing the provisions of the Plan or the Liquidating Trust Agreement, except for any acts or omissions that are the result of fraud, gross negligence or willful misconduct.

## G.    Liquidating Trust Assets

93.    As provided in the Plan, on the Effective Date, the Liquidating Trust Assets shall be deemed irrevocably transferred to the Liquidating Trust or entities to be formed by the Liquidating Trust, in each case in accordance with the Restructuring Transactions Memorandum and without any further action of NewCo, the Liquidating Trust, the Debtor or its subsidiaries or any of their respective managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives.  The Liquidating Trust Assets shall vest in the Liquidating Trust, free and clear of all Liens, Claims, charges, rights, or other

encumbrances subject to and in accordance with the Plan and the Liquidating Trust Agreement. Subject to the terms of the Plan and the Liquidating Trust Agreement, the Liquidating Trust will hold and administer Liquidating Trust Assets, which include, among other things, (i) all Retained Causes of Action, including the FDIC Claims; (ii) all investment securities, including the Debtor's direct investment and warrant portfolios and its synthetic equity instrument in Leerink Partners LLC; (iii) 100% of the equity interests of SVB Investments Holdings, Inc.; (iv) 100% of the equity interests of SVB Global Financial, Inc., (v) interests in existing SVB Capital entities entitling the interest holder to receive 46% of payments or other distributions from existing funds' carried and capital interests (excluding distributions from one SVBFG limited partner interest) and 15.5% of all management fees from existing funds; (vi) the right to receive up to two $5 million payments within ten years based on future fundraising activity of funds that are either successors of the funds subject to the SVB Capital Sale or that use the investment track record of the funds subject to the SVB Capital Sale; (vii) capital interests, carried interests and management fee participation interests in certain existing funds that are not subject to the SVB Capital Sale; (viii) all cash of the Debtor (other than the cash proceeds of any NewCo Transaction which shall be subject to clause (ix) immediately hereafter) in excess of (a) amounts required for distributions to Holders of Allowed Claims pursuant to the Plan, and payment of fees, expenses, and other amounts required to be paid on the Effective Date pursuant to the Plan and (b) the amount required to fund the businesses to be owned by NewCo; (ix) to the extent applicable, proceeds of any NewCo Transaction; *provided* that, with the consent of the Required Ad Hoc Senior Noteholder Parties and the UCC, all or a portion of the proceeds of any NewCo Transaction may remain at, or be transferred to, NewCo rather than being transferred to the Liquidating Trust; (x) Contingent Tax Receivable; (xi) the Debtor's rights and entitlements under

the Insurance Policies (other than Insurance Policies assumed and/or assigned to NewCo

pursuant to Section 9.1 of the Plan in accordance with the terms of Section 9.5 of the Plan) and

(xii) 100% of membership interests in SVB Employee Holdco LLC.

94.     All Liquidating Trust Assets shall vest in the Liquidating Trust free and

clear of all Liens, Claims, charges, rights, or other encumbrances to the extent permitted by

section 1141 of the Bankruptcy Code.  For purposes of section 553 of the Bankruptcy Code, the

transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of

obligations that otherwise may have existed prior to the effectuation of such transfer.  Any

transfers of property pursuant to the Plan, including the transfer of Liquidating Trust Assets to

the Liquidating Trust, shall be exempt from any stamp, real estate transfer, mortgage reporting,

sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon

delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtor and its predecessors,

successors and assigns, and each other Released Parties shall be discharged and released from all

liability with respect to the delivery of such distributions.  Upon the transfer of the Liquidating

Trust Assets and pursuant to the Liquidating Trust Agreement, the Debtor will have no

reversionary or further interest in or with respect to the Liquidating Trust Assets.

**H.     Restructuring Transactions**

95.     At any time prior to, on or after the Effective Date, the Debtor and the

Liquidating Trust shall, subject to the Debtor's agreement to give consent rights under the

Restructuring Support Agreement, be authorized to enter into any transaction and take any and

all actions as may be necessary or appropriate to effectuate, implement, consummate and further

evidence the terms and conditions of the Plan, including the Restructuring Transactions, any

NewCo Transaction, the steps contemplated by the Restructuring Transactions Memorandum,

the NewCo Organizational Documents and the filing of appropriate certificates or articles of

incorporation or formation, reincorporation, merger, conversion, dissolution, cancellation or other organizational documents, as applicable, pursuant to applicable state law, without the need for any further notice to or action, order or approval of the Court.

## I.    Abandonment of SVB Stock

96.    Unless otherwise agreed in writing by the UCC and the Required Ad Hoc Senior Noteholder Parties, at least one day prior to the Effective Date, the Debtor shall abandon all of its equity interests in, including all of the common stock of, Silicon Valley Bank (and all entities and arrangements that are treated as a single entity with successor(s) to Silicon Valley Bank for U.S. federal income tax purposes) (such equity interests, "SVB Stock") and take a corresponding worthless stock deduction for U.S. federal, and any and all applicable state and local tax purposes.

97.    The Debtor and its estate shall abandon its SVB Stock by filing a notice of abandonment of the SVB Stock with this Court, and may take any other appropriate actions to evidence such abandonment.  Upon filing such notice of abandonment, the Debtor and its estate shall automatically be deemed to have abandoned such SVB Stock and surrendered and relinquished all of their right, title and interest to the SVB Stock, including any recovery rights and/or litigation claims with respect thereto; *provided*, *however*, that such abandonment shall not constitute a withdrawal or release of any claims asserted by the Debtor as a creditor of Silicon Valley Bank against the FDIC, in its capacity as receiver for Silicon Valley Bank ("FDIC-R1") or Silicon Valley Bridge Bank, N.A. ("FDIC-R2") or in its corporate capacity on account of the Debtor's status as a creditor.

## J.    Issuance of NewCo Stock

98.    NewCo is hereby authorized to issue, or cause to be issued, and shall issue the NewCo Common Stock on or as soon as reasonably practicable following the Effective Date,

40

in accordance with the terms of the Plan without the need for any further corporate action. The

Debtor, or NewCo, as applicable, shall be authorized to take any action necessary or appropriate

in furtherance thereof. All of the NewCo Common Stock issuable under the Plan shall be duly

authorized, validly issued, fully paid, and non-assessable when so issued.

**K.      Section 1145 Exemption from Registration Under the Securities Act**

99.      The solicitation of acceptances and rejections of the Plan was exempt from

the registration requirements of the Securities Act and applicable state securities laws, and no

other non-bankruptcy law applies to the solicitation.

100.      The offering, issuance and distribution of the Liquidating Trust Interests to

Liquidating Trust Beneficiaries under the Plan (to the extent the Liquidating Trust Interests are

considered "securities" under applicable law) and the issuance of NewCo Common Stock under

the Plan shall be exempt from, among other things, the registration requirements of section 5 of

the Securities Act and any applicable state and local laws requiring registration of securities,

pursuant to section 1145 of the Bankruptcy Code or another available exemption from

registration under the Securities Act.

**L.      DTC**

101.      To the extent any ownership of the NewCo Common Stock or the

Liquidating Trust Interests, as applicable, by an Entity is reflected through the facilities of DTC,

such Entity need not provide any further evidence other than the Plan or this Confirmation Order

with respect to the treatment of transfers, exercise, removal of restrictions, or conversion of

NewCo Common Stock or the Liquidating Trust Interests, as applicable, under applicable U.S.

federal, state or local securities laws. DTC shall be required to accept and conclusively rely

upon the Plan and this Confirmation Order in lieu of a legal opinion regarding whether the

NewCo Common Stock or the Liquidating Trust Interests, as applicable, are exempt from

41

registration and/or eligible for DTC book-entry delivery, settlement and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of

doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated

by the Plan, including, for the avoidance of doubt, whether the NewCo Common Stock or the

Liquidating Trust Interests, as applicable, are exempt from registration and/or eligible for DTC

book-entry delivery, settlement and depository services.

**M.    Determination of Tax Liability**

102.    The Debtor and NewCo are authorized to request an expedited

determination of taxes under section 505 of the Bankruptcy Code for any or all returns filed for,

or on behalf of, the Debtor or NewCo for any and all taxable periods ending on or before the

Effective Date.  The Liquidating Trust Board may also request an expedited determination of

Taxes of the Liquidating Trust or any Disputed Claims Reserve under section 505(b) of the

bankruptcy Code for all Tax Returns filed for, or on behalf of, the Liquidating Trust or any

Disputed Claims Reserve for all taxable periods through the dissolution of the Liquidating Trust.

**N.    References to Plan Provisions**

103.    The failure specifically to include or to refer to any particular article,

section or provision of the Plan, any Plan Document or any related document or agreement in

this Confirmation Order shall not diminish or impair the effectiveness of such article, section or

provision nor constitute a waiver thereof, it being the intent of this Court that the Plan be

confirmed in its entirety, the Plan Documents be approved in their entirety, and all be

incorporated herein by this reference.

**O.    Immediate Binding Effect**

104.    Notwithstanding Bankruptcy Rule 3020(e), 6004(h) or 7062 or otherwise,

upon the occurrence of the Effective Date, the terms of the Plan and the Plan Documents shall be

immediately effective and enforceable and deemed binding upon the Debtor, NewCo, the

Liquidating Trust, the Estate, any and all Holders of Claims and Interests (irrespective of

whether such Holders have accepted, deemed to have accepted, rejected, or deemed to have

rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises,

releases, discharges, and injunctions described in the Plan, each Entity acquiring property under

the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with

the Debtor. The Plan and the Plan Documents constitute legal, valid, binding, and authorized

obligations of the respective parties thereto and shall be enforceable in accordance with their

terms. Pursuant to section 1142(a) of the Bankruptcy Code, the Plan, the Plan Documents, and

this Confirmation Order shall apply and be enforceable notwithstanding any otherwise applicable

nonbankruptcy law.

**P.      Cancellation of Existing Notes, Instruments, Certificates and Other Documents**

        105.     On the Effective Date, except as otherwise specifically provided for in the

Plan, all rights of any Holder of Interests in the Debtor, including options or warrants to purchase

Interests, or obligating the Debtor to issue, transfer or sell Interests of the Debtor, shall be

canceled. On the Effective Date, except as otherwise provided in the Plan, the obligations of the

Debtor under the respective Indentures, and any certificate, share, bond, purchase right, option,

warrant, or other instrument or document, directly or indirectly, evidencing or creating any

indebtedness or obligation of the Debtor giving rise to any Claim or Interest shall be canceled,

without any need for a Holder to take further action with respect thereto, and the Debtor and the

Liquidating Trust shall not have any continuing obligations thereunder; *provided,* that

notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that

governs the rights of the Holder of an Allowed Claim or Interest shall continue in effect solely

for (i) purposes of enabling such Holder to receive distributions under the Plan on account of

such Allowed Claim or Interest as provided herein; and (ii) permit the Indenture Trustees to make or assist in making, as applicable, distributions pursuant to the Plan and deduct therefrom such reasonable compensation, fees and expenses (a) due to the Indenture Trustees, or (b) incurred by the Indenture Trustees in making such distributions. Except as provided in the Plan, on the Effective Date, the Indenture Trustees and their respective agents, successors and assigns shall be automatically and fully discharged of their duties and obligations associated with the respective Indentures. The commitments and obligations of the Holders of the Senior Note Claims and Subordinated Note Claims to extend any further or future credit or financial accommodations to the Debtor, its subsidiaries or assigns under the Indentures, respectively, shall fully terminate and be of no further force or effect on the Effective Date.

## Q. Provisions Governing Distributions

106. All Distributions pursuant to the Plan shall be made in accordance with Articles 4, 7 and 10 of the Plan, which are hereby approved. Except as otherwise set forth in the Plan, the Distribution Agents, at the direction of the Debtor or the Liquidating Trust, shall make all Distributions required under Article 4 and 7 of the Plan.

## R. Treatment of Executory Contracts and Unexpired Leases

107. The Executory Contract and Unexpired Lease provisions of Article 9 of the Plan are hereby approved.

## S. Insurance Policies

108. Notwithstanding anything to the contrary in the Definitive Documents, any bar date notice, any claim objection, any other document related to any of the foregoing or any other order of the Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases):

(a)     except as expressly set forth in Section 9.5(b), (c), (f) and (h) of the Plan, on and after the Effective Date, all Insurance Policies which identify the Debtor as first named insured or as a counterparty thereto shall continue with the Debtor unaltered (which, as to any Insurance Policies that are assumed by the Debtor, shall be effective upon such assumption); and, for the avoidance of doubt, NewCo (to the extent NewCo is not the Debtor) and the Liquidating Trust shall not be an insured under any Insurance Policies (unless, in the case of NewCo (to the extent NewCo is not the Debtor), such terms are agreed as part of any renewal or written amendment of such Insurance Policy after the Effective Date);

(b)     separate and apart from the terms of any Insurance Policies, the Debtor shall turn over recovery of amounts payable and paid to the Debtor or its subsidiaries (other than MoffettNathanson LLC) to the Liquidating Trust with respect to (i) any Insurance Policy as a result of actions or losses that occurred prior to the Effective Date or (ii) any Insurance Policy that is not listed in the Schedule of Assumed Executory Contracts and Unexpired Leases; *provided*, that solely with respect to such payments stated above, the Liquidating Trust (except with respect to D&O Insurance Policies) shall be obligated to reimburse the Debtor for any reasonable expense that the Debtor incurs in order to comply with the terms of the applicable Insurance Policy; *provided, further*, that Insurers shall be authorized but shall not have any duty to turn over or pay any amounts to the Liquidating Trust and shall not have any liability to the Liquidating Trust related to any amounts, except as provided by applicable law;

(c)     except as expressly provided under Section 9.5(b), (f) and (h) of the Plan, nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Insurers, the Debtor or any other individual or Entity, as applicable, under any of the Insurance Policies; *provided* that any such rights, obligations, and defenses shall be determined under the Insurance Policies and applicable law;

(d)     to the extent the insured (as defined or described in the Insurance Policies) seeks coverage or payment under any Insurance Policies, the Insurers shall be entitled to payment or reimbursement in full, to the extent required under the applicable Insurance Policies and applicable law, in the ordinary course and without the need for the Insurers to file or serve any objection to a proposed Cure Cost or a request, application, Claim, Proof of Claim, cure claim, or motion for payment or allowance of any Administrative Expense Claim; *provided* that any and all rights of the Debtor, NewCo and the Liquidating Trust under the terms of the Insurance Policies and applicable law to dispute such payments or reimbursements are expressly reserved;

(e)     except as expressly set forth in Section 9.5(b), (f) and (h) of the Plan, nothing shall permit or otherwise effectuate a sale, assignment or other

45

transfer of the Insurance Policies and/or any rights, benefits, claims, proceeds, rights to payment, or recoveries under and/or relating to the Insurance Policies without the express written consent of the applicable Insurers to the extent required under the terms of the applicable Insurance Policies and/or applicable law;

(f)     the Liquidating Trust shall be responsible on behalf of the Debtor for monitoring and preserving the ability to maintain claims that relate to (i) actions or losses that occurred prior to the Effective Date asserted under the Insurance Policies, including, for the avoidance of doubt, all claims under the D&O Insurance Policies and (ii) any Insurance Policy that is not listed in the Schedule of Assumed Executory Contracts and Unexpired Leases;

(g)     nothing shall constitute a rejection of any Insurance Policy, all Insurance Policies shall remain in full force and effect, and any and all rights of the Debtor and Insurers under any Insurance Policy shall remain in full force and effect and subject to applicable law;

(h)     for the avoidance of doubt, nothing in this Paragraph 105 shall in any way impair (i) the Liquidating Trust's ability on and after the Effective Date to assert on behalf of the Debtor, as applicable, all Retained Causes of Action, including the FDIC Claims, or (ii) the Liquidating Trust's rights, if any, to recover in accordance with applicable law any proceeds of any applicable Insurance Policies in connection with any Retained Causes of Action;

(i)     the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Section 12.10 of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against Insurers under applicable non-bankruptcy law to proceed with their claims; (II) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against Insurers under applicable non-bankruptcy law, or an order has been entered by this Court granting a claimant relief from the automatic stay or the injunctions set forth in Section 12.10 of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) Insurers to cancel any of the Insurance Policies and take any other actions relating to the Insurance Policies (including effectuating a setoff) subject to applicable law and the terms of such Insurance Policies; and

(j)     the Insurers, the Debtor and the Liquidating Trust reserve all rights with respect to the application of applicable law to the terms and conditions of and/or rights and obligations under the Insurance Policies including,

without limitation, all rights with respect to what constitutes applicable law.

**T.     Release of Liens**

109.    Except as otherwise provided in this Confirmation Order, in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan or this Confirmation Order, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released, settled, discharged and compromised, and all of the rights, titles and interests of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Debtor and its successors and assigns, in each case, without further approval of the Bankruptcy Court and without any action or filing being required to be made by the Debtor.

**U.     Releases, Exculpations, Injunction and Related Provisions**

110.    Sections 12.4 through 12.12 of the Plan are hereby approved and authorized.

111.    Nothing in the Plan or this Confirmation Order shall affect any release granted under any prior order of this Court, all of which remain in full force and effect in accordance with their respective terms.

**V.     Subordinated Claims**

112.    The allowance, classification and treatment of all Allowed Claims and Allowed Interests and the respective Distributions and treatments under the Plan take into account, conform to, and satisfy the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto; *provided, however*, that the Debtor and the Liquidating Trust reserve the right to reclassify or modify the treatment of any Allowed Claim or Interest in accordance with any

contractual, legal, or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Interest.

## W. Authority to Prosecute and Settle Actions

113.     Subject to Article 5 and section 12.12 of the Plan, after the Effective Date, the Liquidating Trust shall have the authority to maintain, prosecute, settle, dismiss, abandon or otherwise dispose of any Retained Causes of Action against any Entity, and, subject to the terms of the Plan and the Liquidating Trust Agreement, the Liquidating Trust may enter into and consummate settlements and compromises of Causes of Actions and Defenses without notice to or approval by the Court.

## X. Professional Fee Claims

114.     All final requests for payment of Professional Claims shall be filed and served no later than 60 days after the Effective Date, in accordance with the procedures established under the Interim Compensation Order.  In accordance with the procedures established by the Bankruptcy Code and the Interim Compensation Order, the Court shall determine the Allowed amounts of such Professional Fee Claims.

115.     On or prior to the Effective Date, the Debtor shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Except as otherwise expressly set forth in the last sentence of this paragraph, such funds in the Professional Fee Reserve Account shall not be considered property of the Debtor's Estate as of the Effective Date.  The amount of Professional Fee Claims owing to the Professionals on and after the Effective Date shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Court order; *provided* that

the Debtor's obligation with respect to Professional Fee Claims will not be limited nor be deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow Account. When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall promptly be transferred to the Liquidating Trust, without any further notice to, action, order, or approval of the Court or by any other Entity.

116.    In accordance with Section 3.2.3 of the Plan, Professionals shall provide good-faith estimates of their accrued Professional Fee Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through and including the Effective Date, and shall deliver such good-faith estimates to the Debtor no later than seven (7) days prior to the Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Professionals. If a Professional does not provide such an estimate, the Debtor may estimate, in its reasonable discretion, the Professional Claims of such Professional.  The total amount so estimated shall comprise the Professional Fee Reserve Amount.  To the extent the Professional Fee Reserve Amount is not sufficient to pay all Allowed Professional Fee Claims in full, the remaining aggregate amount of the Allowed Professional Fee Claims shall be paid by the Liquidating Trust.

117.    Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and NewCo and the Liquidating Trust may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order or approval of the Court.

### Y.  Statutory Fees Payable Pursuant to 28 U.S.C. § 1930

118.    All fees due and payable pursuant to 28 U.S.C. § 1930, together with interest, pursuant to 31 U.S.C. § 3717, due and owing prior to the Effective Date shall be paid by the Debtor on or before the Effective Date.  The Debtor shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  On and after the Effective Date, the Liquidating Trust shall pay these fees when due and owing and prepare and file all necessary quarterly reports and other reports required by the Bankruptcy Court.

### Z.  Priority Tax Claims

119.    Subject to Section 11.4 of the Plan, except to the extent that the applicable Holder of an Allowed Priority Tax Claim has been paid by the Debtor before the Effective Date, or such Holder agrees to less favorable treatment or otherwise ordered by the Court by a separate order, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, at the option of the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed) or, after the Effective Date, the Liquidating Trust, (i) payment in full in Cash made (a) on or as soon as reasonably practicable after the Effective Date or (b) on the date such payment is due in the ordinary course of business, (ii) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (iii) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the Holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

## AA.    Ad Hoc Noteholder Group Expenses

120.    From and after the Confirmation Date, any outstanding and unpaid Ad Hoc Noteholder Group Expenses shall be paid in full in Cash subject and pursuant to the procedures set forth in the section 3.4 of the Plan. All Ad Hoc Noteholder Group Expenses to be paid on or after the Effective Date shall be estimated, as necessary, prior to or as of the Effective Date and such estimate shall be delivered to the Debtor; *provided* that such estimate shall not be considered an admission or limitation with respect to such Ad Hoc Noteholder Group Expenses. In addition, the Liquidating Trust is authorized to pay the Ad Hoc Noteholder Group Expenses, as necessary, after the Effective Date when due and payable in the ordinary course solely to the extent incurred on or after this Confirmation Order is entered, without any requirement for review or approval by the Bankruptcy Court or any Entity. The Debtor's payment of the Ad Hoc Noteholder Group Expenses is authorized by and pursuant to Sections 363(b), 364(b), 1123(b)(6) and 1129(a)(4) of the Bankruptcy Code and Bankruptcy Rule 9019.

## BB.    Filing Deadlines

121.    Any Holder of an Administrative Claim who is not excepted, pursuant to Section 3.1 of the Plan, from the requirements to file and serve a request for payment of such Administrative Claim on or prior to the Administrative Claim Bar Date will be forever barred, estopped and enjoined from asserting such Administrative Claim against the Debtor, the Liquidating Trust, or NewCo or their respective property and from participating in any Distribution in the Debtor's case on account of such Administrative Claim.  The Administrative Expense Claim Bar Date shall be (a) 4:00 p.m. (Eastern Time) on the 30th day after the Confirmation Date for Administrative Expense Claims that arose prior to the Confirmation Date, (b) 4:00 p.m. (Eastern Time) on the 30th day after the Effective Date for Administrative Expense Claims that arose during the period from the Confirmation Date through the Effective Date or (c)

such other date established by order of the Court by which requests for payment in respect of Other Administrative Claims must be filed.

**CC.    Section 1146 Exemption from Certain Transfer Taxes and Recording Fees**

122.    Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers from the Debtor to NewCo, the Liquidating Trust or to any other Entity, pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor, the Liquidating Trust, NewCo or Affiliates of NewCo, including, without limitation, the NewCo Common Stock and the Liquidating Trust Interests; (ii) the creation, modification, consolidation, assumption, termination, refinancing and/or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment or recording of any lease or sublease; or (iv) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment. The Bankruptcy Court shall retain specific jurisdiction with respect to these matters.

123.    Each federal, state, commonwealth, local, foreign, or other governmental agency is directed and authorized to accept the validity of (a) any and all documents, trust agreements, mortgages, and instruments, and (b) all actions of the Debtor that are necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan, this Confirmation Order, and the agreements created or contemplated by the Plan or this Confirmation Order, without payment of any recording tax, stamp tax, transfer tax, or similar tax imposed by state or local law.

**DD.    Transfer Restriction Procedures**

124.    The Debtor may seek, with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, Bankruptcy Court approval of certain procedures that set forth (i) certain circumstances under which any Person, group of Persons, or Entity holding, or which as a result of a proposed transaction may hold, a substantial amount of certain Claims against the Debtor may be required to serve notice of its holdings of such Claims and of proposed transactions, which transactions may be restricted, and (ii) certain limited circumstances thereafter under which such Person(s), groups of Persons, or Entities may be required to sell, by a specified date following the confirmation of the Plan, all or a portion of any such Claims acquired during the Chapter 11 Case or prohibited, after a specified date, from acquiring additional Claims as under *Final Order Establishing Notice and Objection Procedures for Transfers of and Claims of Worthlessness with Respect to Stock and Claims Against the Debtor* [D.I. 136].

**EE.    Retention of Jurisdiction**

125.    Notwithstanding the entry of this Confirmation Order and the occurrence of the Effective Date, this Court shall retain its existing jurisdiction over all matters arising out of, or related to, this Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the

Bankruptcy Code, including jurisdiction over those matters set forth in Section 15 of the Plan.

## FF.     Plan Documents

126.    The Plan Documents are approved and, upon execution and delivery of the

Plan Documents, including any amendments, supplements or modifications after the date of this

Confirmation Order that are necessary or appropriate to implement the Plan, by the applicable

parties, such documents shall be in full force and effect and valid, binding and enforceable in

accordance with their terms without the need for any further notice to or action, order or

approval of this Court, or other act or action under applicable law, regulation, order or rule.  The

Debtor and, after the Effective Date, the Liquidating Trust and NewCo, are authorized, without

further approval of this Court or any other party, to execute and deliver all agreements,

documents, instruments, securities and certificates relating to such agreements and perform their

obligations thereunder, including paying all fees due thereunder or in connection therewith.

127.    Any Holder's acceptance of NewCo Common Stock under the Plan shall

be deemed as its agreement to the NewCo Organizational Documents, as the same may be

amended or modified from time to time following the Effective Date in accordance with their

respective terms, and each such Entity shall be bound thereby in all respects. For the avoidance

of doubt, all Holders of Allowed Claims entitled to distribution of NewCo Common Stock under

the Plan shall be deemed to be a party to, and bound by, the NewCo Shareholders Agreement

attached as Exhibit A to the Plan Supplement, regardless of whether such Holder has executed a

signature page thereto.

## GG.     Effectiveness of All Actions

128.    Except as set forth in the Plan, all actions authorized to be taken by the

Plan or this Confirmation Order shall be effective on, prior to, or after the Effective Date

pursuant to the terms of the Plan or this Confirmation Order, without further application to, or order of this Court.

## HH. Authorization to Take Actions to Implement and Consummate the Plan

129. Pursuant to section 1142(b) of the Bankruptcy Code, the Debtor, NewCo and the Liquidating Trust hereby are authorized and empowered to take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, the documents contained in the Plan Supplement, and any other Plan Documents, without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto, and all documents, instruments, securities and agreements authorized thereunder and related thereto and all annexes, exhibits and schedules appended thereto, and the obligations thereunder shall constitute legal, valid, binding and authorized obligations of each of the respective parties thereto, enforceable in accordance with their terms without the need for any stockholder or board of directors' approval.

130. This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules and regulations of all states and any other U.S. governmental authority with respect to the implementation or consummation of the Plan, the Plan Supplement and any other Plan Documents, any amendments or modifications thereto on or prior to the Effective Date and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, and any other Plan Documents and any amendments or modifications thereto entered into on or prior to the Effective Date.

## II. Intercompany Claims and Intercompany Interests

131. On and after the Effective Date, each Intercompany Claim and each Intercompany Interest shall be (a) canceled, released and discharged, (b) reinstated, (c) converted

to equity, or (d) otherwise set off, settled, or distributed, in each case at the option of the Debtor

with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be

unreasonably withheld, conditioned or delayed.

**JJ.     Fees and Expenses of the Distribution Agents**

132.    The Liquidating Trust, on or after the Effective Date, may pay to the

Distribution Agents all of their reasonable and documented fees and expenses without the need

for any approvals, authorizations, actions or consents of the Court or otherwise.  At the request

of counsel to the Debtor or the Liquidating Trust, as applicable, the Distribution Agents shall

submit detailed invoices to counsel to the Debtor or the Liquidating Trust for all fees and

expenses for which the Distribution Agents seek reimbursement, and the Debtor or the

Liquidating Trust, as applicable, shall pay those amounts that it, in its sole discretion, deems

reasonable, and shall object in writing to those fees and expenses, if any, that the Debtor or the

Liquidating Trust, as applicable, deems to be unreasonable.  In the event that the Debtor or the

Liquidating Trust, as applicable, objects to all or any portion of the amounts requested to be

reimbursed in a Distribution Agent's invoice, the Debtor or the Liquidating Trust, as applicable,

and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the

amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the

Debtor or the Liquidating Trust, as applicable, and a Distribution Agent are unable to resolve any

differences regarding disputed fees or expenses, either party shall be authorized to move to have

such dispute heard by the Court.

**KK.    Dissolution of the UCC**

133.    After the Effective Date, the UCC's functions shall be restricted to and

shall not be heard on any issue except (i) applications filed pursuant to sections 330 and 331 of

the Bankruptcy Code and (ii) any appeal, motion for reconsideration or similar litigation related

to this Confirmation Order (the "Post Effective Date UCC Matters"). Upon the resolution of the

Post Effective Date UCC Matters, the UCC shall dissolve, and the members thereof shall be

released and discharged from all rights and duties arising from, or related to, the Chapter 11

Case. The Liquidating Trust shall be responsible for paying the reasonable fees and expenses

incurred by the members of or advisors to the UCC after the Effective Date in connection with

the Post Effective Date UCC Matters without any further notice or application to, action, order,

or approval of the Bankruptcy Court.

## LL.    Modifications or Amendments

134.    Entry of this Confirmation Order shall mean that all modifications and

amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of

the Bankruptcy Code, and do not require additional disclosure or re-solicitation under

Bankruptcy Rule 3019. After the Confirmation Date, but before the Effective Date, subject to

the Debtor's agreement to give consent rights under the Restructuring Support Agreement and

except as set forth in Section 7.3, the Debtor may make appropriate technical adjustments and

modifications to the Plan, including the Plan Supplement, without further order or approval of

the Bankruptcy Court; *provided*, that such adjustments and modifications do not materially and

adversely affect the treatment of Holders of Claims or Interests and are otherwise permitted

under section 1127(b) of the Bankruptcy Code. After the Confirmation Date and before

substantial consummation of the Plan, the Debtor may institute proceedings in the Bankruptcy

Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or

reconcile any inconsistencies in the Plan, including the Plan Supplement, the Disclosure

Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out

the purposes and effects of the Plan.

**MM.   Effect of Conflict between Plan and Confirmation Order**

135.   In the event of any direct conflict between the terms of the Plan or any of the Plan Documents and the terms of this Confirmation Order, the terms of this Confirmation Order shall control.

**NN.   Notice of Entry of Confirmation Order and Occurrence of Effective Date**

136.   In accordance with Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c), within fifteen (15) Business Days following the occurrence of the Effective Date, the Debtor shall serve notice of entry of this Confirmation Order and occurrence of the Effective Date on all parties served with the Confirmation Hearing Notice in substantially the form of the notice annexed hereto as Exhibit B, which form is hereby approved, to be delivered to such parties by first-class mail, postage prepaid, or by electronic mail as authorized in the Solicitation Procedures Order; *provided* that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor served the notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason and the Debtor has made a reasonable effort to ascertain an alternative mailing address, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address; *provided further* that the Debtor may, within its reasonable discretion, determine to serve separate notices of entry of this Confirmation Order and occurrence of the Effective Date on the parties and in the manner described above, each of such separate notice to be, in relevant part, in substantially the form of the notice annexed hereto as Exhibit B.

137.   Mailing of the notice of entry of this Confirmation Order in the time and manner set forth in the previous paragraph shall be good and sufficient notice under the

particular circumstances in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice shall be necessary.

## OO.    Injunctions and Automatic Stay

138.    Unless otherwise provided in the Plan or in this Confirmation Order, any injunction or stay arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code or otherwise that is in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order) shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

139.    This Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, Interests, Causes of Action and Defenses, obligations, setoffs, suits, judgments, damages, demands, debts, rights or liabilities released or discharged pursuant to the Plan.

## PP.    Nonseverability of Plan Provisions upon Confirmation

140.    Each term and provision of the Plan, as it may have been altered or interpreted herein, is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified except in accordance with Article 14 of the Plan; and (c) nonseverable and mutually dependent.

## QQ.   Authorization to Consummate

141.    The Debtor is authorized to consummate the Plan on any Business Day selected by the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, such consent not to be unreasonably withheld, conditioned or delayed) after the entry of this Confirmation Order, subject to satisfaction or waiver of the conditions (by the

required parties) to the Effective Date set forth in Section 13.1 of the Plan. The Plan shall not become effective unless and until the conditions set forth in Section 13.1 of the Plan have been satisfied or waived (by the required parties) pursuant thereto.

## RR.  Governmental Approvals Not Required

142.    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and the Plan Documents.

## SS.  Filing and Recording

143.    This Confirmation Order is and shall be binding upon and shall govern the acts of all persons or entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument. Each and every federal, state, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, or appropriate (including financing statements under the applicable uniform commercial code) to effectuate, implement, and consummate the transactions contemplated by the Plan and this Confirmation Order without payment of any stamp tax or similar tax imposed by state or local law.

## TT.  Tax Withholding

144.    Notwithstanding any provision in the Plan to the contrary, the Debtor, NewCo, the Liquidating Trust and the Distribution Agents shall be authorized to take all actions necessary or appropriate to comply with all Tax withholding and reporting requirements, imposed

on them by any federal, state, local or foreign Tax law, including withholding in kind, liquidating a portion of the distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. All Persons holding Claims against any Debtor shall be required to provide any information reasonably requested by the Debtor, Liquidating Trust, NewCo, the Distribution Agents or another applicable withholding agent that is reasonably necessary to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit. For purposes of the Plan, any withheld amount (or property) paid to the applicable Tax Authority shall be treated as if paid to the applicable claimant. The Liquidating Trust reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to trust fund-type taxes, then to other taxes, and then to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that has accrued on such Claims. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have responsibility for any Taxes imposed by any Governmental Unit, including income, withholding, and other Taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, not to make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The

Distribution Agents may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within one hundred and eighty (180) days after the request is made, the amount of such distribution shall irrevocably revert to the Debtor or the Liquidating Trust and any Claim in respect of such distribution shall be discharged and forever barred from assertion against the Debtor, the Liquidating Trust or its respective property.

## UU.  Substantial Consummation

145.    On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## VV.  Debtor's Actions Post-Confirmation Through the Effective Date

146.    During the period from entry of this Confirmation Order through and until the Effective Date, the Debtor shall continue to operate its business as a debtor in possession in the ordinary course in a manner consistent with past practice in all material respects, and as otherwise necessary to consummate the Plan, subject to the Debtor's agreement to give consent rights under Restructuring Support Agreement and all applicable Final Orders, the Plan and any other Plan Documents.

## WW.  Texas Comptroller Reservation of Rights

147.    Notwithstanding anything else to the contrary in the Plan or this Confirmation Order, the following provisions will govern the treatment of the claims of the Texas Comptroller of Public Accounts (the "Texas Comptroller"): (1) nothing provided in the Plan or this Confirmation Order shall affect or impair any statutory or common law setoff rights of the Texas Comptroller in accordance with 11 U.S.C. § 553; (2) nothing provided in the Plan or this Confirmation Order shall affect or impair any rights of the Texas Comptroller to pursue any non-Debtor third parties for tax debts or claims (other than NewCo or the Liquidating Trust to the

extent that the claims or causes of action against such entities arise from conduct that occurred on or before the Effective Date); (3) nothing provided in the Plan or this Confirmation Order shall be construed to preclude the payment of interest on the Texas Comptroller's administrative expense tax claims; and (4) the Texas Comptroller's timely administrative expense claims are allowed upon filing without application or motion for payment, subject to objection on substantive grounds. In no event shall the Texas Comptroller be paid in a payment schedule that extends past sixty (60) months of the Debtor's bankruptcy petition date.

## XX.     **Leerink Reservation of Rights**

148.     To the extent any provision of this Confirmation Order, the Plan, or any Plan Supplement Document is inconsistent with the *Order (I) Authorizing the Debtor to Sell the SVB Securities Business by (A) Causing Non-Debtor Subsidiary To Sell Membership Interests in Certain Non-Debtor Entities that Operate the SVB Securities Business and Certain Related Assets and (B) Selling Certain Related Assets of the Debtor Free and Clear of All Liens, Claims, Interests and Encumbrances and (II) Granting Related Relief* [D.I. 393] (the "SVB Securities Sale Order") or the documents approved thereby (including the Purchase Agreement and all Ancillary Agreements, each as defined therein) (such documents, collectively, and together with the SVB Securities Sale Order, the "SVB Securities Sale Documents" and the transactions contemplated thereby, the "SVB Securities Sale") concerning any matter relating to the SVB Securities Sale, the SVB Securities Sale Documents shall govern and control. Without limiting the generality of the foregoing, (a) the right of SVB Securities Holdings LLC ("SVBS Holdings") to distributions from Leerink Holdings LLC ("Leerink Holdings") pursuant to that certain Synthetic Equity Consideration Instrument, dated as of October 2, 2023, between Leerink Holdings and SVBS Holdings (such distribution rights, "Synthetic Equity Distribution Rights" and such instrument, the "Synthetic Equity Instrument") (i) shall not vest in or be transferred to the Liquidating Trust,

the Liquidating Trust Beneficiaries, a Blocker Corporation, or any other entity formed by the

Liquidating Trust, or otherwise become Liquidating Trust Assets, except, in each case, in strict

accordance with all applicable transfer restrictions and conditions set forth in the Synthetic Equity

Consideration Instrument; provided, that, upon the occurrence of the Effective Date and without

further action by any person: (A) such conditions will be deemed satisfied pursuant to the Plan and

the agreed provisions of this paragraph, (B) Leerink Holdings is deemed to have consented to the

transfer of the Synthetic Equity Interest (1) from SVBS Holdings to the Debtor and then (2) from

the Debtor to the Liquidating Trust, (or, if applicable, from the Debtor to a Blocker Corporation,

which Blocker Corporation is subsequently transferred to the Liquidating Trust), and (C) the terms

of this paragraph constitute the joinder of the Debtor and the Liquidating Trust (or, if applicable,

such Blocker Corporation) to, and agreement to be bound by the provisions of, the Synthetic Equity

Instrument, and (ii) shall, in any case, remain subject to such transfer restrictions and conditions,

such that any subsequent attempted transfer of such Synthetic Equity Distribution Rights by the

Liquidating Trust or any other person or entity shall be effective only upon strict compliance

therewith; (b) Leerink Holdings' setoff rights under the Synthetic Equity Consideration Instrument

are fully preserved; (c) the right of Leerink Holdings to redeem or "call" the Synthetic Equity

Distribution Rights, or require the holder thereof to participate in a "drag-along" sale, and the

corollary obligation of such holder to participate in any such transaction, in each case on the terms

and subject to the conditions set forth in the Synthetic Equity Consideration Instrument, will

remain binding on, and enforceable against, the Liquidating Trust, any other person or entity that

acquires Synthetic Equity Distribution Rights; (d) no such holder shall have any greater right to

audit, or require information from, Leerink Holdings or its affiliates and investors than as

prescribed by the express terms of the Synthetic Equity Consideration Instrument or applicable

non-bankruptcy law; (e) the governing law and forum selection provisions of the Synthetic Equity

Distribution Instrument are enforceable in accordance with their terms, and Leerink Holdings may

commence any suit, action, or proceeding to which such forum selection provisions apply in the

chosen courts designated thereby without prior leave of the Bankruptcy Court; and (f) the claims,

defenses, and other rights of the Management Team Releasees (as defined in the SVB Securities

Sale Order) that are the subject matter of paragraphs 36 to 40 of the SVB Securities Sale Order

and the Mutual Release Agreements referred to (and as defined) therein are not released or

enjoined by, subject to exculpation under, or otherwise impaired or affected by the provisions of

this Confirmation Order, the Plan, or the Plan Supplement, but instead shall be governed

exclusively by such provisions of the SVB Securities Sale Order and such Mutual Release

Agreements.

## YY. First Citizens Bank Matters

149. To the extent any provision of this Confirmation Order, the Plan, or any

Plan Supplement Document is inconsistent with the *Order (I) Authorizing the Debtor to Sell SVB*

*India by (A) Selling Partnership Interests in SVB India Free and Clear of All Liens, Claims,*

*Interests and Encumbrances and (B) Causing Non-Debtor Subsidiary to Sell Partnership*

*Interests in SVB India; (II) Approving the Debtor's Entry Into, and Performance Under, the*

*Purchase and Sale Agreement; (III) Authorizing Assumption and Assignment of Certain*

*Contracts; and (IV) Granting Related Relief* [D.I. 1028] (the "SVB India Sale Order") or the

documents approved thereby (including the Purchase Agreement and all Ancillary Agreements,

each as defined therein) (such documents, collectively, and together with the SVB India Sale

Order, the "SVB India Sale Documents" and the transactions contemplated thereby, the "SVB

India Sale") concerning any matter relating to the SVB India Sale, the SVB India Sale

Documents shall govern and control. Without limiting the generality of the foregoing, the Debtor

(prior to the Effective Date) and the Liquidating Trust (on or after the Effective Date), shall comply with each of the requirements of Section 10.11 and 12.4 of the Purchase Agreement, and any claims arising under the SVB India Sale Documents shall be preserved and shall not be discharged, released, waived, converted, enjoined, or otherwise adversely affected by (without limitation) entry of this Confirmation Order, confirmation of the Plan, the Debtor's discharge, or any Plan injunction.

150.    Notwithstanding any other provision of the Plan, the Plan Supplement, or this Confirmation Order, the respective rights asserted by First-Citizens Bank & Trust Company ("FCB") and the Debtor with respect to certain third-party warrants initially issued to Silicon Valley Bank (including, without limitation, any proceeds thereof), which the Debtor asserts were transferred to the Debtor prior to the Petition Date but for which payment was not settled, and which FCB asserts were not transferred to the Debtor, shall be preserved and shall not be discharged, released, waived, converted, enjoined, or otherwise adversely affected by (without limitation) entry of this Confirmation Order, confirmation of the Plan, the Debtor's discharge, or any Plan injunction.  If the Debtor and FCB are not able to agree on a consensual resolution with respect to the disputed warrants, the respective rights of the Debtor and FCB to such warrants shall be determined by a separate order of this Court.

151.    Notwithstanding any other provision of the Plan, the Plan Supplement, or this Confirmation Order, the rights asserted by FCB to the Silicon Valley Bank copyrights, trademarks, internet domain names and websites, including, but not limited to those identified in Schedule A/B, Part 10, Nos. 60 and 61 (ECF No. 261) (collectively, the "Intellectual Property") shall be preserved and shall not be discharged, released, waived, converted, enjoined, or otherwise adversely affected by (without limitation) entry of this Confirmation Order,

confirmation of the Plan, the Debtor's discharge, or any Plan injunction; provided that the

preservation of rights in this paragraph from the effects of the Plan shall only last through July

31, 2024 (which date may be extended by written agreement of the Debtor (or, after the Effective

Date, the Liquidating Trust) and FCB), after which FCB may file an adversary proceeding in the

Chapter 11 Case within ten (10) business days in order to seek to assert any such rights, and, if

FCB files such adversary proceeding, the preservation of rights in this paragraph shall extend

through the entry of a final order in, or consensual resolution of, such adversary proceeding.

Nothing herein shall be deemed consent by FCB to final orders of this Court or to preclude FCB

from seeking to withdraw the reference with respect to the issues in dispute about the Intellectual

Property.

153.   Notwithstanding that certain Confidentiality Agreement, dated as of May

10, 2023, by and between FCB and the Debtor (as amended, restated, extended or modified from

time to time, the "FCB Confidentiality Agreement"), all information relating to the direct

investments and warrants owned by the Debtor and its subsidiaries (including the identities of the

applicable portfolio companies, pricing information, dates and financial details), regardless of

whether such information was received by the Debtor pursuant to the FCB Confidentiality

Agreement, is property of the Debtor's estate and shall vest in the Liquidating Trust along with

such direct investments and warrants, and shall not be subject to any confidentiality or use

restrictions other than those specified in the documentation of such direct investments and

warrants or contained in relevant investment agreements with the applicable portfolio companies

and/or co-investors; provided that, since certain direct investments and warrants may cross

reference the confidentiality provision(s) of a related loan agreement originally entered into by

Silicon Valley Bank, FCB has provided the text of standard confidentiality provision from such

loan agreements to the Debtor and represented that such provision is the standard confidentiality provision used in Silicon Valley Bank loan agreements that relate to warrants and direct investments, and the Debtor shall provide such provision to the Liquidating Trust for reference. Except as set forth in this paragraph, and subject to the terms and conditions thereof, nothing in this Confirmation Order, the Plan or any Plan Supplement Document shall modify, supersede, reject or terminate any terms of the FCB Confidentiality Agreement, including any binding effect on the Liquidating Trust and NewCo as the Debtor's successors and assigns in accordance with such terms.

## ZZ. FDIC Matters

153.    Notwithstanding any other provision of the Plan, the Plan Supplement, or this Order, the claims and Causes of Action and Defenses of the Federal Deposit Insurance Corporation, as receiver for Silicon Valley Bank and as receiver for Silicon Valley Bridge Bank, N.A., against non-debtor third parties (including, without limitation, insurers or issuers of bonds), if any, shall not be discharged, released, waived, converted to equity or enjoined (without limitation) by entry of this Order, confirmation of the Plan, the Debtor's discharge, or any Plan injunction.  Any such claims and Causes of Action and Defenses are hereby preserved.

154.    Notwithstanding any other provision of the Plan, the Plan Supplement, or this Order, the ownership interests and property rights (if any) of the Federal Deposit Insurance Corporation, as receiver for Silicon Valley Bank ("SVB"), in any property (whether received prior to or after confirmation of the Plan), including without limitation, with respect to tax refunds received (or to be received) and held in trust for SVB by the Debtor under that certain Amended Tax Allocation Agreement, dated as of January 1, 2016, by and between the Debtor and SVB, shall not be discharged, released, waived, converted to equity or enjoined. Any such ownership rights are hereby preserved.

155.    Notwithstanding any other provision of the Plan, the Plan Supplement, or this Order, each former director and officer of SVB shall be entitled to whatever contractual rights, coverage, and benefits under one or more D&O Liability Insurance Policies as such director or officer is entitled under applicable law and the terms of such D&O Liability Insurance Policies. Further, nothing in this Plan, Plan Supplement or Order affects, modifies or otherwise alters the rights, claims, interests or defenses of the FDIC-R1, if any, (a) except as provided in Section 12.8 of the Plan, against any non-Debtor person or entity or (b) against any insurance policy or surety bond under which SVB or the Debtor is an insured or covered party, including any insurance policy or surety bond that may cover any claim that is asserted by the FDIC-R1, including any such insurance policy or surety bond that is property of the Debtor's bankruptcy estate; additionally, for the avoidance of doubt, nothing in this Plan, the Plan Supplement, or this Order shall be deemed to preclude the FDIC-R1 from or otherwise affect the FDIC-R1's right, if any, to seek to pursue or defend a claim to ownership of claims or causes of action, including any claims or causes of action brought or otherwise prosecuted by the Debtor, including, without limitation, any claims or causes of action under the Financial Institution Bond No. 824039547 issued to SVB Financial Group by Federal Insurance Company for the period August 1, 2020-August 1, 2021 and the excess bond entitled Commercial Banks/Savings Banks (Form 24) Excess Follow Form Certificate, No. BFCB-45001721-26 issued to SVB Financial Group by Berkley Regional Insurance Company for the period August 1, 2020-August 1, 2021.

156.    Notwithstanding any provision of the Plan, the Plan Supplement or this Order, the impairment, discharge or release of defensive setoff rights of the FDIC-R1, as raised in the Federal Deposit Insurance Corporation's Objection to the Debtor's Second Amended Plan of Reorganization [D.I. 1268] (the "FDIC-R Objection") (if any) shall not be determined by this

Order. The Court's decision with respect to the FDIC-R Objection as it pertains to the impairment, discharge or release of defensive setoff rights of the FDIC-R1 (if any) shall be set forth in a separate order, which order shall be subject to the 14-day stay provided in Bankruptcy Rule 3020(e).

## AAA. Interpretation

157. Notwithstanding any other provision of the Plan, the Plan Supplement, or this Confirmation Order, any bona fide, good faith dispute regarding the interpretation of an ambiguity in the Plan or the Plan Supplement in accordance with Section 2.2 of the Plan shall be resolved by this Court.

## BBB. Final Order

158. This Confirmation Order is intended to be a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

**IT IS SO ORDERED.**

Dated:  August 2, 2024
        New York, New York

                                    _____/s/ Martin Glenn_____
                                       MARTIN GLENN
                                Chief United States Bankruptcy Judge

## Exhibit A

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ——————————————— x | | |
| In re | : | Chapter 11 |
| | : | |
| | : | |
| SVB FINANCIAL GROUP,[1] | : | Case No. 23-10367 (MG) |
| | : | |
| Debtor. | : | |
| | : | |
| ——————————————— x | | |

### DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

James L. Bromley
Andrew G. Dietderich
Christian P. Jensen

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel to the Debtor*

Dated: July 26, 2024
    New York, New York

---

[1] The last four digits of SVB Financial Group's tax identification number are 2278.

# TABLE OF CONTENTS

1. INTRODUCTION ........................................................................................................1

2. DEFINITIONS AND RULES OF INTERPRETATION ........................................................2
   2.1 Definitions.........................................................................................2
   2.2 Rules of Interpretation ....................................................................24
   2.3 Governing Law ...............................................................................25
   2.4 Computation of Time ......................................................................25
   2.5 References to Monetary Figures .....................................................26
   2.6 Consent Rights ...............................................................................26

3. OTHER ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS
   AND STATUTORY FEES ..........................................................................................27
   3.1 Other Administrative Claims ..........................................................27
   3.2 Professional Fee Claims .................................................................28
   3.3 Treatment of Priority Tax Claims ...................................................29
   3.4 Ad Hoc Noteholder Group Expenses ..............................................30
   3.5 Statutory Fees Payable Pursuant to 28 U.S.C. § 1930 .....................31
   3.6 Settlement of Ad Hoc Cross-Holder Group Expenses .......................31

4. CLASSIFICATION AND TREATMENT OF OTHER CLAIMS AND INTERESTS.............................33
   4.1 Summary of Classes and Treatment of Claims Against and Interests in the
       Debtor ............................................................................................33
   4.2 Treatment of Claims and Interests .................................................34

5. THE LIQUIDATING TRUST ......................................................................................39
   5.1 The Liquidating Trust Agreement ...................................................39
   5.2 Purpose of the Liquidating Trust ....................................................39
   5.3 Liquidating Trust Assets ................................................................39
   5.4 Administration of the Liquidating Trust ..........................................40
   5.5 Substitution in Pending Legal Actions ............................................41
   5.6 Distribution of Liquidating Trust Assets .........................................41
   5.7 Costs and Expenses of the Liquidating Trust ...................................43
   5.8 Retention of Professionals/Employees by the Liquidating Trust Board.............43
   5.9 Liquidating Trust Disputed Claims Reserve .....................................43
   5.10 Liquidating Trust Disputed GUC Cash-Out Claims Reserve ...............44
   5.11 Liquidating Trust Disputed Interests Reserve ..................................44
   5.12 NewCo Disputed Claims Reserve ...................................................45
   5.13 Federal Income Tax Treatment of the Liquidating Trust....................45
   5.14 Books and Records.........................................................................49
   5.15 Indemnification of Liquidating Trust Board.....................................49
   5.16 Exculpation Relating to the Liquidating Trust..................................50
   5.17 Abandonment of Liquidating Trust Assets .......................................50

i

| 6. | ACCEPTANCE OR REJECTION OF THE PLAN | ..................................................... | 51 |
|---|---|---|---|
| | 6.1 | Voting of Claims or Interests | 51 |
| | 6.2 | Acceptance by Impaired Classes | 51 |
| | 6.3 | Elimination of Vacant Classes | 51 |
| | 6.4 | Special Provisions Regarding Unimpaired Claims | 51 |
| | 6.5 | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 52 |

| 7. | IMPLEMENTATION OF THE PLAN | | 53 |
|---|---|---|---|
| | 7.1 | Operations Between the Confirmation Date and Effective Date | 53 |
| | 7.2 | Sources of Cash for Plan Distributions | 53 |
| | 7.3 | NewCo Transaction | 53 |
| | 7.4 | Exemption from Registration | 53 |
| | 7.5 | NewCo Common Stock and New Parent Merger | 56 |
| | 7.6 | Deemed Holders of Subordinated Note Claims | 58 |
| | 7.7 | Organizational Existence | 58 |
| | 7.8 | Cancellation of Existing Interests, Existing Indebtedness and Related Agreements | 58 |
| | 7.9 | Additional Implementing Transactions | 59 |
| | 7.10 | Section 1146 Exemption from Certain Transfer Taxes and Recording Fees | 60 |
| | 7.11 | Effectuating Documents and Further Transactions | 60 |
| | 7.12 | Abandonment of SVB Stock | 61 |
| | 7.13 | Preservation of Retained Causes of Action | 61 |
| | 7.14 | Document Preservation | 61 |

| 8. | PROVISIONS REGARDING GOVERNANCE OF NEWCO | | 63 |
|---|---|---|---|
| | 8.1 | Organizational Action | 63 |
| | 8.2 | NewCo Organizational Documents | 63 |
| | 8.3 | Shared Services Agreement | 63 |
| | 8.4 | Directors and Officers of NewCo | 64 |

| 9. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 65 |
|---|---|---|---|
| | 9.1 | Assumption and Rejection of Executory Contracts and Unexpired Leases | 65 |
| | 9.2 | Objections to and Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 66 |
| | 9.3 | Modifications, Amendments, Supplements, Restatements or Other Agreements | 66 |
| | 9.4 | Reservation of Rights | 67 |
| | 9.5 | Insurance Policies | 67 |

| 10. | PROVISIONS GOVERNING DISTRIBUTIONS | | 70 |
|---|---|---|---|
| | 10.1 | Distribution Agents | 70 |
| | 10.2 | Timing and Delivery of Distributions | 71 |
| | 10.3 | Manner of Payment Under Plan | 72 |
| | 10.4 | Undeliverable Distributions | 75 |
| | 10.5 | Reversion | 76 |
| | 10.6 | Claims or Interests Paid by Third Parties | 76 |
| | 10.7 | Setoffs | 77 |

ii

| | 10.8 | No Postpetition Interest on Claims | 77 |
| | 10.9 | No Payment Over the Full Amount; Single Satisfaction | 77 |
| 11. | | CLAIMS ADMINISTRATION PROCEDURES | 79 |
| | 11.1 | Allowance of Claims | 79 |
| | 11.2 | Administration Responsibilities | 79 |
| | 11.3 | Estimation of Claims | 79 |
| | 11.4 | Expungement and Disallowance of Paid, Satisfied, Amended, Duplicated, or Superseded Claims or Interests | 80 |
| | 11.5 | Amendments to Proofs of Claim | 80 |
| | 11.6 | Pending Objections | 80 |
| | 11.7 | No Distributions Pending Allowance | 80 |
| | 11.8 | Distributions After Allowance | 81 |
| | **11.9** | **Disallowance of Claims and Interests** | 81 |
| 12. | | EFFECT OF CONFIRMATION | 82 |
| | 12.1 | Vesting of Assets | 82 |
| | 12.2 | Compromise and Settlement of Claims and Controversies | 82 |
| | 12.3 | Subordinated Claims | 83 |
| | 12.4 | Release of Liens | 83 |
| | 12.5 | Discharge | 83 |
| | 12.6 | Term of Injunction or Stays | 84 |
| | 12.7 | Release by the Debtor | 84 |
| | 12.8 | Exculpation | 86 |
| | 12.9 | Third-Party Release by Holders of Claims and Interests | 87 |
| | 12.10 | Injunction | 88 |
| | 12.11 | Scope of Releases | 89 |
| | 12.12 | Preservation of Causes of Action and Defenses | 91 |
| 13. | | CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN | 92 |
| | 13.1 | Conditions to Effectiveness | 92 |
| | 13.2 | Waiver of Conditions to Confirmation or Effectiveness | 93 |
| 14. | | MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN | 94 |
| | 14.1 | Plan Modifications | 94 |
| | 14.2 | Effect of Confirmation on Modification | 94 |
| | 14.3 | Revocation or Withdrawal of the Plan and Effects of Non-Occurrence of Confirmation or Effective Date | 94 |
| 15. | | RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT | 96 |
| 16. | | MISCELLANEOUS | 99 |
| | 16.1 | Expedited Tax Determination | 99 |
| | 16.2 | Plan Supplement | 99 |
| | 16.3 | Additional Documents | 99 |
| | 16.4 | Exhibits; Schedules; Plan Supplement | 99 |
| | 16.5 | Nonseverability | 99 |

16.6   Governing Law ................................................................................................... 99
16.7   Dissolution of the UCC ...................................................................................... 100
16.8   Binding Effect .................................................................................................... 100
16.9   Notices ............................................................................................................... 100
16.10  Reservation of Rights ........................................................................................ 102
16.11  No Stay of Confirmation Order .......................................................................... 102
16.12  Deemed Acts ...................................................................................................... 102
16.13  Waiver or Estoppel ............................................................................................ 102
16.14  Successors and Assigns ...................................................................................... 102
16.15  Entire Agreement ............................................................................................... 103
16.16  Conflicts ............................................................................................................. 103
16.17  Post-Effective Date Service ............................................................................... 103

iv

1. <u>**INTRODUCTION**</u>

SVB Financial Group, a Delaware corporation, as debtor-in-possession in the above-captioned Chapter 11 Case ("<u>SVBFG</u>" or the "<u>Debtor</u>"), proposes the following plan of reorganization (including the Plan Supplement and all other exhibits and schedules hereto and as may be modified, amended or supplemented in accordance with the terms hereof, the "<u>Plan</u>") pursuant to section 1121(a) of the Bankruptcy Code. The Debtor is the proponent of the Plan for purposes of section 1129 of the Bankruptcy Code. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Section 2.

## 2. DEFINITIONS AND RULES OF INTERPRETATION

### 2.1 Definitions

Except as otherwise provided herein, each capitalized term used in the Plan shall have the meaning set forth below:

2.1.1 "2025 Senior Notes" means the 3.500% senior notes due 2025, outstanding under the Senior Notes Indenture.

2.1.2 "2026 Senior Notes" means the 1.800% senior notes due 2026, outstanding under the Senior Notes Indenture.

2.1.3 "2028 Senior Fixed-to-Floating Rate Notes" means the 4.345% senior fixed-to-floating rate notes due 2028, outstanding under the Senior Notes Indenture, as supplemented by the Senior Notes Supplemental Indenture.

2.1.4 "2028 Senior Notes" means the 2.100% senior notes due 2028, outstanding under the Senior Notes Indenture.

2.1.5 "2030 Senior Notes" means the 3.125% senior notes due 2030, outstanding under the Senior Notes Indenture

2.1.6 "2031 Senior Notes" means the 1.800% senior notes due 2031, outstanding under the Senior Notes Indenture.

2.1.7 "2033 Senior Fixed-to-Floating Rate Notes" means the 4.570% senior fixed-to-floating rate notes due 2033, outstanding under the Senior Notes Indenture, as supplemented by the Senior Notes Supplemental Indenture.

2.1.8 "Accredited Investors" has the meaning in Section 7.4 hereof.

2.1.9 "Ad Hoc Cross-Holder Group" means that certain ad hoc group of holders, or investment advisors or managers acting on behalf of holders, of certain Senior Notes and Preferred Stock represented by White & Case LLP.

2.1.10 "Ad Hoc Cross-Holder Group Expenses" means, collectively, all reasonable and documented fees and expenses, whether previously paid or outstanding and whether incurred prior to, on, or after the Petition Date, of (i) White & Case LLP, as counsel to the Ad Hoc Cross-Holder Group, and (ii) Houlihan Lokey Capital, Inc., as investment banker to the Ad Hoc Cross-Holder Group.

2.1.11 "Ad Hoc Cross-Holder Group Member" means any member of the Ad Hoc Cross-Holder Group.

2.1.12 "Ad Hoc Cross-Holder Group Settlement Agreement" means that certain plan settlement agreement made and entered into as of July 3, 2024, by and among the Debtor and certain members of the Ad Hoc Cross-Holder Group.

2

2.1.13    "Ad Hoc Noteholder Group" means that certain ad hoc group of holders, or investment advisors or managers acting on behalf of holders, of certain Senior Notes represented by Davis Polk & Wardwell LLP.

2.1.14    "Ad Hoc Noteholder Group Expenses" means, collectively, all reasonable and documented fees and expenses of (i) Davis Polk & Wardwell LLP, as counsel to the Ad Hoc Noteholder Group, and (ii) PJT Partners LP, as investment banker to the Ad Hoc Noteholder Group.

2.1.15    "Administrative Expense Claim" means any Claim for costs and expenses of administration of the Chapter 11 Case of a kind specified under section 503(b) of the Bankruptcy Code arising on or prior to the Effective Date and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code; *provided* that Administrative Expense Claims shall not include 503(b)(9) Claims.

2.1.16    "Administrative Expense Claim Bar Date" means: (a) 4:00 p.m. (Eastern Time) on the 30th day after the Confirmation Date for Administrative Expense Claims that arose prior to the Confirmation Date, (b) 4:00 p.m. (Eastern Time) on the 30th day after the Effective Date for Administrative Expense Claims that arose during the period from the Confirmation Date through the Effective Date or (c) such other date established by order of the Bankruptcy Court by which requests for payment in respect of Other Administrative Claims must be filed.

2.1.17    "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

2.1.18    "Allowed" means, with respect to any Claim or Interest (or portion thereof) against the Debtor, that:  (i) a Proof of Claim with respect to any such Claim has been timely filed in the Chapter 11 Case, has not been withdrawn and no objection thereto has been filed by the applicable deadlines set forth in the Plan, the Bankruptcy Code, the Bankruptcy Rules, or as determined by the Bankruptcy Court, (ii) that such Claim or Interest (or portion thereof) has been agreed to, compromised, settled or otherwise resolved pursuant to the authority of the Debtor or Liquidating Trust, as applicable, under the terms of the Plan, (iii) such Claim or Interest (or portion thereof) is expressly allowed in the Plan or by Final Order of the Bankruptcy Court, or (iv) such Interest is registered in the ownership register or otherwise on the Debtor's books and records, maintained by, or on behalf of, the Debtor as of the Confirmation Date; *provided*, *however*, that, (x) unless otherwise provided for by the terms of the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 thereof, to the extent applicable, and (y) the Debtor, NewCo and the Liquidating Trust, as applicable, shall retain all claims and defenses with respect to Allowed Claims that are Reinstated, or otherwise Unimpaired pursuant to the Plan (including, for the avoidance of doubt, Administrative Expense Claims not paid prior to the Effective Date).  "Allow" and "Allowance" shall have correlative meanings.

2.1.19    "Avoidance Action" means any and all avoidance, recovery, subordination or other claim, action or remedy that may be brought by or on behalf of the Debtor

3

or its Estate or other authorized parties-in-interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 362, 502, 542 through and including 553 and 724(a) of the Bankruptcy Code or under similar local, state, federal or foreign statutes and common law, including fraudulent transfer laws.

2.1.20    "Ballot" means any ballot sent to Holders of Claims and Interests in Classes 3(a), 3(b), 4 and 5.

2.1.21    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*

2.1.22    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Case.

2.1.23    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the general, local and chambers rules of the Bankruptcy Court as applicable to the Chapter 11 Case and as amended from time to time.

2.1.24    "Bar Date" means the dates established by the Bankruptcy Court by which Proofs of Claim must have been filed with respect to such Claims, pursuant to: (a) the *Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [D.I. 373], entered by the Bankruptcy Court on June 29, 2023; (b) any further orders of the Bankruptcy Court establishing separate deadlines for filing Proofs of Claim; or (c) the Plan.

2.1.25    "Blocker Corporation" means an entity (i) wholly owned by the Liquidating Trust (or wholly owned by SVBFG prior to the Effective Date to be wholly owned, after the Effective Date, by the Liquidating Trust) and (ii) treated as a corporation for U.S. federal income tax purposes.

2.1.26    "Blue Sky Laws" has the meaning set forth in Section 7.4 hereof.

2.1.27    "BP Trust I" means Boston Private Capital Trust I, a statutory trust formed under the Delaware Statutory Trust Act pursuant to the BP Trust I Declaration of Trust and a Certificate of Trust filed with the Secretary of State of the State of Delaware on October 5, 2004.

2.1.28    "BP Trust I Claim" means any Claim arising out of or related to the BP Trust I Indenture.[2]

2.1.29    "BP Trust I Declaration of Trust" means that certain Declaration of Trust, dated as of October 5, 2004, as amended and restated by the Amended and Restated Declaration of Trust, dated as of October 12, 2004 (as further amended or supplemented from time to time) relating to BP Trust I.

---

[2]    For purposes of this Plan, the BP Trust I Claims shall be deemed to be held by the holders of the BP Trust I Preferred Securities in accordance with Section 7.6 of this Plan.

4

2.1.30    "BP Trust I Indenture" means that certain Indenture, dated as of October 12, 2004, between SVBFG and BP Trust I Indenture Trustee, as supplemented by the BP Trust I Supplemental Indenture, and as may be further amended, supplemented or otherwise modified from time to time.

2.1.31    "BP Trust I Indenture Trustee" means Wilmington Trust, National Association, as successor debenture trustee to U.S. Bank Trust, National Association (Delaware) (as successor debenture trustee to SunTrust Bank) pursuant to that certain Instrument of Resignation, Appointment and Acceptance, dated as of May 18, 2023, and any successor trustee appointed in accordance with the terms of the BP Trust I Indenture.

2.1.32    "BP Trust I Junior Subordinated Debentures" means the junior subordinated convertible debentures due 2034, outstanding under the BP Trust I Indenture.

2.1.33    "BP Trust I Preferred Securities" means those certain 4.875% Convertible Trust Preferred Securities issued by BP Trust I pursuant to the BP Trust I Declaration of Trust.

2.1.34    "BP Trust I Supplemental Indenture" means that certain First Supplemental Indenture, dated as of July 1, 2021, by and among SVBFG, BPFH and BP Trust I Indenture Trustee.

2.1.35    "BP Trust II" means Boston Private Capital Trust II, a statutory trust formed under the Delaware Statutory Trust Act pursuant to the BP Trust II Declaration of Trust and a Certificate of Trust filed with the Secretary of State of the State of Delaware on September 23, 2005.

2.1.36    "BP Trust II Capital Securities" means those certain capital securities issued by BP Trust II pursuant to the BP Trust II Declaration of Trust.

2.1.37    "BP Trust II Claim" means any Claim arising out of or related to the BP Trust II Indenture.[3]

2.1.38    "BP Trust II Declaration of Trust" means that certain Declaration of Trust, dated as of September 23, 2005, as amended and restated by the Amended and Restated Declaration of Trust, dated as of September 27, 2005 (as further amended or supplemented from time to time) relating to BP Trust II.

2.1.39    "BP Trust II Indenture" means that certain Indenture, dated as of September 27, 2005, between SVBFG and BP Trust II Indenture Trustee, as supplemented by the BP Trust II Supplemental Indenture, and as may be further amended, supplemented or otherwise modified from time to time.

---

[3]    For purposes of this Plan, the BP Trust II Claims shall be deemed to be held by the holders of the BP Trust II Capital Securities in accordance with Section 7.6 of this Plan.

5

2.1.40    "BP Trust II Indenture Trustee" means Wilmington Trust Company, a Delaware trust company, as debenture trustee of the BP Trust II Indenture, and any successor trustee appointed in accordance with the terms of the BP Trust II Indenture.

2.1.41    "BP Trust II Junior Subordinated Debentures" means the fixed-to-floating rate junior subordinated debt securities due 2035, outstanding under the BP Trust II Indenture.

2.1.42    "BP Trust II Supplemental Indenture" means that certain First Supplemental Indenture, dated as of July 1, 2021, by and among SVBFG, BPFH and BP Trust II Indenture Trustee.

2.1.43    "BPFH" means Boston Private Financial Holdings, Inc., which merged with and into SVBFG pursuant to the terms of an Agreement and Plan of Merger, dated as of January 4, 2021.

2.1.44    "Business Day" means any day other than a Saturday, a Sunday, a "legal holiday" (as defined in Bankruptcy Rule 9006(a)) or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

2.1.45    "Cash" or "$" means the legal tender of the United States of America or equivalents thereof.

2.1.46    "Causes of Action and Defenses" means any action, claim, cause of action, controversy, proceeding, reimbursement claim, affirmative defense, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, loss, damage, remedy, judgment, account, defense, offset (including setoff or recoupment rights), power, privilege, license and franchise of any kind or character whatsoever, known or unknown, foreseen or unforeseen, Contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, and assertable directly or derivatively, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Causes of Action and Defenses include: (i) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to or otherwise contest Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any Avoidance Action, (v) any claim or defense, including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code, and (vi) any claim under any state or foreign law, including any fraudulent transfer or similar claim.

2.1.47    "Certificate" means any instrument evidencing a Claim or an Interest.

2.1.48    "Chapter 11 Case" means the chapter 11 case pending for SVBFG under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

2.1.49    "Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code.

6

2.1.50    "Claims Objection Deadline" means the date that is (i) 180 days after the
Effective Date, (ii) such other later date the Bankruptcy Court may establish upon a motion by
the Debtor or the Liquidating Trust or (iii) such other objection deadline as may be specifically
fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or a Final Order.

2.1.51    "Claims Register" means the official register of Claims maintained by
the Notice and Claims Agent.

2.1.52    "Class" means a class of Claims or Interests classified by Section 4
hereof pursuant to section 1122(a) of the Bankruptcy Code.

2.1.53    "Class A-1 Trust Unit" has the meaning set forth in Section 5.6 hereof.

2.1.54    "Class A-2 Trust Unit" has the meaning set forth in Section 5.6 hereof.

2.1.55    "Class A-3 Trust Unit" has the meaning set forth in Section 5.6 hereof.

2.1.56    "Class C Trust Unit" has the meaning set forth in Section 5.6 hereof.

2.1.57    "Common Equity Interest" means an Equity Interest represented by the
issued and outstanding common stock, $0.001 par value per share, of the Debtor as of the
Petition Date or any interest or right to convert into such an Equity Interest or acquire any Equity
Interest of SVBFG that was in existence immediately prior to or on the Petition Date.

2.1.58    "Company Entity" means the Debtor or any Affiliate of the Debtor.

2.1.59    "Confirmation" means the entry of the Confirmation Order on the docket
of the Chapter 11 Case.

2.1.60    "Confirmation Date" means the date upon which the Bankruptcy Court
enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of
Bankruptcy Rules 5003 and 9021.

2.1.61    "Confirmation Hearing" means the hearing held by the Bankruptcy
Court pursuant to section 1128(a) of the Bankruptcy Code to consider Confirmation of the Plan,
as such hearing may be, or may have been, continued from time to time.

2.1.62    "Confirmation Order" means the order of the Bankruptcy Court entered
confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

2.1.63    "Consenting Noteholders" means Holders of Senior Notes that are party
to (i) the Restructuring Support Agreement or (ii) the Ad Hoc Cross-Holder Group Settlement
Agreement.

2.1.64    "Contingent" means, when used in reference to a Claim, any Claim the
liability for which attaches or is dependent upon the occurrence or happening of, or is triggered
by, an event that has not yet occurred as of the date on which such Claim is sought to be
estimated or on which an objection to such Claim is filed, whether or not such event is within the

7

actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the Debtor now or hereafter exists or previously existed.

2.1.65    "Contingent Tax Receivable" means the contingent right to receive all cash refunds of Taxes actually received by NewCo with respect to Taxes of the Debtor or its subsidiaries for taxable periods ending on or before December 31, 2022, reduced by (i) any amounts in respect of tax refunds payable to the FDIC pursuant to the Amended Tax Allocation Agreement, dated as of January 1, 2016, and (ii) any out-of-pocket expenses incurred by NewCo after the Effective Date and solely relating to services performed after the Effective Date with respect to outside legal or other tax advisors that are participating in any proceeding with any Tax Authorities to resolve any issues relating to Taxes of the Debtor or its subsidiaries for taxable periods ending on or before December 31, 2022; *provided* that, to the extent that any cash refunds of Taxes transferred by NewCo to the Liquidating Trust is subsequently disallowed or required to be returned to the applicable Tax Authority, the Liquidating Trust shall be liable for any amounts payable by NewCo to the applicable Tax Authority as a result of such disallowance or requirement and shall promptly repay, or cause to be repaid, the amount of such refund, together with any interest, penalties or other additional amounts imposed by such Tax Authority, to NewCo.

2.1.66    "Creditor" means any holder of a Claim against the Debtor.

2.1.67    "Cure Cost" means the amounts, including, where applicable, an amount of $0.00, required to cure any and all monetary defaults under an Executory Contract or Unexpired Lease (or such lesser amounts as may be agreed upon by the parties to an Executory Contract or Unexpired Lease) that is to be assumed by the Debtor pursuant to section 365 or 1123 of the Bankruptcy Code.

2.1.68    "Current Directors" means the directors of the board of the Debtor immediately prior to the Effective Date.

2.1.69    "D&O Insurance Policies" means any Insurance Policies for directors', managers', officers' and any other Insured (as defined in such policy) entities' liability (including employment practices liability and fiduciary liability) issued to or providing coverage to the Debtor or any of its predecessors-in-interest at any time, and all agreements, documents, or instruments relating thereto.

2.1.70    "Debtor" has the meaning set forth in the Introduction hereto.

2.1.71    "Debtor Related Parties" means the Related Parties of the Debtor.

2.1.72    "Debtor Released Parties" means the parties identified on Exhibit A hereto.

2.1.73    "Debtor's Records" has the meaning in Section 7.14 hereof.

2.1.74    "Definitive Documents" has the meaning set forth in the Restructuring Support Agreement.

8

2.1.75    "<u>Delaware Trustee</u>" means the trustee, or its successor, appointed in accordance with the Liquidating Trust Agreement to comply with the requirement of section 3807 of the Delaware Statutory Trust Act.

2.1.76    "<u>Disclosure Statement</u>" means the disclosure statement for the Plan, including all exhibits, appendices and schedules thereto, as amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court.

2.1.77    "<u>Disputed</u>" means, with respect to any Claim or Interest, a Claim or Interest or any portion thereof that is not Allowed but that has not been disallowed by a Final Order.

2.1.78    "<u>Disputed Claims Reserve</u>" means any of the Liquidating Trust Disputed Claims Reserve, Liquidating Trust Disputed GUC Cash-Out Claims Reserve, Liquidating Trust Disputed Interests Reserve and the NewCo Disputed Claims Reserve.

2.1.79    "<u>Disputed Invoiced Fees</u>" has the meaning set forth in Section 3.4 hereof.

2.1.80    "<u>Distribution</u>" means a distribution of property, including Cash, NewCo Common Stock and Liquidating Trust Interests, pursuant to the Plan, to take place as provided for herein, and "Distribute" shall have a correlative meaning.

2.1.81    "<u>Distribution Agent</u>" means any Person or Entity designated or retained by the Debtor (prior to the Effective Date) or the Liquidating Trust (after the Effective Date), without the need for any further order of the Bankruptcy Court, to serve as distribution agent under the Plan.

2.1.82    "<u>DTC</u>" means The Depository Trust Company.

2.1.83    "<u>Effective Date</u>" means the first Business Day on or after the Confirmation Date on which the conditions to the effectiveness of the Plan specified in Section 13.1 hereof have been either satisfied or waived as set forth herein, or such later date as determined by the Debtor, the Required Ad Hoc Senior Noteholder Parties, and the UCC.

2.1.84    "<u>Entity</u>" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

2.1.85    "<u>Equity Interest</u>" means the interest of any holder of one or more equity securities of SVBFG (including voting rights, if any, related to such equity securities) represented by issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in SVBFG, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, including unvested restricted stock.

2.1.86    "<u>Estate</u>" means the estate created with respect to the Debtor in the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

9

2.1.87   "Exchange Act" means the U.S. Securities Exchange Act of 1934 (as amended).

2.1.88   "Exculpated Parties" means, collectively, and in each case in its capacity as such:  (i) the Debtor (solely in its capacity as an estate fiduciary in the Chapter 11 Case); (ii) the UCC (solely in its capacity as an estate fiduciary in the Chapter 11 Case); (iii) the members of the UCC in their capacities as such and solely in their capacities as estate fiduciaries in the Chapter 11 Case; (iv) the Ad Hoc Noteholder Group and its members; (v) the Ad Hoc Cross-Holder Group and its members; (vi) the Indenture Trustees; and (vii) with respect to each of the foregoing Persons or Entities in clauses (i) through (vi), each such Entity's or Person's Related Parties, solely in their capacity as such.

2.1.89   "Executory Contract" means a contract to which the Debtor is a party and that is subject to assumption or rejection pursuant to section 365 of the Bankruptcy Code.

2.1.90   "FCB Parent" means First Citizens BancShares, Inc.

2.1.91   "FDIC" means, collectively, the FDIC-C, the FDIC-R1 and the FDIC-R2.

2.1.92   "FDIC Claims" means all Claims and Causes of Action and Defenses against the FDIC, including against each of the FDIC-R1, the FDIC-R2, and the FDIC-C, whether individually or in any combination, including, but not limited to (i) claims asserted in the proofs of claim filed with FDIC-R1 and FDIC-R2, (ii) claims asserted in the complaint filed in that certain adversary proceeding commenced as case number 23-01137 (MG) before the Bankruptcy Court and currently pending before the United States District Court for the Southern District of New York as case number 23 Civ. 7218 (JPC), (iii) claims asserted in the payment demand letter to the FDIC-C dated June 26, 2023 and now pending as case number 23-cv-6543-BLF, (iv) claims asserted in the complaint filed by the Debtor in the United States District Court for the Northern District of California on or about December 19, 2023, and (v) claims asserted in any subsequent complaint filed by the Debtor naming any of the FDIC-R1, the FDIC-R2, and the FDIC-C, in each case including claims for interest, penalties, fees and expenses.

2.1.93   "FDIC-C" means the Federal Deposit Insurance Corporation, in its corporate capacity.

2.1.94   "FDIC-R1" means the Federal Deposit Insurance Corporation, in its capacity as receiver for Silicon Valley Bank.

2.1.95   "FDIC-R2" means the Federal Deposit Insurance Corporation, in its capacity as receiver for Silicon Valley Bridge Bank, N.A.

2.1.96   "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, stayed, modified or amended, and as to (i) which the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired, and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or

10

rehearing is pending or has been timely taken or (ii) if an appeal, writ of *certiorari*, new trial, reargument or rehearing has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, or such appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have otherwise been dismissed with prejudice, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; *provided*, *however*, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Federal Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

2.1.97    "Funded Debt Share" means the percentage represented by a fraction (i) the numerator of which shall be an amount equal to the aggregate amount of the Allowed Senior Note Claims and Allowed Subordinated Note Claims and (ii) the denominator of which shall be the aggregate amount of the Allowed Senior Note Claims, Allowed Subordinated Note Claims and Allowed Other General Unsecured Claims (excluding Other General Unsecured Claims the holder of which elects to receive the GUC Cash-Out); *provided*, that in reference to the distribution of NewCo Common Stock, Non-Qualified Holders shall be excluded from the numerator and denominator.

2.1.98    "General Unsecured Claim" means any Claim against the Debtor that is not an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Subordinated Note Claim, Intercompany Claim, Section 510(b) Claim or a Claim for any Cure Cost, or any other Claim that is subordinated or entitled to priority under Bankruptcy Code or any order of the Bankruptcy Court.  For the avoidance of doubt, General Unsecured Claims do not include Preferred Equity Interests or Common Equity Interests.

2.1.99    "Governmental Unit" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

2.1.100    "GUC Cash-Out" means, with respect to any Allowed Other General Unsecured Claim, Cash in an amount equal to 45% of the lesser of (a) the Allowed amount of such Claim and (b) the GUC Cash-Out Cap.

2.1.101    "GUC Cash-Out Cap" means $11,000,000.00.

2.1.102    "GUC Cash-Out Claim" means an Other General Unsecured Claim whose Holder has elected to receive the GUC Cash-Out with respect to such Claim.

2.1.103    "Holder" means an Entity holding a Claim or an Interest, as applicable.

2.1.104    "Impaired" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

2.1.105    "Indenture Trustees" means, collectively, the BP Trust I Indenture Trustee, the BP Trust II Indenture Trustee and the Senior Notes Indenture Trustee.

11

2.1.106 "<u>Indentures</u>" means, collectively, the Subordinated Note Indentures, the Senior Notes Indenture and the Senior Notes Supplemental Indenture.

2.1.107 "<u>Insurance Policy</u>" means each insurance policy issued to or providing coverage to the Debtor or any of its predecessors-in-interest at any time and any agreements, documents or instruments related thereto, including the D&O Insurance Policies and any other insurance policy for directors', managers' and officers' liability.

2.1.108 "<u>Insurer</u>" means any company or other entity that issued or entered into an Insurance Policy, any third-party administrator, and any respective predecessors and/or affiliates thereof.

2.1.109 "<u>Intercompany Claim</u>" means any Claim held by the Debtor against any other Company Entity or by a Company Entity against the Debtor.[4]

2.1.110 "<u>Intercompany Interest</u>" means any Interest held by the Debtor in a Company Entity or by a Company Entity in the Debtor.

2.1.111 "<u>Interest</u>" means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other equity or ownership interest, including all issued, unissued, authorized or outstanding limited liability company membership interests (including common and preferred) or other equity interests, together with any warrants, options, convertible securities, liquidating preferred securities or contractual rights to purchase or acquire any such equity interests at any time and all rights arising with respect thereto.

2.1.112 "<u>Interim Compensation Order</u>" means the *Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code, Bankruptcy Rule 2016 and Local Rule 2016-1 Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals* [D.I. 134].

2.1.113 "<u>Investment Company Act</u>" means the Investment Company Act of 1940, as amended.

2.1.114 "<u>Invoiced Fees</u>" has the meaning set forth in Section 3.4 hereof.

2.1.115 "<u>IRC</u>" means the Internal Revenue Code of 1986, as amended from time to time.

2.1.116 "<u>IRS</u>" means the Internal Revenue Service.

2.1.117 "<u>Lien</u>" means a "lien" as defined in section 101(37) of the Bankruptcy Code.

---

[4]    For the avoidance of doubt, Intercompany Claims shall not include any Subordinated Note Claims for purposes of this Plan.

2.1.118 "<u>Liquidating Trust</u>" means a Delaware statutory trust (or other form agreed by the Debtor, the UCC, and Required Ad Hoc Senior Noteholder Parties) to be formed on or prior to the Effective Date in accordance with the provisions of Article 5 hereof.

2.1.119 "<u>Liquidating Trust Agreement</u>" means that certain agreement, substantially in the form contained in the Plan Supplement that shall serve as the governing instrument of the Liquidating Trust.

2.1.120 "<u>Liquidating Trust Assets</u>" means from and after the Effective Date, all assets of the Debtor and the Debtor's direct and indirect subsidiaries that the Debtor, the UCC and the Required Ad Hoc Senior Noteholder Parties have agreed to be transferred to the Liquidating Trust and that are not Retained Debtor Assets or NewCo Disputed Claims Reserves; *provided* that, prior to such transfers to the Liquidating Trust and subject to the agreement of the Debtor, the UCC and the Required Ad Hoc Senior Noteholder Parties, any assets previously designated as "Liquidating Trust Assets" may be re-designated as "Retained Debtor Assets" and vice versa; *provided further* that the Debtor, the UCC and the Required Ad Hoc Senior Noteholder Parties shall determine a revised value for NewCo Common Stock, taking into account any such assets re-designated as "Retained Debtor Assets" or "Liquidating Trust Assets", which increased (or decreased) value for NewCo Common Stock shall be subtracted from the initial distribution preferences of Class A-1 Trust Units and Class A-2 Trust Units in accordance with Section 5.6 hereof. The Liquidating Trust Assets shall include, without limitation, the following assets of the Debtor and its direct and indirect subsidiaries:

    i.    all Retained Causes of Action, including the FDIC Claims;

    ii.    all investment securities, including the Debtor's direct investment and warrant portfolios and its synthetic equity instrument in Leerink Partners LLC;

    iii.    100% of equity interests of SVB Investments Holdings, Inc.;[5]

    iv.    100% of equity interests in SVB Global Financial, Inc.;[6]

    v.    interests in existing SVB Capital entities entitling the interest holder to 46% of payments or other distributions from existing funds' carried and capital interests (excluding distributions from one SVBFG limited partner interest) and 15.5% of all management fees from existing funds;

    vi.    the right to receive up to two $5 million payments within ten years based on future fundraising activity of funds that are either successors of the

---

[5]    SVB Investments Holdings, Inc. holds certain direct investments.

[6]    SVB Global Financial, Inc. holds equity interests in certain foreign subsidiaries of the Debtor that are in the process of being wound down under applicable local law. Any remaining value of these subsidiaries following wind down and liquidation will be distributed to the Liquidating Trust via SVB Global Financial, Inc.

13

        funds subject to the SVB Capital Sale or that use the investment track record of the funds subject to the SVB Capital Sale;

    vii.    capital interests, carried interests and management fee participation interests in certain existing funds that are not subject to the SVB Capital Sale;

   viii.    all Cash of the Debtor (other than the cash proceeds of any NewCo Transaction which shall be subject to clause (ix) below) in excess of (a) amounts required for distributions to Holders of Allowed Claims pursuant to the Plan, and payment of fees, expenses, and other amounts required to be paid on the Effective Date pursuant to the Plan, (b) the amount required to fund the businesses to be owned by NewCo, as determined in accordance with a NewCo business plan acceptable to the Required Ad Hoc Senior Noteholder Parties and (c) the amount required to fund the capital call line of credit facility to certain funds of the SVB Capital business until the maturity of such capital call line of credit facility in accordance with the terms of the SVB Capital Sale;

    ix.    to the extent applicable, proceeds of any NewCo Transaction; *provided* that, with the consent of the Required Ad Hoc Senior Noteholder Parties and the UCC, all or a portion of the proceeds of any NewCo Transaction may remain at, or be transferred to, NewCo rather than being transferred to the Liquidating Trust;

    x.    Contingent Tax Receivable;

    xi.    the Debtor's rights and entitlements under the Insurance Policies (other than Insurance Policies assumed and/or assigned to NewCo pursuant to Section 9.1 hereof) in accordance with the terms of Section 9.5 hereof;

    xii.    a contingent right to receive, upon the maturity of the capital call line of credit facility, all Cash held at the Debtor in order to fund the capital call line of credit facility as well as all loans repaid and interest paid to the Debtor under the capital call line of credit facility after the Effective Date; and

   xiii.    100% of membership interests in SVB Employee Holdco LLC.

    2.1.121  "<u>Liquidating Trust Beneficiaries</u>" means the holders of Liquidating Trust Interests.

    2.1.122  "<u>Liquidating Trust Board</u>" means the board of the Liquidating Trust by whom or under whose direction the business and affairs of the Liquidating Trust shall be managed in accordance with the Liquidating Trust Agreement.

    2.1.123  "<u>Liquidating Trust Disputed Claims Reserve</u>" means any Liquidating Trust Assets allocable to, or retained on account of, Disputed Administrative Expense Claims,

<div align="center">14</div>

Disputed Priority Tax Claims, Disputed Other Priority Claims, Disputed Other Secured Claims and Disputed General Unsecured Claims (other than Disputed GUC Cash-Out Claims), which shall be held in one or more separate accounts from other Liquidating Trust Assets.

2.1.124   "Liquidating Trust Disputed GUC Cash-Out Claims Reserve" means any Liquidating Trust Assets allocable to, or retained on account of, Disputed GUC Cash-Out Claims, which shall be held in a separate account from other Liquidating Trust Assets.

2.1.125   "Liquidating Trust Disputed Interests Reserve" means any Liquidating Trust Interest allocable to, or retained on account of, Disputed General Unsecured Claims (other than Disputed GUC Cash-Out Claims), Disputed Subordinated Note Claims and Disputed Preferred Equity Interests which shall be held in one or more separate accounts from other Liquidating Trust Interests.

2.1.126   "Liquidating Trust Interests" means the Class A-1 Trust Units, the Class A-2 Trust Units, the Class A-3 Trust Units and the Class C Trust Units and any other beneficial interests in the Liquidating Trust that may be issued pursuant to the Plan or the Liquidating Trust Agreement.

2.1.127   "Liquidation Preference" means the stated amount per share specified in the applicable certificate of designation (including, in the case of any series of Preferred Stock that does not use the words "stated amount," the specified amount of any preference upon liquidation, dissolution or winding up, without regard to any unpaid dividends that may also be included in the liquidation preference with respect to such shares).

2.1.128   "Local Rules" means the Local Bankruptcy Rules for the Southern District of New York.

2.1.129   "NewCo" means, as applicable, (i) in the event that the New Parent Merger or other New Parent Structure is not effectuated, SVBFG as reorganized pursuant to and under the Plan and any successor thereto, by merger, consolidation, or otherwise on or after the Effective Date, (ii) in the event that the New Parent Merger or other New Parent Structure is effectuated, prior to the consummation of the New Parent Merger or other New Parent Structure, SVBFG as reorganized pursuant to and under the Plan and any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date or (iii) in the event that the New Parent Merger or other New Parent Structure is effectuated, after the consummation of the New Parent Merger or other New Parent Structure, New Parent.

2.1.130   "NewCo Board" means the board of directors of NewCo, whose members as of the Effective Date shall be appointed by the Required Ad Hoc Senior Noteholder Parties in a manner reasonably acceptable to the UCC, and thereafter shall be appointed and removed in accordance with NewCo Organizational Documents.

2.1.131   "NewCo Common Stock" means, as applicable, (i) in the event that the New Parent Merger or other New Parent Structure is not effectuated, SVBFG Common Stock, (ii) in the event that the New Parent Merger or other New Parent Structure is effectuated, prior to the consummation of the New Parent Merger or other New Parent Structure, SVBFG Common

15

Stock and (iii) in the event that the New Parent Merger or other New Parent Structure is effectuated, after the consummation of the New Parent Merger or other New Parent Structure, New Parent Common Stock.

2.1.132 "<u>NewCo Disputed Claims Reserve</u>" means any NewCo Common Stock allocable to, or retained on account of, Disputed General Unsecured Claims (other than Disputed GUC Cash-Out Claims), which shall be held in one or more separate accounts from other assets of NewCo. On or after the Effective Date, any NewCo Disputed Claims Reserve shall be deemed held by the Liquidating Trust and, for the avoidance of doubt, shall not be part of the Liquidating Trust Assets or Retained Debtor Assets.

2.1.133 "<u>NewCo Distribution</u>" has the meaning in Section 7.5.2 hereof.

2.1.134 "<u>NewCo Organizational Documents</u>" means the organizational and governance documents for NewCo, including, as applicable, the certificates or articles of incorporation, certificates of formation, certificates of organization, certificates of limited partnership, certificates of conversion, limited liability company agreements, operating agreements, limited partnership agreements, stockholder or shareholder agreements, bylaws, and indemnification agreements (or equivalent governing documents of any of the foregoing).

2.1.135 "<u>NewCo Transaction</u>" has the meaning in Section 7.3 hereof.

2.1.136 "<u>New Parent</u>" has the meaning in Section 7.5 hereof.

2.1.137 "<u>New Parent Common Stock</u>" shall mean the common stock, shares, membership units or equivalent interest of New Parent, in the event that the New Parent Merger or other New Parent Structure is effectuated.

2.1.138 "<u>New Parent Merger</u>" has the meaning in Section 7.5 hereof.

2.1.139 "<u>New Parent Structure</u>" has the meaning in Section 7.5 hereof.

2.1.140 "<u>Non-Qualified Holder</u>" means a Holder who provides a certification that such Holder is not a "qualified purchaser" as such term is defined in section 2(a)(51) of the Investment Company Act and the rules thereunder or is not an Accredited Investor.

2.1.141 "<u>Notice and Claims Agent</u>" means the Debtor's notice and claims agent, Kroll Restructuring Administration LLC.

2.1.142 "<u>Other Administrative Claim</u>" means any Administrative Expense Claim that is not a Professional Fee Claim, Ad Hoc Noteholder Group Expense, Ad Hoc Cross-Holder Group Expense, Senior Note Trustee Expense, Subordinated Note Trustee Expense, or Claim for U.S. Trustee Fees.

2.1.143 "<u>Other General Unsecured Claim</u>" means any General Unsecured Claim against the Debtor that is not a Senior Note Claim.

16

2.1.144   "Other Priority Claim" means a Claim against the Debtor entitled to priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

2.1.145   "Other Secured Claim" means any Secured Claim or portion thereof against the Debtor, other than a Secured Tax Claim.

2.1.146   "Person" means a "person" as defined in section 101(41) of the Bankruptcy Code.

2.1.147   "Petition Date" means March 17, 2023.

2.1.148   "Plan" has the meaning set forth in the Introduction hereto.

2.1.149   "Plan Sponsor Transaction" means a transaction whereby a third party provides financing and acquires all or a portion of NewCo equity.

2.1.150   "Plan Supplement" means one or more compilations of documents and forms of documents, instruments, schedules and exhibits to the Plan, as each such document, agreement, instrument, schedule and exhibit and form thereof may be altered, restated, modified or replaced from time to time, including subsequent to the filing of any such documents.  Each such document, agreement, instrument, schedule or exhibit, or form thereof, is referred to herein as a "Plan Supplement."  The Plan Supplement may include the following (including drafts or forms, as applicable), or the material terms of the following, as applicable:  (i) the NewCo Organizational Documents, (ii) the Liquidating Trust Agreement, (iii) the Schedule of Assumed Executory Contracts and Unexpired Leases, (iv) the Restructuring Transactions Memorandum, (v) the Shared Services Agreement (if any), and (vi) the Schedule of Retained Causes of Action.

2.1.151   "Post Effective Date UCC Matters" has the meaning in Section 16.7 hereof.

2.1.152   "Preferred Equity Interest" means an Equity Interest represented by an issued and outstanding share of preferred stock of SVBFG prior to or on the Petition Date, including those certain (i) Series A Preferred Stock, (ii) Series B Preferred Stock, (iii) Series C Preferred Stock, (iv) Series D Preferred Stock and (v) Series E Preferred Stock.

2.1.153   "Preferred Stock" means, collectively, Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock and Series E Preferred Stock.

2.1.154   "Priority Tax Claim" means a Claim (whether secured or unsecured) of a Governmental Unit against the Debtor entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

2.1.155   "Pro Rata" means, as applicable and unless otherwise stated, with respect to an Allowed or estimated Claim or Interest, the percentage represented by a fraction (i) the numerator of which shall be an amount equal to such Allowed or estimated Claim or Interest and (ii) the denominator of which shall be an amount equal to the aggregate amount of Allowed and

17

estimated Claims or Interests in the same Class as such Claim or Interest, except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the portion that such Holder's Claim or Interest in a particular class bears to the aggregate amount of all Allowed and estimated Claims or Interests in such multiple Classes.

2.1.156  "Professional" means a Person or Entity:  (i) employed in the Chapter 11 Case pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to section 327, 328, 329, 330 or 331 of the Bankruptcy Code, or (ii) for which compensation and reimbursement has been awarded by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

2.1.157  "Professional Fee Claim" means any Claim of a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

2.1.158  "Professional Fee Escrow Account" means an account to be funded by the Debtor on or prior to the Effective Date and maintained by the Liquidating Trust in an amount equal to the Professional Fee Reserve Amount.

2.1.159  "Professional Fee Reserve Amount" means the estimate, as determined in accordance with Section 3.2.3 hereof, of the aggregate amount of unpaid Professional Claims for all Professionals through the Effective Date.

2.1.160  "Proof of Claim" means a proof of claim against a Debtor filed by a holder of a Claim against the Debtor.

2.1.161  "Qualified Holder" means a Holder who provides a certification that such Holder is a "qualified purchaser" as such term is defined in section 2(a)(51) of the Investment Company Act and the rules thereunder and is an Accredited Investor.

2.1.162  "Qualified Holder Certification Request" has the meaning in Section 7.5.2 hereof.

2.1.163  "Regulation D" has the meaning in Section 7.4 hereof.

2.1.164  "Reinstated" means, with respect to any Claim or Interest, that such Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, and "Reinstatement" shall have a correlative meaning.

2.1.165 "Related Parties" means with respect to a Person or Entity, and in each case solely in its capacity as such, each such Person or Entity's predecessors, successors, assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, board members, directors, principals, agents, members, partners (general or limited), managers, employees, advisory board members, financial advisors, attorneys and legal representatives, accountants, investment bankers, consultants, trustees, investment committee members,

18

affiliated investment funds or investment vehicles, management companies, direct or indirect owners and/or equityholders, investment or fund advisors, representatives, and other professionals and advisors and any such Person or Entity's respective heirs, executors, estates and nominees.

2.1.166  "Released Parties" means (i) the Debtor, (ii) NewCo (solely with respect to any Claims or Causes of Action and Defenses asserted against it as a purported successor to the Debtor), (iii) the Liquidating Trust (solely with respect to any Claims or Causes of Action and Defenses asserted against it as a purported successor to the Debtor), (iv) the UCC and its members, (v) the Ad Hoc Noteholder Group, (vi) the Consenting Noteholders, (vii) the Indenture Trustees, (viii) each such Entity's or Person's Related Parties; *provided* that no Person or Entity shall be a Released Party if it files with the Bankruptcy Court an objection to the Plan (including the releases) that is not consensually resolved before Confirmation or supports any such objection or objector; *provided further* that, no current or former director, officer or other Related Parties of the Debtor is a Released Party in respect of any prepetition conduct, transactions, or events, unless such Person is listed on Exhibit A hereof.

2.1.167  "Releasing Parties" means (i) the Released Parties listed in clauses (i)–(vii) in the definition thereof, (ii) all holders of Claims or Interests who affirmatively opt in to the releases provided by the Plan by checking the box on the applicable Ballot or Third-Party Release Election Form indicating that they opt in to grant the releases provided in the Plan to the Released Parties and (iii) each Related Party of each Person or Entity in clauses (i) and (ii) for which such Person or Entity is legally entitled to bind.

2.1.168  "Required Ad Hoc Senior Noteholder Parties" means at any time, Consenting Noteholders that are members of the Ad Hoc Noteholder Group holding greater than 50% in amount of Senior Notes held by all Consenting Noteholders that are members of the Ad Hoc Noteholder Group at such time.

2.1.169  "Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of January 9, 2024 [D.I. 798], by and among the Debtor and the Supporting Parties (as defined therein) party thereto, as amended, supplemented or otherwise modified from time to time, including all exhibits and annexes thereto.

2.1.170  "Restructuring Transactions" has the meaning set forth in Section 7.9 hereof.

2.1.171  "Restructuring Transactions Memorandum" shall mean a memorandum included in the Plan Supplement describing the Restructuring Transactions.

2.1.172  "Retained Causes of Action" means all of the Debtor's claims or Causes of Action and Defenses, other than those settled, released or exculpated under this Plan; *provided*, that, notwithstanding anything herein to the contrary, NewCo or the Liquidating Trust shall retain the Debtor's right to commence and pursue (a) the FDIC Claims, (b) Claims against any Debtor Related Party to the extent not released under the Plan and (c) any Claims or Causes of Action and Defenses the Debtor may have against First Citizens Bank & Trust Company.

19

2.1.173 "<u>Retained Debtor Assets</u>" means all of the Debtor's assets to be retained by NewCo and its subsidiaries after the Effective Date that include the following assets:

    i.     all equity interests in SVB Securities Holdings LLC;

    ii.    all equity interests in MoffettNathanson LLC;

    iii.   Cash sufficient to fund (a) the businesses to be owned by NewCo, as determined in accordance with a NewCo business plan acceptable to the Required Ad Hoc Senior Noteholder Parties and (b) the capital call line of credit facility to certain funds of the SVB Capital business until the maturity of such capital call line of credit facility in accordance with the terms of the SVB Capital Sale;

    iv.   Insurance Policies;

    v.    Cash refunds of Taxes received by NewCo with respect to Taxes of the Debtor or its subsidiaries; and

    vi.   Debtor's Tax attributes.

2.1.174 "<u>Review Period</u>" has the meaning set forth in Section 3.4 hereof.

2.1.175 "<u>Schedule of Assumed Executory Contracts and Unexpired Leases</u>" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed or assumed and assigned by the Debtor pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtor.

2.1.176 "<u>Schedule of Retained Causes of Action</u>" means the schedule of certain Causes of Action and Defenses of the Debtor that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

2.1.177 "<u>SEC</u>" means the United States Securities and Exchange Commission.

2.1.178 "<u>Section 510(b) Claim</u>" means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

2.1.179 "<u>Secured Claim</u>" means a Claim that is (i) secured by a Lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code, or (ii) Allowed pursuant to the Plan as a Secured Claim.

2.1.180 "<u>Secured Tax Claim</u>" means any Secured Claim against the Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

2.1.181 "<u>Securities Act</u>" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder.

2.1.182 "<u>security</u>" means a security as defined in section 2(a)(1) of the Securities Act.

2.1.183 "<u>Senior Note Claim</u>" means any Claim arising out of or related to the Senior Notes Indenture.

2.1.184 "<u>Senior Note Trustee Expenses</u>" means the reasonable and documented compensation, fees, expenses, disbursements, and claims for indemnity, subrogation, and contribution incurred or owed to the Senior Notes Indenture Trustee and its professionals, recoverable in accordance with the Senior Notes Indenture Trustee's charging lien, whether prior to or after the Petition Date and whether prior to or after the Effective Date, and reasonable fees and expenses incurred in connection with distributions made pursuant to the Plan or the cancellation and discharge of the Senior Notes Indenture and/or the Senior Notes Supplemental Indenture, in each case to the extent payable or reimbursable under the Senior Notes Indenture and/or the Senior Notes Supplemental Indenture, as applicable, including the reasonable and documented fees and expenses of Davis Polk & Wardwell LLP and Seward & Kissel LLP, as counsel to the Senior Notes Indenture Trustee and PJT Partners LP, as investment banker to the Senior Notes Indenture Trustee; *provided* that Davis Polk & Wardwell LLP and PJT Partners LP shall provide summary copies of applicable invoices to counsel to the Debtor and counsel to the UCC, and copies of the invoices, together with time records and other documents as may be requested, to the U.S. Trustee, subject to the procedures applicable to the Invoiced Fees in Section 3.4 hereof.

2.1.185 "<u>Senior Notes</u>" means the 2025 Senior Notes, 2026 Senior Notes, 2028 Senior Notes, 2030 Senior Notes, 2031 Senior Notes, 2028 Senior Fixed-to-Floating Rate Notes, and the 2033 Senior Fixed-to-Floating Rate Notes.

2.1.186 "<u>Senior Notes Indenture</u>" means that certain Indenture, dated as of September 10, 2010, between SVBFG and the Senior Notes Indenture Trustee, pursuant to which the Senior Notes were issued, as may be amended, supplemented or otherwise modified from time to time.

2.1.187 "<u>Senior Notes Indenture Trustee</u>" means U.S. Bank Trust Company, National Association (as successor-in-interest to U.S. Bank National Association), as indenture trustee of the Senior Notes Indenture, and any successor trustee appointed in accordance with the terms of the Senior Notes Indenture.

2.1.188 "<u>Senior Notes Supplemental Indenture</u>" means that certain First Supplemental Indenture, dated as of April 28, 2022, between SVBFG and the Senior Notes Indenture Trustee, supplementing and amending the terms of the Senior Notes Indenture with respect to the 2028 Senior Fixed-to-Floating Rate Notes and the 2033 Senior Fixed-to-Floating Rate Notes.

2.1.189 "Series A Preferred Stock" means the 5.250% fixed-rate series A non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series A Certificate of Designation dated December 6, 2019.

2.1.190 "Series B Preferred Stock" means the 4.100% Fixed-to-Reset series B non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series B Certificate of Designation dated February 2, 2021.

2.1.191 "Series C Preferred Stock" means the 4.000% Fixed-to-Reset series C non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series C Certificate of Designation dated May 13, 2021.

2.1.192 "Series D Preferred Stock" means the 4.250% Fixed-to-Reset series D non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series D Certificate of Designation dated October 28, 2021.

2.1.193 "Series E Preferred Stock" means the 4.7000% Fixed-to-Reset series D non-cumulative perpetual preferred stock of SVBFG having the terms set forth in the Series E Certificate of Designation dated October 28, 2021.

2.1.194 "Shared Services Agreement" means a shared services agreement or similar arrangement or understanding which governs the provision of operating services and general and administrative services, including but not limited to legal, accounting and treasury between NewCo and the Liquidating Trust.

2.1.195 "Solicitation Procedures Order" means the *Order (I) Approving the Disclosure Statement; (II) Establishing a Voting Record Date; (III) Approving Solicitation Packages and Solicitation Procedures; (IV) Approving the Forms of Ballots; (V) Establishing Voting and Tabulation Procedures; and (VI) Establishing Notice and Objection Procedures for the Confirmation of the Plan* [D.I. 1172].

2.1.196 "Specified Governmental Unit" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code but excluding for sake of clarity the FDIC, including in its corporate capacity and in its capacities as receiver for either Silicon Valley Bank of Santa Clara, California or Silicon Valley Bridge Bank, N.A.

2.1.197 "Stock Register" means the ownership register of SVBFG Common Stock maintained by, or behalf of, the Debtor.

2.1.198 "Subordinated Note Claims" means the BP Trust I Claims and the BP Trust II Claims.

2.1.199 "Subordinated Note Indenture Trustees" means BP Trust I Indenture Trustee and BP Trust II Indenture Trustee.

2.1.200 "Subordinated Note Indentures" means BP Trust I Indenture, BP Trust I Supplemental Indenture, BP Trust II Indenture and BP Trust II Supplemental Indenture.

22

2.1.201 "<u>Subordinated Note Trustee Expenses</u>" means the reasonable and documented compensation, fees, expenses, disbursements, and claims for indemnity, subrogation, and contribution incurred or owed to the Subordinated Note Indenture Trustees and their professionals, recoverable in accordance with the Subordinated Note Indenture Trustees' charging liens, whether prior to or after the Petition Date and whether prior to or after the Effective Date, and reasonable fees and expenses incurred in connection with distributions made pursuant to the Plan or the cancellation and discharge of the Subordinated Note Indentures, in each case to the extent payable or reimbursable under the Subordinated Note Indentures, including the reasonable and documented fees and expenses of Pryor Cashman LLP, as counsel to the Subordinated Note Indenture Trustees.

2.1.202 "<u>Subordinated Notes</u>" means the BP Trust I Preferred Securities and the BP Trust II Capital Securities.

2.1.203 "<u>SVB Capital Sale</u>" means the sale of the SVB Capital business, subject to the terms and conditions provided in the Interest Purchase Agreement, dated as of May 2, 2024, by and between the Debtor and Pinegrove Sierra HoldCo LLC.

2.1.204 "<u>SVBFG</u>" has the meaning set forth in the Introduction hereto.

2.1.205 "<u>SVBFG Common Stock</u>" means the common stock of SVBFG.

2.1.206 "<u>Tax Authority</u>" means a federal, state, local or foreign government, or agency, instrumentality, or employee thereof, court, or other body (if any) charged with the administration of any law relating to Taxes.

2.1.207 "<u>Tax Return</u>" means a return, declaration, form, election letter, report, statement, estimate, information return, or other information filed or required to be filed with respect to any Taxes, including any schedule or attachment thereto or amendment thereof.

2.1.208 "<u>Taxes</u>" means all (i) federal, state, local, or foreign taxes, including all net income, net worth or gross receipts, capital, value added, franchise, profits, employment, estimated, excise, severance, stamp, occupation, premium, windfall profits, environmental, custom duties, property, sales, use, license, transfer, registration, payroll, withholding, social security, unemployment, disability, alternative or add-on minimum or other taxes, and (ii) interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority or paid in connection with any item described in clause (i) hereof.

2.1.209 "<u>Third-Party Release</u>" means the third-party release contained in Section 12.9 hereof.

2.1.210 "<u>Third-Party Release Election Form</u>" means an election form annexed to the non-voting notices to Holders of Claims and Interests in Classes 1, 2, 6, 7 and 8 to permit such Holders to opt in to the Third-Party Release.

2.1.211 "<u>Treasury Regulations</u>" means the United States Department of Treasury regulations promulgated under the IRC.

23

2.1.212  "U.S. Trustee" means William K. Harrington, the United States Trustee for Region 2, U.S. Department of Justice, Office of the U.S. Trustee.

2.1.213  "U.S. Trustee Fees" mean fees arising under 28 U.S.C. § 1930(a)(6), together with interest, if any pursuant to 31 U.S.C. § 3717.

2.1.214  "UCC" means the official committee of unsecured creditors of the Debtor appointed in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code, as may be reconstituted from time to time.

2.1.215  "Unclaimed Distribution" means any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not: (i) accepted a particular distribution or, in the case of a distribution made by check, negotiated such check, (ii) given written notice to the Distribution Agent of an intent to accept a particular distribution, (iii) responded in writing to the request of the Distribution Agent for information necessary to facilitate a particular distribution, (iv) taken such actions in respect of DTC designation as are required under Sections 10.3.8 and 10.3.9 hereof, or (v) taken any other action necessary to facilitate such distribution (including, with respect to any NewCo Distribution, certification that it is a Qualified Holder or a Non-Qualified Holder).

2.1.216  "Unexpired Lease" means a lease to which the Debtor is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

2.1.217  "Unimpaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not impaired within the meaning of such term in section 1124 of the Bankruptcy Code.

2.1.218  "United States of America," "United States" or "U.S." means the United States of America and its federal agencies.

2.1.219  "Voting Record Date" means the record date for voting on the Plan, which shall be May 14, 2024.

2.2     Rules of Interpretation

For the purposes of this Plan:  (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender, (ii) any reference herein to the word "including" or any word of similar import shall be read to mean "including without limitation," (iii) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto, (iv) unless otherwise specified, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than a particular portion of the Plan, (v) captions and headings to Sections are inserted for the convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, (vi) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, (vii) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement, (viii) all references to docket numbers of documents filed in the Chapter 11 Case are references to the docket numbers under the

24

Bankruptcy Court's Case Management/Electronic Case Files system, (ix) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Case, unless otherwise stated, (x) unless otherwise specified, any reference herein to a contract, agreement, lease, plan, policy, document or instrument being in a particular form or on particular terms and conditions means that the same shall be substantially in that form or substantially on those terms and conditions, (xi) unless otherwise specified, any reference herein to a contract, agreement, lease, plan, policy, document or instrument or schedule or exhibit thereto, whether or not filed, shall mean the same as amended, restated, modified or supplemented from time to time in accordance with the terms hereof or thereof, (xii) any effectuating provisions may be interpreted by the Debtor, NewCo or the Liquidating Trust, as applicable, with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties (not to be unreasonably withheld, conditioned or delayed and to the extent provided in the Restructuring Support Agreement), in a manner consistent with the overall purpose and intent of this Plan or the Confirmation Order, all without further notice to or action, Order, or approval of the Bankruptcy Court or any other Entity, (xiii) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and permitted assigns, (xiv) references to "shareholders," "directors" and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company laws, (xv) except as otherwise expressly provided in this Plan, where this Plan contemplates that the Debtor, NewCo or the Liquidating Trust, as applicable, shall take any action, incur any obligation, issue any security or adopt, assume, execute or deliver any contract, agreement, lease, plan, policy, document or instrument on or prior to the Effective Date, the same shall be duly and validly authorized by the Plan and effective against and binding upon the Debtor, NewCo or the Liquidating Trust, as applicable, on and after the Effective Date without further notice to, order of or other approval by the Bankruptcy Court, action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of the board of directors of the Debtor or any other Entity, (xvi) except as otherwise provided in the Plan, anything required to be done by the Debtor, NewCo or the Liquidating Trust, as applicable, on the Effective Date may be done on the Effective Date or as soon as reasonably practicable thereafter and (xvii) all references herein to the NewCo Transaction shall be deemed to be followed by "if any" whether or not stated.

2.3     Governing Law

        Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein (including in the Plan Supplement), the laws of the State of New York, without giving effect to the principles of conflicts of laws, shall govern the construction and implementation of the Plan and any agreement, document or instrument executed or entered into in connection with the Plan; *provided*, *however*, that corporate or limited liability company governance matters relating to the Debtor, NewCo, and the Liquidating Trust, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable).

2.4     Computation of Time

        In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  If any

25

payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

        2.5    <u>References to Monetary Figures</u>

        All references in the Plan to monetary figures shall refer to currency of the United States of America.

        2.6    <u>Consent Rights</u>

        Notwithstanding anything herein to the contrary, (i) any and all consent and consultation rights of all parties to the Restructuring Support Agreement under such agreement with respect to the Plan, all exhibits to the Plan, the Plan Supplement, the proposed form of Confirmation Order, and any other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, as more fully set forth in the Restructuring Support Agreement, are incorporated herein by this reference and shall be fully enforceable as if stated in full herein, and (ii) any action or inaction that may be taken by the Debtor or any of its subsidiaries shall be subject to the covenants of the Debtor set forth in the Restructuring Support Agreement. Failure to reference herein any right, privilege or obligation provided for by the Restructuring Support Agreement shall not impair any such right, privilege or obligation.

4895-9352-2380 v.11

## 3. OTHER ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS AND STATUTORY FEES

### 3.1 Other Administrative Claims

#### 3.1.1 Treatment of Other Administrative Claims

Subject to Section 11.4 hereof, except to the extent that the applicable Holder of an Allowed Other Administrative Claim agrees to less favorable treatment with the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed) or, after the Effective Date, the Liquidating Trust, each Holder of an Allowed Other Administrative Claim shall receive, on account of such Allowed Other Administrative Claim to the extent any portion of such Allowed Other Administrative Claim has not been paid in full during the course of the Chapter 11 Case, payment in full in Cash (i) on or as soon as reasonably practicable after the later of the Effective Date and the date such Claim is Allowed, (ii) if such Allowed Other Administrative Claim is for goods and services provided to the Debtor in the ordinary course of business, in accordance with the terms and conditions of the applicable transaction documentation or course of business dealings with the Debtor, (iii) as otherwise may be agreed upon by such Holder and the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed) or, after the Effective Date, the Liquidating Trust or (iv) as otherwise ordered by the Bankruptcy Court.

#### 3.1.2 Filing Other Administrative Claims

Absent order of the Bankruptcy Court to the contrary, all requests for payment of Other Administrative Claims that accrued on or before the Effective Date must be filed with the Notice and Claims Agent or the Bankruptcy Court and served on counsel for the Debtor by the Administrative Expense Claim Bar Date. Any Holder of an Other Administrative Claim who is required to, but does not, file and serve a request for payment of such Other Administrative Claim pursuant to the procedures specified in the Confirmation Order on or prior to the Administrative Expense Claim Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Expense Claim against the Debtor, the Liquidating Trust or NewCo or its respective property, and such general Other Administrative Claim shall be deemed discharged as of the Effective Date.

Following the Effective Date, the Liquidating Trust shall have exclusive authority to settle Other Administrative Claims without further Bankruptcy Court approval.

Unless the Debtor or the Liquidating Trust or any other Entity object to a timely filed and properly served Other Administrative Claim by the 90th calendar day after the Effective Date, subject to further extensions and/or exceptions as may be ordered by the Bankruptcy Court upon motion on notice to all parties filing a notice of appearance and request for service pursuant to Bankruptcy Rule 2002 in the Chapter 11 Case, such Other Administrative Claim shall be deemed Allowed in the amount requested. If the Debtor or the Liquidating Trust or any other Entity object to an Other Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Other

27

Administrative Claim should be Allowed and, if so, in what amount. Notwithstanding the foregoing, requests for payment of Other Administrative Claim need not be filed for Other Administrative Claims that (i) are undisputed Claims for unpaid invoices for goods or services provided to the Debtor in the ordinary course of business, (ii) previously have been Allowed by Final Order of the Bankruptcy Court, (iii) are for Cure Costs or (iv) the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed) or, after the Effective Date, the Liquidating Trust, have otherwise agreed in writing to not require such a filing.

3.2 <u>Professional Fee Claims</u>

3.2.1 <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims shall be filed and served no later than 60 days after the Effective Date, in accordance with the procedures established under the Interim Compensation Order. In accordance with the procedures established under the Interim Compensation Order, the Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims.

Except to the extent that the applicable Holder of an Allowed Professional Fee Claim agrees to less favorable treatment with the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed) or, after the Effective Date, the Liquidating Trust, each Holder of a Professional Fee Claim that has been approved by the Bankruptcy Court shall be paid in full in Cash.

3.2.2 <u>Professional Fee Escrow Account</u>

On or prior to the Effective Date, the Debtor shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds in the Professional Fee Escrow Account shall not constitute property of the Debtor's Estate, except as otherwise expressly set forth in the last sentence of this paragraph. The amount of Professional Fee Claims owing to the Professionals on and after the Effective Date shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order; *provided* that the Debtor's obligation with respect to Professional Fee Claims will not be limited nor be deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow Account. When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall promptly be transferred to the Liquidating Trust, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

3.2.3 <u>Professional Fee Reserve Amount</u>

To receive payment for unbilled fees and expenses incurred through and including the Effective Date, the Professionals shall estimate their accrued Professional Fee Claims prior to

28

and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through and including the Effective Date, and shall deliver such good-faith estimates to the Debtor by no later than seven days before the Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Professional.  If a Professional does not provide such estimate, the Debtor may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated shall comprise the Professional Fee Reserve Amount.  To the extent the Professional Fee Reserve Amount is not sufficient to pay all Allowed Professional Fee Claims in full, the remaining aggregate amount of the Allowed Professional Fee Claims shall be paid by the Liquidating Trust.

### 3.2.4    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, NewCo and the Liquidating Trust, as applicable, may, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the legal, professional or other fees and expenses related to the implementation and consummation of the Plan incurred by NewCo, the Liquidating Trust or any Professional following the Effective Date.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and NewCo and the Liquidating Trust may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

### 3.3    Treatment of Priority Tax Claims

Subject to Section 11.4 hereof, except to the extent that the applicable Holder of an Allowed Priority Tax Claim has been paid by the Debtor before the Effective Date, or such Holder agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, at the option of the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed) or, after the Effective Date, the Liquidating Trust, (i) payment in full in Cash made (a) on or as soon as reasonably practicable after the Effective Date or (b) on the date such payment is due in the ordinary course of business, (ii) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (iii) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the Holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

The Liquidating Trust shall have the right, in its sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time after the Effective Date without premium or penalty.

<div align="center">29</div>

3.4    Ad Hoc Noteholder Group Expenses

From and after the Confirmation Date, any outstanding and unpaid Ad Hoc
Noteholder Group Expenses shall be paid in full in Cash subject and pursuant to the procedures
set forth in the following paragraph.

Each professional or party shall provide summary copies of applicable invoices
(the fees thereunder, the "Invoiced Fees") to counsel to the Debtor, counsel to the UCC and the
U.S. Trustee.[7]  Any objections raised by the Debtor, the U.S. Trustee or the UCC challenging the
reasonableness of any portion of the Invoiced Fees (such portion, the "Disputed Invoiced Fees")
must be in writing and state with particularity the grounds therefor and must be submitted to the
applicable professional or party within 10 Business Days of receipt (the "Review Period") and, if
after the Review Period an objection remains unresolved, such objection will be subject to
resolution by the Court.  After the Review Period, the undisputed portion of Invoiced Fees will
be paid promptly by the Debtor, without the necessity of filing formal fee applications,
regardless of whether such amounts arose or were incurred before or after the Petition Date.  The
Debtor or the Liquidating Trust shall pay any Disputed Invoiced Fees promptly upon resolution
of the objection, including to the extent resolved through approval by the Court, to the extent of
such approval.  In no event shall any invoice or other statement submitted by any professional of
the Ad Hoc Noteholder Group to any Debtor, the UCC, the U.S. Trustee or any other interested
person (or any of their respective professionals) with respect to fees or expenses incurred by any
professional retained by the Ad Hoc Noteholder Group operate to waive the attorney/client
privilege, the work-product doctrine or any other evidentiary privilege or protection recognized
under applicable law.

All Ad Hoc Noteholder Group Expenses to be paid on or after the Effective Date
shall be estimated, as necessary, prior to or as of the Effective Date and such estimate shall be
delivered to the Debtor; *provided* that such estimate shall not be considered an admission or
limitation with respect to such Ad Hoc Noteholder Group Expenses.  In addition, the Liquidating
Trust is authorized to pay the Ad Hoc Noteholder Group Expenses, as necessary, after the
Effective Date when due and payable in the ordinary course solely to the extent incurred on or
after the Confirmation Order is entered, without any requirement for review or approval by the
Bankruptcy Court or any Entity.

---

[7]    For the avoidance of doubt, the fees provided for must be reasonable.  Although the U.S. Trustee fee guidelines
do not apply, professionals shall submit time and expense detail entries to the U.S. Trustee, as well as any
further information or back up documentation requested by the U.S. Trustee to determine the reasonableness of
the invoiced amount.  Invoices for such fees and expenses provided to any party other than the U.S. Trustee
shall not be required to include any information subject to the attorney-client privilege, joint defense privilege,
bank examiner privilege, or any information constituting attorney work product, and time and expense detail
entries and other information provided solely to the U.S. Trustee shall be returned or destroyed after the U.S.
Trustee has reviewed such material and any objections to the applicable fees and expenses have been resolved
upon request of the applicable professional.  Furthermore, the provision of invoices, time entries or other
information pursuant to the terms hereof shall in no event constitute a waiver of the attorney-client privilege or
of any benefits of the attorney work product doctrine.

30

For the avoidance of doubt, any Ad Hoc Noteholder Group Expenses paid in accordance with this Section 3.4 shall not be paid as Senior Note Trustee Expenses as part of the treatment of Class 3(a) under the Plan.

3.5     Statutory Fees Payable Pursuant to 28 U.S.C. § 1930

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with interest, pursuant to section 3717 of Title 31, United States Code due and owing prior to the Effective Date shall be paid by the Debtor on or before the Effective Date. The Debtor shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. On and after the Effective Date, the Liquidating Trust shall pay these fees when due and owing and prepare and file all necessary quarterly reports and other reports required by the Bankruptcy Court.

3.6     Settlement of Ad Hoc Cross-Holder Group Expenses

The Debtor and the Ad Hoc Cross-Holder Group have agreed that, from and after the Confirmation Date, Ad Hoc Cross-Holder Group Expenses in an aggregate amount not to exceed $17,000,000 (the "Cross-Holder Fee Cap") shall be paid by the Debtor in full in Cash subject and pursuant to the procedures set forth in this Section 3.6 (such payment, the "Cross-Holder Fees Settlement").

Each professional or party shall provide Invoiced Fees to the Debtor, counsel to the UCC and the U.S. Trustee.[8]  Any objections raised by the Debtor, the U.S. Trustee or the UCC challenging the reasonableness of any portion of the Invoiced Fees must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional or party within 10 Business Days of receipt and, if after the Review Period an objection remains unresolved, such objection will be subject to resolution by the Court. After the Review Period, the undisputed portion of Invoiced Fees will be paid promptly by the Debtor, without the necessity of filing formal fee applications, regardless of whether such amounts arose or were incurred before or after the Petition Date. The Debtor or the Liquidating Trust shall pay any Disputed Invoiced Fees promptly upon resolution of the objection, including to the extent resolved through approval by the Court, to the extent of such approval. In no event shall any invoice or other statement submitted by any professional of the Ad Hoc Cross-Holder Group to any Debtor, the UCC, the U.S. Trustee or any other interested person (or any of their respective professionals) with respect to fees or expenses incurred by any professional retained by the Ad

---

[8]     For the avoidance of doubt, the fees provided for must be reasonable. Although the U.S. Trustee fee guidelines do not apply, professionals shall submit time and expense detail entries to the U.S. Trustee, as well as any further information or back up documentation requested by the U.S. Trustee to determine the reasonableness of the invoiced amount. Invoices for such fees and expenses provided to any party other than the U.S. Trustee shall not be required to include any information subject to the attorney-client privilege, joint defense privilege, bank examiner privilege, or any information constituting attorney work product, and time and expense detail entries and other information provided solely to the U.S. Trustee shall be returned or destroyed after the U.S. Trustee has reviewed such material and any objections to the applicable fees and expenses have been resolved upon request of the applicable professional. Furthermore, the provision of invoices, time entries or other information pursuant to the terms hereof shall in no event constitute a waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine.

31

Hoc Cross-Holder Group operate to waive the attorney/client privilege, the work-product doctrine or any other evidentiary privilege or protection recognized under applicable law.

All Ad Hoc Cross-Holder Group Expenses to be paid on or after the Effective Date shall be estimated, as necessary, prior to or as of the Effective Date and such estimate shall be delivered to the Debtor; *provided* that such estimate shall not be considered an admission or limitation with respect to such Ad Hoc Cross-Holder Group Expenses but shall be subject to the Cross-Holder Fee Cap in all respects. In addition, the Liquidating Trust is authorized to pay the Ad Hoc Cross-Holder Group Expenses, as necessary, after the Effective Date when due and payable in the ordinary course solely to the extent incurred on or after the Confirmation Order is entered, without any requirement for review or approval by the Bankruptcy Court or any Entity but subject to the Cross-Holder Fee Cap in all respects.

Confirmation of the Plan shall constitute approval of the Cross-Holder Fees Settlement under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, subject to the occurrence of the Effective Date. The Cross-Holder Fees Settlement is inseverable from the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Cross-Holder Fees Settlement under section 1123(b)(3) of the Bankruptcy Code in connection with the Plan and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that, taking into consideration and in the context of the participation in and support of the Plan by the Ad Hoc Cross-Holder Group, the resolution of the potential Plan objection by the Ad Hoc Cross-Holder Group, the value saved in litigation costs and delay as a result of the objection resolutions, and the value of the Plan to the Debtor and its Estate, taken as a whole, the Cross-Holder Fees Settlement is fair, equitable, reasonable, and in the best interests of the Debtor and its Estate.

4895-9352-2380 v.11

## 4.    CLASSIFICATION AND TREATMENT OF OTHER CLAIMS AND INTERESTS

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, all Claims and Interests, except for Claims addressed in Section 3 hereof, are classified for all purposes as set forth in this Section 4.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.  For any Claim or Interest where a Proof of Claim has been filed, upon payment or satisfaction of such Claim or Interest and notice of such payment or satisfaction to the Holder of such Claim or Interest, such Claim or Interest may be adjusted or expunged on the Claims Register without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable non-bankruptcy law, in no event shall any Holder of an Allowed Claim be entitled to receive (x) payments that in the aggregate exceed the Allowed amount of such Holder's Claim or (y) distributions that in the aggregate exceed the amount permitted by Section 11.4 hereof.

### 4.1    Summary of Classes and Treatment of Claims Against and Interests in the Debtor

The following table designates the Classes of Claims against and Interests in the Debtor, as applicable, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or presumed to accept or deemed to reject the Plan.[9]  All of the potential Classes for the Debtor are set forth herein.

| Class | Designation | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3(a) | Senior Note Claims | Impaired | Entitled to Vote |
| 3(b) | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Subordinated Note Claims | Impaired | Entitled to Vote |
| 5 | Preferred Equity Interests | Impaired | Entitled to Vote |
| 6 | Common Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[9]    The information in the table is provided in summary form, and is qualified in its entirety by Section 4.2 hereof.

33

| Class | Designation | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 8 | Intercompany Claims and Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

4.2 <u>Treatment of Claims and Interests</u>

4.2.1 <u>Class 1 – Other Secured Claims</u>

    i.     *Classification*: Class 1 consists of all Other Secured Claims.

    ii.     *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the Debtor's option (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed): (a) payment in full in Cash; (b) delivery of the collateral securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    iii.     *Voting*: Claims in Class 1 are Unimpaired. Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of Other Secured Claims is entitled to vote to accept or reject the Plan.

4.2.2 <u>Class 2 – Other Priority Claims</u>

    i.     *Classification*: Class 2 consists of all Other Priority Claims.

    ii.     *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

    iii.     *Voting*: Claims in Class 2 are Unimpaired. Each Holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No

Holder of an Other Priority Claim is entitled to vote to accept or reject the Plan.

### 4.2.3   Class 3(a) – Senior Note Claims

i.   *Classification*:  Class 3(a) consists of all Senior Note Claims.

ii.   *Allowance*:  Senior Note Claims shall be Allowed in the aggregate outstanding principal amount of $3,300,000,000.00, *plus* accrued and unpaid interest to and including the Petition Date at the non-default contract rate.

iii.   *Treatment*:  Except to the extent that a Holder of an Allowed Senior Note Claim agrees to a less favorable treatment (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Senior Note Claim, each Holder of an Allowed Senior Note Claim shall receive (a)(i) if and solely to the extent such Holder is a Qualified Holder, its Pro Rata Share of the Funded Debt Share of the NewCo Common Stock subject to dilution by any NewCo Transaction or (ii) if and solely to the extent such Holder is a Non-Qualified Holder, Cash in an amount equal to the value of the NewCo Common Stock it would be entitled to receive if it and all holders of Senior Notes Claims and Other General Unsecured Claims were Qualified Holders, (b) its Pro Rata share of the Class A-1 Trust Units and (c) Cash in an amount equal to the Senior Note Trustee Expenses that will be satisfied through application of the Senior Notes Indenture Trustee's charging lien included in the applicable Indenture.

iv.   *Voting*:  Claims in Class 3(a) are Impaired.  Each Holder of an Allowed Senior Note Claim is entitled to vote to accept or reject the Plan.

### 4.2.4   Class 3(b) – Other General Unsecured Claims

i.   *Classification*:  Class 3(b) consists of all Other General Unsecured Claims.

ii.   *Treatment*:  Except to the extent that a Holder of an Allowed Other General Unsecured Claim agrees to a less favorable treatment (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other General

35

Unsecured Claim, each Holder of an Allowed Other General Unsecured Claim shall receive:

(a) (i)(A) if and solely to the extent such Holder is a Qualified Holder, its Pro Rata share (together with all Holders receiving Distributions in NewCo Common Stock) of the NewCo Common Stock subject to dilution by any NewCo Transaction or (B) if and solely to the extent such Holder is a Non-Qualified Holder, Cash in an amount equal to the value of the NewCo Common Stock it would be entitled to receive if it and all holders of Senior Notes Claims and Other General Unsecured Claims were Qualified Holders, and (ii) its Pro Rata share of the Class A-2 Trust Units; or

(b) if such Holder elects on the applicable ballot, the GUC Cash-Out with respect to such Claim.

iii.     *Voting*:  Claims in Class 3(b) are Impaired.  Each Holder of an Allowed Other General Unsecured Claim is entitled to vote to accept or reject the Plan.

### 4.2.5   Class 4 – Subordinated Note Claims

i.     *Classification*:  Class 4 consists of all Subordinated Note Claims.

ii.     *Allowance*:  Subordinated Note Claims shall be Allowed in the aggregate outstanding principal amount of $100,000,445.00, *plus* accrued and unpaid interest to and including the Petition Date at the non-default contract rate.

iii.     *Treatment*:  Except to the extent that a Holder of an Allowed Subordinated Note Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Subordinated Note Claim, each Holder of an Allowed Subordinated Note Claim shall receive (a) its Pro Rata share of the Class A-3 Trust Units in an aggregate amount equal to such Holder's Allowed Subordinated Note Claim and (b) Cash in an amount equal to the Subordinated Note Trustee Expenses that will be satisfied through application of the Subordinated Note Indenture Trustees' charging liens included in the applicable Indentures.

iv.     *Voting*:  Claims in Class 4 are Impaired.  Each Holder of an Allowed Subordinated Note Claim is entitled to vote to accept or reject the Plan.

4895-9352-2380 v.11

4.2.6    Class 5 – Preferred Equity Interests

    i.     *Classification*:  Class 5 consists of all Preferred Equity Interests.

    ii.    *Allowance*:  Preferred Equity Interests shall be Allowed in an amount equal to the Liquidation Preference per share, together with an amount equal to all dividends (if any) that have been declared but not paid prior to the date of distributions (but without regard to any undeclared dividends).

    iii.   *Treatment*:  Except to the extent that a Holder of an Allowed Preferred Equity Interest agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Preferred Equity Interest, each Holder of an Allowed Preferred Equity Interest shall receive its Pro Rata share of the Class C Trust Units.

    iv.   *Voting*:  Claims in Class 5 are Impaired.  Each Holder of an Allowed Preferred Equity Interest is entitled to vote to accept or reject the Plan.

4.2.7    Class 6 – Common Equity Interests

    i.     *Classification*:  Class 6 consists of all Common Equity Interests.

    ii.    *Treatment*:  No Holder of a Common Equity Interest shall receive any Distributions on account of its Common Equity Interest.  On and after the Effective Date, all Common Equity Interests shall be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Interests shall not receive or retain any distribution, property, or other value on account of such Interests.

    iii.   *Voting*:  Interests in Class 6 are Impaired.  Each Holder of a Common Equity Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a Common Equity Interest is entitled to vote to accept or reject the Plan.

4.2.8    Class 7 – Section 510(b) Claims

    i.     *Classification*:  Class 7 consists of all Section 510(b) Claims.

    ii.    *Treatment*:  No Holder of a Section 510(b) Claim shall receive any Distributions on account of its Section 510(b) Claim.  On and after the Effective Date, all Section 510(b) Claims shall be canceled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims shall not

37

receive or retain any distribution, property, or other value on account of such Claims.

iii.   *Voting*:  Claims in Class 7 are Impaired.  Each Holder of a Section 510(b) Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a Section 510(b) Claim is entitled to vote to accept or reject the Plan.

### 4.2.9    Class 8 – Intercompany Claims and Intercompany Interests

i.   *Classification*:  Class 8 consists of all Intercompany Claims and Intercompany Interests.

ii.   *Treatment*:  On and after the Effective Date, each Intercompany Claim and each Intercompany Interest shall be (a) canceled, released, and discharged, (b) Reinstated, (c) converted to equity, or (d) otherwise set off, settled, or distributed, in each case at the option of the Debtor with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed.

iii.   *Voting*:  Claims and Interests in Class 8 are Impaired or Unimpaired.  Each Holder of an Intercompany Claim or an Intercompany Interest is conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code.  No Holder of an Intercompany Claim or an Intercompany Interest is entitled to vote to accept or reject the Plan.

4895-9352-2380 v.11

## 5. THE LIQUIDATING TRUST

### 5.1 The Liquidating Trust Agreement

On or prior to the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties and authorities do not affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes. Notwithstanding anything in the Liquidating Trust Agreement to the contrary, the Liquidating Trust will be structured and operate in a manner that does not require registration of the Liquidating Trust under the Investment Company Act.

### 5.2 Purpose of the Liquidating Trust

The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. The Liquidating Trust shall be deemed a successor-in-interest of the Debtor to the maximum extent necessary for the Liquidating Trust to execute its purpose, and shall not otherwise be deemed a successor-in-interest to the Debtor for any purpose other than as specifically set forth in the Plan or in the Liquidating Trust Agreement.

### 5.3 Liquidating Trust Assets

On the Effective Date, the Liquidating Trust Assets shall be deemed irrevocably transferred to the Liquidating Trust or entities to be formed by the Liquidating Trust, in each case in accordance with the Restructuring Transactions Memorandum and without any further action of NewCo, the Debtor or its subsidiaries or any of their respective managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives. The Liquidating Trust Assets shall vest in the Liquidating Trust, free and clear of all Liens, Claims, charges, rights, or other encumbrances subject to and in accordance with the Plan and the Liquidating Trust Agreement. For purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code. Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtor and its predecessors, successors and assigns, and each other Entity released pursuant to Section 12.9 herein shall be discharged and released from all liability with respect to the delivery of such distributions. Upon the transfer of the Liquidating Trust Assets and pursuant to the Liquidating Trust Agreement, the Debtor will have no reversionary or further interest in or with respect to the Liquidating Trust Assets.

After the Effective Date, the Liquidating Trust may, in its reasonable discretion, contribute all or a portion of the Liquidating Trust Assets to one or more Blocker Corporations;

39

*provided* that, the Liquidating Trust shall evaluate any such transfer based on the relative tax costs and other tax consequences to the Liquidating Trust Beneficiaries of contributing such assets as compared to if such assets were not contributed to a Blocker Corporation.

To the extent that any cash refunds of Taxes transferred by NewCo to the Liquidating Trust is subsequently disallowed or required to be returned to the applicable Tax Authority, the Liquidating Trust shall be liable for any amounts payable by NewCo to the applicable Tax Authority as a result of such disallowance or requirement and shall promptly repay, or cause to be repaid, the amount of such refund, together with any interest, penalties or other additional amounts imposed by such Tax Authority, to NewCo.

## 5.4    Administration of the Liquidating Trust

The business and affairs of the Liquidating Trust shall be managed by or under the direction of the Liquidating Trust Board. On the Effective Date, the Liquidating Trust Board shall be appointed by the Required Ad Hoc Senior Noteholder Parties in a manner reasonably acceptable to the UCC, and the Ad Hoc Cross-Holder Group shall be entitled to participate in the appointment process. In furtherance of the participation rights of the Ad Hoc Cross-Holder Group as provided in the foregoing sentence, members of the Ad Hoc Cross-Holder Group or a steering committee thereof shall be provided with a reasonable opportunity to vet any candidates, to propose candidates and participate in the deliberation process with respect to the appointment of the Liquidating Trust Board members, and the Required Ad Hoc Senior Noteholder Parties shall consider, in good faith (without prejudice to the fact that the members of the Ad Hoc Cross-Holder Group are in a separate ad hoc group), the views and proposals of the Ad Hoc Cross-Holder Group or a steering committee thereof.  The Court shall consider on an emergency basis any dispute regarding the Ad Hoc Cross-Holder Group participation rights set forth in this Section 5.4.  Following the Effective Date, the appointment and removal of the members of the Liquidating Trust Board shall be governed by the Liquidating Trust Agreement.

The Liquidating Trust shall have all the rights, powers and duties necessary to carry out its responsibilities under this Plan and the Confirmation Order.  For the avoidance of doubt, these powers shall include, to the extent applicable, the power to assert, enforce, release, or waive any privilege or any defense (including as to any privilege that the Debtor held prior to the Effective Date).  The Liquidating Trust shall be the exclusive representative of the Debtor's estate for the purposes of 31 U.S.C. § 3713(b) and section 1123(b)(3)(B) of the Bankruptcy Code and receiver, trustee or assignee of all or substantially all the property or business pursuant to 26 U.S.C. § 6012(b)(3).

In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan and the Liquidating Trust Agreement, the Liquidating Trust shall, among other things, have the following rights and powers:  (i) to hold, manage, convert to Cash, and distribute the Liquidating Trust Assets to holders of Liquidating Trust Interests, including (x) prosecuting and resolving the claims and Retained Causes of Action belonging to the Liquidating Trust and (y) reducing, from time to time, the amount of Liquidating Trust Assets held in the Disputed Claims Reserves and returning such amounts to the Liquidating Trust, *provided*, for the avoidance of doubt, that any investment powers of the Liquidating Trust, other than those reasonably necessary to maintain the value of

40

the assets and to further the liquidating purpose of the trust, must be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills, (ii) to sell, transfer, lease, encumber, or otherwise dispose of the Liquidating Trust Assets, (iii) to investigate, prosecute, settle and/or abandon rights, causes of action, or litigation of the Liquidating Trust, including Avoidance Actions, (iv) to disburse funds in the Professional Fee Reserve, the Liquidating Trust Disputed Claims Reserve, and the Liquidating Trust Disputed GUC Cash-Out Claims Reserve in accordance with the Liquidating Trust Agreement, which shall be consistent with the Plan, (v) to distribute Liquidating Trust Interest from the Liquidating Trust Disputed Interests Reserve in accordance with the Liquidating Trust Agreement, which shall be consistent with the Plan, (vi) to distribute NewCo Common Stock from the NewCo Disputed Claims Reserve in accordance with the Shared Services Agreement and the Liquidating Trust Agreement, as applicable, which shall be consistent with the Plan, (vii) to file all Tax Returns and tax and regulatory forms, returns, reports, and other documents required with respect to the Liquidating Trust and any Disputed Claims Reserve, (viii) to object to Claims, and manage, control, prosecute, and/or settle on behalf of the Liquidating Trust, objections to Claims on account of which the Distribution Agent will be responsible (if Allowed) for making distributions under the Plan, (ix) to take all actions necessary and create any document necessary to implement the Plan, (x) to act as a signatory to the Debtor for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of the Debtor's assets, and (xi) to take all necessary actions and file all appropriate motions to obtain an order closing the Chapter 11 Case.  Under no circumstance may any person on the Liquidating Trust Board serve on the board of directors of any Affiliate of the Liquidating Trust.

5.5     Substitution in Pending Legal Actions

On the Effective Date, the Liquidating Trust shall be deemed to be substituted as the party to any pending litigation of a Retained Cause of Action in which the Debtor is a party and shall be authorized, but not required, to file notices or other pleadings in such actions to effectuate its substitution for the Debtor.  Such substitution shall not result in holders of Claims, including litigation Claims, against the Debtor receiving greater rights in or against the Liquidating Trust than they are otherwise entitled to under the Plan and Liquidating Trust Agreement on account of such Claims.

5.6     Distribution of Liquidating Trust Assets

i.      From time to time (but no less frequently than annually), the Liquidating Trust shall distribute to the Liquidating Trust Beneficiaries on account of their Liquidating Trust Interests in accordance with this Section 5.6 all unrestricted Cash on hand; *provided*, that in no event shall the Liquidating Trust be required to distribute amounts reasonably necessary to (A) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (B) pay reasonable incurred or anticipated expenses (including, but not limited to, any Taxes imposed on or payable by the Liquidating Trust or in respect of the Liquidating Trust Assets), or (C) satisfy other liabilities incurred or anticipated by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement.

41

ii.   The Liquidating Trust shall issue class A-1 trust units (the "Class A-1
Trust Units"), class A-2 trust units (the "Class A-2 Trust Units"), class A-
3 trust units (the "Class A-3 Trust Units") and class C trust units (the
"Class C Trust Units") to holders of Claims and Interests in accordance
with Sections 4.2 and 11.8.

iii.  The Class A-1 Trust Units shall be issued to Holders of Allowed Senior
Note Claims with an initial distribution preference,[10] which shall accrete at
an annual rate of 11%.  The Class A-1 Trust Units shall be entitled to the
Funded Debt Share of distributions from the Liquidating Trust until the
distribution preference (including, for the avoidance of doubt, any
accretion thereto) of the Class A-1 Trust Units has been satisfied in full.

iv.   The Class A-2 Trust Units shall be issued to Holders of Allowed Other
General Unsecured Claims (other than Holders of Allowed Other General
Unsecured Claims that elect to receive the GUC Cash-Out) with an initial
distribution preference,[11] which shall accrete at an annual rate of 11%.
The Class A-2 Trust Units shall be entitled to all distributions from the
Liquidating Trust other than those to be received by the Class A-1 Trust
Units and Class A-3 Trust Units until the distribution preference
(including, for the avoidance of doubt, any accretion thereto) of the Class
A-2 Trust Units has been satisfied in full.

v.    The Class A-3 Trust Units shall be issued to Holders of Allowed
Subordinated Note Claims with an initial distribution preference,[12] which
shall accrete at an annual rate of 11%.  The Class A-3 Trust Units shall
receive no distributions until the distribution preference (including, for the
avoidance of doubt, any accretion thereto) of the Class A-1 Trust Units
has been satisfied in full, after which the Class A-3 Trust Units shall
receive the Funded Debt Share of distributions from the Liquidating Trust

---

[10]   The initial distribution preference of the Class A-1 Trust Units shall equal the face amount (including accrued
and unpaid interest on the Senior Notes as of the Petition Date) of all Allowed Senior Note Claims *minus* the
value of NewCo Common Stock distributable to Class 3(a) under the Plan (taking into the effect of any NewCo
Transactions); *provided* that the determination of such value shall be acceptable to the Debtor, the UCC, and the
Required Ad Hoc Senior Noteholder Parties and shall take into account any NewCo Transactions to be
consummated on or prior to the Effective Date.

[11]   The initial distribution preference of the Class A-2 Trust Units shall equal the face amount of all Allowed Other
General Unsecured Claims *minus* amount of the Allowed Other General Unsecured Claims satisfied by the
GUC Cash-Out and *minus* the value of NewCo Common Stock distributable to Class 3(b) under the Plan
(taking into the effect of any NewCo Transactions); *provided* that the determination of such value shall be
acceptable to the Debtor, the UCC, and the Required Ad Hoc Senior Noteholder Parties and shall take into
account any NewCo Transactions to be consummated on or prior to the Effective Date.

[12]   The initial distribution preference of the Class A-3 Trust Units shall equal the face amount (including accrued
and unpaid interest on the Subordinated Notes as of the Petition Date) of all Allowed Subordinated Note
Claims.

4895-9352-2380 v.11

until the distribution preference (including, for the avoidance of doubt, any accretion thereto) of the Class A-3 Trust Units has been satisfied in full.

vi.   The Class C Trust Units shall be issued to Holders of Allowed Preferred Equity Interests.  The Class C Trust Units shall receive no distributions until the distribution preferences (including, for the avoidance of doubt, any accretion thereto) of the Class A-1 Trust Units, the Class A-2 Trust Units and the Class A-3 Trust Units have been satisfied in full.

vii.  After satisfaction of the Class A-1 Trust Units, Class A-2 Trust Units and Class A-3 Trust Units in full, the Class C Trust Units shall be entitled to 100% of Liquidating Trust distributions.

5.7   <u>Costs and Expenses of the Liquidating Trust</u>

The individuals serving as or comprising the Liquidating Trust Board shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles and paid out of the Liquidating Trust Assets.  The fees and expenses incurred by the Liquidating Trust Board on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including attorney fees and expenses) made by the Liquidating Trust Board in connection with such Liquidating Trust Board's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Liquidating Trust Assets.  Fees and expenses incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Liquidating Trust.

The Debtor, NewCo, the Delaware Trustee and the Liquidating Trust Board, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  In the event that the Delaware Trustee or the Liquidating Trust Board is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Liquidating Trust Assets.

5.8   <u>Retention of Professionals/Employees by the Liquidating Trust Board</u>

The Liquidating Trust Board may appoint officers or other representative agents of the Liquidating Trust, including a Liquidating Trust manager and a secretary, to serve as agents to the Liquidating Trust and carry out the purpose of the Liquidating Trust. The Liquidating Trust Board shall have the right to hire employees and retain the services of attorneys, accountants, and other professionals, subject to any limitations imposed by the Liquidating Trust Board, that are necessary to assist the Liquidating Trust Board in the performance of their duties without Bankruptcy Court approval. Without limiting the foregoing, the Liquidating Trust Board may retain any professional that represented parties in interest in the Chapter 11 Case.

5.9   <u>Liquidating Trust Disputed Claims Reserve</u>

On or after the Effective Date, the Liquidating Trust shall be authorized, but not directed, to establish one or more Liquidating Trust Disputed Claims Reserves.  After the

43

Effective Date, the Liquidating Trust may, in its sole discretion, hold any property to be distributed pursuant to the Plan, in the same proportions and amounts as provided for in the Plan, in the Liquidating Trust Disputed Claims Reserve in trust for the benefit of the Holders of Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Other Priority Claims, Disputed Other Secured Claims and Disputed General Unsecured Claims (other than Disputed GUC Cash-Out Claims) ultimately determined to be Allowed after the Effective Date; *provided* that the Liquidating Trust shall use reasonable effort to allocate sufficient property for the Liquidating Trust Disputed Claims Reserves. The Liquidating Trust shall distribute such amounts (net of any expenses, including any Taxes relating thereto or otherwise payable by the Liquidating Trust Disputed Claims Reserve), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date. Amounts remaining in the Liquidating Trust Disputed Claims Reserve, if any, after the resolution of all applicable Disputed Claims and the satisfaction of all applicable Allowed Disputed Claims shall promptly be transferred to the Liquidating Trust, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

5.10   Liquidating Trust Disputed GUC Cash-Out Claims Reserve

On or after the Effective Date, the Liquidating Trust shall establish the Liquidating Trust Disputed GUC Cash-Out Claims Reserve. On or after the Effective Date, the Liquidating Trust shall place Cash in the Liquidating Trust Disputed GUC Cash-Out Claims Reserve in trust for the benefit of the Holders of Disputed GUC Cash-Out Claims ultimately determined to be Allowed after the Effective Date, in an amount, as reasonably determined by the Liquidating Trust (and with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties), sufficient to satisfy the GUC Cash-Out for such GUC Cash-Out Claims to the extent such Claims are Allowed after the Effective Date. The Liquidating Trust shall distribute such amounts (net of any expenses, including any Taxes relating thereto or otherwise payable by the Liquidating Trust Disputed GUC Cash-Out Claims Reserve), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date; *provided* that, to the extent the Cash held in such Liquidating Trust Disputed GUC Cash-Out Claims Reserve is insufficient to fund the GUC Cash-Out for any GUC Cash-Out Claim when Allowed, such GUC Cash-Out Claim shall receive its Distribution in accordance with Section 4.2.4(ii)(a) hereof as though it had not elected the GUC Cash-Out; *provided further* that Cash remaining in the Liquidating Trust Disputed GUC Cash-Out Claims Reserve, if any, after the resolution of all applicable Disputed GUC Cash-Out Claims and the satisfaction of all applicable Allowed Disputed GUC Cash-Out Claims shall promptly be transferred to the Liquidating Trust, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

5.11   Liquidating Trust Disputed Interests Reserve

On or after the Effective Date, the Liquidating Trust shall be authorized, but not directed, to establish one or more Liquidating Trust Disputed Interests Reserves. After the Effective Date, the Liquidating Trust may, in its sole discretion, hold any property to be

44

distributed pursuant to the Plan (other than NewCo Common Stock), in the same proportions and amounts as provided for in the Plan, in the Liquidating Trust Disputed Interests Reserve in trust for the benefit of the Holders of Disputed General Unsecured Claims (other than Disputed GUC Cash-Out Claims), Disputed Subordinated Note Claims and Disputed Preferred Equity Interests ultimately determined to be Allowed after the Effective Date; *provided* that the Liquidating Trust shall use reasonable effort to allocate sufficient property for the Liquidating Trust Disputed Interests Reserves.  The Liquidating Trust shall distribute such amounts (net of any expenses, including any Taxes relating thereto or otherwise payable by the Liquidating Trust Disputed Interests Reserve), as provided herein, as such Claims or Interests are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims or Interests as such amounts would have been distributable had such Claims or Interests been Allowed Claims or Interests as of the Effective Date.  Amounts remaining in the Liquidating Trust Disputed Interests Reserve, if any, after the resolution of all applicable Disputed Claims or Interests and the satisfaction of all applicable Allowed Disputed Claims and Interests, if any, shall promptly be transferred to the Liquidating Trust, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

 5.12 <u>NewCo Disputed Claims Reserve</u>

  On or after the Effective Date, the Liquidating Trust shall be authorized, but not directed, to establish one or more NewCo Disputed Claims Reserves, and such NewCo Disputed Claims Reserves shall be deemed transferred to the Liquidating Trust or entities to be formed by the Liquidating Trust, in each case in accordance with the Restructuring Transactions Memorandum and without any further action of NewCo, the Debtor or its subsidiaries or any of their respective managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives.  After the Effective Date, the Liquidating Trust may, in its sole discretion, hold any NewCo Common Stock to be distributed pursuant to the Plan, in the same proportions and amounts as provided for in the Plan, in the NewCo Disputed Claims Reserve in trust for the benefit of the Holders of Disputed General Unsecured Claims (other than Disputed GUC Cash-Out Claims) ultimately determined to be Allowed after the Effective Date; *provided* that the Liquidating Trust shall use reasonable effort to allocate sufficient property for the NewCo Disputed Claims Reserves.  The Liquidating Trust shall distribute such amounts (net of any expenses, including any Taxes relating thereto or otherwise payable by the NewCo Disputed Claims Reserve), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims or Interest as of the Effective Date.  Amounts remaining in the NewCo Disputed Claims Reserve, if any, after the resolution of all applicable Disputed Claims and the satisfaction of all applicable Allowed Disputed Claims, if any, shall promptly be transferred to NewCo, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

 5.13 <u>Federal Income Tax Treatment of the Liquidating Trust</u>

  5.13.1 <u>Liquidating Trust Assets Treated as Owned by Creditors</u>

  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not

<div align="center">45</div>

contested by the Liquidating Trust Board), for all United States federal income tax purposes, all parties (including the Debtor, the Liquidating Trust Board and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (i) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to the Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims or Interests, which shall be treated as transferred to the applicable Disputed Claims Reserve), followed by (ii) the transfer by such beneficiaries to the Liquidating Trust of the Liquidating Trust Assets (other than to the extent Liquidating Trust Assets are allocable to any Disputed Claims Reserve) in exchange for Liquidating Trust Interests. Accordingly, the Liquidating Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to any Disputed Claims Reserve, discussed below). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

### 5.13.2 Tax Reporting

i.  The Liquidating Trust Board shall file Tax Returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) (excluding any Disputed Claims Reserve, which shall be reported in accordance with Section 5.13.2.iv below) and in accordance with this Section 5.13. The Liquidating Trust Board shall also annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income Tax Returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income Tax Returns. The Liquidating Trust Board shall also file (or cause to be filed) any other statement, return or disclosure relating to the Liquidating Trust or any Disputed Claims Reserve that is required by any Governmental Unit.

ii.  As soon as reasonably practicable after Liquidating Trust Assets are transferred to the Liquidating Trust, the Liquidating Trust Board shall make a good faith valuation of Liquidating Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Liquidating Trust (including the Debtor, the Liquidating Trust Board and Liquidating Trust Beneficiaries) for all United States federal income tax purposes.

iii.  Allocations of Liquidating Trust taxable income among the Liquidating Trust Beneficiaries (other than to the extent such taxable income is allocable to any Disputed Claims Reserve) shall be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution,

46

the Liquidating Trust had distributed all its assets (valued at their tax book value, other than assets allocable to any Disputed Claims Reserve) to the holders of the Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets (other than the assets allocable to any Disputed Claims Reserve). The tax book value of the Liquidating Trust Assets for purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

iv.     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trust Board of a private letter ruling if the Liquidating Trust Board so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trust Board), the Liquidating Trust Board shall (A) timely elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Liquidating Trust Board, the Debtor, and the Liquidating Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

v.      The Liquidating Trust Board shall be responsible for payment, out of the Liquidating Trust Assets, of any Taxes imposed on the trust or its assets, including any Disputed Claims Reserve; *provided* that, any Disputed Claims Reserve shall bear all Taxes allocable to such Disputed Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims or Interests in any Disputed Claims Reserve is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims or Interests (including any income that may arise upon the distribution of the assets of any Disputed Claims Reserve), such Taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of such Disputed Claims or Interests, (ii) paid with the proceeds from a sale of the assets of the applicable Disputed Claims Reserve or (iii) to the extent such Disputed Claims or Interests have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidating Trust Board as a result of the resolution of such Disputed Claims or Interests.

47

vi. The Liquidating Trust Board may request an expedited determination of Taxes of the Liquidating Trust, any Disputed Claims Reserve, or the Debtor under section 505(b) of the Bankruptcy Code for all Tax Returns filed for, or on behalf of, the Liquidating Trust or any Disputed Claims Reserve for all taxable periods through the dissolution of the Liquidating Trust.

### 5.13.3 Tax Withholdings by Liquidating Trust Board

The Liquidating Trust Board may withhold and pay to the appropriate Tax Authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Liquidating Trust Interests. All such amounts withheld and paid to the appropriate Tax Authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Liquidating Trust Interests for all purposes of the Liquidating Trust Agreement; *provided* that any amount placed in escrow pending resolution of the need to withhold that is deemed to exceed the amount required to be withheld shall be distributed to the applicable holders of Liquidating Trust Interests as soon as reasonably practicable following the determination of the withholding requirement. The Liquidating Trust Board shall be authorized to collect such tax information from the holders of Liquidating Trust Interests (including social security numbers or other tax identification numbers) as in its sole discretion the Liquidating Trust Board deems necessary to effectuate the Plan, the Confirmation Order, and the Liquidating Trust Agreement. In order to receive distributions under the Plan, all holders of Liquidating Trust Interests (including holders of Allowed Senior Note Claims, Allowed Other General Unsecured Claims, Allowed Subordinated Note Claims and Allowed Preferred Equity Interests, who, in each case, deliver a release in accordance with the provisions of Section 12.9 hereof) shall be required to identify themselves to the Liquidating Trust Board and provide tax information and the specifics of their holdings, to the extent the Liquidating Trust Board deems appropriate in the manner and in accordance with the procedures from time to time established by the Liquidating Trust Board for these purposes. This identification requirement generally applies to all holders, including those who hold their securities in street name. The Liquidating Trust Board may refuse to make a distribution to any holder of a Liquidating Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered, and may treat such holder's Liquidating Trust Interests as disputed; *provided*, *however*, that, if such information is not furnished to the Liquidating Trust Board within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such Liquidating Trust Interest; and, *provided*, *further*, that, upon the delivery of such information by a holder of a Liquidating Trust Interest, the Liquidating Trust Board shall make such distribution to which the holder of the Liquidating Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; and, *provided*, *further*, that if the Liquidating Trust Board fails to withhold in respect of amounts received or distributable with respect to any such holder and the Liquidating Trust Board is later held liable for the amount of such withholding, such holder shall reimburse the Liquidating Trust Board for such liability (to the extent such amounts were actually distributed to such holder).

48

### 5.13.4 Dissolution

The Liquidating Trust Board and the Liquidating Trust shall be discharged or dissolved, as the case may be, upon the earlier to occur of (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and the Liquidating Trust Agreement, (ii) the Liquidating Trust Board determines that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit and (iii) all distributions required to be made by the Liquidating Trust Board under the Plan and the Liquidating Trust Agreement have been made; *provided*, *however*, in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth (5th) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trust Board that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets. If at any time the Liquidating Trust Board determines, in reliance upon such professionals as the Liquidating Trust Board may retain, that the expense of administering the Liquidating Trust (and any Disputed Claims Reserve) so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Liquidating Trust, the Liquidating Trust Board may apply to the Bankruptcy Court for authority to (a) reserve any amount necessary to dissolve the Liquidating Trust (and any Disputed Claims Reserve), (b) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, (C) not a "private foundation", as defined in section 509(a) of the IRC, and (D) that is unrelated to the Debtor, NewCo, the Liquidating Trust and any insider of the foregoing and (c) dissolve the Liquidating Trust (and any Disputed Claims Reserve).

### 5.14 Books and Records.

The Liquidating Trust shall have reasonable access to the Debtor's books and records for the purpose of investigating and pursuing the Retained Causes of Action.

### 5.15 Indemnification of Liquidating Trust Board

The Liquidating Trust Agreement shall provide for the indemnification of the Liquidating Trust Board, the individual(s) comprising the Liquidating Trust Board, the Delaware Trustee and certain other individuals as may be set forth therein. Any indemnification claim of the Liquidating Trust Board (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the Liquidating Trust Assets. The Liquidating Trust may obtain, at the expense of the Liquidating Trust and with funds from the Liquidating Trust Assets, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Liquidating Trust Board or any employees of the Liquidating Trust.

5.16    Exculpation Relating to the Liquidating Trust

No Holder of a Claim or Interest or any other party in interest will have, or otherwise pursue, any claim or Cause of Action and Defense against the Liquidating Trust Board, the Liquidating Trust, or the consultants or professionals thereof (for each of the foregoing, solely in the performance of their duties) for making payments and distributions in accordance with the Plan and the Liquidating Trust Agreement or for fulfilling any functions incidental to implementing the provisions of the Plan or the Liquidating Trust Agreement, except for any acts or omissions that are the result of fraud, gross negligence or willful misconduct.

5.17    Abandonment of Liquidating Trust Assets

Subject to the Liquidating Trust Agreement, after the Effective Date, the Liquidating Trust Board may abandon any Liquidating Trust Assets which the Liquidating Trust Board determines in its reasonable discretion to be of de minimis value or burdensome to the Liquidating Trust.

4895-9352-2380 v.11

**6.** <u>**A**CCEPTANCE OR **R**EJECTION OF THE **P**LAN</u>

6.1     <u>Voting of Claims or Interests</u>

Each Holder of a Claim or Interest in an Impaired Class that is entitled to vote on the Plan as of the Voting Record Date pursuant to Section 4 hereof shall be entitled to vote to accept or reject the Plan.

6.2     <u>Acceptance by Impaired Classes</u>

Pursuant to sections 1126(c) and (d) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, (i) an Impaired Class of Claims shall have accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan and (ii) an Impaired Class of Interests shall have accepted the Plan if the Holders of at least two-thirds in dollar amount of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan.

Other Secured Claims (Class 1) and Other Priority Claims (Class 2) are Unimpaired and presumed to accept the Plan, and the votes of Holders of Claims in such Classes will not be solicited.  Senior Note Claims (Class 3(a)), Other General Unsecured Claims (Class 3(b)), Subordinated Note Claims (Class 4) and Preferred Equity Interests (Class 5) are Impaired, and the votes of Holders of Claims or Interests, as applicable, in such Classes will be solicited. Common Equity Interests (Class 6) and Section 510(b) Claims (Class 7) are Impaired and deemed to reject the Plan, and the votes of Holders of Claims or Interests in such Classes will not be solicited.  Intercompany Claims and Intercompany Interests (Class 8) are either Impaired and presumed to accept the Plan or Unimpaired and deemed to reject the Plan, and the votes of Holders of Claims or Interests in such Classes will not be solicited.

6.3     <u>Elimination of Vacant Classes</u>

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court solely for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan solely for purposes of (i) voting to accept or reject the Plan and (ii) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

6.4     <u>Special Provisions Regarding Unimpaired Claims</u>

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtor's, the Liquidating Trust's or NewCo's rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any claim, Cause of Action and Defense, right of setoff, or other legal or equitable defense which the Debtor now has or had immediately

51

prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Liquidating Trust shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action and Defenses, rights of setoff, and other legal or equitable defenses which the Debtor now has or had immediately prior to the Petition Date as if the Chapter 11 Case had not been commenced, and all of the Liquidating Trust's legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Case had not been commenced. Unless Allowed, Claims that are Unimpaired shall remain as Disputed Claims under this Plan.

      6.5     <u>Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code</u>

If there is one or more rejecting Class of Claims or Interests, the Debtor shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any such rejecting Class or Classes. Subject to Sections 14 and 16.4 hereof, the Debtor reserves the right to amend the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

4895-9352-2380 v.11

## 7. IMPLEMENTATION OF THE PLAN

### 7.1 Operations Between the Confirmation Date and Effective Date

During the period from the Confirmation Date through and until the Effective Date the Debtor may continue to operate its businesses as debtor-in-possession in the ordinary course in a manner consistent with past practice in all material respects, and as otherwise necessary to consummate the Plan, subject to the terms and conditions of the Restructuring Support Agreement and all applicable orders of the Bankruptcy Court and the consent rights set forth in the Restructuring Support Agreement, this Plan and any other Definitive Documents.

### 7.2 Sources of Cash for Plan Distributions

Cash payments or cash distributions to be made hereunder on or after the Effective Date shall be funded from the existing Cash of the Debtor and the Cash proceeds of a NewCo Transaction, as applicable.

### 7.3 NewCo Transaction

If at any time prior to the Effective Date, the Debtor determines in good faith and consistent with its fiduciary duties (and with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties) that a sale, private placement or rights offering of some or all of the assets or equity of NewCo to one or more third parties, including through a Plan Sponsor Transaction, pursuant to sections 1129 and 363 of the Bankruptcy Code (any such transaction, a "NewCo Transaction"), will maximize the value of NewCo and is in the best interests of the Estate, such NewCo Transaction shall be consummated pursuant to the Plan subject to approval by the Bankruptcy Court pursuant to the Confirmation Order or another order of the Bankruptcy Court; *provided* that the Debtor may only enter into a NewCo Transaction that results in the Debtor receiving proceeds from such NewCo Transaction with a value no less than the value attributed by the Plan to the NewCo equity or assets that are subject to such NewCo Transaction.

Following Confirmation, without further order or approval of the Bankruptcy Court and subject to any applicable consent rights set forth in the Restructuring Support Agreement, the Debtor may in good faith make modifications to the Plan to maximize the value of all or some of the assets or equity of NewCo in connection with a NewCo Transaction (if any); *provided* that such modifications do not materially and adversely affect the treatment of Holders of Claims or Interests and are otherwise permitted under section 1127(b) of the Bankruptcy Code.

### 7.4 Exemption from Registration

The Debtor believes that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code and applicable state securities laws ("Blue Sky Laws") exempt from federal and state securities registration requirements (i) the offering, issuance, exchange, distribution or sale of securities pursuant to the Definitive Documents and (ii) subsequent transfers of such securities.

53

The Liquidating Trust Interests to be distributed to the Liquidating Trust Beneficiaries pursuant to this Plan shall be transferrable as set forth in the Liquidating Trust Agreement. The Liquidating Trust Interests shall not be listed on any national exchange and shall have the consent and voting rights provided in the Liquidating Trust Agreement. The Liquidating Trust and the Liquidating Trust Board shall not take any steps to facilitate the development of a trading market in the Liquidating Trust Interests.

### Section 1145

Except with respect to any Person that is an underwriter as defined in section 1145(b) of the Bankruptcy Code or otherwise issued in reliance on section 4(a)(2) of the Securities Act ("Section 4(a)(2)") as elected by the Debtor, the issuance of the Liquidating Trust Interests to Liquidating Trust Beneficiaries under the Plan (to the extent the Liquidating Trust Interests are considered "securities" under applicable law) and the issuance of NewCo Common Stock to Holders of Allowed General Unsecured Claims under the Plan shall be exempt from registration under Section 5 of the Securities Act (and any applicable Blue Sky Laws) under section 1145(a)(1) of the Bankruptcy Code.

Section 1145(a)(1) of the Bankruptcy Code exempts the issuance, offer, sale, and distribution of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if the following three principal requirements are satisfied: (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

To the extent the issuance and distribution of the NewCo Common Stock (and, to the extent deemed securities under applicable law, the Liquidating Trust Interests) are made under the requirements of section 1145 of the Bankruptcy Code, such issuance and distribution are exempt from registration under the Securities Act and any state or local law requiring registration. To the extent any "offer or sale" of NewCo Common Stock may be deemed to have occurred, such offer or sale is made under the Plan and in exchange for Claims against the Debtor, or principally in exchange for such Claims and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code or under Section 4(a)(2). The availability of the exemptions under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to occurrence of the Effective Date of the Plan. To the extent section 1145 of the Bankruptcy Code is applicable, the securities to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) in general are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtor as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act. In addition, securities governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue

54

Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined, and recipients of securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration in any given instance. Notwithstanding the foregoing, any securities or instruments issued under the Plan in reliance on section 1145(a) of the Bankruptcy Code remain subject to: (x) compliance with any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments; (y) the restrictions, if any, in the applicable NewCo Organizational Documents and the Liquidating Trust Agreement, as applicable, on the transferability of such securities and instruments and (z) any other applicable regulatory approval.

*Section 4(a)(2)*

To the extent securities are issued pursuant to the Plan or the other Definitive Documents in reliance on Section 4(a)(2), the offering, issuance, exchange, or distribution of such securities pursuant to the Plan or the other Definitive Documents shall be conducted in a manner that is exempt from, among other things, the registration requirements of section 5 of the Securities Act. Section 4(a)(2) exempts from section 5's registration requirements transactions not involving a public offering, and Regulation D under the Securities Act ("Regulation D") provides a safe harbor under Section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as "accredited investors" within the meaning of Rule 501 under Regulation D ("Accredited Investors"). Such offering, issuance, exchange or distribution shall be structured to be available only to Holders who certify that they are Accredited Investors and who submit documentation allowing verification of their status as Accredited Investors. Any such securities shall be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and shall only be transferable if registered under the Securities Act or if transferred pursuant to an exemption from the registration requirements of the Securities Act and other applicable securities laws.

*DTC*

Should NewCo and/or the Liquidating Trust elect on or after the Effective Date to reflect any ownership of the NewCo Common Stock or the Liquidating Trust Interests, as applicable, through the facilities of DTC, such Entity need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of transfers, exercise, removal of restrictions, or conversion of NewCo Common Stock or the Liquidating Trust Interests, as applicable, under applicable U.S. federal, state or local securities laws.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the NewCo Common Stock or the Liquidating Trust Interests, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the NewCo Common

Stock or the Liquidating Trust Interests, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

7.5    NewCo Common Stock and New Parent Merger

On the Effective Date, SVBFG shall issue 100% of the SVBFG Common Stock to Holders of Allowed General Unsecured Claims that are Qualified Holders (other than Holders of GUC Cash-Out Claims) and the NewCo Disputed Claims Reserve, subject to dilution by any NewCo Transaction (the recipients of SVBFG Common Stock, together with holders of any SVBFG Common Stock issued pursuant to any NewCo Transaction, the "New Equityholders"). Subject to agreement of the Debtor, the UCC and the Required Ad Hoc Senior Noteholder Parties, the additional steps may occur if provided for under the Restructuring Transactions Memorandum that result in the formation of a new corporation, limited liability company, partnership or other entity (in a form agreed by the Debtor, the UCC and the Required Ad Hoc Senior Noteholder Parties) ("New Parent") that will, following the Effective Date, directly or indirectly own 100% of the SVBFG Common Stock (a "New Parent Structure") and the New Equityholders will receive 100% of New Parent Common Stock as a result of such New Parent Structure. The steps to effectuate a New Parent Structure have not yet been determined, and if effectuated, the steps will be provided in the Restructuring Transactions Memorandum. The following steps are one possible way that the New Parent Structure may be effectuated.

(i)    One or more nominees on behalf of the Holders of Allowed General Unsecured Claims forms New Parent;

(ii)    New Parent forms a new corporation, limited liability company, partnership or other entity ("Merger Sub");

(iii)    On or after the Effective Date, after the issuance of 100% of SVBFG Common Stock to the New Equityholders, Merger Sub merges with and into SVBFG, with SVBFG surviving as a wholly-owned subsidiary of New Parent (the "New Parent Merger"), and pursuant to such New Parent Merger, all of the SVBFG Common Stock held by the New Equityholders are exchanged for New Parent Common Stock; and

(iv)    Any equity issued in clause (i) hereof is cancelled for no consideration.

All of the NewCo Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of NewCo Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the NewCo Organizational Documents and other instruments evidencing or relating to such distribution or issuance, as applicable, which terms and conditions shall bind each Entity receiving such distribution or issuance. For the avoidance of doubt, the acceptance of NewCo Common Stock by any Holder of any Claim or Interest shall be deemed as such Holder's agreement to the NewCo Organizational Documents, as may be amended or modified from time to time following the Effective Date in accordance with their terms.

56

To the extent practicable, as determined in good faith by the Debtor and the Required Ad Hoc Senior Noteholder Parties, NewCo shall: (a) emerge from this Chapter 11 Case as a non-publicly reporting company on the Effective Date and not be subject to SEC reporting requirements under Sections 12 or 15 of the Exchange Act, or otherwise; (b) not be voluntarily subjected to any reporting requirements promulgated by the SEC; except, in each case, as otherwise may be required pursuant to the applicable organizational documents or applicable law; (c) not be required to list the NewCo Common Stock on a U.S. stock exchange; (d) timely file or otherwise provide all required filings and documentation to allow for the termination and/or suspension of registration with respect to SEC reporting requirements under the Exchange Act prior to the Effective Date; and (e) to the extent requested by the Required Ad Hoc Senior Noteholder Parties, make good faith efforts to ensure DTC eligibility of securities issued by NewCo in connection with the Plan (other than any securities required by the terms of any agreement to be held on the books of an agent and not in DTC or not otherwise DTC eligible).

### 7.5.1 NewCo Common Stock Cash-Out

Certain Holders of Senior Note Claims and Other General Unsecured Claims that are Non-Qualified Holders shall be entitled to receive, in lieu of NewCo Common Stock, Cash Distributions in an amount equal to the value of the NewCo Common Stock such Holders would be entitled to if such Holder were a Qualified Holder; *provided* that any such Non-Qualified Holder must provide a certification of its status as a Non-Qualified Holder in order to receive any such Distribution.

### 7.5.2 NewCo Common Stock Cash-Out Certification

Prior to the Distribution to any Holder of a Senior Note Claim or Other General Unsecured Claim of, as applicable, (a) NewCo Common Stock or (b) Cash (not including any Cash Distribution in connection with the GUC Cash-Out) in an amount equal to the value of the NewCo Common Stock it would be entitled to if it were a Qualified Holder (such Distributions described in the preceding clause (a) or (b), as applicable, a "NewCo Distribution"), such Holder shall be required to deliver to the Distribution Agent, within 60 days following the Distribution Agent's request (or such longer period as the Distribution Agent may determine in its reasonable discretion (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed)), a certification that such Holder (x) is a Qualified Holder or (y) is a Non-Qualified Holder (such request, the "Qualified Holder Certification Request").  If a Holder entitled to receive a NewCo Distribution fails to provide such certification within 60 days of receiving the Qualified Holder Certification Request, such Holder's NewCo Distribution shall be deemed to be an Unclaimed Distribution and such Holder's Claim may be canceled, discharged and forever barred in accordance with Section 10.5 hereof, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.

To the extent that, during the six (6) month period following the designation of any NewCo Distribution as an Unclaimed Distribution, the Holder entitled to receive such NewCo Distribution provides a certification to the Distribution Agent that such Holder (x) is a Qualified Holder or (y) is a Non-Qualified Holder, such Holder may thereafter receive its distribution pursuant to the terms of the Plan.

57

7.6    Deemed Holders of Subordinated Note Claims

The BP Trust I Declaration of Trust provides that BP Trust I will automatically terminate upon the bankruptcy of SVBFG, as successor by merger to BPFH.[13]  Upon such termination of BP Trust I, the terms of the BP Trust I Preferred Securities require the administrative trustee of the trust to distribute to holders of the BP Trust I Preferred Securities the BP Trust I Junior Subordinated Debentures having a principal amount equal to the liquidation amount per security plus accumulated and unpaid distributions thereon to the date of payment, after satisfaction of liabilities to creditors of BP Trust I as provided by applicable law.[14]  For purposes of this Plan, holders of the BP Trust I Preferred Securities shall be deemed to hold the BP Trust I Junior Subordinated Debentures and thus such holders shall be deemed to hold the BP Trust I Claims.

The BP Trust II Declaration of Trust provides that BP Trust II will dissolve upon the bankruptcy of SVBFG, as successor by merger to BPFH.[15]  Upon such dissolution of BP Trust II, the terms of the BP Trust II Capital Securities require the institutional trustee of the trust to distribute to holders of the BP Trust II Capital Securities the BP Trust II Junior Subordinated Debentures on a pro rata basis, after satisfaction of liabilities to creditors of BP Trust II as provided by applicable law.[16]  For purposes of this Plan, holders of the BP Trust II Capital Securities shall be deemed to hold the BP Trust II Junior Subordinated Debentures and thus such holders shall be deemed to hold the BP Trust II Claims.

7.7    Organizational Existence

Except as otherwise provided in the Plan and the Restructuring Transactions Memorandum, the Debtor shall, as a subsidiary of NewCo or as NewCo, as applicable, continue to exist after the Effective Date as a separate legal Entity, with all the powers of a corporation or other form of organization, as applicable, under the laws of its jurisdiction of organization and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under the law of the applicable state or other jurisdiction.

7.8    Cancellation of Existing Interests, Existing Indebtedness and Related Agreements

On the Effective Date, except as otherwise specifically provided for in this Plan, all rights of any Holder of Interests in the Debtor, including options or warrants to purchase Interests, or obligating the Debtor to issue, transfer or sell Interests of the Debtor, shall be canceled.

Upon the indefeasible payment in full in Cash of all Allowed Other Secured Claims, or promptly thereafter, Holders of such Allowed Claims shall deliver to the Debtor or, after the Effective Date, the Liquidating Trust, any termination statements, instruments of

---

[13]    *See* Section 8.1(a)(i) of the BP Trust I Declaration of Trust.

[14]    *See* Annex I, Section 3 of the BP Trust I Declaration of Trust.

[15]    *See* Section 7.1(a)(ii) of the BP Trust II Declaration of Trust.

[16]    *See* Annex I, Section 3 of the BP Trust II Declaration of Trust.

58

satisfaction, or releases of all security interests with respect to its Allowed Claim that may reasonably be required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*, and take any and all other steps reasonably requested by the Debtor or, after the Effective Date, the Liquidating Trust, that are necessary to cancel and/or extinguish any Liens or security interests securing such Holder's Claim; *provided*, *however*, that the Debtor or the Liquidating Trust, as applicable, shall be solely responsible for all costs and expenses associated with any of the foregoing actions or requests.

On the Effective Date, except as otherwise provided in the Plan, the obligations of the Debtor under the respective Indentures, and any certificate, share, bond, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of the Debtor giving rise to any Claim or Interest shall be canceled, without any need for a Holder to take further action with respect thereto, and the Debtor and the Liquidating Trust shall not have any continuing obligations thereunder; *provided,* that notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of an Allowed Claim or Interest shall continue in effect solely for (i) purposes of enabling such Holder to receive distributions under the Plan on account of such Allowed Claim or Interest as provided herein; and (ii) permit the Indenture Trustees to make or assist in making, as applicable, distributions pursuant to the Plan and deduct therefrom such reasonable compensation, fees and expenses (a) due to the Indenture Trustees, or (b) incurred by the Indenture Trustees in making such distributions.  Except as provided in the Plan, on the Effective Date, the Indenture Trustees and their respective agents, successors and assigns shall be automatically and fully discharged of their duties and obligations associated with the respective Indentures.  The commitments and obligations of the Holders of the Senior Note Claims and Subordinated Note Claims to extend any further or future credit or financial accommodations to the Debtor, its subsidiaries or assigns under the Indentures, respectively, shall fully terminate and be of no further force or effect on the Effective Date.

7.9     Additional Implementing Transactions

On or prior to the Effective Date, the Debtor and the Liquidating Trust shall, subject to the Debtor's agreement to give consent rights under the Restructuring Support Agreement, enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, the issuance of all securities, notes, instruments, certificates and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, entity formations, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions, including any restructuring transaction contemplated by the Restructuring Support Agreement, including any NewCo Transaction (collectively, the "Restructuring Transactions").

The Confirmation Order shall, and shall be deemed to, pursuant to sections 105, 363, 1123 and 1141 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate this Plan, including any NewCo Transaction.

7.10    Section 1146 Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers from the Debtor to NewCo, the Liquidating Trust or to any other Entity, pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor, the Liquidating Trust, NewCo or Affiliates of NewCo, including, without limitation, the NewCo Common Stock and the Liquidating Trust Interests; (ii) the creation, modification, consolidation, assumption, termination, refinancing and/or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment or recording of any lease or sublease; or (iv) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment. The Bankruptcy Court shall retain specific jurisdiction with respect to these matters.

7.11    Effectuating Documents and Further Transactions

The Debtor or, after the Effective Date, the Liquidating Trust and NewCo, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. The secretary and any assistant secretary of each Debtor, NewCo or the Liquidating Trust shall be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtor shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable law, and without any requirement of further action by the shareholders, directors, managers or partners of the Debtor, or the need for any approvals, authorizations, actions or consents.

On the Effective Date, the Liquidating Trust Agreement, any other organizational document of the Liquidating Trust and the NewCo Organizational Documents shall become effective and deemed binding without further action from any Person or Entity (other than the relevant consents required by under the Restructuring Support Agreement) and shall be binding and enforceable upon each of the parties thereto.

60

7.12    Abandonment of SVB Stock

Unless otherwise agreed in writing by the UCC and the Required Ad Hoc Senior Noteholder Parties, at least one day prior to the Effective Date, the Debtor shall abandon all of its equity interests in, including all of the common stock of, Silicon Valley Bank (and all entities and arrangements that are treated as a single entity with successor(s) to Silicon Valley Bank for U.S. federal income tax purposes) (such equity interests, "SVB Stock") and take a corresponding worthless stock deduction for U.S. federal, and any and all applicable state and local tax purposes.

Upon the Debtor and the Estate's abandonment of the SVB Stock, the Debtor and the Estate shall automatically be deemed to have surrendered and relinquished all of their right, title and interest to the SVB Stock, including any recovery rights and/or litigation claims with respect thereto; provided, however, that such abandonment shall not constitute a withdrawal or release of any claims asserted by the Debtor as a creditor of Silicon Valley Bank against the FDIC, in its capacity as receiver for Silicon Valley Bank or Silicon Valley Bridge Bank, N.A. or in its corporate capacity on account of the Debtor's status as a creditor.

7.13    Preservation of Retained Causes of Action

Except as provided in the Plan, the Confirmation Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trust or NewCo, as applicable, will retain and may enforce any Retained Causes of Action that the Estate may hold against any Entity. The Liquidating Trust or NewCo, as applicable, may pursue any such Retained Causes of Action in accordance with the Plan and the Liquidating Trust Agreement, as applicable. The Debtor's inclusion or failure to include or describe with sufficient specificity any Retained Causes of Action herein or in the Plan Supplement shall not be deemed an admission, denial or waiver of any Retained Causes of Action that the Debtor or the Estate may hold. The Debtor intends to preserve all Retained Causes of Action. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to the Retained Causes of Action upon or after entry of the Confirmation Order on the Effective Date of the Plan based on the Plan or the Confirmation Order, including any argument of waiver on account of the failure to include or describe with sufficient specificity any Retained Causes of Action herein or in the Plan Supplement.

7.14    Document Preservation

The Debtor and the Liquidating Trust, as applicable, shall preserve and maintain the Debtor's books, records, documents, files, electronic data (in whatever format, including native format) and tangible objects, wherever stored (the "Debtor's Records"), and shall not destroy, abandon, or otherwise render them unavailable without providing at least sixty (60) days' advance written notice filed on the Bankruptcy Court's docket and served in accordance with the Case Management Order [D.I. 131]. In the event of any objection to such destruction or abandonment, the applicable Debtor's Records shall be preserved until entry of an order of the Bankruptcy Court or other court of competent jurisdiction permitting the destruction,

61

abandonment, or transfer thereof. For the avoidance of doubt, the Debtor, the Liquidating Trust and any other transferee of the Debtor's Records shall not have any liability or obligation to preserve and maintain records that remain solely in the possession of FCB Parent or its subsidiaries, the FDIC or any other former custodian of the Debtor's Records.

4895-9352-2380 v.11

## 8. PROVISIONS REGARDING GOVERNANCE OF NEWCO

### 8.1 Organizational Action

On and after the Effective Date, the adoption, filing, approval, and ratification, as necessary, of all corporate, or related actions contemplated hereby for NewCo shall be deemed authorized and approved in all respects. Without limiting the foregoing, such actions may include: (i) the adoption of the NewCo Organizational Documents, (ii) the nomination, election, or appointment, as the case may be, of officers, directors and managers for NewCo, (iii) the issuance of the securities contemplated by the Plan or other Definitive Documents and (iv) the Restructuring Transactions to be effectuated pursuant to the Plan and the Restructuring Support Agreement.

Upon the occurrence of the Effective Date, all matters provided for herein involving the organizational structure of the Debtor or NewCo, or any corporate action required by the Debtor or NewCo in connection with the Plan, shall be deemed to have occurred in accordance with the Restructuring Transactions Memorandum and shall be in effect, without any requirement of further action by the security holders or directors of the Debtor or NewCo or by any other stakeholder or any other corporate action.

On and after the Effective Date, the appropriate officers of NewCo and members of the board of directors of NewCo are authorized and directed to issue, execute, deliver, file, and record any and all agreements, documents, securities, deeds, bills of sale, conveyances, releases, and instruments contemplated by the Plan in the name of and on behalf of NewCo and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 8.2 NewCo Organizational Documents

On the Effective Date, the NewCo Organizational Documents shall be adopted automatically by NewCo and its subsidiaries. On or promptly after the Effective Date, NewCo and its subsidiaries may file their respective NewCo Organizational Documents and other applicable agreements with the applicable Secretaries of State or other applicable authorities in their respective states, provinces, or countries of incorporation or formation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or formation.

After the Effective Date, NewCo and each of its subsidiaries may amend and restate its limited liability company agreement, certificate of incorporation, limited partnership agreement, and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the NewCo Organizational Documents, as applicable.

### 8.3 Shared Services Agreement

Upon the Effective Date, NewCo and the Liquidating Trust may enter into a Shared Services Agreement. The terms of the Shared Services Agreement (if any) shall be acceptable to each of the Debtor, the Required Ad Hoc Senior Noteholder Parties and the UCC.

63

Confirmation of the Plan shall be deemed (a) approval of the Shared Services Agreement (if any), and (b) authorization for NewCo and the Liquidating Trust to enter into and perform under the Shared Services Agreement (if any).

8.4 Directors and Officers of NewCo

On the Effective Date, the management, control and operation of NewCo shall become the general responsibility of the board of directors of NewCo or other governing body as provided in the NewCo Organizational Documents.

On the Effective Date, the term of the Current Directors shall expire and the members of any other governing bodies of the Debtor shall be deemed to have resigned, such Current Directors shall cease to hold office or have any authority from or after such time, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity, and such Current Directors shall be replaced by the NewCo Board (or, if the reorganized Debtor is not governed by a board, shall be governed and managed as set forth in its applicable NewCo Organizational Documents).

The classification and composition of the NewCo Board shall be consistent with applicable non-bankruptcy law and the terms of the NewCo Organizational Documents. In the Plan Supplement, to the extent known, the Debtor will disclose, pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of the Persons proposed to serve on the NewCo Board. The NewCo Board members shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the NewCo Organizational Documents.

Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any advancement, indemnity or other obligations arising under the D&O Insurance Policies. In addition, after the Effective Date, none of the Debtor, the Liquidating Trust or NewCo shall terminate all or any portion of the coverage under the D&O Insurance Policies with respect to conduct occurring prior to the Effective Date, and, subject to and in accordance in all respects with the terms of the D&O Insurance Policies, all directors and officers of the Debtor who served in such capacity at any time prior to the Effective Date shall be entitled from the insurers to the full benefits of any such D&O Insurance Policy, if any, including any prepaid extended reporting period, regardless of whether such directors and officers remain in such positions after the Effective Date.

As of the Effective Date, NewCo shall be authorized to procure and maintain directors' and officers' liability insurance policies for the benefit of its directors, officers, members, trustees and managers in the ordinary course of business.

64

# 9. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 9.1 Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, all Executory Contracts and Unexpired Leases will be deemed automatically rejected as of the Effective Date in accordance with sections 365 and 1123 of the Bankruptcy Code, other than (a) Executory Contracts or Unexpired Leases that, as of the Effective Date, are the subject of a pending motion to assume, motion to assume and assign, or for which a notice of assumption has been filed pursuant to the assumption and assignment procedures approved by the Bankruptcy Court, (b) Executory Contracts or Unexpired Leases listed in the Schedule of Assumed Executory Contracts and Unexpired Leases, (c) Executory Contracts or Unexpired Leases that have been previously assumed, assumed and assigned or rejected by the Debtor, (d) Executory Contracts related to investment securities held by the Debtor, including the Debtor's direct investment and warrant portfolios and its synthetic equity instrument in Leerink Partners LLC or (e) any Insurance Policy that is an Executory Contract, including, for the avoidance of doubt, the Insurance Policies listed in the Schedule of Assumed Executory Contracts and Unexpired Leases.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions, assumption and assignment, or rejections, as applicable, of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.

Executory Contracts and Unexpired Leases assumed pursuant to the Plan or by Bankruptcy Court order shall revest in and be fully enforceable by NewCo or the Liquidating Trust in accordance with their terms, except as such terms may have been modified by the Debtor and the applicable counterparty, or by order of the Bankruptcy Court. To the maximum extent permitted by Law, the transactions contemplated by this Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan, or any other transaction, event, or matter that would (a) result in a violation, breach or default under such Executory Contract or Unexpired Lease, (b) increase, accelerate or otherwise alter any obligations, rights or liabilities of the Debtor, the Liquidating Trust or NewCo, as applicable, under such Executory Contract or Unexpired Lease, or (c) result in the creation or imposition of a Lien upon any property or asset of the Debtor, the Liquidating Trust or NewCo, as applicable, pursuant to the applicable Executory Contract or Unexpired Lease. Any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with assumption or assumption and assignment thereof shall be deemed satisfied by Confirmation. Any provision of any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan that requires (i) the consent or approval of one or more lessors or other parties, or (ii) the payment of any fees or obligations, in order for the Debtor to pledge, grant, sell, assign, or otherwise transfer any such Executory Contract or Unexpired Lease, or the proceeds thereof, or other collateral related thereto, shall be deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provisions of any such Executory Contracts or Unexpired Leases shall have no force and effect with respect to the pledge, grant, sale, assignment, or other transfer thereof, or the proceeds thereof, or other collateral related thereto, in accordance with the terms of this Plan.

65

In connection with the transfer and vesting of any Debtor's investments assets in the Liquidating Trust or NewCo, any related investment agreements, including shareholder and lockup agreements, shall be deemed assumed and assigned to the applicable transferee and deemed listed as an Executory Contract on the Schedule of Assumed Executory Contracts and Unexpired Leases.

The Debtor or the Liquidating Trust, as applicable, reserves the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases, including to add or remove any Executory Contracts and Unexpired Leases, at any time up to and including forty-five (45) days after the Effective Date upon notice to the affected counterparty.

9.2     <u>Objections to and Cure of Defaults for Assumed Executory Contracts and Unexpired Leases</u>

To the extent a monetary default exists under an Executory Contract or Unexpired Lease proposed to be assumed or assumed and assigned pursuant to the Plan, such monetary default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the applicable Cure Cost by the Debtor, NewCo or the Liquidating Trust, as applicable, on the Effective Date or promptly thereafter, in the ordinary course of business, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.

Objections to the assumption of any Executory Contract or Unexpired Lease or any applicable Cure Cost shall be made in accordance with the Solicitation Procedures Order.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims held by the non-Debtor Entity party thereto against, or defaults, including bankruptcy-related defaults, by, the Debtor arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of the assumption; *provided*, *however*, that the counterparty to such Executory Contract or Unexpired Lease may seek additional amount(s) on account of any defaults occurring between the filing of the notice of assumption and the occurrence of the Effective Date of the Plan.

Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

9.3     <u>Modifications, Amendments, Supplements, Restatements or Other Agreements</u>

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed, assumed and assigned, or rejected shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims or Interests that may arise in connection therewith.

9.4     Reservation of Rights

Nothing contained in the Plan, or the Debtor's delivery of a notice of proposed assumption of a contract or lease to the applicable contract and lease counterparties, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor, NewCo or the Liquidating Trust would have any liability thereunder.

Notwithstanding any non-bankruptcy law to the contrary, the Debtor, NewCo or the Liquidating Trust expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the Debtor from counterparties to rejected Executory Contracts or Unexpired Leases.

9.5     Insurance Policies

Notwithstanding anything to the contrary in the Definitive Documents, any bar date notice, any claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases):

(a)     except as expressly set forth in Section 9.5(b), (c), (f) and (h) hereof, on and after the Effective Date, all Insurance Policies which identify the Debtor as first named insured or as a counterparty thereto shall continue with the Debtor unaltered (which, as to any Insurance Policies that are assumed by the Debtor, shall be effective upon such assumption); and, for the avoidance of doubt, NewCo (to the extent NewCo is not the Debtor) and the Liquidating Trust shall not be an insured under any Insurance Policies (unless, in the case of NewCo (to the extent NewCo is not the Debtor), such terms are agreed as part of any renewal or written amendment of such Insurance Policy after the Effective Date);

(b)     separate and apart from the terms of any Insurance Policies, the Debtor shall turn over recovery of amounts payable and paid to the Debtor or its subsidiaries (other than MoffettNathanson LLC) to the Liquidating Trust with respect to (i) any Insurance Policy as a result of actions or losses that occurred prior to the Effective Date or (ii) any Insurance Policy that is not listed in the Schedule of Assumed Executory Contracts and Unexpired Leases; *provided*, that solely with respect to such payments stated above, the Liquidating Trust (except with respect to D&O Insurance Policies) shall be obligated to reimburse the Debtor for any reasonable expense that the Debtor incurs in order to comply with the terms of the applicable Insurance Policy; *provided*, *further*, that Insurers shall be authorized but shall not have any duty

67

to turn over or pay any amounts to the Liquidating Trust and shall not have any liability to the Liquidating Trust related to any amounts, except as provided by applicable law;

(c)  except as expressly provided under Section 9.5(b), (f) and (h) hereof, nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Insurers, the Debtor or any other individual or Entity, as applicable, under any of the Insurance Policies; *provided* that any such rights, obligations, and defenses shall be determined under the Insurance Policies and applicable law;

(d)  to the extent the insured (as defined or described in the Insurance Policies) seeks coverage or payment under any Insurance Policies, the Insurers shall be entitled to payment or reimbursement in full, to the extent required under the applicable Insurance Policies and applicable law, in the ordinary course and without the need for the Insurers to file or serve any objection to a proposed Cure Cost or a request, application, Claim, Proof of Claim, cure claim, or motion for payment or allowance of any Administrative Expense Claim; *provided* that any and all rights of the Debtor, NewCo and the Liquidating Trust under the terms of the Insurance Policies and applicable law to dispute such payments or reimbursements are expressly reserved;

(e)  except as expressly set forth in Section 9.5(b), (f) and (h) hereof, nothing shall permit or otherwise effectuate a sale, assignment or other transfer of the Insurance Policies and/or any rights, benefits, claims, proceeds, rights to payment, or recoveries under and/or relating to the Insurance Policies without the express written consent of the applicable Insurers to the extent required under the terms of the applicable Insurance Policies and/or applicable law;

(f)  the Liquidating Trust shall be responsible on behalf of the Debtor for monitoring and preserving the ability to maintain claims that relate to (i) actions or losses that occurred prior to the Effective Date asserted under the Insurance Policies, including, for the avoidance of doubt, all claims under the D&O Insurance Policies and (ii) any Insurance Policy that is not listed in the Schedule of Assumed Executory Contracts and Unexpired Leases;

(g)  nothing shall constitute a rejection of any Insurance Policy, all Insurance Policies shall remain in full force and effect, and any and all rights of the Debtor and Insurers under any Insurance Policy shall remain in full force and effect and subject to applicable law;

(h)  for the avoidance of doubt, nothing in this Section 9.5 shall in any way impair (i) the Liquidating Trust's ability on and after the Effective Date to assert on behalf of the Debtor, as applicable, all Retained Causes of Action, including the FDIC Claims, or (ii) the Liquidating Trust's rights, if any, to recover in accordance with applicable law any proceeds of any applicable Insurance Policies in connection with any Retained Causes of Action;

(i)  the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Section 12.10 of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against Insurers under applicable non-bankruptcy law to proceed with their claims; (II) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy

68

Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against Insurers under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Section 12.10 of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) Insurers to cancel any of the Insurance Policies and take any other actions relating to the Insurance Policies (including effectuating a setoff) subject to applicable law and the terms of such Insurance Policies; and

       (j)    the Insurers, the Debtor and the Liquidating Trust reserve all rights with respect to the application of applicable law to the terms and conditions of and/or rights and obligations under the Insurance Policies including, without limitation, all rights with respect to what constitutes applicable law.

## 10.     PROVISIONS GOVERNING DISTRIBUTIONS

10.1     Distribution Agents

The Debtor, in its reasonable discretion (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), or, after the Effective Date, the Liquidating Trust (and, with respect to the distribution of NewCo Common Stock, NewCo), in their respective sole discretion, shall have the authority, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  To the extent the Debtor or the Liquidating Trust, as applicable, determines to utilize a Distribution Agent to facilitate any distributions, such Distribution Agent would first be required to:  (i) affirm its obligation to facilitate the prompt distribution of any documents, (ii) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan and (iii) waive any right or ability to set off, deduct from or assert any Lien or other encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent.

Notwithstanding any provision in the Plan to the contrary, distributions to the Holders of Senior Note Claims and Subordinated Note Claims shall be made to or at the direction of the respective Indenture Trustees, which shall act as Distribution Agent (or direct the Distribution Agent) for distributions to the Holders of Senior Note Claims and Subordinated Note Claims, respectively, in accordance with the Plan and the applicable Indentures.

The Debtor (if prior to the Effective Date) or the Liquidating Trust (if on or after the Effective Date) may pay to the Distribution Agents all of their reasonable and documented fees and expenses without the need for any approvals, authorizations, actions or consents of the Bankruptcy Court or otherwise.  At the request of counsel to the Debtor or the Liquidating Trust, as applicable, Distribution Agents shall submit detailed invoices to counsel to the Debtor or the Liquidating Trust for all fees and expenses for which the Distribution Agents seek reimbursement, and the Debtor or the Liquidating Trust, as applicable, shall pay those amounts that it, in its sole discretion, deems reasonable, and shall object in writing to those fees and expenses, if any, that the Debtor or the Liquidating Trust, as applicable, deem to be unreasonable.  In the event that the Debtor or the Liquidating Trust, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtor or the Liquidating Trust, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtor or the Liquidating Trust, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

10.1.1    Powers of the Distribution Agent

The Distribution Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities and (iv) exercise such other powers as may be vested in the

70

Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

> 10.2     Timing and Delivery of Distributions

>> 10.2.1  Timing

Except as otherwise expressly provided herein, distributions to be made under the Plan shall be made on (i) the later of (a) the Effective Date or (b) the date that a Claim or Interest becomes an Allowed Claim or Interest, or (ii) such other date that is determined by the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed) or, after the Effective Date, the Liquidating Trust, in accordance with the Plan.  The Liquidating Trust may commence distributions to beneficiaries of the Estate at any time after the Effective Date, subject to the terms of the Plan, the Liquidating Trust Agreement and the Confirmation Order.

>> 10.2.2  *De Minimis* Distributions

Notwithstanding any other provision of the Plan, none of the Debtor, the Liquidating Trust or any Distribution Agent shall have any obligation to make any distributions under the Plan with a value of less than $50, unless a written request therefor is received by the Distribution Agent from the relevant recipient within 120 days after the later of (i) the Effective Date and (ii) the date such Claim or Interest becomes an Allowed Claim or Interest.  Such undistributed amounts shall revert to the Debtor or the Liquidating Trust, as applicable.  Upon such reversion, the relevant Allowed Claim or Interest of less than $50 (and any Claim or Interest on account of such *de minimis* distributions) shall be automatically deemed satisfied, discharged, and forever barred, notwithstanding any federal or state escheat laws to the contrary. For the avoidance of doubt, this Section 10.2.2 shall not apply to Distributions to any Holder of an Allowed General Unsecured Claim who timely elects to receive the GUC Cash-Out.

>> 10.2.3  Record Date and Delivery of Distributions

Distributions shall only be made to the record holders of Allowed Claims and Interests as of the Confirmation Date (the "Distribution Record Date").  On the Confirmation Date, the Claims Register and Stock Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those Holders of Claims and Interests listed on the Claims Register and Stock Register as of the close of business on the Confirmation Date. Notwithstanding the foregoing, if a Claim or Interest is transferred twenty (20) or fewer days before the Confirmation Date, the Distribution Agent, at the direction of the Debtor or, after the Effective Date, the Liquidating Trust, shall make distributions to the transferee (rather than the transferor) only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.  The Distribution Record Date shall not apply to publicly held securities deposited with DTC and, in connection with any Distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtor, NewCo or the Liquidating Trust, as applicable, shall be entitled to recognize and deal for

71

all purposes under the Plan with Holders of Claims and Interests in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions.

        If any dispute arises as to the identity of a Holder of an Allowed Claim or Interest that is entitled to receive a distribution pursuant to the Plan, the Distribution Agent may, in lieu of making such distribution to such Entity, make the distribution into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute. Distributions made after the Confirmation Date to Holders of Disputed Claims or Interests that are not Allowed Claims or Interests as of the Confirmation Date, but which later become Allowed Claims or Interests, shall be deemed to have been made on the Confirmation Date.

        Except as otherwise provided herein, the Distribution Agent, at the direction of the Debtor or the Liquidating Trust, as applicable, shall make all Distributions required under the Plan to Holders of Allowed Claims or Interests. Except as otherwise provided herein, and notwithstanding any authority to the contrary, Distributions to Holders of Allowed Claims or Interests shall be made to Holders of record as of the Confirmation Date by the Distribution Agent, as appropriate: (i) to the signatory set forth on any Proof of Claim filed by such Holder or other representative identified therein (or at the last known address of such Holder if no Proof of Claim is filed or if the Debtor, the Liquidating Trust or the Distribution Agent have been notified in writing of a change of address) or (ii) at the address set forth in any written notice of change of address delivered to the Notice and Claims Agent. The Distribution Agent and the Notice and Claims Agent shall not incur any liability whatsoever on account of the delivery of any Distributions under the Plan.

    10.3    <u>Manner of Payment Under Plan</u>

       10.3.1  <u>Cash Payments</u>

        At the Distribution Agent's option, any Cash payment may be made by check, wire transfer or any other customary payment method.

       10.3.2  <u>Notes Distribution</u>

        As applicable, the Indenture Trustees may transfer or direct the transfer of such Distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the respective Holders of such Claims to the extent consistent with the customary practices of DTC.

        For the avoidance of doubt, DTC shall be considered a single Holder with respect to Distributions made on account of the Senior Note Claims and Subordinated Note Claims. The Indenture Trustees shall have no duties, responsibilities, or liability relating to any form of Distribution that is not DTC eligible, *provided* that the Indenture Trustees shall use commercially reasonable efforts to cooperate with the Debtor, the Liquidating Trust, or NewCo, as applicable, to the extent that a Distribution is not DTC eligible.

<div align="center">72</div>

Notwithstanding anything to the contrary herein, such Distributions shall be subject in all respect to any rights of the Indenture Trustees to assert a charging lien against such Distributions. All Distributions to be made to Holders of Senior Note Claims and Subordinated Note Claims through DTC shall be made eligible for Distributions through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Indenture Trustees be responsible for making or required to make any Distribution under the Plan to Holders of Senior Note Claims and Subordinated Note Claims if such Distribution is not eligible to be distributed through the facilities of DTC.

Upon the final distribution on account of the Senior Note Claims or Subordinated Note Claims, (i) the Senior Notes or Subordinated Notes, as applicable, shall thereafter be deemed to be worthless, and (ii) at the request of the respective Indenture Trustee, DTC shall take down the relevant position relating to the Senior Notes or Subordinated Notes, as applicable, without any requirement of indemnification or security on the part of the Debtor, the Liquidating Trust, NewCo, or the Indenture Trustees.

### 10.3.3  Allocation of Plan Distributions Between Principal and Interest

To the extent that any Claim entitled to a distribution under the Plan is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of the Debtor and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### 10.3.4  Compliance Matters

In connection with the Plan, to the extent applicable, the Debtor, NewCo, the Liquidating Trust and the Distribution Agent shall comply with all Tax withholding and reporting requirements imposed on them by any federal, state, local or foreign Tax law, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtor, NewCo, the Liquidating Trust and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. For purposes of the Plan, any withheld amount (or property) paid to the applicable Tax Authority shall be treated as if paid to the applicable claimant. The Liquidating Trust reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to trust fund-type taxes, then to other taxes, and then to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that has accrued on such Claims. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a Distribution pursuant to the Plan shall have responsibility for any Taxes imposed by any Governmental Unit, including income, withholding, and other Taxes, on account of such

73

Distribution. Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, not to make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The Distribution Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within one hundred and eighty (180) days after the request is made, the amount of such Distribution shall irrevocably revert to the Debtor or the Liquidating Trust and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against the Debtor, the Liquidating Trust or its respective property.

### 10.3.5 Foreign Currency Exchange Rate

Except as otherwise provided herein or in an order of the Bankruptcy Court, or as agreed to by any Holder and either the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed) or, after the Effective Date, the Liquidating Trust, any Claim or Interest asserted in a currency other than U.S. dollars shall be automatically deemed converted, as of the Effective Date, to the equivalent U.S. dollar value using the exchange rate on the first Business Day prior to the Petition Date, as quoted at 4:00 p.m. (New York time), at the mid-range spot rate of exchange for the applicable foreign currency as published in *The Wall Street Journal*, National Edition, on the first Business Day after the Petition Date; *provided* that instead of such automatic conversion, the Debtor may instead elect, subject to the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties (not to be unreasonably withheld, conditioned or delayed) to make payments on account of any such Claim or Interest pursuant to the Plan in the applicable foreign currency.

### 10.3.6 Fractional Payments and Distributions

Whenever the Plan would otherwise call for, with respect to a particular Entity, payment of a fraction of a dollar, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under the Plan remain undistributed as a result of the aforementioned rounding, such Cash shall be treated as an Unclaimed Distribution.

### 10.3.7 Fractional Shares or Units

No fractional shares of NewCo Common Stock or fractional units of Liquidating Trust Interest shall be distributed under the Plan. When any distribution pursuant to the Plan on account of an Allowed Claim or Interest would otherwise result in the issuance or delivery of a number of shares of NewCo Common Stock or a number of units of Liquidating Trust Interest that is not a whole number, the actual distribution of shares of NewCo Common Stock or units of Liquidating Trust Interest shall be rounded to the next lower whole number with no further payment or other distribution therefor (i.e., no consideration will be provided in lieu of fractional shares of NewCo Common Stock or fractional units of Liquidating Trust Interests that are rounded down). The total number of shares of NewCo Common Stock or units of Liquidating

Trust Interest to be distributed to holders of Allowed Claims and Interests shall be adjusted downward as necessary to account for the rounding provided in this Section 10.3.7. For distribution purposes, including rounding, DTC will be treated as a single Holder.

      10.3.8  <u>DTC Delivery of Class C Trust Units</u>

      Prior to the Distribution to any Holder of Preferred Equity Interests of Class C Trust Units, such Holder shall be required to designate a direct or indirect participant in DTC with whom such Holder has a securities account, provide the Distribution Agent with instructions as to DTC delivery, including the name and DTC participant number of its custodian for the Trust Units and its account name and number of the custodian, and take such other ministerial actions as the Distribution Agent shall from time to time reasonably require by written communication by the Distribution Agent in connection with the DTC delivery of the Class C Trust Units to such Holder. If such Holder fails to comply with the provisions of this Section 10.3.8 within six months following the Effective Date, such Holder's Distribution of Class C Trust Units shall be deemed to be an Unclaimed Distribution and such Holder's entitlement to such Class C Trust Units shall be canceled, discharged and forever barred in accordance with Section 10.5 hereof, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary. The Distribution Agent shall send a notice to each such Holder on or prior to the Effective Date informing such Holder of the requirements of this Section 10.3.8.

      10.3.9  <u>DTC Delivery of NewCo Common Stock</u>

      To the extent required by the NewCo Organizational Documents, prior to the Distribution to any Holder of Other General Unsecured Claims of NewCo Common Stock, such Holder shall be required to designate a direct or indirect participant in DTC with whom such Holder has a securities account, provide the Distribution Agent with instructions as to DTC delivery, including the name and DTC participant number of its custodian for the applicable Trust Units and its account name and number of the custodian, and take such other ministerial actions as the Distribution Agent shall from time to time reasonably require by written communication by the Distribution Agent in connection with the DTC delivery of NewCo Common Stock to such Holder. If such Holder fails to comply with the provisions of this Section 10.3.9 within six months following the Effective Date, such Holder's Distribution of NewCo Common Stock shall be deemed to be an Unclaimed Distribution and such Holder's entitlement to such NewCo Common Stock shall be canceled, discharged and forever barred in accordance with Section 10.5 hereof, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary. The Distribution Agent shall send a notice to each such Holder on or prior to the Effective Date informing such Holder of the requirements of this Section 10.3.9. For the avoidance of doubt, if a Holder is not required by the NewCo Organizational Documents to hold NewCo Common Stock through DTC, the provisions of this Section 10.3.9 shall not apply to such Holder.

      10.4    <u>Undeliverable Distributions</u>

      If any distribution is returned as undeliverable, (i) the Debtor or the Liquidating Trust, as applicable, may, but shall not be required to, make reasonable efforts to determine the

address for such Holder and (ii) no further distribution to such Holder shall be made unless and until the Liquidating Trust or the Distribution Agent is notified in writing of the then-current address of such Holder, at which time such distribution shall be made to such Holder not less than 30 days thereafter.  Undeliverable distributions shall remain in the possession of the Liquidating Trust or the Distribution Agent until such time as such distribution becomes deliverable or such distribution reverts to the Liquidating Trust, or is canceled pursuant to Section 10.5 herein, and shall not be supplemented with any interest, dividends or other accruals of any kind.

10.5     Reversion

Any distribution under the Plan that is an Unclaimed Distribution for a period of six months thereafter, shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the Liquidating Trust; *provided*, *however*, that any Unclaimed Distributions consisting of NewCo Common Stock shall, after such six month period, promptly be transferred to NewCo, without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.  Upon such revesting or such transfer, the Claim or Interest of any Holder or its successors and assigns with respect to such property shall be canceled, discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Liquidating Trust, NewCo or the Distribution Agent made pursuant to any indenture or Certificate, notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

10.6     Claims or Interests Paid by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable under one of the Debtor's Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.

Except as otherwise provided in the Plan, payments to Holders of Claims covered by an Insurance Policy and otherwise payable under the Plan shall be made from the proceeds of such Insurance Policy in accordance with the provisions of any such applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action and Defense that the Debtor or any Entity may hold against any other Entity, including Insurers, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by Insurers.

To the extent a Creditor receives a payment on account of a Claim from a party that is not the Debtor, the Liquidating Trust, NewCo or a Distribution Agent on account of such Claim, the Debtor or the Liquidating Trust, as applicable, shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of the third-party payment, and such Claim shall be disallowed or deemed satisfied, as applicable, to the extent of such third-party payment without an objection having to be filed, but subject to the filing of a notice with the Bankruptcy Court and service of such notice on any affected Creditor.  Any

76

Creditor that receives full or partial payment on account of such Claim from an Entity that is not the Debtor, the Liquidating Trust, NewCo or a Distribution Agent shall provide notice of the date and amount of such payment to the Debtor or, after the Effective Date, the Liquidating Trust and NewCo within five (5) Business Days of receipt of such payment. Such Creditor shall repay and/or return to the Debtor or, after the Effective Date, the Liquidating Trust or NewCo any Distribution received on account of the portion of its Claim that was satisfied by such third-party payment within thirty (30) days.

10.7    Setoffs

Except as otherwise provided herein, a Final Order of the Bankruptcy Court, or as agreed to by the Holder and the Liquidating Trust or NewCo, each as applicable, pursuant to the Bankruptcy Code (including section 553 thereof), applicable non-bankruptcy law, or such terms as may be agreed to by the Holder and the Liquidating Trust or NewCo, as applicable, the Liquidating Trust or NewCo, as applicable, may, without any further notice to, or action, order or approval of the Bankruptcy Court, set off against any Allowed Claim or Interest and the distributions to be made on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any claim, right and Cause of Action and Defense of any nature that the Liquidating Trust or NewCo, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such claim, right or Cause of Action and Defense against such Holder has not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided* that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Debtor, the Liquidating Trust or NewCo, as applicable, of any such Claims or Interests, rights and Causes of Action and Defenses that the Debtor or the Liquidating Trust may possess against or in such Holder. In no event will any Person or Entity be entitled to set off any Claim or Interest against any Claim or Interest, right, or Cause of Action and Defense of the Debtor, the Liquidating Trust or NewCo, as applicable, in any judicial or administrative proceeding, unless such Person or Entity has filed a Proof of Claim in this Chapter 11 Case preserving such setoff and a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff.

10.8    No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable law, or agreed to by the Debtor or, after the Effective Date, the Liquidating Trust or NewCo, as applicable, no Holder of a Claim or Interest against the Debtor shall be entitled to interest accruing on or after the Petition Date with respect to such Claim or Interest, notwithstanding any dispute or other delay with respect to any distribution. For the avoidance of doubt, the foregoing does not apply to any interest accretion on the Liquidating Trust Interests provided under the Plan.

10.9    No Payment Over the Full Amount; Single Satisfaction

In no event shall a Holder of a Claim or Interest receive more than the full payment of such Claim or Interest. To the extent any Holder has received payment in full with respect to a Claim or Interest, such Claim or Interest shall be expunged without an objection to

77

such Claim or Interest having been filed and without any further notice to or action, order or approval of the Bankruptcy Court.

4895-9352-2380 v.11

## 11.   CLAIMS ADMINISTRATION PROCEDURES

### 11.1   Allowance of Claims

After the Effective Date, the Liquidating Trust shall have any and all rights and defenses that the Debtor had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or satisfied, settled, released and discharged under this Plan. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no Proof of Claim has been timely filed by the applicable Claims Bar Date, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

### 11.2   Administration Responsibilities

Except as otherwise specifically provided in the Plan, the Debtor in consultation with the Required Ad Hoc Senior Noteholder Parties and the UCC, before the Effective Date, and Liquidating Trust, after the Effective Date, subject to the Liquidating Trust Agreement, shall have the sole authority to (i) file, withdraw or litigate to judgment objections to Claims or Interests, (ii) settle or compromise any Disputed Claim or Interest without any further notice to or action, order or approval of the Bankruptcy Court, and (iii) administer and adjust, or cause to be administered and adjusted, the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court. Nothing in this Section 11.2 shall limit the ability under the Bankruptcy Code of any party-in-interest to object to any Claim or Interest unless otherwise ordered by the Bankruptcy Court.

Objections to Claims and Interests must be filed and served by no later than the Claims Objection Deadline. For the avoidance of doubt, the Claims Objection Deadline may be extended on multiple occasions.

### 11.3   Estimation of Claims

Before the Effective Date, the Debtor (with the consent of the UCC and the Required Ad Hoc Senior Noteholder Parties, not to be unreasonably withheld, conditioned or delayed), or after the Effective Date, the Liquidating Trust, may, within its reasonable discretion, at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.

Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the

79

subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtor, NewCo or the Liquidating Trust, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court or under the Plan.

11.4 <u>Expungement and Disallowance of Paid, Satisfied, Amended, Duplicated, or Superseded Claims or Interests</u>

Any Claim or Interest that has been paid, satisfied, amended, duplicated or superseded may be adjusted or expunged on the Claims Register by the Liquidating Trust on or after 14 calendar days after the date on which notice of such adjustment or expungement has been filed with the Bankruptcy Court, without an objection to such Claim or Interest having to be filed, and without any further action, order or approval of the Bankruptcy Court.

11.5 <u>Amendments to Proofs of Claim</u>

On or after the Effective Date, a Proof of Claim may not be amended (other than solely to update or correct the name or address of the Holder of such Claim) without the prior authorization of the Bankruptcy Court or the Liquidating Trust, and any such amended Proof of Claim filed without such prior authorization shall be deemed disallowed in full and expunged without any further notice to or action, order or approval of the Bankruptcy Court. Nothing in the paragraph shall remove any claimant's ability to seek leave from the Bankruptcy Court to amend a Claim or Proof of Claim.

11.6 <u>Pending Objections</u>

To the extent the Debtor has filed objections to Claims that remain pending as of the Effective Date, the Liquidating Trust shall be substituted as the objecting party without further action of the parties or order of the Bankruptcy Court.

11.7 <u>No Distributions Pending Allowance</u>

Subject to an objection to the amount, validity, priority, or classification of a Claim or Interest or a portion thereof is filed or is intended to be filed as set forth herein or a Claim or Interest otherwise remains a Disputed Claim or Interest, except as otherwise provided in a Final Order of the Bankruptcy Court, no payment or distribution provided under the Plan

80

shall be made on account of such Claim or Interest or portion thereof, as applicable, unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

    11.8    <u>Distributions After Allowance</u>

    To the extent that a Disputed Claim or Interest ultimately becomes a finally Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the applicable provisions of the Plan, including Section 11.3 hereof. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Liquidating Trust, Distribution Agent or NewCo, as applicable, shall provide to the Holder of such Claim or Interest the Distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous Distribution (if any) that was made on account of the undisputed portion of such Claim or Interest, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law or as otherwise provided in this Plan.

    **11.9**    **<u>Disallowance of Claims and Interests</u>**

    **Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the applicable Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless such late filed Claim has been deemed timely filed by a Final Order at or before the Confirmation Hearing.**

## 12. EFFECT OF CONFIRMATION

### 12.1 Vesting of Assets

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtor shall vest in NewCo or its subsidiaries or the Liquidating Trust (or entities to be formed by the Liquidating Trust), as applicable, in accordance with this Plan and the Restructuring Transactions Memorandum, free and clear of all Claims, Liens, encumbrances, charges and Interests. All Liens, Claims, encumbrances, charges and Interests shall be deemed fully released and discharged as of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order. Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, each of NewCo and the Liquidating Trust may, as applicable, operate its businesses and may use, acquire, and dispose of property and the Liquidating Trust may settle and compromise Claims and Interests, in each case without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code with respect to the Debtor.

The transfer of information to the Liquidating Trust shall not result in the destruction or waiver of any applicable work product, attorney-client, or other applicable privilege (the "Privileges"). Further, with respect to any Privileges: (i) Privileges are transferred to the Liquidating Trust to the extent necessary to enable the Liquidating Trust Board to perform its duties to administer the Liquidating Trust and for no other reason, (ii) such Privileges shall be preserved and not waived (except as the Liquidating Trust Board may affirmatively elect to waive such Privileges), and (iii) no information subject to a Privilege shall be publicly disclosed by the Liquidating Trust or communicated to any Person not entitled to receive such information or in a manner that would diminish the protected status of any such information, except following a waiver of such Privilege pursuant to (ii) above or pursuant to the specific terms of the Plan and the Confirmation Order and the Liquidating Trust Agreement.

### 12.2 Compromise and Settlement of Claims and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions, releases and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise of all Claims, Interests, Causes of Action and Defenses and controversies relating to the contractual, legal and subordination rights that a Holder of an Allowed Claim or Interest may have against the Debtor, or any distribution to be made on account of such an Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtor and its Estate and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice or action, order or approval of the Bankruptcy Court, after

82

the Effective Date, the Liquidating Trust may compromise and settle Claims against it and Causes of Action and Defenses against other entities.

12.3    Subordinated Claims

The allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account, conform to, and satisfy the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto; *provided*, *however*, that the Debtor and the Liquidating Trust reserve the right to reclassify or modify the treatment of any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Interest.  For the avoidance of doubt, the Distributions to the Holders of Subordinated Note Claims under the Plan are in settlement and compromise of any contractual, legal and equitable subordination rights relating to such Subordinated Note Claims, and all claims to turnover, release or payment of such Distributions are expressly waived hereby.

12.4    Release of Liens

Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, indefeasible payment and satisfaction in full in cash of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released, settled, discharged and compromised, and all rights, titles and interests of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall revert to the Debtor and its successors and assigns, in each case, without any further approval of the Bankruptcy Court and without any action or filing being required to be made by the Debtor.  The Debtor, or after the Effective Date, the Liquidating Trust shall be authorized to file any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges or other security interests. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

12.5    Discharge

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan or the Restructuring Transactions Memorandum, the Confirmation Order or in any contract, instrument, or other agreement or document created pursuant to this Plan or the Confirmation Order, the distributions, rights, and treatments that are provided in this Plan or the Confirmation Order shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims against, Interests in, and Causes of Action and Defenses against the Debtor, NewCo and the Liquidating Trust of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether

83

known or unknown, against Liabilities of, Liens on, obligations of, rights against, and interests in, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan and the Confirmation Order on account of such Claims or Interests, including demands, Liabilities and Causes of Action and Defenses that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case, whether or not (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the bankruptcy Code, (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Interest has accepted this Plan. Any default or "event of default" by the Debtor or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the chapter 11 cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims against, Causes of Action and Defenses against, and Interests in the Debtor, NewCo or the Liquidating Trust, subject to the occurrence of the Effective Date.

12.6    Term of Injunction or Stays

Unless otherwise provided herein, any injunction or stay arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code or otherwise that is in existence on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

12.7    Release by the Debtor

**For good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate the administration of the Chapter 11 Case and the implementation of the transactions contemplated by the Plan, on and after the Effective Date, each of the Released Parties including the Debtor Released Parties but excluding each other Related Party of the Debtor shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever, and permanently released and discharged by the Debtor, NewCo (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor), the Liquidating Trust (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor) and the Debtor's Estate, including any successor and assign to the Debtor, NewCo (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor), the Liquidating Trust (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor) or any estate representative, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action and Defense, directly or derivatively, by, through, for, or because of the foregoing Entities, from all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims, in**

84

each case asserted or assertable on behalf of the Debtor, NewCo (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor) or the Liquidating Trust (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor), and their respective successors, assigns, and representatives, or that any Entity or party claiming under or through the Debtor or its Estate, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including those that any of the Debtor, NewCo (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor), the Liquidating Trust (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor) or the Debtor's Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or any other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, NewCo (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor), the Liquidating Trust (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor), the Estate, the conduct of the businesses of the Debtor, the Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor, NewCo (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor) or the Liquidating Trust (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor), the release or discharge of any mortgage, lien or security interest, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration of Claims and Interests prior to or during the Chapter 11 Case, the negotiation, formulation, preparation, dissemination, implementation, administration, confirmation and/or effectuation of the Restructuring Support Agreement (and each prior version thereof), the Plan, any plan supplement, any disclosure statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to intercompany claims and intercompany settlements, any action or omission as an officer, director, agent, representative, fiduciary, controlling Person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of such Released Party to the extent such act or omission is determined by a final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud, or a criminal act.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release in <u>Section 12.7</u>, which includes by reference each of the related provisions and definitions contained in this Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release in <u>Section 12.7</u> is: (a) given in exchange for good and valuable consideration provided by the

85

applicable Released Parties, including the applicable Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good-faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtor and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) a bar to the assertion by the Debtor, NewCo (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor), the Liquidating Trust (solely with respect to any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor), or the Debtor's estate of any claim or Cause of Action and Defense of any kind whatsoever released pursuant to the Debtor Release; (g) essential to the Confirmation of the Plan; and (h) a prudent exercise of the Debtor's business judgment.

Notwithstanding the foregoing, nothing contained in this Section 12.7 shall be deemed to release any Retained Causes of Action, including any Claims and Causes of Action and Defenses against any Debtor Related Parties other than those Debtor Related Parties identified on Exhibit A hereof.

12.8    Exculpation

As of the Effective Date, without affecting, expanding or limiting the releases contained in this Article 12, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, any Claims or Causes of Action and Defenses related to any act or omission occurring between the Petition Date and the Effective Date in connection with, relating to, or arising out of, directly or indirectly resulting from, in consequence of, or in any way attributable to, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, any plan supplement), or any aspect of the restructuring of the Debtor, including any related contract, instrument, release, or other agreement or document created or entered into during the Chapter 11 Case, the pursuit of confirmation of the Plan (including the solicitation of votes for the Plan), the pursuit of consummation of the Plan, the administration and implementation of the Plan (including the issuance of any securities under or in connection with the Plan to the extent permitted by section 1125(e) of the Bankruptcy Code), or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place from the Petition Date through and including the Effective Date, except for Claims related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted fraud, willful misconduct, gross negligence or a criminal act, or claims for legal malpractice, release of which is prohibited by Rule 1.8(h) of the New York Rules of Professional Conduct (22 N.Y.C.R.R. § 1200).

Notwithstanding anything to the contrary in the foregoing, nothing contained in this Section 12.8 shall be deemed to exculpate any party from liability with respect to any Retained Causes of Action or other Claims or Causes of Action and Defenses related to actions or inactions occurring prior to the Petition Date, including any Claims and Causes

of Action and Defenses against any Debtor Related Parties other than those Debtor Related
Parties identified on Exhibit A hereof.

12.9    Third-Party Release by Holders of Claims and Interests

For good and valuable consideration, the adequacy of which is hereby
confirmed, including the service of the Released Parties to facilitate the administration of
the Chapter 11 Case, the implementation of the reorganization contemplated by the Plan,
the release of mortgages, liens and security interests on property of the Estate, and
distributions made pursuant to the Plan, on and after the Effective Date, to the fullest
extent permitted by applicable law, the Releasing Parties (regardless of whether a
Releasing Party is a Released Party), in each case on behalf of themselves and their
respective successors, assigns, and representatives, and any and all other Entities who may
purport to assert any Claim or Cause of Action and Defense, directly or derivatively, by,
through, for, or because of the foregoing Entities, shall be deemed to conclusively,
absolutely, unconditionally, irrevocably and forever release, waive and discharge the
Released Parties of any and all claims, obligations, rights, suits, damages, causes of action,
remedies and liabilities whatsoever, including any derivative claims asserted or assertable
on behalf of the Debtor, NewCo (solely with respect to any Claims or Causes of Action and
Defenses assertable by it as a successor to the Debtor) or the Liquidating Trust (solely with
respect to any Claims or Causes of Action and Defenses assertable by it as a successor to
the Debtor) and any of its or their successors, assigns, and representatives, whether known
or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed,
existing in law, at equity or otherwise, whether for indemnification, tort, contract,
violations of federal or state securities laws or otherwise, including, those that any of the
Debtor, NewCo (solely with respect to any Claims or Causes of Action and Defenses
assertable by it as a successor to the Debtor), the Liquidating Trust (solely with respect to
any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor)
or the Estate would have been legally entitled to assert in their own right (whether
individually or collectively) or on behalf of the holder of any Claim or Interest or any other
Person, based on or relating to, or in any manner arising from, in whole or in part, the
Debtor, NewCo (solely with respect to any Claims or Causes of Action and Defenses
assertable by it as a successor to the Debtor), the Liquidating Trust (solely with respect to
any Claims or Causes of Action and Defenses assertable by it as a successor to the Debtor),
the Estate, the conduct of the businesses of the Debtor, this Chapter 11 Case, the purchase,
sale or rescission of the purchase or sale of any security of the Debtor, NewCo (solely with
respect to any Claims or Causes of Action and Defenses asserted against it as a purported
successor to the Debtor) or the Liquidating Trust (solely with respect to any Claims or
Causes of Action and Defenses assertable by it as a successor to the Debtor), the subject
matter of, or the transactions or events giving rise to, any Claim or Interest that is treated
in the Plan, the administration of Claims and Interests prior to or during this Chapter 11
Case, the negotiation, formulation, preparation, dissemination, implementation,
administration, confirmation and/or effectuation of the Restructuring Support Agreement
(and each prior version thereof), the Plan, any plan supplement, any disclosure statement
or, in each case, related agreements, instruments or other documents, any action or
omission with respect to intercompany claims or intercompany settlements, any action or
omission as an officer, director, agent, representative, fiduciary, controlling Person,

87

member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud, or a criminal act.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not constitute a release by the Debtor of any of its Related Parties other than the Debtor Released Parties nor shall they release any obligations arising on or after the Effective Date of any party or Entity under this Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan as set forth in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Section 12.9, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the releases set forth in this Section 12.9 is:  (a) consensual; (b) essential to the Confirmation of this Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (d) a good faith settlement and compromise of the Claims released pursuant to this Section 12.9; (e) in the best interests of the Debtor and its Estate; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action and Defense of any kind whatsoever released pursuant to this Section 12.9.

For the avoidance of doubt, notwithstanding anything to the contrary in this Section 12.9, the releases set forth above shall not release the rights of Holders of Allowed Claims to receive the treatment of their Claims as provided in the Plan and otherwise to enforce the terms of the Plan, all of which rights are fully preserved.

12.10    <u>Injunction</u>

Except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons or Entities who have held, hold or may hold (i) Claims or Interests that arose prior to the Effective Date, (ii) claims, obligations, rights, suits, damages, causes of action, remedies and liabilities that have been released pursuant to Sections 12.7 and 12.9 hereof or are subject to exculpation pursuant to Section 12.8 hereof (but only to the extent of the exculpation provided in Section 12.8 of the Plan), or (iii) Claims, Interests or other claims, obligations, rights, suits, damages, causes of action, remedies and liabilities that are otherwise discharged, satisfied, stayed, or terminated pursuant to the terms of the Plan and all other parties-in-interest seeking to enforce such Claims, Interests or other claims, obligations, rights, suits, damages, causes of action, remedies and liabilities are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any

such Claim (including a Section 510(b) Claim) against or such Interest in the Debtor, NewCo or the Liquidating Trust, or property of the Debtor, NewCo or the Liquidating Trust, other than to enforce any right to a distribution pursuant to the Plan, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor, NewCo or the Liquidating Trust or property of the Debtor, NewCo or the Liquidating Trust with respect to any such Claim or Interest, other than to enforce any right to a distribution pursuant to the Plan, (c) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtor, NewCo or the Liquidating Trust, or against the property or interests in property of the Debtor, NewCo or the Liquidating Trust with respect to any such Claim or Interest, other than to enforce any right to a distribution pursuant to the Plan, or (d) asserting any right of setoff (except for setoffs validly exercised prepetition) or subrogation of any kind against any obligation due from the Debtor, NewCo or the Liquidating Trust, or against the property or interests in property of the Debtor, NewCo or the Liquidating Trust, with respect to any such Claim or Interest.  Such injunction shall extend to any successors or assignees of the Debtor, NewCo or the Liquidating Trust and their respective properties and interests in properties.

      12.11   Scope of Releases

      Each Person providing releases under the Plan, including the Debtor, NewCo, the Liquidating Trust, the Debtor's Estate and the Releasing Parties, shall be deemed to have granted the releases set forth in the Plan notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.

      For the avoidance of doubt, nothing herein, including the releases, waivers, and exculpations provided in Sections 12.7–12.9, shall constitute a release, waiver, discharge, or limitation of any kind of (i) any Retained Causes of Action, including any Claims or Causes of Action and Defenses against Debtor Related Parties other than those Debtor Related Parties identified on Exhibit A hereto or (ii) any rights, liabilities, or obligations arising under the Plan or any other agreement, document or instrument executed in connection with the Plan.

      Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan or Confirmation Order, no provision shall (i) preclude the SEC and Specified Governmental Units with jurisdiction over state or federal securities laws from enforcing their police or regulatory powers or (ii) enjoin, limit, impair or delay the SEC and Specified Governmental Units with jurisdiction over state or federal securities laws from commencing or continuing any claims, causes of action, proceeding or investigations against any non-Debtor (other than NewCo or the Liquidating Trust to the extent that the claims or causes of action against such entities arise from conduct that occurred on or before the Effective Date) in any forum; *provided* that the foregoing sentence shall not

89

(x) limit the scope of discharge granted to the Debtor, NewCo or the Liquidating Trust under sections 524 and 1141 of the Bankruptcy Code or (y) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

As to any Specified Governmental Unit, nothing in the Plan or the Confirmation Order shall limit or expand the scope of discharge, release or injunction to which the Debtor, NewCo or the Liquidating Trust are entitled to under the Bankruptcy Code, if any. The discharge, release, and injunction provisions contained in the Plan and the Confirmation Order are not intended and shall not be construed to bar any Specified Governmental Unit from, subsequent to the entry of the Confirmation Order, pursuing any police or regulatory action (except to the extent the applicable Bar Date bars the Specified Governmental Unit from pursuing prepetition Claims).

Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, nothing in the Plan or the Confirmation Order shall discharge, release, impair or otherwise preclude: (1) any liability to any Specified Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of any Specified Governmental Unit arising on or after the Effective Date; (3) any valid right of setoff or recoupment of any Specified Governmental Unit against the Debtor; or (4) any liability of the Debtor, NewCo or the Liquidating Trust under police or regulatory statutes or regulations to any Specified Governmental Unit as the owner, lessor, lessee or operator of property that such Person or Entity owns, operates or leases after the Confirmation Date. Nor shall anything in the Confirmation Order or the Plan: (i) enjoin or otherwise bar any Specified Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by any Specified Governmental Unit are discharged or otherwise barred by the Confirmation Order, the Plan or the Bankruptcy Code.

Moreover, nothing in the Confirmation Order or the Plan shall release or exculpate any non-Debtor, including any Released Parties and/or Exculpated Parties but excluding the Debtor, NewCo or the Liquidating Trust, from any liability to any Specified Governmental Unit, including but not limited to any liabilities arising under the IRC, the environmental laws, the securities laws, or the criminal laws, nor shall anything in the Confirmation Order or the Plan enjoin any Specified Governmental Unit from bringing any claim, suit, action or other proceeding against any non-Debtor (other than NewCo or the Liquidating Trust) for any liability whatsoever; *provided* that the foregoing sentence shall not (x) limit the scope of discharge granted to the Debtor, NewCo or the Liquidating Trust under sections 524 and 1141 of the Bankruptcy Code or (y) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

Nothing contained in the Plan or the Confirmation Order shall be deemed to determine the tax liability of any Person or Entity, including but not limited to the Debtor, NewCo or the Liquidating Trust, nor shall the Plan or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution or entity, including the federal tax consequences of this Plan, nor shall any language in the Plan or the Confirmation Order be deemed to expressly expand or diminish the jurisdiction of the

**Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment under the Bankruptcy Code and 28 U.S.C. §§ 157, 1334.**

    12.12   <u>Preservation of Causes of Action and Defenses</u>

        Except as expressly provided in this Article 12 hereof or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action and Defenses that the Debtor, NewCo or the Liquidating Trust may have or that the Debtor, NewCo or the Liquidating Trust, as applicable, may choose to assert on behalf of the Estate under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including (i) any and all Causes of Action and Defenses or Claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim and/or claim for setoff that seeks affirmative relief against the Debtor, NewCo or the Liquidating Trust, and in each case, its officers, directors or representatives or (ii) the turnover of any property of the Estate to the Debtor, NewCo or the Liquidating Trust.

        No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action and Defense against them as any indication that the Debtor, NewCo or the Liquidating Trust, as applicable, will not pursue any and all available Causes of Action and Defenses against them. The Debtor, NewCo or the Liquidating Trust expressly reserves all rights to prosecute any and all Causes of Action and Defenses against any Entity, except as otherwise expressly provided herein.

        Except as set forth in this Article 12 hereof or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action and Defenses that the Debtor had immediately prior to the Petition Date or the Effective Date against or regarding any Claim or Interest left Unimpaired by the Plan. The Liquidating Trust shall have, retain, reserve, and be entitled to assert all such rights and Causes of Action and Defenses, including any actions specifically enumerated in the Schedule of Retained Causes of Action, as fully as if the Chapter 11 Case had not been commenced, and all of the Liquidating Trust's legal and equitable rights respecting any Claim or Interest left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

        Except as set forth in this Article 12 hereof or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

        Unless any Causes of Action and Defenses against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, including pursuant to Article 12 hereof or a Final Order, the Liquidating Trust expressly reserves all Causes of Action and Defenses for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches shall apply to such Causes of Action and Defenses upon, after, or as a consequence of the Confirmation or occurrence of the Effective Date.

<div align="center">91</div>

## 13.   CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN

13.1   Conditions to Effectiveness

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied on or prior to the Effective Date or waived in accordance with Section 13.2 hereof:

i.   The Restructuring Support Agreement shall not have been terminated, and shall remain in full force and effect, and no event or occurrence shall have occurred that, with the passage of time or the giving of notice, would give rise to the right of the Required Ad Hoc Senior Noteholder Parties or the UCC to terminate the Restructuring Support Agreement;

ii.   All Definitive Documents for the Restructuring Transactions contemplated by the Restructuring Support Agreement to be executed and delivered on or before the Effective Date shall have been executed and delivered and remain in full force and effect;

iii.   The Bankruptcy Court shall have entered the Confirmation Order which shall be a Final Order;

iv.   The Debtor shall have filed the final version of the Plan, including all of the schedules, documents, and exhibits contained therein, and the Plan Supplement in a manner consistent in all material respects with the Restructuring Support Agreement and the Plan;

v.   The Debtor shall have obtained all applicable authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan (and all applicable waiting periods have expired);

vi.   The Debtor shall have implemented the Restructuring Transactions and all other transactions contemplated in the Restructuring Support Agreement (subject to, and in accordance with, the consent rights set forth therein) and the Plan to be implemented on or before the Effective Date;

vii.   No governmental entity or federal or state court of competent jurisdiction has enacted, issued, promulgated, enforced or entered any law or order (whether temporary, preliminary or permanent), in any case which is in effect and which prevents or prohibits consummation of the Plan, and no governmental entity has instituted any action or proceeding (which remains pending at what would otherwise be the Effective Date) seeking to enjoin, restrain

92

or otherwise prohibit consummation of the transactions contemplated by the Plan;

viii. All Ad Hoc Noteholder Group Expenses invoiced in accordance with Section 3.4 (other than any Disputed Invoiced Fees) shall have been paid in full in Cash;

ix. All Ad Hoc Cross-Holder Group Expenses invoiced in accordance with Section 3.6 (other than any Disputed Invoiced Fees) shall have been paid in full in Cash in an aggregate amount not to exceed $17,000,000;

x. All amounts sufficient to pay the Senior Note Trustee Expenses and Subordinated Note Trustee Expenses in full in Cash on the Effective Date shall have been reserved by the Debtor in order to make distributions to Holders of Senior Note Claims and Subordinated Note Claims consistent with their treatment provided under Sections 4.2.3 and 4.2.5 of the Plan, respectively;

xi. All professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses in full after the Effective Date shall have been placed in a professional fee escrow account as set forth in, and in accordance with, the Plan; and

xii. All Claims asserted by the IRS or any other Tax Authority shall have been resolved in a manner acceptable to the Required Ad Hoc Senior Noteholder Parties and the UCC or estimated by the Bankruptcy Court for the purpose of Plan distributions at an amount acceptable to the Required Ad Hoc Senior Noteholder Parties and the UCC.

### 13.2   Waiver of Conditions to Confirmation or Effectiveness

Except as set forth below, the Debtor, with the prior written consent (e-mail being sufficient) of the Required Ad Hoc Senior Noteholder Parties and the UCC, may waive any of the conditions set forth in Section 13.1 hereof at any time, without any notice to any other parties-in-interest or the Bankruptcy Court and without any formal action other than proceeding to confirm and/or consummate the Plan; *provided* that the waiver of the condition set forth in Section 13.1(ix) shall also require the prior written consent (e-mail being sufficient) of the Ad Hoc Cross-Holder Group.  The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

**14.** **MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN**

14.1 <u>Plan Modifications</u>

Subject to certain restrictions and requirements set forth in section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, subject to any applicable consent rights set forth in the Restructuring Support Agreement, the Debtor may alter, amend or modify the Plan, including the Plan Supplement, without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date. After the Confirmation Date and before substantial consummation of the Plan, the Debtor may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, including the Plan Supplement, the Disclosure Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and effects of the Plan.

After the Confirmation Date, but before the Effective Date, subject to any applicable consent rights set forth in the Restructuring Support Agreement and except as set forth in Section 7.3, the Debtor may make appropriate technical adjustments and modifications to the Plan, including the Plan Supplement, without further order or approval of the Bankruptcy Court; *provided*, that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests and are otherwise permitted under section 1127(b) of the Bankruptcy Code.

14.2 <u>Effect of Confirmation on Modification</u>

Entry of a Confirmation Order shall mean that all modifications and amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code, and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

14.3 <u>Revocation or Withdrawal of the Plan and Effects of Non-Occurrence of Confirmation or Effective Date</u>

Subject to the Restructuring Support Agreement, the Debtor reserves the right to revoke, withdraw, or delay consideration of the Plan before the Confirmation Date. If the Debtor revokes or withdraws the Plan or if the Confirmation Date or the Effective Date does not occur, then, absent further order of the Bankruptcy Court, (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void, and (iii) nothing contained in the Plan shall (A) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Person or Entity, (B) prejudice in any manner the rights of the Debtor or any other Person or Entity or (C) constitute an admission of any sort by the Debtor or any other Person or Entity.

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction over any request to extend the deadline for assuming or rejecting Executory Contracts or Unexpired Leases.

4895-9352-2380 v.11

## 15. RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain its existing jurisdiction over all matters arising in or out of, or related to, the Chapter 11 Case or the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

i. Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

ii. Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

iii. Resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease and, if necessary, liquidate, any Claims arising therefrom, including any disputes regarding cure obligations in accordance with the Plan, (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, (iii) any dispute regarding whether a contract or lease is, or was, executory or expired, or (iv) any dispute regarding the Plan or any Restructuring Transactions trigger any cross-default or change-of-control provision in any contract or agreement.

iv. Ensure that distributions to Holders of Allowed Claims or Interests are accomplished pursuant to the Plan and adjudicate any and all disputes from, or relating to, distributions under the Plan or the Confirmation;

v. Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and Causes of Action and Defenses, and grant or deny any applications, involving the Debtor that may be pending before the Bankruptcy Court on the Effective Date;

vi. Adjudicate, decide, or resolve any and all matters related to Causes of Action and Defenses that may arise from or in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

96

vii.      Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

viii.     Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, Plan Supplement, or Disclosure Statement;

ix.       Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

x.        Adjudicate, decide, or resolve any and all disputes as to the ownership of any Claim or Interest;

xi.       Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with enforcement of the Plan;

xii.      Resolve any cases, controversies, suits, disputes, or Causes of Action and Defenses with respect to the existence, nature, and scope of the releases, injunctions, and other provisions contained in the Plan, and enter such orders as may be necessary or appropriate to implement and enforce such releases, injunctions, and other provisions;

xiii.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

xiv.      Determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

xv.       Enter an order or final decree concluding or closing the Chapter 11 Case;

xvi.      Consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

xvii.     Hear and determine disputes, cases, controversies, or Causes of Action and Defenses arising in connection with the interpretation, implementation, or enforcement of the Plan, Confirmation Order, or any other agreement, document or instrument executed in connection with the Plan;

97

xviii.  Hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge;

xix.  Hear and determine matters concerning state, local or federal Taxes in accordance with sections 346, 505, or 1146 of the Bankruptcy Code;

xx.  Enforce all orders previously entered by the Bankruptcy Court; and

xxi.  Hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code, Section 4(a)(2) and Regulation D;

xxii.  Adjudicate all other matters over which the Bankruptcy Court has jurisdiction;

xxiii.  Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters relating to the Retained Causes of Action (without prejudice to any right of the FDIC-C, FDIC-R1 or FDIC-R2 to contest that the Bankruptcy Court has existing jurisdiction over the FDIC Claims); and

xxiv.  Adjudicate any disputes on the Ad Hoc Noteholder Group Expenses and Ad Hoc Cross-Holder Group Expenses.

*provided*, *however*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement or any other Definitive Documents, in each case, that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court, or allows Entities to bring disputes to a different court, and any disputes concerning documents contained in the Plan Supplement or any other Definitive Document that contain such clauses shall be governed in accordance with the provisions of such documents.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

# 16.   MISCELLANEOUS

### 16.1   Expedited Tax Determination

The Debtor or NewCo may request an expedited determination of Taxes under section 505 of the Bankruptcy Code for all returns filed for or on behalf of the Debtor or NewCo, as applicable, for all taxable periods ending on or before the Effective Date.

### 16.2   Plan Supplement

Draft forms of certain documents, agreements, instruments, schedules, and exhibits specified in the Plan shall, where expressly so provided for in the Plan, be contained in the Plan Supplement and filed from time to time.

### 16.3   Additional Documents

The Debtor, NewCo, the Liquidating Trust, all Holders of Claims or Interests receiving distributions hereunder, and all other parties-in-interest may and shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 16.4   Exhibits; Schedules; Plan Supplement

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

### 16.5   Nonseverability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter such term or provision to make it valid or enforceable consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term shall then be applicable as altered; *provided* that such alteration shall be consistent with Restructuring Support Agreement. Notwithstanding any such holding or alteration, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding or alteration. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may be deleted or modified subject to the consent rights set forth in the Restructuring Support Agreement, and (iii) nonseverable and mutually dependent.

### 16.6   Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein or therein, the laws of the State of New York, without giving effect to the principles of conflicts of laws, shall govern the construction and implementation of the Plan and any agreement, document or instrument executed or entered into in connection with the Plan (except as otherwise set forth

4895-9352-2380 v.11

in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate or other governance matters relating to the Debtor, NewCo or the Liquidating Trust, as applicable, not incorporated or formed (as applicable) in the State of New York shall be governed by the laws of the jurisdiction of incorporation or formation (as applicable) of the Debtor, NewCo or the Liquidating Trust.

16.7    Dissolution of the UCC

After the Effective Date, the UCC's functions shall be restricted to and shall not be heard on any issue except (i) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and (ii) any appeal, motion for reconsideration or similar litigation related to the Confirmation Order (the "Post Effective Date UCC Matters").  Upon the resolution of the Post Effective Date UCC Matters, the UCC shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Case.  The Liquidating Trust shall be responsible for paying the reasonable fees and expenses incurred by the members of or advisors to the UCC after the Effective Date in connection with the Post Effective Date UCC Matters without any further notice or application to, action, order, or approval of the Bankruptcy Court.

16.8    Binding Effect

Notwithstanding Bankruptcy Rule 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtor, NewCo, the Liquidating Trust, the Estate, any and all Holders of Claims and Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

16.9    Notices

To be effective, any notice, request or demand to or upon, as applicable, the Debtor, the Ad Hoc Noteholder Group, the UCC and the U.S. Trustee must be in writing (email being sufficient) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually received and confirmed by the relevant party as follows:

If to the Debtor:

SVB Financial Group
2770 Sand Hill Road
Menlo Park, CA 94025
Attention:    William C. Kosturos

with a copy to:

Sullivan & Cromwell, LLP
125 Broad Street
New York, New York  10004
Attention:      James L. Bromley (bromleyj@sullcrom.com)
                Andrew G. Dietderich (dietdericha@sullcrom.com)
                Christian P. Jensen (jensenc@sullcrom.com)
Telephone:      (212) 558-4000
Facsimile:      (212) 558-3588

If to the Ad Hoc Noteholder Group:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention:      Marshall S. Huebner
                Elliot Moskowitz
                Angela M. Libby
                David Schiff
                Aryeh Ethan Falk
Telephone:      (212) 450-4000
Facsimile:      (212) 701-5800

If to the UCC:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attention:      Ira S. Dizengoff (idizengoff@akingump.com)
                Brad M. Kahn (bkahn@akingump.com)
Telephone:      (212) 872-1000
Facsimile:      (212) 872-1002

Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
Attention:      James R. Savin (jsavin@akingump.com)
Telephone:      (202) 887-4000
Facsimile:      (202) 887-4288

101

If to the U.S. Trustee:

William K. Harrington
United States Trustee for Region 2
U.S. Department of Justice
Office of the U.S. Trustee
Alexander Hamilton U.S. Custom House
One Bowling Green, Room 534
New York, New York 10004
Attention:    Andrea B. Schwartz, Esq.
               Annie Wells, Esq.
               Rachael E. Siegel, Esq.
Telephone:    (212) 510-0500

### 16.10   Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Before the Effective Date, none of the filing of the Plan, any statement or provision contained herein or the taking of any action by the Debtor related to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtor of any kind, including as to the holders of Claims or Interests or as to any treatment or classification of any contract or lease.

### 16.11   No Stay of Confirmation Order

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e), 6004(h) or 7062.

### 16.12   Deemed Acts

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party by virtue of this Plan and the Confirmation Order.

### 16.13   Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, be Allowed in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtor or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement or papers filed with the Bankruptcy Court prior to the Confirmation Date.

### 16.14   Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir,

102

executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 16.15   Entire Agreement

Except as otherwise provided in the Plan or the Confirmation Order, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan and Confirmation Order supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 16.16   Conflicts

In the event of any inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control.  In the event of any inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless otherwise stated in the Plan Supplement document or the Confirmation Order).  In the event of any inconsistency between the Confirmation Order and the Plan or any other document, the Confirmation Order shall control.

### 16.17   Post-Effective Date Service

After the Effective Date, the Debtor is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed renewed requests for service.

4895-9352-2380 v.11

New York, New York
July 26, 2024

Respectfully Submitted,


**SULLIVAN & CROMWELL LLP**

James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
125 Broad Street
New York, NY 10004
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3588
E-mail:       bromleyj@sullcrom.com
              dietdericha@sullcrom.com
              jensenc@sullcrom.com

*Counsel to the Debtor*

104

## Exhibit A

The following parties shall be "Debtor Released Parties":

1. William Kosturos;
2. Nicholas Grossi;
3. Jeff Liu;
4. Centerview Partners LLC;
5. Alvarez & Marsal North America, LLC; and
6. Kroll Restructuring Administration LLC.

## **Exhibit B**

**Notice of Confirmation**

James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel to the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | : |
| | : |
| SVB Financial Group,[1] | : |
| Debtor. | : |

Chapter 11

Case No. 23-10367 (MG)

## NOTICE OF EFFECTIVE DATE OF DEBTOR'S CONFIRMED SECOND AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that on [●], 2024, the Honorable Martin Glenn, United States Bankruptcy Chief Judge for the United States Bankruptcy Court for the Southern District of New York, entered the *Findings of Fact, Conclusions of Law and Order Confirming the Debtor's Second Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [D.I. [●]] (the "Confirmation Order"). The Confirmation Order, among other things, confirmed the *Debtor's Second Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [D.I. 1178] (including the Plan Supplement and all other exhibits and schedules thereto, as may be amended, modified or supplemented from time to time in accordance with its terms and the terms hereof, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE** that on [●], 2024, the Effective Date of the Plan occurred. All conditions precedent to the Effective Date set forth in Article 13 of the Plan have either been satisfied or waived in accordance with the Plan and the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that in accordance with Section 3.2 of the Plan, any Holder of an Administrative Claim (except as otherwise provided in the Plan) must file

---

[1] The last four digits of SVB Financial Group's tax identification number are 2278.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

and serve a request for payment of such Administrative Claim on the Liquidating Trust on or before 4:00 p.m. (Eastern Time) on the 30th day after the Effective Date (the "Administrative Claim Bar Date"). Any Holder of an Administrative Claim who is required to, but does not, file and serve a request for payment of such Administrative Claim pursuant to the procedures specified in the Confirmation Order on or prior to the Administrative Claim Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claim against the Debtor, the Liquidating Trust (solely with respect to any Claims or Causes of Action and Defenses asserted against it as a purported successor to the Debtor), NewCo (solely with respect to any Claims or Causes of Action and Defenses asserted against it as a purported successor to the Debtor) or its respective property.

**PLEASE TAKE FURTHER NOTICE** that in accordance with the *Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [D.I. 373], any Proof of Claim arising from or relating to the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Notice and Claims Agent on or before the date that is 30 days after the effective date of rejection for such executory contract or unexpired lease.

**PLEASE TAKE FURTHER NOTICE** that Article 12 of the Plan and the Confirmation order contain certain release, exculpation and injunction provisions that are binding on the Holders of Claims and Interests as set forth in more detail in the Plan and Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that the Plan and its provisions are binding on the Debtor, the Liquidating Trust, NewCo and any Holder of a Claim or an Interest and such Holder's respective successors and assigns, regardless of whether the Claim or the Interest of such Holder is Impaired under the Plan, and regardless of whether such Holder voted to accept the Plan.

**PLEASE TAKE FURTHER NOTICE** that copies of the Confirmation Order and the Plan may be obtained from the Court's website, https://ecf.nysb.uscourts.gov, for a nominal fee, or obtained free of charge by accessing the website of the Debtor's claims and noticing agent, https://restructuring.ra.kroll.com/svbfg/.

Dated:  [●], 2024
New York, New York

/s/_____

James L. Bromley
Andrew G. Dietderich
Christian P. Jensen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:      (212) 558-4000
Facsimile:      (212) 558-3588
E-mail:          bromleyj@sullcrom.com
                 dietdericha@sullcrom.com
                 jensenc@sullcrom.com

*Counsel to the Debtor*

# Exhibit B



# Corporate Overview

July 2022



# SVB is the financial partner of the innovation economy

**SVB helps individuals, investors and the world's most innovative companies achieve their ambitious goals.**

We offer services that our dynamic and fast-growing clients require, including commercial and investment banking, wealth planning and capital investing.

**Our businesses include:**

svb⟩ Silicon Valley Bank

svb⟩ Capital

svb⟩ Private

svb⟩ Securities

# Our clients are changemakers

We serve individuals, investors and companies of all sizes around the world.



Note: Sample list of clients



# We serve our clients' needs through four businesses



**svb**

**svb** Silicon Valley Bank
Global commercial banking

**svb** Private
Private banking and wealth management

Clients

**svb** Securities
Investment banking

**svb** Capital
Venture capital and credit investing

# We complement our core businesses with innovations, investments and partnerships that help increase our clients' probability of success.















Note: Sample list

# Silicon Valley Bank: Global commercial banking for innovators, entrepreneurs and investors



Silicon Valley Bank provides business banking, liquidity management, global business solutions and global fund banking.

**Helping our clients succeed at every stage**



**Unparalleled access, connections and insights**

| Startup (Early-Stage) Revenue <$5M | Venture-Funded Revenue $5M–$75M | Corporate Revenue >$75M |

**Investors** Private Equity & Venture Capital

**We bank:**

**Nearly half** U.S. venture-backed technology and life science companies*

**52%** U.S. venture-backed technology and healthcare IPOs in H1 2022*

\* Source: PitchBook and SVB Analysis

 **PRIVATE EQUITY & VENTURE CAPITAL**

 **CLIMATE TECH**

 **FINTECH**

 **HARDWARE & FRONTIER TECH**

 **LIFE SCIENCE & HEALTHCARE**

 **CONSUMER INTERNET**

 **ENTERPRISE SOFTWARE**

 **PREMIUM WINE**

 **Deep sector expertise**

5

# SVB Capital: Giving limited partners unrivaled access to the global innovation economy



Our experienced investment teams leverage unparalleled access and insights to power a unique, diversified platform that seeks to deliver compelling returns on behalf of our LPs.



**Fund of Funds**

Strategic Investor Fund (SIF)

SIF Ascension Fund

**Direct Funds**

Capital Partners Fund

Arterial Fund

**Credit Funds**

Innovation Credit Growth Fund

Innovation Credit Income Fund

+ Custom solutions across the platform

**$8.8B** AUM

**760+** unicorns

**20+** years

Source: SVB Capital data, AUM as of 6/30/2022. Unicorn count as of 7/29/22.
Past performance is not indicative of future results. Future returns cannot be guaranteed.

6

# SVB Private: Private banking, wealth management and trust services that drive possibility and impact



Providing a powerful combination of solutions based on a deep understanding of what drives clients to advance and protect their wealth for generations to come.

As of 06/30/22



HNW/UHNW advisory
Tax planning
Philanthropic planning
Advanced Planning Solutions
Trust & Estate Administration

Custom Solution
Values-Aligned Investing
Brokerage Capabilities
Custody safekeeping services

Mortgages
Home Equity Lines of Credit (HELOC)
Securities-backed lending
Private stock-backed lending
Specialty commercial lending
Full private banking payment solutions

**$16.5B**
assets under management

**$14.4B**
average deposits*

**$14.2B**
average loans*

*Financials from the 3/31/22 10-Q

Banking services are offered by Silicon Valley Bank, member FDIC and the Federal Reserve System. Loans are subject to underwriting, credit, and collateral approval. NMLSR ID 442029.
See important disclosures at the end of this presentation

# SVB Securities: Investment banking that propels technology, healthcare and life science companies



Our acute focus on technology and healthcare sectors allows us to deliver honest guidance, unique opportunities, and finely calibrated solutions that help our clients achieve their long-term ambitions.

SVB Securities LLC, Member FINRA/SIPC



As of 6/30/22

## 1,080+
transactions completed

## $205+
billion dollars raised

## 260
companies under coverage

| Deep Understanding | Indispensable Partners | Full Commitment | Powerful Connections |

**TECHNOLOGY**

**LIFE SCIENCES/HEALTHCARE**



EDUCATION TECHNOLOGY



INDUSTRIAL TECHNOLOGY



ENTERPRISE SOFTWARE



DIGITAL INFRA & TECH SERVICES



CONSUMER SOFTWARE, INTERNET & INFO SERVICES



FINTECH



TOOLS & DIAGNOSTICS



MEDICAL DEVICES



BIOPHARMA



HEALTHCARE SERVICES



DIGITAL HEALTH & HEALTHTECH

8

# Supporting innovation...

# ...around the world



● SVB's offices

**International Offices**
Full-service branch: London.
Business development offices: Shanghai, Beijing, Dublin, Vancouver and Montreal.
Representative offices: Copenhagen, Hong Kong and Tel Aviv.
Lending branches: Frankfurt and Toronto.
SVB's joint venture bank, SPD Silicon Valley Bank: Shanghai, Beijing, Shenzhen and Suzhou.







## Canada
Toronto
Vancouver
Montreal

## China
Shanghai
Hong Kong
Beijing
Shenzhen
Suzhou

## Denmark
Copenhagen

## Germany
Frankfurt

## Ireland
Dublin

## Israel
Tel Aviv

## UK
London

# Global Gateway

SVB's Global Gateway team works with companies and investors in emerging innovation centers with a mix of banking and global market entry services in regions including Latin America, Australia - New Zealand, India and the Middle-East - North Africa.



# Our values guide us

**At SVB:**

We start with **EMPATHY** for others.

We speak & act with **INTEGRITY**.

We embrace **DIVERSE** perspectives.

We take **RESPONSIBILITY**.

We keep **LEARNING & IMPROVING**.

svb

# Our Environmental, Social & Governance initiatives are embedded in our strategy

## ENVIRONMENTAL
Speed transition to low carbon, sustainable economy

## SOCIAL
Advance DEI and Access to Innovation

## GOVERNANCE
Operate with transparency and ethics

# **6** Strategic ESG Initiatives



**Talent**

Engaging and empowering employees



**DEI at SVB**

Promoting Diversity, Equity & Inclusion at SVB



**Economic Impact**

Championing inclusion in the innovation economy



**Citizenship**

Supporting communities where we live and work



**Climate & Environment**

Supporting the transition to a sustainable, low-carbon world



**Governance**

Practicing responsible corporate governance



See  SVB's ESG Report  for more information.

# We promote diversity, equity and inclusion

## Inclusion Ignites Innovation

We are intentionally and strategically working for a world where every client and employee has the opportunity to bring their bold ideas to life.

We also know that diverse perspectives and inclusive environments ignite new ideas to power innovation. That is why we're building a culture of belonging with a global workforce that celebrates greater dimensions of diversity and reflects the markets we strive to serve.

## Diversity at SVB



We report demographic metrics using racial categories defined by the US Equal Employment Opportunity Commission. Race & ethnicity figures represent US employees only, as regulatory requirements governing data collection and privacy preclude comprehensive data collection in our international offices. We are exploring how we can effectively track and share data on our global workforce. Senior leadership includes anyone in the following job levels: Executive Committee (includes our executive officers), and leaders from certain top levels of SVB's two highest bands of management. Categories with less than 1% representation do not appear in the graphs. Not disclosed represents individuals who did not choose to disclose race & ethnicity data. All Workforce and Leadership data is as of 12/31/21. Board data is as of 4/22/22. Note: Refer to www.svb.com/living-our-values/inclusion-diversity for more information, including our DEI report, UK Gender Pay Report and EEO data.



# SVB engages in our communities

CONTRIBUTING TO
NOT FOR PROFITS

## $18M
DONATED

## 21K+ hrs
VOLUNTEERED

2021

## $1.6B*
LOANED TO SMALL BUSINESSES

## Outstanding
CRA RATING – 2021

AFFORDABLE HOUSING
FROM 2002–2021

## $1.6B
LOANED

## $1.1B
INVESTED

## 10,000+
AFFORDABLE
HOUSING UNITS





*Community Reinvestment Act reportable small business loans. 2021



# Our commitment to advance inclusion and opportunity

## Access to Innovation

**Inclusion ignites innovation.** We launched Access to Innovation to create opportunities across the innovation economy – because when more people get the chance to share unique perspectives and ideas, there's no limit to where bold thinking can take us.

By leveraging powerful connections among founders, funders and talent, SVB is helping advance equity and inclusion across the innovation economy.

### How we take action



Increase the pipeline of diverse talent for our clients with powerful partnerships.



Connect diverse groups to SVB's vast network within the innovation economy.



Unlock greater access to capital, professional relationships and career opportunities.





# Recognized for growth and corporate responsibility

Bay Area Business Journals

**TOP**

**Corporate Philanthropist**

Fastest-Growing Companies

**FORTUNE**

Member of the

**BLOOMBERG**

**Gender Equality Index**

Best Banks in America

**FORBES**

America's Most Responsible Companies

**NEWSWEEK**

Corporate Social Responsibility Award

**FOREIGN POLICY ASSOCIATION**



# Strong, seasoned management team
## Diverse experience and skills to help direct our growth





**Dan Beck**
**Chief Financial Officer**
5 years at SVB



**Greg Becker**
**President and CEO**
29 years at SVB



**Marc Cadieux**
**Chief Credit Officer**
29 years at SVB



**John China**
**President  SVB Capital**
26 years at SVB

## 14 years
### average tenure at SVB



**Phil Cox**
**Chief Operations Officer**
12 years at SVB



**Anthony DeChellis**
**CEO SVB Private**
1 year at SVB



**Mike Descheneaux**
**President Silicon Valley Bank**
16 years at SVB



**Michelle Draper**
**Chief Marketing & Strategy Officer**
9 years at SVB



**Chris Edmonds-Waters**
**Chief Human Resources Officer**
18 years at SVB



**Jeffrey Leerink**
**CEO SVB Securities**
3 years at SVB



**John Peters**
**Chief Auditor**
15 years at SVB



**Michael Zuckert**
**General Counsel**
8 years at SVB

# SVB financial highlights

| | | |
|---|---|---|
| **Full Year 2021**<br>## $1.8B<br>Net Income | **Q2 2022**<br>## $333M<br>Net Income | **Q2 2022**<br>## $71B<br>Total Loans |
| **Q2 2022**<br>## $379B<br>Deposits & Investments | **Q2 2022**<br>## $191.2B<br>In Investment Funds<br>(off balance sheet) | **Q2 2022**<br>## $214B<br>Assets |

## 7,700+ Employees
US | UK | Canada | China | Denmark | India | Ireland | Germany | Israel



As reported on a consolidated basis for the period end June 30, 2022



## About SVB

SVB is the financial partner of the innovation economy, helping individuals, investors and the world's most innovative companies achieve their ambitious goals. SVB's businesses — Silicon Valley Bank, SVB Capital, SVB Private and SVB Securities — together offer the services that dynamic and fast-growing clients require as they grow, including commercial banking, venture investing, wealth planning and investment banking. Headquartered in Santa Clara, California, SVB operates in centers of innovation around the world. Learn more at svb.com/global.

18



## Disclosures

SVB Financial Group (SVB) (Nasdaq: SIVB) is the holding company for all business units and groups. © 2022 SVB Financial Group. All rights reserved. SVB, SVB FINANCIAL GROUP, SILICON VALLEY BANK, SVB CAPITAL, SVB PRIVATE, SVB SECURITIES and the chevron device are trademarks of SVB Financial Group, used under license. The Boston Private name, logo, and any related marks are trademarks of SVB Financial Group, used under license. Silicon Valley Bank is a member of the FDIC and the Federal Reserve System. Silicon Valley Bank is the California bank subsidiary of SVB Financial Group.

Banking, lending and trust products or services are offered by Silicon Valley Bank, a California bank with trust powers. Silicon Valley Bank is the California bank subsidiary of SVB Financial Group (Nasdaq: SIVB) and a member of the Federal Reserve System and the FDIC.

SVB Wealth LLC (an SEC-registered investment adviser) offers wealth management services. SVB Investment Services Inc. (member FINRA and SIPC) offers brokerage products and services. Both SVB Wealth LLC and SVB Investment Services Inc. are wholly-owned, non-bank subsidiaries of Silicon Valley Bank. Investment Products offered by SVB Wealth LLC and/or SVB Investment Services Inc. are:
Not FDIC Insured | Not Bank Guaranteed | May Lose Value

Not all products/services are offered by all advisors or registered representatives. None of Silicon Valley Bank, SVB Wealth LLC, SVB Investment Services Inc., or any of their respective affiliates provide legal advice. Estate planning requires legal assistance. Please consult your tax or legal advisors for such guidance.

All loans are subject to underwriting, credit, and collateral approval. Financing available and varies by stats. Restrictions may apply. All information contained herein is for informational purposes only and no guarantee is expressed or implied. Rates, terms, programs, and underwriting policies subject to change without notice. This is not a commitment to lend. Terms and conditions apply. NMLSR ID 442029.

SVB Securities LLC, Member FINRA/SIPC

19



# Silicon Valley Bank
# Corporate Overview

September 2020

# Bank of the innovation economy

Our mission is to increase the probability of our clients' success.

**For more than 35 years, Silicon Valley Bank has helped innovators, enterprises and their investors move bold ideas forward fast.**

Today, we provide a full range of banking services to companies of all sizes in innovation centers around the world.

PLAY VIDEO



# Our values
## guide us



**At SVB**

We start with EMPATHY for others.

We speak & act with INTEGRITY.

We embrace DIVERSE perspectives.

We take RESPONSIBILITY.

We keep LEARNING & IMPROVING.



# Our clients are
# defining what comes next


















# We help innovators
# move bold ideas forward, fast.

## SVB is at the intersection of innovation and capital



**HARDWARE & FRONTIER TECH**



**SOFTWARE & INTERNET**



**LIFE SCIENCE & HEALTHCARE**



**ENERGY & RESOURCE INNOVATION**



**PRIVATE EQUITY & VENTURE CAPITAL**



**PREMIUM WINE**

## Providing a range of comprehensive financial services



**GLOBAL COMMERCIAL BANKING**



**INVESTMENT SOLUTIONS**



**RESEARCH & INSIGHTS**



**FUNDS MANAGEMENT**



**PRIVATE BANKING & WEALTH MANAGEMENT**



**INVESTMENT BANKING**



# We help high-growth companies navigate at every stage



## SVB LOAN PORTFOLIO



**4%***
Startups

**96%***
Larger companies

## OUR CLIENTS



**50%***
of all venture capital-backed tech and life science companies in the U.S.



**67%****
of US venture capital-backed companies that completed an IPO in 2020 YTD

*Approximate
**According to NVCA data

# We connect
# the innovation ecosystem

Silicon Valley Bank is central to the ecosystem of investors, service providers and influencers that supports growth among disruptive technology and life science businesses.





# We serve businesses
# where innovation can be found



● SVB Financial Group's offices
● SVB Financial Group's international banking network

Canada | China | Denmark | Germany | India | Ireland | Israel | United Kingdom | United States

## $5.6B
International loans*
## $16.9B
International deposits*



Q3 2020 Corporate Overview and Financial Results September 30, 2020
* Reflects period-end balances as of September 30, 2020 for international operations in U.K., Europe, Israel and Asia; Canada balances included in our
US Technology Banking segment. This management segment view does not tie to regulatory definitions of foreign exposure.

Silicon Valley Bank 2020 Corporate Overview    8

# Supporting our clients, employees and communities
# Our response to COVID-19

**Employee Support**
- Expanded benefits for impacted employees (e.g., leave, counseling and care)
- Home office setup and utility reimbursements and practical support for working from home

**Client Support**
- SVB payment deferral programs for venture debt, wine and private bank
- Over 5,500 applications received and more than 4,400 approved, representing $1.8B in relief*
- Accredited lender in the UK for the CBILS and CLBILS programs

**Community Support**
- Pledged $5.5M to support local, regional and global activities focused on health, food security & shelter and small business owner relief
- Donating net fees received from SBA PPP program to community and diversity efforts
- Committed to DEI at SVB and championing causes that impact access to and diversity in the Innovation Economy

**Business Continuity**
- Technology and enablement investments allow continued client service as almost all SVB colleagues work from home



**Our Priorities Right Now**

SUPPORT our employees and clients

Lead with EMPATHY

ADAPT to rapid changes



*As of September 30, 2020

# We deliver
# a diversified platform



## Silicon Valley Bank
Global commercial banking for innovators, enterprises and investors

## SVB Capital
Private venture investing expertise, oversight and management

## SVB Private Bank/ Wealth Advisory
Private banking and investment strategies for influencers in the innovation ecosystem

## SVB Leerink
Investment banking for healthcare and life science companies



# Our clients say
# we deliver on our mission







## The innovation economy

**the muse**

"Access to SVB's network of entrepreneurs led to some of our early first clients. It's been really helpful to have a partner (SVB) that knows the technology industry and that has such a wide network of relationships and connections."
— Katherine Minshew, CEO, The Muse

**Q4**

"We found the guys at SVB to be the most entrepreneurially friendly bank that we've dealt with. That goes a long way."
— Darrell Heaps, CEO, Q4 Inc.

**FOUNDRY GROUP**

"The entire team at SVB is unique among banks in their willingness to make bets on behalf of founders and startups and are often the first stop when a startup needs banking services."
— Brad Feld, partner, Foundry Group

## In the news

**THE WALL STREET JOURNAL.**

"Close connections – and lots of them – are an essential part of the business strategy at what in many ways is the hometown bank of America's tech industry."

**The New York Times**

"While Wall Street banks scramble to stake claims in the booming technology industry, they are finding a smaller one already firmly entrenched."

**Los Angeles Times**

"Part lender, part consultant, part cheerleader and part investor, Silicon Valley Bank has been a nursemaid to countless start-ups as well as banking the venture capitalists who fund them."



# Our employees say
# SVB is a great place to work



**World's Best Employers**
*Forbes* Global 2000

"Our business requires being agile and responsive to our tech-savvy clients. This keeps me challenged and engaged every day."

— Raju Chiluvuri, Global Digital Banking

"SVB is a collaborative and supportive place to work. The environment is incredibly dynamic, and it really stretches you."

— Jason Hughes, Life Sciences

"Opportunities for growth here are amazing. My managers tell me that if I'm interested in a specific area, go for it. I'm a part-time MBA student, and they support me in that."

— Sara Cohn, Private Equity Services



# We embrace diverse perspectives and promote equity and inclusion

We aim to foster an inclusive and diverse work environment for all of our employees and within the innovation ecosystem through a variety of goals, initiatives and programs.





# SVB's Workforce Diversity Metrics

**We have a corporate goal to increase diversity of senior leaders\* to 56% by 2025**



**DIVERSE^**
**REPRESENTATION (U.S.)**

**67%**
of Total Workforce

**50%**
of Senior Leaders*

**69%**
of Board Members**

**FEMALE**
**REPRESENTATION (GLOBAL)**

**45%**
of Total Workforce

**32%**
of Senior Leaders

**31%**
of Board Members

**RACIAL MINORITY**
**REPRESENTATION (U.S.)**

**40%**
of Total Workforce

**28%**
of Senior Leaders

**15%**
of Board Members

^ We define diverse as a blended measure, which includes (as disclosed to us) any woman, any person of color, veteran, or person with disability. Person of color refers to anyone who self identifies as any of the following: Hispanic/Latino, Black or African American, Asian, American Indian or Native Alaskan, Native Hawaiian or Other Pacific Islander, or Two or More Races/Other. We utilize this blended measure to include different backgrounds and social categorizations. Figures represent US employees only, as regulatory requirements governing data collection and privacy preclude comprehensive data collection in our international offices. We are exploring how we can effectively track and share data on our global workforce. Data as of September 30, 2020.
* Senior leader is defined as anyone in the following job levels: Executive Committee (includes our executive officers), and leaders from certain top levels of SVB's two highest bands of management. **Metrics for Board Members are as of October 22, 2020.



# We transform lives by creating opportunities and access to the innovation economy



**83%**
of tech executives
are white*

**1/2** as many Black Americans
and Latinx in tech as
in the rest of the private sector*

**12 million**
jobs requiring postsecondary
education will go unfilled
in the next decade**

**6 in 10** startups
have no women on their
board of directors***

**58% of startups**
have no women
in executive positions***

Only
**13% of VCs**
are women****

**Our Access to
Innovation Program**
connects untapped
pools of talent with
opportunities in the
innovation economy.



*EEOC
**Year Up
***Startup Outlook Women in Technology Leadership Report 2020
****All Raise, US

# Access to Innovation Initiative
## Overview

### Why
**Social Good:** Create new opportunities and career possibilities; transform lives

**Business Growth:** Increase business opportunities for SVB

**Help All Clients Succeed:** Increase and diversify the talent pool for innovation companies

### What
Building an inclusive and diverse innovation economy

### For Whom
Non-degreed, Women, Black and LatinX professionals in Technology, Life Science and Venture Capital

### Impact
Economic empowerment for all via access to the innovation economy

### How
Funding, business support, connections, education, professional development, and work experiences



Mission:
Build a more diverse, equitable and accessible innovation economy for all.



# We give back

## A Top Corporate Philanthropist
*Bay Area Business Journals* since 2003

## Investing in our Communities

**$750 million**
Community lending and investments goal (2018-2020)

**$1 billion+** loaned
**$750 million** invested for
**9,085** affordable housing units

**$4.6 million**
donated by SVB employees and matched by SVB since 2015

## 2019

**$8 million**
donated

**27K hours**
volunteered

**120 grants**
for employee volunteerism

**$790K** granted
via the SVB Foundation

**$1.6 million**
Supporting gender parity in innovation

**$1.2 million**
Supporting opportunities for diverse, emerging talent in innovation





https://www.svb.com/globalassets/svb_csr-2019-report_digital.pdf

# Our dedicated management team



**Greg Becker**
PRESIDENT AND CEO
SVB FINANCIAL GROUP



**Dan Beck**
CHIEF FINANCIAL OFFICER



**Marc Cadieux**
CHIEF CREDIT OFFICER



**John China**
PRESIDENT SVB CAPITAL



**Phil Cox**
CHIEF OPERATIONS OFFICER



**Mike Descheneaux**
PRESIDENT SILICON VALLEY BANK



**Michelle Draper**
CHIEF MARKETING OFFICER



**Chris Edmonds-Waters**
CHIEF HUMAN RESOURCES OFFICER



**Laura Izurieta**
CHIEF RISK OFFICER



**Michael Zuckert**
GENERAL COUNSEL



# SVB financial highlights

Q3 2020
## $441.7M
Net Income

Full Year 2019
## $1.1B
Net Income

Q3 2020
## $38.4B
Total Loans

Q3 2020
## $211.6B
Deposits & Investments

Q3 2020
## $126.8B
In Investment Funds
(off balance sheet)

Q3 2020
## $96.9B
Assets

## 4,300+
Employees
15 US states and 9 countries
US | UK | Canada | China | Denmark | India | Ireland | Germany | Israel



# We are well-capitalized **with significant liquidity**

## Strong capital to support growth and investments

**+ comprehensive capital stress testing**

Capital adequacy assessments to support our clients under severe economic conditions

**SILICON VALLEY BANK CAPITAL RATIOS[1]**

- ■ SVB's Q3'20 Capital Ratio
- ■ Regulatory Minimum



| | Common Equity Tier 1 | Tier 1 Capital | Total Capital | Tier 1 Leverage |
|---|---|---|---|---|
| SVB's Q3'20 | 10.75% | 10.75% | 11.75% | 6.45% |
| Regulatory Minimum | 7.00% | 8.50% | 10.50% | 4.00% |

Capital ratios impacted by **robust balance sheet growth,** partially offset by **strong earnings**

**HoldCo liquidity** available to support Bank Tier 1 leverage ratio if needed

Estimate **10%** of PPP loans outstanding will roll off in Q4[2] and **65%** in Q1'21

**Stock repurchase program remains on pause** (authorization expired October 29, 2020)

## Ample liquidity to meet clients' needs

**$54.6B in cash and high-quality fixed income securities**

**9/30/20 ASSETS**
$ Billions



Net loans $38

Cash and fixed income securities $55

Other $3

Non-marketable securities $1

**Liquidity**

**$43.4B**
Borrowing capacity through Federal Reserve, FHLB and repo + unpledged securities

**$1.3B**
HoldCo liquidity, a portion of which can be downstreamed to Bank

**$1.3B**
Unrealized fixed income gains[3]

1. Ratios as of September 30, 2020.
2. Based on PPP forgiveness expectations. Estimate only, subject to PPP terms; amounts actually forgiven and timing of forgiveness may differ.
3. Consists of $667M unrealized pretax gains in the available-for-sale portfolio and $630M unrealized pretax gains in the held-to-maturity portfolio as of September 30, 2020. Amounts actually realized are subject to various factors and may differ from unrealized amounts.





Thank you.



# Q4 2022
# Financial
# Highlights

January 19, 2023

# Contents

**3**  Snapshot and current environment

**23**  Performance detail and outlook drivers

**36**  Appendix

**49**  Non-GAAP reconciliations

This presentation should be reviewed with our Q4 2022 Earnings Release and Q4 2022 CEO Letter, as well as the company's SEC filings.





# Snapshot and current environment

# Key takeaways



**Continued strength and momentum in underlying business**

- Client engagement is very high as companies seek our advice as a trusted partner of the innovation economy
- Strong Tech borrowing activity, client acquisition, GFB loan term sheets and PE/VC dry powder – all positive indicators of future business growth

**Moderation in both client cash burn and pace of VC investment decline**

- Improving balance between inflows from private fundraising activity and outflows from client cash burn
- Expect market and deposit mix + pricing pressures to persist near-term, but moderate, with NII and NIM improving by Q4'23



**Strong and well-positioned**

- We have a high-quality, liquid balance sheet; strong capital ratios; and multiple levers to manage liquidity
- Our investments in our four core businesses have expanded our capabilities and diversified our revenues – enhancing our ability to serve our clients
- While prolonged market volatility will likely increase NPLs and NCOs from historic lows, we still expect overall healthy credit performance, with losses concentrated in Early Stage (only 3% of loans)



**Continued confidence in our strategy**

- Innovation propels global economic growth – we continue to believe the growth trajectory of the innovation economy will outpace other industries over the long term



**Q4'22 snapshot:** Continued pressure from market challenges, but underlying business activity remained strong; both client cash burn and pace of VC investment decline moderated

## Financial highlights

| EPS: | Net Income: | ROE: |
|------|-------------|------|
| **$4.62\*** | **$275M** | **8.9%** |

**Q4'22 performance**
+/− changes are vs. Q3'22

**$341B**
-$12B, -3%
**EOP client funds**
**$173B** Deposits, -$4B, -2%
**$168B** OBS, -$8B, -5%

**$348B**
-$21B, -6%
**Average client funds**
**$175B** Deposits, -$11B, -6%
**$173B** OBS, -$10B, -5%

**$74B**
+$3B, +4%
**Average loans**

**$1.0B**
-$160M, -13%
**Net interest income**[1]

**$349M**
+$33M, +10%
**Core fee income**[2]

**$152M**
+$53M, +54%
**SVB Securities revenue**[2,3]

**($49M)**
-$13M, -36%
**Warrant gains and investment losses net of NCI**[2,4]

**$141M**
+$69M, +96%
**Provision for credit losses**
(driven by increased NPLs and NCOs, growth, and model assumptions)

**19.1%**
-8.1%
**Effective Tax Rate**
(driven by state tax and R&D credits)

**\*includes −$0.15** impact from
**$11M**
**Pre-tax merger-related charges**[5]

1. Net interest income presented on a fully taxable equivalent basis.
2. Non-GAAP financial measure. See "Use of non-GAAP Financial Measures" in our Q4 2022 Earnings Release and our non-GAAP reconciliations at the end of this presentation.
3. Represents investment banking revenue and commissions.
4. Includes $27M pre-tax investment losses on sale of $1B AFS US Treasury securities.
5. Related to acquisition of Boston Private.



# FY'22 snapshot: Overall healthy performance despite market challenges

**Financial highlights**

| EPS: | Net Income: | ROE: |
|---|---|---|
| **$25.35*** | **$1,509M** | **12.1%** |

**FY'22 performance**
+/− changes are vs. FY'21

### $375B
+$46B, +14%
**Average client funds**

**$186B** Deposits, +$38B, +26%
**$189B** OBS, +$8B, +4%

### $70B
+$16B, 29%
**Average loans**

### $4.5B
+$1.3B, +41%
**Net interest income[1]**

### $1.2B
+$430M, +57%
**Core fee income[2]**

### $518M
-$20M, -4%
**SVB Securities revenue[2, 3]**

### ($75M)
-$1.2B, -107%
**Warrant gains and investment losses net of NCI[2]**

### $420M
+$297M, +241%
**Provision for credit losses**
(driven primarily by growth and economic conditions)

*includes **−$0.63** impact from

### $50M
**Pre-tax merger-related charges[4]**

1. Net interest income presented on a fully taxable equivalent basis.
2. Non-GAAP financial measure. See "Use of non-GAAP Financial Measures" in our Q4 2022 Earnings Release and our non-GAAP reconciliations at the end of this presentation.
3. Represents investment banking revenue and commissions.
4. Related to acquisition of Boston Private.



# Continued strength and momentum in underlying business

## Strong new client growth ~1,600 in Q4'22

SVB commercial client count



## Near record GFB loan term sheets and strong Tech, LS/HC borrowing activity

Average loans
$B



## Record PE/VC dry powder

Global PE/VC dry powder[1]
$B



## Record core fee income

Core fee income[2]
$M



## Healthy credit metrics

NPLs and NCOs
Bps



## Healthy profitability

ROE





1. Source: Preqin. As of January 3, 2023.
2. Non-GAAP financial measure. See "Use of non-GAAP Financial Measures" in our Q4 2022 Earnings Release and our non-GAAP reconciliations at the end of this presentation.
3. Non-performing loans as a percentage of period-end total loans.
4. Net loan charge-offs as a percentage of average total loans.

# Trusted financial partner of the global innovation economy, especially in challenging times

For nearly 40 years, we have helped the world's most innovative companies, their people and investors **achieve their ambitious goals**

**Meeting innovation clients' unique needs at all stages**

**Technology & Life Sciences/Healthcare**


**Startup (Early-Stage)**
Revenue <$5M


**Venture-Funded**
Revenue $5M–$75M


**Corporate Banking**
Revenue >$75M


**Investors**
Private Equity
Venture Capital


**Individuals**
Entrepreneurs,
Investors,
Executives



Unparalleled access, connections and insights to **increase our clients' probability of success**

Leveraging the combined power of our four core businesses to help clients navigate volatile markets

**We bank:**



**Nearly**
# Half
2022 U.S. venture-backed technology and life science companies*

# 44%
2022 U.S. venture-backed technology and healthcare IPOs*

* Source: PitchBook and SVB analysis.


**PRIVATE EQUITY & VENTURE CAPITAL**


**CLIMATE TECH**


**FINTECH**


**HARDWARE & FRONTIER TECH**


**LIFE SCIENCE & HEALTHCARE**


**CONSUMER INTERNET**


**ENTERPRISE SOFTWARE**

**PREMIUM WINE**

# Q4'22 highlights

1. **Improved balance between VC investment and client cash burn**, moderating EOP client fund declines QoQ

2. **Lower NII and NIM despite higher loan yields** as growth in proportion of interest-bearing deposits and average borrowings pressured interest expense; premium amortization expense also increased

3. **Higher provision** balanced across increased NCOs and NPLs, strong growth and model assumptions; **still expect overall healthy credit performance**, with losses concentrated in Early Stage

4. **Investment losses** driven by private fund investment markdowns and sale of $1.0B AFS securities

5. **Healthy loan growth** driven by GFB capital call, Technology and Private Bank mortgage borrowing

6. **Record core fee income***  as Fed rate hikes drove improved client investment fee margin

7. **Outperformed SVB Securities revenue* outlook** on strong Biopharma deal activity – **higher than expected expenses** reflect related incentives and deferred compensation costs

8. **Lower effective tax rate (in Q4 only)** driven by state tax and R&D credits

9. **Continued, but moderating, market challenges to pressure FY'23 growth;** reducing pace of investment to reflect current environment, but remain optimistic in the long-term opportunity of the innovation economy



\* Non-GAAP financial measure. See "Use of non-GAAP Financial Measures" in our Q4 2022 Earnings Release and our non-GAAP reconciliations at the end of this presentation.

# Improved balance between VC deployment and client cash burn

**Slowing VC deployment continued to reduce client fund inflows in Q4'22, but at a more moderate pace**

- QoQ U.S. VC investment declined **23%** in Q4'22 vs. **37%** in Q3'22

**Client cash burn decreased, helping limit period-end declines**

- Client cash burn remains **~2x** higher than pre-2021 levels and still has room to adjust to the slower fundraising environment[2]

**We expect client funds growth will resume when VC investment improves and client cash burn normalizes, even if VC investment does not return to 2021 levels**

U.S. VC-backed investment activity[1]
$B



QoQ period-end total client funds ("TCF") by client activity (management's approximation)[2]
$B



1. VC data sourced from PitchBook. Investment data has been updated with PitchBook's proprietary back-end data set and filters which has resulted in prior period revisions.
2. Determination of TCF changes by client activity is an illustrative approximation based on management assumptions and analysis of SVB client and PitchBook data; assumes each client's total change in period-end balances is attributed to one of the following activities: fundraising, other inflows or outflows.



# Leveraging flexible liquidity solutions

## Robust client funds franchise, with flexibility to shift liquidity on- or off-balance sheet

**40+** liquidity management products to meet clients' needs

- Noninterest-bearing deposits
- Interest-bearing deposits
- Off-balance sheet managed funds
- Off-balance sheet sweep funds
- Off-balance sheet repo funds



**$341B** TCF

4% · 24% · 27% · 26% · 19%

- Clients' operating cash typically held in on-balance sheet noninterest-bearing deposits
- Clients' excess liquidity generally held in on-balance sheet interest-bearing deposits or off-balance sheet client funds
- Flexible liquidity solutions enable us to shift client funds on- or off-balance sheet

## Total client funds by client niche[1]

- Early stage technology
- Technology
- Early stage life science/ healthcare
- Life science/ healthcare
- International[2]
- U.S. Global Fund Banking
- Private Bank
- Other



**$173B** Deposits

6% · 30% · 21% · 9% · 3% · 18% · 13%



**$168B** OBS

1% · 22% · 30% · 23% · 13% · 8% · 3%

Note: All figures as of December 31, 2022 unless otherwise noted.
1. Represents management view of client niches.
2. International balances do not represent foreign exposure as disclosed in regulatory reports. Includes clients across all client niches and life stages, with International Global Fund Banking representing 3% of total client funds.
3. Based on deposit rates and total deposit balances at December 31, 2022.



## Actions to support deposits are pressuring deposit beta and mix

**47%**
12/31/22 noninterest-bearing share of total deposits

**High 30s %**
Estimated Q4'23 noninterest-bearing share of total deposits

**1.50%**
12/31/22 weighted average spot deposit rate (total deposits)[3]

**63%**
2022 interest-bearing deposit beta

**~70%**
Expected through-the-cycle interest-bearing deposit beta

Leveraging flexible liquidity solutions that allow us to allocate funds on- or off- balance sheet

When client fund growth returns, these flexible liquidity solutions can help us optimize our deposit rates and mix by shifting higher-cost deposits off-balance sheet

# Deposit mix shift and beta continue to pressure asset sensitivity

## Flexible liquidity solutions can help regain some asset sensitivity when VC deployment increases and client funds growth returns

**Assumptions[2]**

| Estimated change in annualized pre-tax NII per each 25 bp increase in rates[1] | 12/31/22 static balance sheet | Assuming FY'23 outlook |
|---|---|---|
| | **$0M to + $20M** | **- $15M to + $5M** |
| NIB % of total deposits | 47% | High 30s % Q4'23 average |
| Modeled interest-bearing deposit beta | 70% | ~70% |
| Total borrowings | $18.9B | $12-16B avg. borrowings |
| Receive floating swaps | $550M | $550M |
| Deposits | $173.1B | Mid single digit % decline FY'23 vs. FY'22 avg. deposits |
| Loans | $74.3B | Low double digit % growth FY'23 vs. FY'22 avg. loans |
| Fixed income securities | $117.4B | $2-3B paydowns/quarter |

Each percentage point decrease in NIB % of total deposits reduces estimated NII benefit by ~ **$3M** (pre-tax)

Each percentage point increase in deposit beta reduces estimated NII benefit by ~ **$3M** (pre-tax)

**Q4'22 interest rate risk management activity**
- **Termed out $15B** borrowings
- **Executed $550M** receive floating swaps on AFS portfolio

## 2023 client investment fee expectations

- YoY growth in FY'23 client investment fees due to higher full-year margin vs. 2022

- Client investment fees likely to peak ~35-37 bps

- Declining quarterly client investment fees due to lower OBS balances

**OBS balance growth expected to return when markets reopen**



1. Expected 12-month impact of a +25 bp rate shock on net interest income. Management's sensitivity analysis assumes an instantaneous and sustained parallel shift in rates. Actual results may differ.
2. Assumptions for 12/31/22 static balance sheet scenarios based on period-end balances.



# Continued market uncertainty: Expect continued, but moderating, market challenges in 2023

## Outlook considerations

- Continued market uncertainty presents forecasting challenges – providing Q1'23 expectations to supplement FY'23 outlook[2]

- Current market pressures will likely persist, but moderate, impacting FY'23 growth

- Expect improving balance between inflows from private fundraising activity and outflows from client cash burn as clients reduce spending

- Expect near-term NII and NIM pressure as proportion of interest-bearing deposits and deposit rates increase, with improvement by Q4'23

- Prolonged market volatility will likely increase credit losses and NPLs from historic lows – still expect overall healthy credit performance, with losses concentrated in Early Stage (only 3% of loans)

- Moderating pace of investment in light of current market headwinds

**Note:** Outlook excludes impact of potential changes to rates other than expected Fed rate hikes noted below[1], adverse developments with respect to U.S. or global economic or geopolitical conditions, and regulatory/policy changes under the current U.S. government administration

*Outlook includes expected changes to Fed Funds rates[1]*

| Business driver | FY'22 results | FY'23 vs. FY'22 outlook | Q1'23 expectations |
|---|---|---|---|
| Average loans | $70.3B | Low double digits % growth | ~ $74-76B |
| Average deposits | $185.7B | Mid single digits % decline | ~ $171-175B |
| Net interest income[3] | $4,522M | High teens % decline | ~ $925-955M |
| Net interest margin | 2.16% | 1.75-1.85% | ~ 1.85-1.95% |
| Net loan charge-offs | 0.10% | 0.15-0.35% | ~ 0.15-0.35% |
| Core fee income[4,5] | $1,181M | Low teens % growth | ~ $325-350M |
| SVB Securities revenue[4,6] | $518M | $540-590M | ~ $125-150M |
| Noninterest expense excluding merger-related charges[7] | $3,571M | Low single digits % growth | ~ $910-940M |
| Effective tax rate | 25.2% | 26-28% | ~ 26-28% |

Given continued market uncertainty, providing Q1'23 expectations to supplement FY'23 outlook[2]

Note: Actual results may differ. For additional information about our financial outlook, please refer to our Q4 2022 Earnings Release and Q4 2022 CEO Letter.
1. Expect Fed Funds rate of 4.75% in February and 5.00% in March.
2. We do not regularly provide quarterly expectations but may do so from time to time, as needed.
3. NII is presented on a fully taxable equivalent basis, while NII guidance excludes fully taxable equivalent adjustments.
4. Non-GAAP financial measure. See "Use of non-GAAP Financial Measures" in our Q4 2022 Earnings Release and our non-GAAP reconciliations at the end of this presentation.
5. Excludes SVB Securities revenue.
6. Represents investment banking revenue and commissions.
7. Excludes pre-tax merger-related charges related to acquisition of Boston Private ($50M incurred in FY'22 , estimated $5-10M in Q1'23 and $10-15M for FY'23).

svb

# Well-positioned to support our clients and navigate challenging market conditions

**Strong execution**
- Active client engagement + investments to deepen and expand our business help support earnings through rate and economic cycles

**Trusted partner**
- Nearly 40 years serving innovation clients
- Committed partnership with our clients to promote better outcomes

**Robust, resilient markets**
- Remain confident in the long-term growth opportunity of the innovation economy

**Ample liquidity**
- Highly-liquid balance sheet with multiple levers to manage liquidity position while client funds growth remains pressured

**Strong credit and asset quality**
- Long track record of strong underwriting and resilient credit performance
- 86% of assets in high-quality investments and low credit loss lending*

**Strong capital**
- Strong foundation to manage shifting economic conditions while investing in our business

**Proven experience**
- Deep bench of recession-tested leaders supported by strong global team



* Based on cash, fixed income investment portfolio and Global Fund Banking and Private Bank loan portfolios as of December 31, 2022.

# Long-term tailwinds supporting the innovation economy remain intact

## U.S. VC investment, company formation and the Digital Economy's share of GDP



Legend:
- Digital Economy's share of GDP[1]
- U.S. VC Investment (in $ Billions TTM)[2]
- U.S. VC-Backed Company Formation (TTM)[2]

Chart annotations: 6.0% (2000), 7.8% (2005), 8.7% (2010), 9.2% (2015), 10.2% (2020)

Timeline markers: Dotcom Bubble Crash, Global Financial Crisis, VC Recalibration[3], Early COVID-19, Fed Tightening

### Innovation drives economic growth

- The innovation economy grew at **2.4x** the rate of the overall U.S. economy between 2000-2020[1], and COVID-19 has since accelerated digital adoption

### Great companies are founded across business cycles

- **127** unicorns were founded during the Global Financial Crisis and **64** during the VC recalibration[4]

### The innovation economy is better-positioned today to weather a downturn than in past cycles

- The innovation economy was **3.5x** larger in 2020 than 2000[1]

- PE and VC firms globally have **$2.6T** dry powder to invest, **8.7x** more than in 2000[5]

1. Digital economy's share of GDP as defined and measured by the Bureau of Economic Analysis used as a proxy for the innovation economy.
2. VC investment and company formation data sourced from PitchBook. First VC round raised used as a proxy for company formation. Data has been updated with PitchBook's proprietary back-end data set and filters which has resulted in prior period revisions.
3. Pullback in VC investment.
4. Unicorn data sourced from PitchBook. Includes U.S. VC-backed companies that have reached and maintained at least a $1B post-money valuation through time of exit.
5. Source: Preqin. Global VC dry powder was $0.6T and global PE dry powder was $2.0T as of January 3, 2023.



# Robust client funds growth over the long term

Note: VC investment data sourced from PitchBook. Investment data has been updated with PitchBook's proprietary back-end data set and filters which has resulted in prior period revisions.
* Pullback in VC investment.

svb



# Ample liquidity + flexibility to manage liquidity position

## High-quality, liquid balance sheet
### 62% of assets in cash and fixed income securities

- Cash
- Fixed Income Securities
- Net Loans
- Non-marketable Securities
- Other



Assets
**$212B**

1% 2%
7%
55%
35%

### 92% of fixed income portfolio in U.S. Treasuries and securities issued by government-sponsored enterprises

- U.S. Treasury Securities
- Agency Debenture
- Agency CMOs – Fixed Rate
- Agency RMBS
- Agency CMBS
- Municipal Bonds
- Corporate Bonds



AFS
+HTM
**$117B**

1%
14%
1%
9%
55%
13%
7%

## Levers to support liquidity

Targeting Fed cash at **4-6%** of total deposits (**$7-11B**)*

| Securities cashflows | **~ $2-3B** estimated securities paydowns/quarter | |
|---|---|---|
| Flexible on- vs. off-balance sheet liquidity solutions and deposit pricing strategies | **$79B** Off-balance sheet sweep and repo client funds (OBS balances that can be shifted on-balance sheet to support deposits) | **~ 70%** Modeled interest-bearing deposit beta |
| Remaining borrowing capacity | **$69B** (FHLB, Repo, FRB and Fed Funds lines) | |



Note: Figures as of December 31, 2022 unless otherwise noted.
* Actual balances depend on timing of fund flows.

# We've successfully navigated economic cycles before

## Proven leadership supported by strong global team

### 13 years
Executive management average tenure at SVB

### 24 years
Credit leadership average tenure at SVB

# Long history of strong, resilient credit
and the risk profile of our loan portfolio has improved over time

Non-performing loans (**NPLs**[1]) & net charge-offs (**NCOs**[2])
Bps



Improved loan mix
% of period-end total loans

| 2000 | 2009 | 12/31/22 |
|---|---|---|
| 30% Early Stage | 11% Early Stage | 3% Early Stage |
| 5% GFB + Private Bank | 30% GFB + Private Bank | 70% GFB + Private Bank |

1. Non-performing loans as a percentage of period-end total loans.
2. Net loan charge-offs as a percentage of average total loans.
3. Pullback in VC investment.

# High-quality loan mix: 70% of loans in low credit loss portfolios
## Closely monitoring loans given increased recession risk



## Expect continued strong credit performance

**56%** **Global Fund Banking**
- Primarily PE/VC capital call lines of credit secured by LP capital commitments
- Only 1 net loss since inception

Low credit loss portfolios

**14%** **Private Bank**
- Primarily low LTV mortgages to innovation economy influencers and legacy Boston Private high net worth clients

Note: Percentages indicate percent of total loans as of 12/31/22

**Loans make up 35%** of total assets

## Watching portfolio-specific risks

**2%** **Premium Wine**
- Loans to premium wine producers and vineyards
- Typically secured by high-quality real estate with low LTVs

**1%** **Other C&I**
- Working capital, revolving lines of credit and term loans to non-innovation companies and non-profits

**3%** **CRE**
- Acquisition financing for CRE properties
- Well-margined collateral

## More sensitive to market correction

**3%** **Cash Flow Dependent – Sponsor-Led Buyout**
- Loans to facilitate PE Sponsors' acquisition of businesses
- Reasonable leverage and meaningful financial covenants

Larger loan sizes may introduce greater volatility in credit metrics

**12%** **Innovation C&I**
- Cash flow or balance sheet dependent loans to later- and corporate-stage innovation companies

**6%** **Growth Stage**
- Loans to mid-stage and later-stage innovation companies with over $5M in revenues

Repayment dependent on borrower's ability to fundraise or exit

Clients generally have stronger balance sheets vs. previous cycles from record VC investment in 2020-2021

**3%** **Early Stage**
- Loans to development-stage innovation companies with $0-5M in revenues
- Historically our highest risk portfolio

Low credit loss portfolios

Technology & Life Science / Healthcare

As of 12/31/22
Total loans

# Strong capital position with multiple levers to support capital

## Targeting **7-8%** Bank Tier 1 leverage

### Q4'22 Bank capital ratio drivers

- $294M dividend to SVBFG
- Healthy earnings and increased ACL
- Higher risk-weighted assets from loan and unfunded commitment growth
- Decrease in average assets driven by securities paydowns and lower cash balances

### Silicon Valley Bank capital ratios*
As of 12/31/22



SVB capital ratio

Regulatory minimum

| | Common Equity Tier 1 | Tier 1 Capital | Total Capital | Tier 1 Leverage |
|---|---|---|---|---|
| SVB capital ratio | 15.29% | 15.29% | 16.08% | 7.96% |
| Regulatory minimum | 7.00% | 8.50% | 10.50% | 4.00% |

## Levers to support capital ratios

### Healthy profitability

**12.1%**

FY'22 ROE

### SVBFG liquidity

**$2.2B**

12/31/22 SVBFG liquidity, a portion of which can be downstreamed to Bank as capital

### Capital markets activity

2022 new issuances
**$800M**

Senior notes



* Ratios as of December 31, 2022 are preliminary.

# Continue to invest for the long-term, but moderating pace of investment in light of current market headwinds

## Progress made against our strategic priorities enables us to focus our investments

### 2023 investment focus



**Private Banking & Wealth Management go-to-market strategy**

- Advisor hiring and development program
- Liquidity and loan solutions
- Digital banking



**Commercial Bank revenue growth and digital enhancements**

- Client-facing teams
- End-to-end digital banking platform
- Client onboarding
- Payment enablement



**One SVB collaboration**

- Partnership across our four core businesses to deliver the full power of the SVB platform to clients
- Integrated solutions
- Client introductions
- Client and industry insights



**Risk management enhancements**

- Large Financial Institution regulatory requirements*
- Data foundation
- Privacy and cybersecurity



* Became subject to Category IV requirements in 2021. Category III standards will become applicable at ≥ $250B in average total consolidated assets or ≥ $75B in weighted short-term wholesale funding, nonbank assets or off-balance-sheet exposure. Category II standards will become applicable at either ≥$700B in average total consolidated assets, or ≥ $100B in average total consolidated assets and ≥$75B in cross-jurisdictional activity. Metrics determined based on four quarter averages.

Q4 2022 FINANCIAL HIGHLIGHTS    21

# Key takeaways



**Continued strength and momentum in underlying business**

- Client engagement is very high as companies seek our advice as a trusted partner of the innovation economy
- Strong Tech borrowing activity, client acquisition, GFB loan term sheets and PE/VC dry powder – all positive indicators of future business growth

**Moderation in both client cash burn and pace of VC investment decline**

- Improving balance between inflows from private fundraising activity and outflows from client cash burn
- Expect market and deposit mix + pricing pressures to persist near-term, but moderate, with NII and NIM improving by Q4'23



**Strong and well-positioned**

- We have a high-quality, liquid balance sheet; strong capital ratios; and multiple levers to manage liquidity
- Our investments in our four core businesses have expanded our capabilities and diversified our revenues – enhancing our ability to serve our clients
- While prolonged market volatility will likely increase NPLs and NCOs from historic lows, we still expect overall healthy credit performance, with losses concentrated in Early Stage (only 3% of loans)



**Continued confidence in our strategy**

- Innovation propels global economic growth – we continue to believe the growth trajectory of the innovation economy will outpace other industries over the long term



# Performance detail and outlook drivers



# Key external variables to our forecast

Our performance is influenced by a variety of external variables, including but not limited to:

**VC fundraising and investment**
- Promote new company formation which helps support client acquisition
- Source of client liquidity which impacts total client funds growth
- A source of repayment for Investor Dependent loans

**PE fundraising and investment**
- Primary driver of capital call line demand which has been the largest source of loan growth over the past 9 years

**Exit activity**
- Proceeds from public market exits generate client liquidity
- A source of repayment for Investor Dependent loans
- Ability for companies to exit affects VC/PE fundraising and investment
- Impacts investment banking revenue and value of warrants and investment securities

**Capital markets**
- Performance and volatility of public, private and fixed income markets impact exit activity, VC/PE fundraising and investment, and market-driven revenues (FX, loan syndications, investment banking revenue and commissions, warrant and investment gains and wealth management and trust fees)

**Interest rates**
- Level of interest rates and shape of yield curve directly impact NIM via lending and investment yields/spreads vs. funding costs
- Level of short-term rates impact clients' preference for on- vs. off-balance sheet liquidity solutions and interest-bearing vs. noninterest-bearing deposits, variable rate loan yields and client investment fee margin
- Affect mortgage and securities prepayment speeds, impacting timing of premium amortization
- Affect mortgage demand

**Economic environment**
- Affects health of clients which determines credit quality
- Level of business activity drives client liquidity and demand for our products and services
- Inflation impacts costs (for us and clients) and influences fiscal and monetary policy decisions

**Competitive landscape**
- Affects margins and client acquisition
- Impacts compensation to attract and retain talent

**Political environment**
- Current administration and Congress will influence economic policy and stimulus, business and market sentiment, global trade relationships, bank regulations and corporate taxes
- Geopolitical events can impact capital markets and economic environment



# Improved balance between VC deployment and client cash burn
## Expect ~$171-175B Q1'23 average deposits and mid single digit % decline in FY'23 average deposits

### Q4'22 activity

• Both client cash burn and the pace of decline in VC investment moderated in Q4, reducing QoQ EOP declines and EOP deposit mix shift

• Higher proportion of interest-bearing deposits and increased deposit costs reflect client cash burn from NIB, continued success leveraging flexible liquidity solutions to shift OBS client funds on-balance sheet and client preferences for higher rates

### FY'23 considerations

Expect moderating deposit declines, with modest growth returning in 2H'23:

**−  Closed public markets**
Limited inflows from public fundraising and exit activity

**−  Pressured private markets**
Impacts inflows from private fundraising activity

**−  Higher rate environment**
Increased demand for yield off-balance sheet

**−  PE/VC distributions**
2022 year-end distributions will impact Q1 average balances

**+  Robust liquidity solutions and substantial OBS balances**
Provide flexibility to support on-balance sheet deposit balances

**+  Slowing client cash burn**
Improving balance between inflows from private fundraising activity and outflows from client cash burn as clients reduce spending

Expect higher cost of deposits:

**+  Higher cost of interest-bearing deposits**
NII sensitivity model assumes ~70% beta on interest-bearing deposits

**+  Continued, but moderating, NIB to IB deposit mix shift**
Expect high 30s % Q4'23 NIB % of total deposits due to client cash burn from NIB, actions to shift OBS client funds on-balance sheet and client preferences for rates





* Based on deposit rates and total deposit balances at period end.

# Slightly lower securities balances from paydowns and $1B AFS sale; higher premium amortization expense pressured securities yields

## Q4'22 activity

- Sold $1.0B US Treasuries (20 bps w.a. yield) at a $27M loss and reinvested proceeds in cash (4.33% 12/31/22 spot yield, ~3 quarter pre-tax payback period)
- $2.2B paydowns (1.81% w.a. yield)
- $0.3B purchases (3.44% w.a. yield) related to the subsidiarization of our U.K. branch
- Portfolio yield decreased 14bps QoQ driven primarily by premium amortization expense of $131M in Q4 vs. $94M in Q3 – Q3 premium amortization expense included a $50M benefit[1] due to higher rates that was not repeated in Q4

## FY'23 considerations

- Estimated ~$2-3B paydowns/quarter; expect limited securities purchases/reinvestment activity
- Expect Q1'23 and FY'23 portfolio yield ~1.78-1.82%

 **Premium amortization expense[1]**
From prepayments of securities purchased at a premium

Expect Q1 premium amortization expense ~$110-120M based on 10-year UST at 3.75% – changes in 10-year UST will impact premium amortization expense

If 10-year drops 50 bps, premium amortization expense could increase by ~$10-20M

 **Rate protections**
Executed $550M receive floating swaps on AFS portfolio in Oct'22 (20 bp positive carry at 12/31/22)

$290M remaining locked-in pre-tax gains from unwind of $6B AFS fair value hedges in Q2'22 to be amortized into interest income over the life of the underlying hedged securities, ~7 years



Average fixed income investment securities[2]
$B

Portfolio yield **-14 bps QoQ**

Tax-effected Yield[2]

| | Q4'21 | Q1'22 | Q2'22 | Q3'22 | Q4'22 | |
|---|---|---|---|---|---|---|
| | 1.54% | 1.79% | 1.92% | 1.90% | 1.76% | |
| | 111.7 | 125.6 | 126.7 | 123.0 | 121.5 | |
| | 4.0y | 4.9y | 5.4y | 5.7y | 5.6y | Portfolio duration |
| | 3.7y | 4.8y | 5.3y | n/a | 5.6y | Hedge-adjusted |
| | $160M | $112M | $86M | $94M | $131M | Premium amortization expense[1] |



Average cash and equivalents
$B

**$9B** Fed Cash at 12/31/22
Targeting Fed cash at **4-6%** of total deposits ($7-10B)[3]

| | Q4'21 | Q1'22 | Q2'22 | Q3'22 | Q4'22 | |
|---|---|---|---|---|---|---|
| | 22.1 | 14.8 | 14.8 | 15.7 | 13.6 | |
| | 6.0 | 5.6 | 5.5 | 6.1 | 5.1 | Cash in other financial institutions and foreign central banks |
| | 16.1 | 9.2 | 9.3 | 9.6 | 8.5 | Fed cash |



1. SVB applies the retrospective method of amortization for premiums/discounts of its fixed income securities and recalculates the estimated lives on a quarterly basis. When a change is made to the estimated lives of the securities (e.g., due to changes in actual or expected prepayment activity), the related change to premium or discount from date of acquisition of the securities is recorded in that period.
2. Bonds accrue interest according to each security's respective day count convention while reported yields are based off of actual/365 day count.
3. Actual balances depend on timing of fund flows.

# Continued healthy loan growth driven by GFB capital call, Tech and Private Bank mortgage borrowing
## Expect ~$74-76B Q1'23 average loans and low double digit % growth in FY'23 average loans

### Q4'22 activity

- GFB capital call growth driven by new originations, offsetting lower utilization rates as PE/VC investment slowed – GFB term sheets continue to be at near record highs
- Persistent market volatility continued to fuel strong Tech growth as clients turned to debt as an alternative to raising equity at pressured valuations
- Continued Private Bank mortgage momentum driven by new purchase activity; refi demand remained pressured by rate environment





### FY'23 considerations

Expect moderate loan growth:

- **Healthy Tech and Life Science/Healthcare borrowing**
  Market volatility fueling demand
- **Consistent SVB Private mortgage origination**
  Referrals from commercial clients offset reduced demand from higher rates and economic uncertainty
- **Current strong GFB pipeline**
  New originations to offset pressured utilization from slowdown in PE/VC investment activity

Expect higher loan yields:

- **Higher yields with future rate hikes**
  92% of Q4'22 average loans were variable rate
- **Rate protections**
  $60M remaining locked-in pre-tax swap gains from unwind of loan cash flow hedges as of 12/31/22 (vast majority to be amortized by end of 2023)
- **Boston Private purchase accounting**
  Amortization of fair value mark ups on loans ($24M remaining at 12/31/22, vast majority to be amortized by end of 2023)



# Lower NII and NIM despite higher loan yields as liability mix shift pressured interest expense and premium amortization expense increased; expect near-term NII and NIM pressure, with improvement by Q4'23
## NII: Expect ~$925-955M in Q1'23 and high teens % decline in FY'23
## NIM: Expect ~1.85-1.95% in Q1'23 and 1.75-1.85% in FY'23



Net Interest Income[1]
$M

NII **-13%** QoQ

Q3 premium amortization expense included a **$50M** benefit due to higher rates that was not repeated in Q4[2]

Includes **$130M** of higher deposit costs from shifting OBS client funds to on-balance sheet deposits

Net Interest Margin

NIM **-28 bps** QoQ

## FY'23 considerations

Expect near-term NII and NIM pressure, with improvement by Q4'23:

**−** **Higher deposit costs**
Given rising rate environment and continued, but moderating, NIB to IB deposit mix shift (see page 25)

**−** **Premium amortization expense**
From prepayments of securities purchased at a premium (see page 26)

**−** **Boston Private purchase accounting**
Amortization of fair value mark ups on loans ($24M remaining at 12/31/22, vast majority to be amortized by end of 2023)

**+** **Improving balance between VC investment and client cash burn**
Supports modest deposit growth in 2H'23

**+** **Higher loan yields**
From future Fed rate hikes (see page 27)

**+** **Rate protections**
Executed $550M receive floating swaps on AFS portfolio in Oct '22 (20 bp positive carry at 12/31/22)
$290M remaining locked-in pre-tax gains from unwind of $6B AFS fair value hedges in Q3'22 to be amortized into interest income over the life of the underlying hedged securities, ~7 years
$60M remaining locked-in pre-tax swap gains from unwind of loan cash flow hedges as of 12/31/22 (vast majority to be amortized by end of 2023)



1. NII is presented on a fully taxable equivalent basis, while NII guidance excludes fully taxable equivalent adjustments.
2. SVB applies the retrospective method of amortization for premiums/discounts of its fixed income securities and recalculates the estimated lives on a quarterly basis. When a change is made to the estimated lives of the securities (e.g., due to changes in actual or expected prepayment activity), the related change to premium or discount from date of acquisition of the securities is recorded in that period.

# Provision driven by increased NCOs and NPLs, strong growth and model assumptions
## While prolonged market volatility likely increases credit losses and NPLs from historic lows, still expect overall healthy credit performance (expect 15-35 bps Q1'23 and FY'23 NCOs)

### Q4'22 activity

- Increase in QoQ NCOs (+$13M), NPLs (+$55M) and Criticized (+$230M) reflect current market challenges
- Provision driven primarily by:
  - $36M gross charge-offs not previously specifically reserved for, driven primarily by Early Stage and Growth Stage portfolios, partially offset by $9M recoveries
  - $26M from higher NPLs, driven primarily by Investor Dependent and Innovation C&I portfolios
  - $46M from robust loan and unfunded commitment growth
  - $44M from model assumptions (deterioration in projected economic conditions and increased weighted average life of loan portfolio)

| Credit quality metrics | Q4'21 | Q1'22 | Q2'22 | Q3'22 | Q4'22 | |
|---|---|---|---|---|---|---|
| | 0.01% | 0.05% | 0.12% | 0.08% | 0.15% | Net charge-offs[1] |
| | 0.14% | 0.10% | 0.13% | 0.11% | 0.18% | Non-performing loans[2] |
| Provision for credit losses $M | $48 | $11 | $196 | $72 | $141 | |

Model assumptions
HTM securities
Unfunded
Net credit losses
Other
Non-performing loans
Loan growth

Q4'21: 3, 1, 22, 2, 20
Q1'22: 4, 15, (13), 6, (1)
Q2'22: 89, 50, 20, 18, 3
Q3'22: 9, 42, 10, 18, 4, (11)
Q4'22: 31, 37, 27, 26, 22, (2)

### FY'23 considerations

While prolonged market volatility likely increases credit losses and NPLs from historic lows, still expect overall healthy credit performance, with losses concentrated in Early Stage:

Weightings applied to Moody's December economic scenarios

**40%** baseline   **30%** downside   **30%** upside

− **Pressured public and private markets**
Likely impacts performance of Tech and Life Science/Healthcare portfolio, particularly Investor Dependent loans where repayment is dependent on borrower's ability to fundraise or exit

− **Larger Growth Stage, Innovation C&I and Cash Flow Dependent – Sponsor-Led Buyout loan sizes**
Growth of our balance sheet and our clients has increased the number of large loans, which may introduce greater volatility in credit metrics, but expect more limited migration from NPLs to NCOs

− **CRE loans acquired from Boston Private**
Limited overall exposure (only 3% of total loans) and well-margined collateral

+ **High-quality loan mix**
70% of loans in low credit loss GFB and Private Bank portfolios
Early Stage – historically our highest risk portfolio – only 3% of loans

+ **Stronger client balance sheets vs. previous cycles**
Record VC investment in 2020-2021 has generally extended client runway and clients are taking steps to reduce burn



1. Net loan charge-offs as a percentage of average total loans (annualized).
2. Non-performing loans as a percentage of period-end total loans.

# Increased NPLs, strong growth, and model assumptions drove higher reserves

Weightings applied to Moody's December economic scenarios:

**40%** baseline
**30%** downside
**30%** upside

Baseline scenario assumptions:

**4.19%** peak unemployment in Q4'23
**0.96%** 1 year GDP decline

## ALLOWANCE FOR CREDIT LOSSES FOR LOANS AND UNFUNDED CREDIT COMMITMENTS
$ Millions



Changes in loan composition/growth
Charge-offs/recoveries
Specific reserves

Projected economic conditions and scenario weightings
Weighted average life of loan portfolio

vs. **~6%** average Early-Stage NCOs over 2008-2010

| $ Millions | ACL 9/30/22 (%) | ACL 9/30/22 | Portfolio Changes | Model Assumptions | ACL 12/31/22 | ACL 12/31/22 (%) |
|---|---|---|---|---|---|---|
| Early Stage Investor Dependent | 4.55% | 87 | 9 | 3 | 99 | 5.05% |
| Growth Stage Investor Dependent | 3.34% | 147 | 23 | 5 | 175 | 3.68% |
| Cash Flow Dep: Sponsor Led Buyout | 1.41% | 26 | (3) | - | 23 | 1.18% |
| Innovation C&I | 1.31% | 109 | 14 | 8 | 131 | 1.52% |
| Global Fund Banking | 0.23% | 91 | 3 | 17 | 111 | 0.27% |
| Private Bank | 0.47% | 47 | 2 | - | 49 | 0.47% |
| Other C&I | 1.20% | 13 | (1) | 1 | 13 | 1.31% |
| Commercial Real Estate | 1.07% | 28 | - | (3) | 25 | 0.96% |
| Premium Wine & Other | 0.59% | 9 | 1 | - | 10 | 0.67% |
| **ACL for loans** | **0.77%** | **557** | **48** | **31** | **636** | **0.86%** |
| ACL for unfunded credit commitments | 0.48% | 265 | 25 | 13 | 303 | 0.48% |
| ACL for loans and unfunded credit commitments | 0.64%* | 822 | 73 | 44 | 939 | 0.69%* |

Tech & LS / HC



* Weighted average ACL ratio for loans outstanding and unfunded credit commitments.

# Improved client investment fee margin drove record core fee income
## Expect ~$325-350M Q1'23 core fee income and low teens % growth in FY'23 core fee income

Core fee income[1]
$M



62% increase in YoY core fees



Wealth management & trust fees ("WM&T")
Credit card fees
FX fees
Deposit service charges
Client investment fees
Lending related fees
LOC fees

SVB Private AUM[2]
$M



### Q4'22 activity

- Client investment fees +$30M as average fee margin increased 8 bps to 34 bps (35 bps EOP) with Fed rate hikes
- Lending related fees +$9M on strong unused commitment fees
- FX fees -$5M driven by reduced EMEA activity as GBP stabilized
- Private Bank AUM +$1.4B AUM driven by market returns (+$754M) as well as net flows (+$680M) related to recent wealth advisor hires, new investment solutions and referrals from commercial bank corporate clients

### FY'23 considerations

Expect full-year core fee income growth, but quarterly declines:

 **Higher full-year, but lower quarterly client investment fees**
Expect YoY growth in FY'23 client investment fees due to higher full-year fee margin vs. 2022

Expect declining quarterly client investment fees due to lower OBS balances (see page 12)

 **Pressured public and private markets**
Impact GFB FX activity, client fund inflows, client spending, demand for syndicated loans and SVB Private AUM balances

 **Continued strong new client growth and deepening engagement**
From investments in client acquisition, new products and client experience



1. Non-GAAP financial measure. See "Use of non-GAAP Financial Measures" in our Q4 2022 Earnings Release and our non-GAAP reconciliations at the end of this presentation.
2. Represents SVB Private's client investment account balances.

# Strong Biopharma deal activity drove SVB Securities revenue outperformance vs. outlook
## Expect ~$125-150M Q1'23 and $540-590M FY'23 SVB Securities revenue



### Q4'22 activity

- Increased underwriting and M&A advisory fees driven by Biopharma follow-on transactions and M&A activity
- Compensation related to prior year hiring and deferred compensation costs drove SVB Securities expenses higher than revenue



SVB Securities revenue[1] $M

| | Q4'21 | Q1'22 | Q2'22 | Q3'22 | Q4'22 |
|---|---|---|---|---|---|
| Total | 145 | 118 | 149 | 99 | 152 |
| Commissions | 21 | 25 | 24 | | 25 |
| Private placements and other[2] | 17 | 7 | 15 | 24 | 10 |
| M&A advisory[2] | 51 | 54 | 69 | 11 | 51 |
| | | | | 40 | |
| Underwriting fees[2] | 56 | 32 | 41 | 24 | 66 |

| SVB Securities expenses | $184M | $134M | $141M | $131M | $198M |

### FY'23 considerations

Expect increased FY'23 investment banking activity – quarterly activity may vary:

**–** **Pressured public markets**
Pressures later-stage/public valuations, delaying near-term ECM activity

**+** **New hires and expertise**
Hiring and investment over the past 2 years to grow Technology, Healthcare Services and HealthTech investment banking help diversify business

**+** **Strengthening collaboration**
Between commercial bank and investment bank teams



**Life Sciences/Healthcare**

- Tools & Diagnostics
- Medical Devices
- Biopharma
- Digital Health & HealthTech
- Healthcare Services

**Technology**

- Consumer Software, Internet & Info Services
- Industrial Technology
- Education Technology
- Fintech
- Enterprise Software
- Digital Infra & Tech Services



1. Non-GAAP financial measure. See "Use of non-GAAP Financial Measures" in our Q4 2022 Earnings Release and our non-GAAP reconciliations at the end of this presentation.
2. Included in investment banking revenue.

# Continued market volatility and $1B sale of AFS securities drove investment losses

Expect muted warrant gains and additional private fund investment losses given prolonged market volatility

## Q4'22 activity

- Investment losses net of NCI included:
  - $50M investment losses driven primarily by further valuation declines in our managed funds and strategic investments reflective of continued adverse market conditions
  - $27M realized loss on the sale of $1B AFS U.S. Treasuries
- $28M warrant gains driven primarily by valuation updates and M&A activity

## Outlook considerations

Expect muted warrant gains and additional private fund investment losses given prolonged market volatility:

- **—** **Pressured public and private markets**
  Slows PE/VC investment
  Fewer exits reduce opportunities to realize gains

- **—** **Private funds' 2022 year-end audit and valuation cycle**
  Funds' annual audit and valuation process may result in valuation declines that drive additional private fund investment losses (estimated ~$50-60M) through 1H'23

- **—** **Increased potential for down rounds**
  Clients generally have extended runway, but eventually will need to raise funds

- **+** **Granular, diversified positions**
  **Warrants:** Only 65 warrants out of 3,234 positions with a fair value >$1M, collectively representing $199M in fair value
  **Private fund investments:** Exposure to over 500 funds with nearly 25,000 investments in ~10,000 companies across various industries and stages of development

Warrant and investment gains (losses)
Net of NCI[1]
$M



Warrant gains
Investment
gains (losses)
less AFS sales
Gains (losses)
from AFS sales

Warrants & non-marketable and other equity securities[1, 2]
$M



Warrants

Non-marketable and other equity securities[1, 2]



Note: The extent to which unrealized gains (or losses) from investment securities from our non-marketable and other equity securities portfolio as well as our equity warrant assets will become realized is subject to a variety of factors, including, among other things, performance of the underlying portfolio companies, investor demand for IPOs and SPACs, fluctuations in the underlying valuation of these companies, levels of M&A activity and legal and contractual restrictions on our ability to sell the underlying securities.
1.  Non-GAAP financial measure. See "Use of non-GAAP Financial Measures" in our Q4 2022 Earnings Release and our non-GAAP reconciliations at the end of this presentation.
2.  Net of investments in qualified affordable housing projects and noncontrolling interests.

# Net warrant gains more than offset Early Stage charge-offs over time and offer meaningful long-term earnings support

Warrant gains net of
Early Stage losses
$M

**$1.1B**
Cumulative net
gains (2002-2022
warrant gains less
Early Stage NCOs)

Net gains on equity
warrant assets

Early Stage
NCOs

| Year | Net gains | Early Stage NCOs |
|------|-----------|------------------|
| 2002 | -3 | -13 |
| 2003 | 8 | -1 |
| 2004 | 3 | 0 |
| 2005 | 3 | -2 |
| 2006 | 22 | -7 |
| 2007 | 23 | -10 |
| 2008 | 11 | -16 |
| 2009 | 0 | -58 |
| 2010 | 7 | -23 |
| 2011 | 37 | 1 |
| 2012 | 19 | -21 |
| 2013 | 46 | -26 |
| 2014 | 71 | -30 |
| 2015 | 71 | -12 |
| 2016 | 38 | -45 |
| 2017 | 55 | -35 |
| 2018 | 89 | -28 |
| 2019 | 138 | -23 |
| 2020 | 237 | -27 |
| 2021 | 560 | -28 |
| 2022 | 148 | -40 |



# SVB Securities outperformance and deferred compensation costs drove increased incentive comp
## Continue to invest for the long-term, but moderating pace of investment in light of current market headwinds – excluding merger-related charges, expect ~$910-940M Q1'23 noninterest expenses and low single digit % growth in FY'23 noninterest expenses*



Noninterest expenses
$M

### Q4'22 activity

- $81M increase in compensation and benefits driven primarily by:
  - $67M increase in incentive compensation driven by SVB Securities revenue outperformance and deferred compensation costs
  - $20M increase in salaries and wages expense from hiring to drive and support our strategic priorities

### FY'23 considerations

- Moderating pace of investment in 2023; expect lower Q1'23 expenses as SVB Securities-related expenses normalize and pace of investment in our strategic priorities moderates



Low single digit % growth
(excluding merger-related charges)*


* Excludes pre-tax merger-related charges related to acquisition of Boston Private (estimated $5-10M in Q1'23 and $10-15M for FY'23).

# Appendix



# Our vision: Be the most sought-after partner helping innovators, enterprises and investors move bold ideas forward, fast



Strategic partnerships, M&A and talent acquisition have bolstered organic initiatives to expand and deepen our global platform

# Building the premier investment bank dedicated to the innovation economy



Enhancing our ability to deliver strategic support to our clients as they grow

### 2019

Acquired healthcare investment bank Leerink Partners

### 2021

Added Leveraged Finance, SPACs and Structured Finance capabilities
Launched Technology Investment Banking
Acquired technology equity research firm MoffettNathanson LLC
Deepened Healthcare Services and HealthTech Practices

### 2022

Rebranded as SVB Securities to reflect our expanded focus
Continued team build out

**Life Sciences/Healthcare**



Tools & Diagnostics



Medical Devices



Biopharma



Healthcare Services



Digital Health & HealthTech

**Technology**



Education Technology



Industrial Technology



Enterprise Software



Digital Infra & Tech Services



Consumer Software, Internet & Info Services



Fintech



# Creating a premier private banking & wealth management platform

## Trusted advisor and team

- Dedicated advisor supported by a team of specialists
- Deep wealth management and innovation economy expertise

## Full product suite



HNW/UHNW
Family office
Tax planning
Philanthropy
Trust & estate

Mortgages
Private stock lending
Securities-based loans
Specialty commercial

SVB Capital access
Private placements
Brokerage solutions
Impact investing

## Wealth access digital portal

Seamless onboarding

$360^\circ$ view of financial positions

Integrated banking and wealth solutions

Personalized financial planning

Customized portfolio management

24-7 access and support

## Premier private banking and wealth platform



**Superior client focus**

Holistic, relationship-based advice and service



**Comprehensive planning**

to prepare for complex financial needs resulting from liquidity and life events



**Exclusive access**

to networking events, insights and investment opportunities in the innovation economy



**Tailored solutions**

to address equity compensation, concentrated stock positions and non-liquid assets



**Next generation digital platform**

"Always on" digitally enabled interactions and improved efficiencies



**Large balance sheet**

to support clients' borrowing needs



# Strategic partnerships: another channel to expand capabilities to better meet clients' needs



Centralized marketplace for trading private company stock



Marketplace for on-demand executive talent



Investment analytics platform for VCs, LPs and other private capital investors



Largest global seed investor and accelerator program



Commercial insurance provider powered by technology serving high-growth, venture-backed startups

    

**Commercial Banking:**

Enable clients to manage secondary offerings with leading technology platform and global distribution network

**SVB Private, SVB Capital & SVB Securities:**

Provide investor clients more liquidity options and broader access to investment opportunities

**Commercial Banking:**

Help clients rapidly scale and diversify their leadership teams and boards

**SVB Private:**

Provide clients with access to job opportunities within the innovation economy

**Commercial Banking:**

Provide a powerful solution for our PE and VC clients to gain enhanced insights into their portfolios

**SVB Capital:**

Assist SVB Capital team with market benchmarking, streamlined LP reporting and portfolio analytics

**Commercial Banking:**

Expand SVB's early-stage client acquisition channels and support innovative companies in Techstars' global network

Gain sector and market insights in the innovation economy

**Commercial Banking:**

Connect early and mid-stage clients to Vouch's tailored commercial insurance solutions to benefit customer retention and risk mitigation



Note: SVB maintains a noncontrolling equity interest in each of the companies listed above.

# High-quality balance sheet

## Period-end assets
$B

86% of assets in high-quality investments and low credit loss lending*



211.3    211.8

39% CAGR

Other assets
Non-marketable securities (primarily VC & LIHTC investments)
Held-to-maturity securities

115.5

Available-for-sale securities
Cash and cash equivalents

56.9    71.0

Net loans

2018    2019    2020    2021    2022

## Period-end liabilities
$B

Noninterest-bearing deposits 41% of total liabilities



39% CAGR

194.7    195.5

Other liabilities
Borrowings

Interest-bearing deposits

107.1

51.7    64.4

Noninterest-bearing deposits

2018    2019    2020    2021    2022



\* Based on cash, fixed income investment portfolio and Global Fund Banking and Private Bank loan portfolios as of December 31, 2022.

# Improved risk profile over time, with loan growth driven by lowest risk loan portfolios
## 70% of loans in Global Fund Banking and Private Bank, portfolios with lowest historical credit losses

Period-end total loans
$B

**Early Stage** Investor Dependent ("ID") loans, **our highest risk loan portfolio**, now **only 3%** of total loans, **down from 11%** in 2009 and **30%** in 2000



**Early Stage ID % of total loans**

PPP
CRE
Other C&I
Premium Wine and Other
Private Bank

Technology and
Life Science/Healthcare

Global Fund Banking



# Low credit risk capital call lines of credit
## Largest driver of loan growth over past 9 years; strong underwriting and well-diversified

### Global Fund Banking capital call lending

Short-term lines of credit used by PE and VC funds to support investment activity prior to the receipt of Limited Partner capital contributions

**53%**[1] of total loans

**Strong** sources of repayment



**Limited partner commitments**
and robust secondary markets



**Value of fund investments**
with solid asset coverage

**Only 1 net loss** in our ~30 years of capital call lending

### Global Fund Banking portfolio[2]

**By investment style**


PE Funds



- VC funds 19%
- Real estate 5%
- Debt 10%
- Other 12%
- Fund of funds 11%
- Buyout 20%
- Growth 23%

**By industry**



- Energy Other
- Infrastructure 2%
- Natural resources 1%
- Fintech 3%
- Life sciences 12%
- Real estate 8%
- Industrial 4%
- Consumer 6%
- Technology 39%
- Debt 16%
- Other 6%



1. Based on period-end loans at December 31, 2022. Capital call lines represent 96% of GFB portfolio.
2. Based on total GFB loan commitments (funded + unfunded) as of December 31, 2022.

# Supporting innovation around the world



## 2022 VC investment by market[1]



| $258B | $107B | $131B |
|---|---|---|
| Americas | EMEA | APAC |

● SVB Financial Group's offices

## Expanding our platform globally


**U.K.**
2004 — **London**
Silicon Valley Bank UK Limited, wholly owned subsidiary of Silicon Valley Bank (2022)


**China**
2005 — **Shanghai**
Business development
**Hong Kong** (2009)
Representative office
**Beijing** (2010)
Business development


**Israel**
2008 — **Tel Aviv**
Representative office

**China Joint Venture**
2012 — SPD Silicon Valley Bank (JV)
**Shanghai**
Additional JV branches
**Beijing** (2017)
**Shenzhen** (2018)
**Suzhou** (2022)


**Europe**
2016 — **Ireland** (2016)
Business development
**Germany** (2018)
Lending branch
**Denmark** (2019)
Representative office
**Sweden** (2022)
Representative office


**Canada**
2019 — **Toronto** (2019)
Lending branch
**Vancouver** (2020)
Business Development
**Montréal** (2021)
Business Development

---

**$10B | 14% of total loans**
International average loans[2]
$B



| 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| 2.9 | 4.0 | 5.7 | 8.3 | 9.7 |

**$41B | 11% of total client funds**
International average total client funds[2]
$B



| | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| Total | 12.9 | 15.0 | 19.0 | 37.7 | 41.3 |
| OBS client funds | 2.4 | 3.1 | 3.6 | 4.4 | 5.4 |
| Total deposits | 10.5 | 11.9 | 15.4 | 33.3 | 35.9 |

**$145M | 12% of total core fees[3]**
International core fee income[2]
$M



| 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| 57 | 70 | 80 | 117 | 145 |

---

1. Source: PitchBook. Investment data has been updated with PitchBook's proprietary back-end data set and filters which has resulted in prior period revisions.
2. International activity reflects figures for our international operations in the U.K., Europe, Israel, Asia and Canada. This management segment view does not represent foreign exposure as disclosed in regulatory reports.
3. Non-GAAP financial measure. See "Use of non-GAAP Financial Measures" in our Q4 2022 Earnings Release and our non-GAAP reconciliations at the end of this presentation.

# History of industry-leading performance

**Strong return on equity**

### Return on equity

■ SVB  ■ Peer Average[1]



**Strong total shareholder return**

### Total shareholder return[2]
Since 1/1/13



As of 12/31/22:

SVB
4.1x

S&P 500
2.7x

BKX
2.0x

1. Source: S&P Global Market Intelligence or peer publicly reported earnings results. "Peers" refers to peer group as reported in our Proxy Statement for each year and is subject to change annually. 2022 average peer ROE includes 8 of 16 peers as of January 19, 2023.
2. Cumulative total return on $100 invested on 1/1/13 in stock or index. Includes reinvestment of dividends.



# Strong, seasoned management team
## Diverse experience and skills to help direct our growth



## 13 years
average tenure
at SVB



### Dan Beck
**Chief Financial Officer**
5 years at SVB



### Greg Becker
**President and CEO**
29 years at SVB



### Marc Cadieux
**Chief Credit Officer**
30 years at SVB



### John China
**President SVB Capital**
26 years at SVB



### Phil Cox
**Chief Operations Officer**
13 years at SVB



### Laura Cushing
**Chief Human Resources Officer**
Joined SVB 2022



### Mike Descheneaux
**President Silicon Valley Bank**
17 years at SVB



### Michelle Draper
**Chief Marketing & Strategy Officer**
9 years at SVB



### Jeffrey Leerink
**CEO SVB Securities**
4 years at SVB



### Kim Olson
**Chief Risk Officer**
Joined SVB 2022



### John Peters
**Chief Auditor**
16 years at SVB



### Michael Zuckert
**General Counsel**
8 years at SVB

# Glossary

The following terms are used throughout this presentation to refer to certain SVB-specific metrics:

**Non-GAAP measures**

Please see "Use of non-GAAP Financial Measures" in our Q4 2022 Earnings Release and non-GAAP reconciliations at the end of this presentation

**Core Fee Income** – Fees from letters of credit, client investments, credit cards, deposit service charges, foreign exchange, lending-related fees and wealth management and trust, in aggregate.

**Core Fee Income plus SVB Securities Revenue** – Core fee income, from above, plus investment banking revenue and commissions.

**SVB Securities Revenue** – SVB Securities revenue defined as investment banking revenue and commissions and excludes other income earned by SVB Securities.

**Tangible Common Equity ("TCE") / Tangible Book Value ("TBV")** – Stockholders' equity less preferred stock and intangible assets, plus net deferred taxes on intangible assets.

**Gains (losses) on Investment Securities, Net of Noncontrolling Interests** – Net gains on investment securities include gains and losses from our non-marketable and other equity securities, which include public equity securities held as a result of exercised equity warrant assets, gains and losses from sales of our Available-For-Sale debt securities portfolio, when applicable, and carried interest. This measure excludes amounts attributable to noncontrolling interests for which we effectively do not receive the economic benefit or cost.

**Non-GAAP Non-marketable and Other Equity Securities, Net of investments in Qualified Affordable Housing Projects and Noncontrolling Interests in Non-marketable Securities** – This measure represents non-marketable and other equity securities but excludes qualified affordable housing projects and noncontrolling interests.

**Other measures**

**Fixed Income Securities** – Available-For-Sale ("AFS") and Held-To-Maturity ("HTM") securities held on the balance sheet.

**Total Client Funds ("TCF")** – The sum of on-balance sheet deposits and off-balance sheet client investment funds. Beginning in Q3'21, TCF excludes SVB Private assets under management.

**SVB Private Assets Under Management ("AUM")** – Consists of SVB Private's client investment accounts balances.

**Total Client Position  ("TCP")** – Represents sum of SVB Private AUM, and loans and deposits as reported in our segment reporting for SVB Private.



# Acronyms and abbreviations

**ACL** – Allowance for credit losses

**AFS** – Available-for-sale

**APAC** – Asia-Pacific

**AUM** – Assets under management

**BD&T** – Business development & travel

**BKX** – KBW Nasdaq Bank Index

**BP** – Boston Private

**bp** – Basis point

**C&I** – Commercial and industrial

**CAGR** – Compound annual growth rate

**CMBS** – Commercial mortgage-backed security

**CMO** – Collateralized mortgage obligation

**CRE** – Commercial Real Estate

**Dep** – Dependent

**ECM** – Equity capital market

**EMEA** – Europe, the Middle East and Africa

**EOP** – End of period

**EPS** – Earnings per share

**Ex** – Excluding

**FDIC** – Federal Deposit Insurance Company

**FHLB** – Federal Home Loan Bank

**FRB** – Federal Reserve Board

**FTE** – Full-time employee

**FX** – Foreign exchange

**FY** – Full year

**GBP** – British Pound

**GDP** – Gross domestic product

**GFB** – Global Fund Banking

**HC** – Healthcare

**HNW/UHNW** – High net worth, ultra high net worth

**HTM** – Held-to-maturity

**IB** – Interest-bearing

**ID** – Investor dependent

**IPO** – Initial public offering

**JV** – Joint venture

**LIHTC** – Low income housing tax credit funds

**LOC** – Letter of credit

**LP** – Limited partner

**LS** – Life science

**LTV** – Loan-to-value

**M&A** – Merger & acquisition

**MBS** – Mortgage-backed security

**NCI** – Noncontrolling interests

**NCO** – Net charge-off

**NIB** – Noninterest-bearing

**NII** – Net interest income

**NIM** – Net interest margin

**NPL** – Non-performing loan

**OBS** – Off-balance sheet

**PBWM** – Private bank wealth management

**PE** – Private equity

**QoQ** – Quarter over quarter

**R&D** – Research and development

**Refi** – Refinance

**Repo** – Repurchase agreement

**RMBS** – Residential mortgage-backed security

**ROE** – Return on equity

**SBA PPP** – Small Business Administration Paycheck Protection Program

**SEC** – Securities & Exchange Commission

**SPAC** – Special purpose acquisition company

**SPD** – Shanghai Pudong Development Bank

**ST** – Short-term

**SVBFG** – SVB Financial Group

**TBV** – Tangible book value

**TCE** – Tangible common equity

**TCF** – Total client funds

**TCP** – Total client position

**Tech** – Technology

**TTM** – Trailing 12 months

**UST** – U.S. Treasury security

**VC** – Venture capital

**W.A.** – Weighted average

**WM&T** – Wealth management and trust

**YoY** – Year over year

**YTD** – Year-to-date



# Non-GAAP reconciliations



Non-GAAP reconciliation
# Core fee income and investment gains, net of NCI

| Non-GAAP core fee income (dollars in millions) | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 |
| GAAP noninterest income | 745 | 1,221 | 1,840 | 2,738 | 1,728 |
| Less: gains (loss) on investment securities, net | 88 | 135 | 421 | 761 | (285)* |
| Less: net gains on equity warrant assets | 89 | 138 | 237 | 560 | 148 |
| Less: other noninterest income | 52 | 55 | 98 | 128 | 166 |
| Non-GAAP core fee income plus SVB Securities revenue | 516 | 893 | 1,084 | 1,289 | 1,699 |
| Investment banking revenue | — | 195 | 414 | 459 | 420 |
| Commissions | — | 56 | 67 | 79 | 98 |
| Less: total non-GAAP SVB Securities revenue | — | 251 | 481 | 538 | 518 |
| Non-GAAP core fee income | 516 | 642 | 603 | 751 | 1,181 |

| Non-GAAP net gains on investment securities, net on noncontrolling interests (dollars in millions) | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 |
| GAAP net gains (loss) on investment securities | 88 | 135 | 421 | 761 | (285)* |
| Less: income (loss) attributable to noncontrolling interests, including carried interest allocation | 38 | 48 | 86 | 240 | (62) |
| Non-GAAP net gains on investment securities, net of noncontrolling interests | 50 | 87 | 335 | 521 | (223) |



See "Use of non-GAAP Financial Measures" in our Q4 2022 Earnings Release for more information.
*Primarily driven by non-marketable and other equity securities.

Non-GAAP reconciliation
# Non-marketable and other equity securities

| Non- GAAP Non-marketable and other equity securities, net of investments in qualified affordable housing projects and noncontrolling interests (dollars in millions) | Period-end balances at | | | | |
|---|---|---|---|---|---|
| | 12/31/21 | 3/31/22 | 6/30/22 | 9/30/22 | 12/31/22 |
| GAAP non-marketable and other equity securities | 2,543 | 2,605 | 2,645 | 2,595 | 2,664 |
| Less: investments in qualified affordable housing projects | 954 | 957 | 1,134 | 1,205 | 1,306 |
| Less: noncontrolling interests in non-marketable securities | 367 | 389 | 358 | 307 | 292 |
| Non- GAAP Non-marketable and other equity securities, net of investments in qualified affordable housing projects and noncontrolling interests | 1,222 | 1,259 | 1,153 | 1,083 | 1,066 |



See "Use of non-GAAP Financial Measures" in our Q4 2022 Earnings Release for more information.

# Important information regarding forward-looking statements and use of non-GAAP financial measures

The Company's financial results for 2022 reflected in this presentation are unaudited. This document should be read in conjunction with the Company's SEC filings.

Forward-Looking Statements

This presentation contains forward-looking statements within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are subject to known and unknown risks and uncertainties, many of which may be beyond our control. Forward-looking statements are statements that are not historical facts, such as forecasts of our future financial results and condition, expectations for our operations and business, and our underlying assumptions of such forecasts and expectations. In addition, forward-looking statements generally can be identified by the use of such words as "becoming," "may," "will," "should," "could," "would," "predict," "potential," "continue," "anticipate," "believe," "estimate," "assume," "seek," "expect," "plan," "intend," the negative of such words or comparable terminology. In this presentation, we make forward-looking statements discussing management's expectations for 2023 and the first quarter of 2023 about, among other things, economic conditions; the continuing and potential effects of the COVID-19 pandemic; opportunities in the market; our commitments and objectives in relation to sustainable finance and managing risks associated with climate change; the outlook on our clients' performance; our financial, credit, and business performance, including potential investment gains, loan and deposit growth, mix and yields/rates, and expense levels; our expected effective tax rate; the interest rate environment; accounting impacts and financial results (and the components of such results).

Although we believe that the expectations reflected in our forward-looking statements are reasonable, we have based these expectations on our current beliefs as well as our assumptions, and such expectations may not prove to be correct. Because forward-looking statements relate to the future, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict and many of which are outside our control. Our actual results of operations and financial performance could differ significantly from those expressed in or implied by our management's forward-looking statements. Important factors that could cause our actual results and financial condition to differ from the expectations stated in the forward-looking statements include, among others: market and economic conditions (including elevated inflation levels, sustained interest rate increases, the general condition of the capital and equity markets, and private equity and venture capital investment, IPO, secondary offering, SPAC fundraising, M&A and other financing activity levels) and the associated impact on us (including effects on total client funds and client demand for our commercial and investment banking and other financial services, as well as on the valuations of our investments); disruptions to the financial markets as a result of current or anticipated military conflicts, including the ongoing military conflict between Russia and Ukraine, terrorism and other geopolitical events; the COVID-19 pandemic, including COVID-19 variants and their effects on the economic and business environments in which we operate, and its effects on our business and operations; the impact of changes from the Biden-Harris administration and the U.S. Congress on the economic environment, capital markets and regulatory landscape, including monetary, tax and other trade policies, as well as regulatory changes from bank regulatory agencies; changes in the volume and credit quality of our loans as well as volatility of our levels of nonperforming assets and charge-offs; the impact of changes in interest rates or market levels or factors affecting or affected by them, including on our loan and investment portfolios and deposit costs; the adequacy of our allowance for credit losses and the need to make provisions for credit losses for any period; the sufficiency of our capital and liquidity positions, and our ability to generate capital or raise capital on favorable terms; changes in the levels or composition of our loans, deposits and client investment fund balances; changes in the performance or equity valuations of funds or companies in which we have invested or hold derivative instruments or equity warrant assets; variations from our expectations as to factors impacting our cost structure; changes in our assessment of the creditworthiness or liquidity of our clients or unanticipated effects of credit concentration risks which create or exacerbate deterioration of such creditworthiness or liquidity; variations from our expectations as to factors impacting the timing and level of employee share-based transactions; the occurrence of fraudulent activity, including breaches of our information security or cyber security-related incidents; business disruptions and interruptions due to natural disasters and other external events; the impact on our reputation and business from our interactions with business partners, counterparties, service providers and other third parties; the expansion of our business internationally, and the impact of geopolitical events and international market and economic events on us; the effectiveness of our risk management framework and quantitative models; unexpected delays or expenses associated with executing against our climate-related commitments and goals; the quality and availably of carbon emissions data; our ability to maintain or increase our market share, including through successfully implementing our business strategy and undertaking new business initiatives, including through the continuing integration of Boston Private, the expansion of SVB Private and the growth and expansion of SVB Securities; greater than expected costs or other difficulties in the continuing integration of our business and that of Boston Private; variations from our expectations as to the amount and timing of business opportunities, growth prospects and cost savings associated with the acquisition of Boston Private; the inability to retain existing Boston Private clients and employees following the Boston Private acquisition; unfavorable resolution of legal proceedings or claims, as well as legal or regulatory proceedings or governmental actions; variations from our expectations as to factors impacting our estimate of our full-year effective tax rate; changes in applicable accounting standards and tax laws; and regulatory or legal changes (including changes to the laws and regulations that apply to us as a result of the growth of our business) and their impact on us.

We refer you to the documents the Company files from time to time with the Securities and Exchange Commission, including (i) our latest Annual Report on Form 10-K, (ii) our most recent Quarterly Report on Form 10-Q, and (iii) our most recent earnings release filed on Form 8-K. These documents contain and identify important risk factors that could cause the Company's actual results to differ materially from those contained in our projections or other forward-looking statements. All forward-looking statements included in this presentation are made only as of the date of this presentation. We assume no obligation and do not intend to revise or update any forward-looking statements contained in this presentation, except as required by law. This presentation shall not constitute an offer or solicitation in connection with any securities.

Use of Non-GAAP Financial Measures

To supplement our financial disclosures that are presented in accordance with GAAP, we use certain non-GAAP measures of financial performance (including, but not limited to, non-GAAP core fee income, non-GAAP SVB Securities revenue, non-GAAP core fee income plus non-GAAP SVB Securities revenue, non-GAAP net gains on investment securities, non-GAAP non-marketable and other equity securities net of investments in qualified affordable housing projects and noncontrolling interests in non-marketable securities, and non-GAAP financial ratios) of financial performance. These supplemental performance measures may vary from, and may not be comparable to, similarly titled measures by other companies in our industry. Non-GAAP financial measures are not in accordance with, or an alternative for, GAAP. Generally, a non-GAAP financial measure is a numerical measure of a company's performance that either excludes or includes amounts that are not normally calculated or included in the most directly comparable measure calculated and presented in accordance with GAAP. A non-GAAP financial measure may also be a financial metric that is not required by GAAP or other applicable requirement.

We believe that these non-GAAP financial measures, when taken together with the corresponding GAAP financial measures (as applicable), provide meaningful supplemental information regarding our performance by: (i) excluding amounts attributable to noncontrolling interests for which we effectively do not receive the economic benefit or cost of, where indicated, or (ii) providing additional information used by management that is not otherwise required by GAAP or other applicable requirements. Our management uses, and believes that investors benefit from referring to, these non-GAAP financial measures in assessing our operating results and when planning, forecasting and analyzing future periods. These non-GAAP financial measures also facilitate a comparison of our performance to prior periods. We believe these measures are frequently used by securities analysts, investors and other interested parties in the evaluation of companies in our industry. However, these non-GAAP financial measures should be considered in addition to, not as a substitute for or superior to, net income or other financial measures prepared in accordance with GAAP. Under the "Use of Non-GAAP Financial Measures" section in our latest earnings release attached as an exhibit to our Form 8-K on January 19, 2023, we have provided reconciliations of, where applicable, the most comparable GAAP financial measures to the non-GAAP financial measures used in this presentation, or a reconciliation of the non-GAAP calculation of the financial measure. Please refer to that section of the earnings release for more information.

.





## About SVB

SVB is the financial partner of the innovation economy, helping individuals, investors and the world's most innovative companies achieve their ambitious goals. SVB's businesses - Silicon Valley Bank, SVB Capital, SVB Private and SVB Securities - together offer the services that dynamic and fast-growing clients require as they grow, including commercial banking, venture investing, wealth planning and investment banking. Headquartered in Santa Clara, California, SVB operates in centers of innovation around the world. Learn more at svb.com/global.

*SVB Financial Group (Nasdaq: SIVB) is the holding company for all business units and groups. © 2023 SVB Financial Group. All rights reserved. SVB, SVB FINANCIAL GROUP, SILICON VALLEY BANK, SVB SECURITIES, SVB PRIVATE, SVB CAPITAL and the chevron device are trademarks of SVB Financial Group, used under license. Silicon Valley Bank is a member of the FDIC and the Federal Reserve System. Silicon Valley Bank is the California bank subsidiary of SVB Financial Group.*

   

Investor Relations   |   3005 Tasman Drive Santa Clara, CA  95054   |   T 408 654 7400   |   ir@svb.com



# 2020 Global Startup Outlook

Key insights from the Silicon Valley Bank
Startup Outlook Survey

# Startups see bright conditions in 2020

Silicon Valley Bank is pleased to present our 11th annual **Startup Outlook Report**, capturing entrepreneurs' perspectives on the health of the innovation economy. For our 2020 report, we drew on 1,100 responses from technology and healthcare founders and executives based in the US, the UK, China and Canada.

The headline. Two-thirds of these entrepreneurs tell us they expect business conditions to improve in 2020, underscoring the resiliency of the innovation sector. This level of confidence has essentially remained unchanged over the past few annual surveys, even in the face of shifting economic and political headwinds and increasing scrutiny of the tech sector.

The 2020 results underscore a few key themes. There's rarely been a better time to be an entrepreneur; almost all are planning to hire, and most of those who are attempting to raise capital report that they are successful. In many ways, technology has reduced the cost of entry, allowing companies to more quickly solve for product-market fit or move on.

But there's another part to the story. As technology becomes embedded in nearly everything we do, the debates grow louder over who should have access to tech jobs and why most leadership roles still go to white males. Front and center now at the highest levels of many governments are discussions about how to handle data privacy and cybersecurity issues. And more than ever, we are all talking about the real-world impacts of the technology revolution.

Entrepreneurs are not ones to shy away from tough problems; in fact, they thrive on the pursuit of solutions. We do this report every year with the goal of helping startups, policymakers and the public understand what drives the innovation economy, and we hope you find useful information that can help you succeed in 2020. Let us know what you think.

**Greg Becker**
CEO, Silicon Valley Bank

# Two-thirds of startups say 2020 will be better

The innovation economy continuously adapts to change, and entrepreneurs are optimistic by nature. Despite the dramatic political and economic transitions under way, startups consistently share a positive forecast for improving business conditions.

In addition, 79% of startups plan to hire in 2020, underscoring their critical role as job creators.

## Describe your outlook for business conditions for your company in the coming year.







# Capital abounds, but it's not easy to access

While there is no shortage of investors, they are increasingly selective about how and when to invest. Just 12% of startups say it's getting easier to raise funding, while 41% say it is getting harder. Even so, for those startups that sought capital in 2019, all but 11% were successful, and 56% said they raised their most recent round in less than six months.

## What is your view of the current fundraising environment for companies like yours?



**41%**
Getting harder

**47%**
No change

**12%**
Getting easier

"As an early-stage, diverse (with women and minority co-founders) medtech company, access to pre–Series A and A financing is a monumental challenge."

Co-founder, US medical device company

# Startup capital comes from many sources

With the rise of non-traditional sources of capital, startups report that they are tapping a variety of funders. Venture capital, however, was still the top source for those that recently raised capital.

## If you raised private capital in 2019, what was the primary source of funding?



*Other includes seed venture firm, accelerator/incubator, government grant, bank debt, crowdfunding, ICO and IPO.

# Venture capital still dominates

Startups again expect venture capital to be their next source of funding. Interestingly, 12% of startups do not plan to raise money in the near future but to instead rely on organic growth.



## What do you expect your next source of funding to be?

*Other includes accelerator/incubator, crowdfunding, merger, government grant, IPO and ICO.

# Most startups expect to be acquired

While headlines both trumpet and criticize recent IPOs, the fact is most entrepreneurs never expect to reach a public market exit (except in China, where an IPO is typically the top goal). And in this environment, it's sometimes hard to pinpoint a long-term goal.

## What is the realistic long-term goal for your company?



- Be acquired
- Go public via an IPO
- Remain private
- Don't know/ prefer not to say

| | Be acquired | Go public via an IPO | Remain private | Don't know/prefer not to say |
|---|---|---|---|---|
| US | 58% | 17% | 14% | 11% |
| UK | 58% | 18% | 11% | 13% |
| China | 14% | 46% | 21% | 19% |
| Canada | 60% | 16% | 20% | 4% |

# Access to talent is top public policy issue

Finding skilled talent is a top concern in many innovation hubs.

## What are the three most important public policy issues affecting companies like yours?



"Talent 'wars' continue to drive up costs and make scaling more difficult."

VP of finance,
US cybersecurity company

"Cybersecurity and data sovereignty need to be addressed systematically by Canada for us to just maintain our standing in the world."

Executive, Canadian tech company

# Many startups say hiring is getting harder

Low unemployment rates, competition for top talent, stiffer immigration rules and the high cost of living in global tech hubs combine to make hiring talent difficult. Demand is highest for development and R&D roles.

> "Access to EU talent and being a welcoming place are key for the UK to remain a technology leader."
>
> VP of finance,
> UK cybersecurity company

> "We should be open to educating everyone, and talented people should be allowed to stay and work in the US."
>
> Co-founder, US fintech company

## How would you describe the hiring environment compared with last year?



**45%** Harder    **39%** No change    **16%** Easier

## What are the top three skills you are hiring for?



Product development/R&D — 64%

Sales — 54%

Technical — 53%

# Entrepreneurship knows no boundaries

Entrepreneurs hail from countries all over the world, bringing their ideas to innovation hubs in the US, the UK and Canada. Half of startups in those three countries have at least one foreign-born founder.

"**Bring back US entrepreneur visas for founders.**"

CEO, US AI company

## Startups with at least one foreign-born founder:



52%
US

53%
UK

52%
Canada

# Are women making it into startup leadership?

Industry leaders and individual companies are increasing awareness and efforts to improve female representation in tech leadership, but the gap to reach gender parity remains wide.

SVB will publish an in-depth report on Women in US Technology Leadership in H1 2020.



## 43%
have at least one female **C-suite executive**

## 42%
have at least one female **board member**

# How are ethnic and racial minorities represented in startup leadership?

For the first time, we asked startups in the US, the UK and Canada about ethnic and racial minorities* in leadership positions.



## 42%
have at least one **C-suite executive** who is ethnically or racially diverse

## 44%
have at least one **board member** who is ethnically or racially diverse

*Ethnic and racial minorities are defined as:
US: Black/African American, Hispanic, Asian/Pacific Islander, American Indian and Alaskan Native.
UK: Black/African/Caribbean or Asian.
Canada: Visible Minority or Indigenous/Aboriginal. Visible Minority is defined by Canada's Employment Equity Act as "persons, other than Aboriginal people, who are non-Caucasian in race or non-white in colour."

# What are startups doing to encourage a diverse workforce?

We asked startups in the US, the UK and Canada what kinds of programs they have to increase diversity. While 43% say they have companywide promotion and hiring goals, fewer than one in five has these goals specifically for C-level positions. About one-third have board member diversity goals.

> **"Make it easier for injustices to be corrected and penalize VCs and boards for poor diversity."**
>
> CEO, US consumer internet company

## Does your company have any programs to increase diverse representation in leadership?



26%
Yes

55%
No

19%
Don't know/
prefer not
to say

## What types of programs do you have in place?



58%
Flexible work
environment

58%
Recruiting
outreach/interview
techniques

48%
Leadership
development
and training

45%
Supporting
diversity-focused
organizations

43%
Establishing
promotion/
hiring goals
companywide

# About the Startup Outlook Survey

Our annual survey offers insights into what is on the minds of technology and healthcare startup leaders. For the 2020 report, we conducted the survey in October and November 2019 and received responses from startup executives in innovation hubs primarily in the **US**, the **UK**, **Canada** and **China**.



**Total respondents**

1,100

**Industry sector**

69% Technology (net)
17% Healthcare (net)
14% Other

**Size**

58% 0–25 employees
27% 26–100 employees
15% >100 employees

**Company age**

71% < 5 years old
29% > 5 years old

**Profitable**

56% Yes
44% No

**Primary place of business**

63% US
1% Other
5% Canada
24% China
7% UK

**Ownership**

97% Private
3% Public

**Revenue stage** (USD)

64% < $25 million in revenue
24% Pre-revenue
12% ≥ $25 million in revenue

**Founder gender**

32% At least one female founder
68% Male-only founder(s)

**Companies with at least one founder born outside their primary country**

52% US
53% UK
52% Canada

© 2020 SVB Financial Group. All rights reserved. SVB, SVB FINANCIAL GROUP, SILICON VALLEY BANK, MAKE NEXT HAPPEN NOW and the chevron device are trademarks of SVB Financial Group, used under license. Silicon Valley Bank is a member of the FDIC and the Federal Reserve System. Silicon Valley Bank is the California bank subsidiary of SVB Financial Group (Nasdaq: SIVB). Silicon Valley Bank, an authorized bank branch under the Bank Act (Canada). This material, including without limitation to the statistical information herein, is provided for informational purposes only, and has been derived based upon the responses received from SVB's Startup Outlook Survey. Nothing relating to the material should be construed as a solicitation, offer or recommendation to acquire or dispose of any investment, or to engage in any other transaction.



# State of the US Wine Industry 2022

Written by Rob McMillan, EVP and Founder
Silicon Valley Bank Wine Division

# Contents

1  **Introduction**                                          **3**

2  **2021 predictions in review**                            **5**

What we got right                                             6

What we got partially right                                   7

What we got wrong                                             7

3  **2022 US wine business predictions and observations**    **8**

Top-level forecasts                                           9

Supply                                                        9

Demand                                                       10

Price                                                        10

Seven tailwinds                                              10

Seven headwinds                                              11

4  **Channel trends and changes**                            **12**

Predicting a party with business reopening                   13

Total sales through the distributor channel                  14

Changes in alcoholic beverage per capita consumption         15

The decline of entry-level wine                              17

Off-premise (grocery) sales                                  19

On-premise (restaurant) sales                                21

Post-COVID restaurant changes                                25

Premium winery sales channel shifts                          25

Digital and online sales                                     26

5  **Premium winery business performance**                   **30**

6  **Demographics and marketing**                            **34**

Millennials versus boomers                                   39

7  **Harvest and grape and wine supply**                     **41**

With two consecutive bad yields in California, shouldn't grape and bulk prices rise?   42

Volatile harvest swings for the past several years           44

Impacts from disasters                                       44

8  **Packaging and varietals**                               **49**

9  **Cumulative negative health messaging**                  **52**

Neo-prohibition — the start                                  53

Modern-day prohibition                                       54

10  **What do we do about declining demand?**                **56**

The beginning of a change in how we do things                57

Agreeing on a path                                           57

Beginning to make WineRAMP a reality                         58

Objections                                                   58

Final thoughts                                               61

11  **Endnotes**                                             **62**



# 1 | Introduction

We can definitively say that 2021 was a good year for the US wine industry — not a great year or a bad year, but a good year. Reopening tasting rooms, hotels and restaurants, along with thawing travel, rejuvenated sales opportunities in those venues.

Restaurant sales of alcohol recovered and surpassed pre-pandemic measures at least on a same-store basis, while direct-to-consumer (DTC) sales grew and internet sales maintained their strong pandemic-era performance. Mergers and acquisition (M&A) transactions were by all accounts the strongest ever, underscored by the first IPOs of major wineries in 20 years.[1] Strikingly, almost 30 percent of winery owners finished the year believing 2021 was not just much better than 2020, but their best year ever!

CONTENTS  |  **1 INTRODUCTION**  |  2  |  3  |  4  |  5  |  6  |  7  |  8  |  9  |  10  |  11

The success throughout 2021 was supported by the rollout of vaccines, allowing COVID-19 mandates to be gradually relaxed and businesses to reopen. Other factors backing the positive results included the strongest US GDP since 1984, steadily improving employment and wage growth and record levels of pandemic-induced savings that provided spending fuel for consumers. The Federal Reserve held interest rates near zero, stimulating added consumer demand from a wealth effect, as the stock market closed with more than 60 record highs during the year.[2, 3]

There was a lot to celebrate, including just getting out of the house! And that success was hard-earned. A disastrous 2020 holiday season bled into 2021; then the Delta variant caused another wave of infections and slowed reopening in many regions. Added to that were continuing impacts from climate change — more fires, more smoke, an unprecedented drought in the West and low soil moisture, which impacted yields and will require added mitigation going forward. Other stresses included the challenge of finding a sufficient number of employees and paying higher wages for those employees, rising input costs and supply chain issues, water rationing in many regions throughout the West and a scarcity of affordable property insurance — and we haven't mentioned consumer demand yet.

Looking at a single good year doesn't define the industry as successful any more than looking at 2020 defines the business as a failure. We must consider long-term trends to get a true accounting of industry health, and doing so this year reveals issues with consumer demand that may portend serious conditions for the industry for years to come.

That last point is a big deal. In prior reports, we noted that the falling interest in wine among younger consumers, coupled with the encroaching retirement and decreasing wine consumption of baby boomers, poses a primary threat to the business.[4] That issue has yet to be addressed or solved, and the negative consequences are increasingly evident.

Throughout the reopening, wine lost market share to spirits. Worse yet, total wine sold through wholesale declined through most of the year despite tasting rooms, restaurants, hotels and travel resuming business. We predicted there would be a reopening celebration, and it turns out we were correct, but the reopening celebration that took place in 2021 didn't include the wine industry.

This report is written primarily for wineries, investors in the wine business and academia. For the winery owner, it is meant to inform your team's thinking about the position you occupy within the wine business, help you anticipate scenarios that can require planning, and guide you toward strategies that might improve your opportunity to succeed in the future. For the wine industry as a whole, we hope this year's report will be a clarion call that creates greater industry cooperation to address the long-term threats that are diminishing opportunity.

> "
> ## Total wine sold through wholesale declined through most of the year despite tasting rooms, restaurants, hotels and travel resuming business.



# 2

# 2021 predictions in review

We have been making public forecasts in this report for 21 years. The 2020 report was a challenge for us, as it was released six weeks before the pandemic started. Obviously, our predictions didn't consider a worldwide plague! But coming into the 2021 report, we bounced back, making bold predictions about the year ahead, including pandemic impacts. Some of these predictions turned out to be remarkably prescient, others still offer promise to be correct in direction if not in specific numbers, and a very small number might have been slightly askew.

CONTENTS | 1 | **2 2021 PREDICTIONS IN REVIEW** | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11

Anticipating that the country would gain control over COVID and that the hospitality sector would reopen, last year we led with the following observation:

"The post-COVID world won't be the same one we left in early 2020. There will be many permanent changes we will need to consider, such as the shift to working from home, the increasing relocation of consumers to the suburbs and the acceleration of consumer online sales, which will take sales away from other channels. Even the best-run wineries in 2019 won't find the same level of success in 2021 unless they evolved in 2020 and continue to do so in 2021."

That view appears to have hit the mark. As we move through more phases in the recovery, we can clearly see how COVID is driving several changes, such as working from home and, with that, the exit from large cities by those seeking larger homes with office space. These relocated consumers have changed their buying patterns.

The country will more than likely never fully go back to the traditional office or completely recover the amount of business travel, which impacts both restaurant and airline wine sales. There have also been enduring changes to online sales, with more consumers using online as an option to purchase virtually anything instead of walking into a shop in a metropolitan city.

## What we got right

- We predicted that 2021 would be a year of two phases: first, continuing to execute in a COVID-restricted mode during the early part of the year; and second, moving away from emergency responses once the wide distribution of vaccines signaled a move into a less risky, post-COVID world.

- We said there would be a reversal of the COVID-induced channel shifting as reopening gathered momentum.

- Restaurants, we predicted, would come out of the lockdown damaged and need new investment. We believed that wine sales through restaurants would not recover to pre-COVID levels in 2021 and that it might take several years.

- We thought wineries with DTC models would focus on new COVID-era strategies in the front half of the year but, upon the reopening of the hospitality sector, would finish 2021 with strong sales.

- We predicted that when restaurants reopened, their wine inventories would be minimized and streamlined into smaller wine lists and the investment in long wine lists might be limited going forward.

- We anticipated that the US economy would continue to recover and grow as vaccines and therapeutics gained traction.

- We thought M&A activity would take off due to low interest rates and the high level of liquidity looking for a return.

- We guessed that when 2020 totals were calculated, California would have crushed 3.3 million tons, which would be the smallest harvest since 2011. We came close enough, with the actual crush coming in at 3.4 million tons. We posited that the Pacific Northwest harvests in both Oregon and Washington would also come in smaller than normal, and they did.

- With respect to supply in the West, we believed the industry had remarkably transitioned in one year from being acutely oversupplied to being largely in balance for most grape supplies in most regions.

- We forecast that some acres of vines would need to be removed in California and Washington to sustain the balance.

- We thought that grape and bulk prices would stabilize at lower levels than we've seen on average over the prior five years and that buyers would remain cautious.

- We believed retiring baby boomers would continue to buy wine at all price points but that their buying patterns would moderate with lockdowns and population decline.

- In an understated view, we said that millennials weren't engaging in wine as hoped, continuing to show a preference for premium spirits and craft beers, which have a better value per serving. We should have included spiked seltzers and ready-to-drink cocktails (RTDs) in that observation, but it's a true statement that will have greater impact over the next decade unless the industry changes the way it markets to younger consumers.

## What we got partially right

- In terms of sales growth, we said that wine sales would start off sluggishly until business restrictions were lifted but that sales would gather momentum through the year and end on a modestly positive note. We were correct that growth started off sluggish, but there was a distinct difference in performance for wineries producing wines under $11 versus more expensive wines, with the premium and luxury sectors showing growth above 10 percent for the first time in years. But overall, sales of wine on volume appear to have come in lower than 2020.

- We thought that the consumer would celebrate in 2021 and make up for many postponed life events. That was largely true, but wine didn't participate in reopening as much as spirits did.

## What we got wrong

- We missed our call on premiumization. We have felt that the premiumization trend in its present form, which includes higher volumes and growing sales in higher-priced wines, was nearing an apex. While we could argue this was close to correct, it's become clear over the past year that for now premiumization is continuing but as a tradeoff, with lower total volumes offsetting higher sales at higher price points. The reality was that COVID continued to accelerate premiumization, and while total volumes of wine sold are dropping, survey respondents in the premium wine segment said they increased the volume sold at higher prices in 2021.

- We said California vineyard prices in premium regions would remain lower than their prior high points, flattening in the best areas and softening in secondary regions. It turns out that vineyard buyers were out in force in 2021. Often, those buyers were funds looking for alternative investments with extra cash to spend. Vineyard prices were generally stable through the year.

- In our worst miss last year, we said that overall pricing should hold in both off- and on-premise sales, as well as in the DTC channels, as demand for alcohol and special occasions went through a spurt of temporary growth. In fact, there were price increases in the direct channel, price decreases in off-premise sales and price increases in on-premise sales. Outside of good improvement in the premium wine space, wine sales did not have a growth spurt.



# 3

# 2022 US wine business predictions and observations

The US wine industry had pockets of success in 2021, but it's increasingly obvious that wine as a product has lost the luster it once had with the consumer 20 years ago and is probably entering a phase of negative volume growth. For 2022, we should still see positive sales on a value (dollar) basis.

CONTENTS  |  1  |  2  |  **3 2022 US WINE BUSINESS PREDICTIONS AND OBSERVATIONS**  |  4  |  5  |  6  |  7  |  8  |  9  |  10  |  11

We are basing the following forecasts on the assumption that the fight against COVID will continue in 2022, but at a pace that won't put the US back into a restricted business mode, and that the economy will continue on with healthy but lower rates of GDP growth than in 2021.

As we contemplate the forecast, there are permanent changes to consider, such as the shift to working from home, the relocation of consumers to the suburbs and the move to online purchases, which was enhanced by shelter-in-place orders.

### Top-level forecasts

- The pandemic experience will have owners thinking twice about the strategy of focusing sales just through the tasting room.

- Analysts disagree on year-end total sales of wine. But within three years, we believe declining sales by volume will be accepted as reality by all analysts.

- Premium wine sales were positively impacted by several one-time events during reopening, which will lead to another good year for premium wine but at lower growth rates.

- The median age of baby boomers, who drove success in the industry over the past 23 years, will hit normal retirement age in 2022. (That's not a difficult prediction, but it's an important milestone.)

- In the West, the impact of drought will likely become a focal point of industry discussions and planning in 2022, particularly if there isn't substantial rain and snow before the spring in California. With increasing climate impacts from drought, fire, low soil moisture and record low reservoir levels, there will be even more pressure for agriculture and residential users to share limited water.

- The restaurant industry will likely continue to decline in its importance to the wine industry as a viable sales channel due to overpricing on the menu and consumers who value other alcoholic beverages over wine. Restaurants may find that wine is not in demand at the prices charged and that the cost to maintain deep stocks of wine is becoming senseless.

### Supply

- When 2021 totals are calculated, we are guessing that California will have crushed 3.6 million tons, which would be a second small harvest in a row. Washington and Oregon have also reported smaller-yielding vintages, but across the West, the quality of the harvest was reported as excellent. New York and Virginia began the season with perfect conditions, but in the same way that the West has to factor in drought and fire, hurricanes in August/September are becoming the norm in the Eastern US, with Hurricane Ida impacting the Eastern states.

- Supply in the West is largely balanced in early 2022, but low levels of demand suggest that some acres of vines will still need to be removed in California and Washington to sustain the balance, particularly if volume sold continues to dip.

- There was less bulk on the market at the end of 2021 compared to 2020, but buying behavior was sporadic. Grape and bulk prices have stabilized at lower levels than we've seen in the past five years for California. Buyers will likely remain cautious on price this year. The fact that price hasn't increased on bulk wine and grapes after two weak-yielding harvests says something about demand.

> "
>
> The fact that price hasn't increased on bulk wine and grapes after two weak-yielding harvests says something about demand.

## Demand

- While boomers are still purchasing at higher price points, demand for wine will be slack as the median boomer hits normal retirement age in 2022 and younger consumers continue to prefer alcoholic beverages other than wine.

- While there were many reports of boomers taking early retirement in the pandemic as the stock market crested, retiring baby boomers likely will not change their preference for wine, though undoubtedly they will drink less as they age.

- Online sales will continue to grow as an important part of Direct-to-consumer (DTC) efforts and expand past its current share of 9 percent of an average winery's sales.

- By 2025, 27.9 million Americans will cross normal retirement age at 66, while 30.3 million will cross age 40.[5] That will be too many consumers leaving their best buying years, and too many consumers entering their best buying years, to ignore.

- The wine industry will begin to work on a USDA Research and Promotions Order (discussed later in this report). The rotation to younger consumers is not an even trade on an economic basis, but the under-40 cohorts are the likely place where we will find growth in the next decade. The story has to be taken to younger consumers in a way that engages their values.

- Supply chain issues will gradually ease through the year but will likely have an impact on individual wineries in their own production capacities.

## Price

- Forty-two percent of survey respondents said they will make a small price increase in 2022. Given the higher costs of production in a modest inflationary environment, we should see wide instances of small price increases. Napa and Northern Oregon will see more moderate price increases.

- Vineyards and land retained their values in 2021. When the Fed begins to raise interest rates, that will slow up the heated demand for high-end vineyards and wineries.

- Inflation will impact product delivery, transportation costs, labor and supplies well into 2022 and add pressure on wine sellers to increase price.



> Wine proved again that it is recession-resistant during the depth of the lockdowns in 2020.

## Seven tailwinds

- The strong US economy and the amount of pent-up savings will play a positive role in wine sales as we continue to normalize business conditions and improve the number and frequency of occasions where wine is served.

- The oldest millennial turns 40 this year. The sheer number of consumers crossing that line means that our opportunity to get more consumers should be increasing, all else being equal.

- Families who were able to work from home saw some expense savings that position them for an expected push in spending in a post-COVID era.

- With more by-appointment tastings, wineries found an improved average check. The opportunity exists to create more off-property experiences to attract consumers who don't visit the winery.

- Wine proved again that it is recession-resistant during the depth of the lockdowns in 2020. While many consumers stocked up on everyday wines at the supermarket, consumers also rapidly switched to online options, either because their selections weren't available in grocery stores or because doorstep delivery was viewed as safer. Online sales continued hot in 2021, and there is room for wineries to expand e-commerce and integrate that with other winery initiatives.

- Not fully open through 2021, the industry stands to benefit from delayed reopening opportunities in 2022.

- Consumers who drink wine continue to show that they prefer drinking better but less wine. That benefits the premium segment.

## Seven headwinds

- The labor supply is limited, and the price for labor is increasing. In the vineyard, we need better immigration laws that will allow workers from other countries to come to the US to work. In the tasting room, we need to be more creative about diversity in the hiring process.

- Water could become the most important discussion topic, perhaps as early as this year depending on the amount of rain and snow the West receives in the winter and spring of 2022.

- The wine industry has allowed the lower-priced entry-level wines to be produced without transparency as to ingredients and in a homogenous and uninteresting way that's unlikely to appeal to those young consumers who want to drink better and drink less today. Premium wine producers haven't figured out how to produce their wine for an entry-level consumer. Without an on-ramp, it's going to be hard to grow the wine category.

- The challenge of recruiting younger, health-conscious, multicultural consumers into the wine category, combined with the aging of the older core wine consumer, remains. These consumer groups have different values and spending patterns. The wine industry has done little to alter their marketing message to attract or retain either consumer cohort.

- Anti-alcohol messaging continues to grow while guidelines from a variety of government and health organizations loosely apply science to influence consumption and taxes. The renewed push to place additional and more dire cancer warnings on wine is a threat today. The industry can't allow that to become a reality.[6, 7, 8]

- While 2020's and 2021's light harvests brought supply into temporary balance in most regions, more vineyards will need to be removed in California to reach sustainable farming levels in several regions. A normal harvest in California this year might produce another oversupply.

- The need to invest in sales channels other than the tasting room has never been more apparent. Our slow and traditional approach to change in our industry is a threat of its own, yet the opportunities to accelerate are growing. More and more wineries have succeeded with data-driven approaches and online sales, and an increasing number of digital platforms are available to help sell wine.



> The challenge of recruiting younger, health-conscious, multicultural consumers into the wine category, combined with the aging of the older core wine consumer, remains.



# 4 | Channel trends and changes

Sales offer the opportunity to make a profit, and profit is why businesses exist and remain sustainable. Having sales doesn't mean you will make a profit because there are many ways to produce sales and still lose money. But you can't be profitable without sales. It's a precondition to profitability and a good place to start.

Our analysis of sales opens with questions such as: Are sales likely to reoccur? Are they influenced by short-term or long-term trends? Is the rate of change in growth positive or negative? Are sales trending up or down?



Figure 1: **Total US wine gallons consumed**
*1934–1960*

Source: Wine Institute

Analyzing the wine business in the US has always been difficult because it's a largely private industry and private individuals don't share their personal information publicly. It's been even more challenging over the past two years.

The public data that's available on channel volume has been impacted by the degree of channel shifting that occurred with the lockdowns in 2020, followed by channel un-shifting in 2021 coincident with reopening.[9, 10] Sales on a value (dollar) basis have been harder to track because restaurants mark up their wine more than wine retailers, and without those markups, declining sales by value were almost guaranteed in 2020. But what about 2021? Haven't sales returned to more normalized conditions?

While hard to pin down because of the cross-channel noise, we'd estimate still wine sales by volume will finish 2021 between negative 2 percent and 0 percent for the year. Total value (dollar-based) sales will probably range between 0 percent and 2 percent to the positive side thanks to the reopening of restaurants and their heavier markup. Those growth ranges compare to the US population growth estimate of 0.6 percent in 2021.

Analysts grappled with the data last year because the movement of wine sales to the grocery accounts in 2020 was replaced by channel un-shifting back to restaurants,

hospitality and tasting rooms. In addition, government reporting on taxes paid on alcohol has been delayed by months.[11] As a result, it's still difficult to get clean reads of sales performance, and you will likely see contradictory analyst reports regarding sales, particularly in the early part of 2022.[12]

## Predicting a party with business reopening

In the *Annual State of the Wine Industry Report 2021*, we predicted that something resembling a party would break out during 2021 as COVID restrictions were relaxed and service industries reopened.[13] Some analysts and writers predicted that reopening would be like the Roaring Twenties, while I likened it more to the celebrations that took place after the Allies' victory in World War II.[14] We at least had data to prove there was wine consumption during that period (see figure 1), as opposed to Prohibition, when apparently nobody consumed alcohol.

For any purchase to take place, the buyer must have both the willingness and the capacity to buy any good or service.

Consumers in the US traditionally spend more on services and experiences than on goods. But with so many service industries closed or restricted during the 2020 lockdowns, consumers had no place to spend that money.



Figure 2: **Growth in combined on- and off-premise depletions**

Source: SipSource

Consequently, they let their discretionary cash pile up in savings. At the peak in April of 2020, the personal savings rate in the US hit an all-time high of 33.8 percent of total personal income, according to the US Bureau of Economic Analysis.[15] Consumers clearly had the capacity to spend on wine.

We also believed that with the relaxation of personal restrictions, consumers would have the willingness to get out of their homes, shop, and seek experiences that are naturally linked to wine, such as restaurant dining. By early 2021, people were clearly anxious to find normal again.

In addition to recovering those life celebrations that had been delayed or canceled, such as graduations, birthdays and weddings, consumers wanted to go to sporting events, concerts and the movies and to travel regionally. Tasting rooms, hotels and restaurants began to book up with guests. The rollout of vaccines early in 2021 bolstered our belief that there would be a celebration and a bounce-back in wine sales. Wine was clearly available, so all the conditions were present to expect growth in the category.

It turned out that a celebration did take place, but the wine category wasn't invited to the party! How can we understand that lost wine opportunity?

**Total sales through the distributor channel**

There is one source of information today that cuts through much of the fog from channel shifting, at least between on- and off-premise. SipSource is a newer data consortium of large wine and spirits wholesalers that contribute their sales data (through the Wine & Spirits Wholesalers of America) to provide the most reliable depletion-level information available.[16] The company doesn't produce total wine sales data because not every sale of wine goes through wholesalers. But it does track both on- and off-premise sales by volume — allowing for valid comparisons during the last two years, something no other data source can provide.

If there is one chart that's important for you to understand this year, it's figure 2, which shows the growth in total volume depletion for both wines and spirits on- and off-premise from September 2020 through September 2021. Sadly, the obvious takeaway from this figure is that consumers shunned wine and chose spirits during reopening celebrations.

While that's discouraging, through all of 2020 spirits and wine were at least tracking together and both showing positive volume growth on a trailing 12-month basis. That trend ended in January 2021 in a rather dramatic way when business reopened.



Figure 3: **Share of alcohol consumption per capita in US**

Source: National Institute of Health, Surveillance Report #117
*SVB estimate

Beginning in February 2021, restaurants started restocking their depleted inventories, and hotels and tasting rooms also began reopening. Data from the spring of 2021 showed increasing hotel occupancy rates, improving numbers of seated diners in restaurants and higher numbers of air travelers going through security.

But even with the tailwind of reopening, wine depletions did not continue trending with spirits or show nominal growth of any kind. In fact, spirits depletion volumes increased while wine volumes went in the opposite direction and declined! That meant a loss of market share along with a negative growth rate.

The explanation for this situation lies in the confluence of many factors: the aging of the baby boomers, consumers' increasing tendency to drink across categories (into spirits, beer and spiked seltzers), anti-alcohol messaging from modern-day prohibitionists, higher prices charged for wine in restaurants, the changed values of the next generation of alcohol beverage consumers — and, critically, a lack of leadership within the wine industry to counter these obvious trends and cooperate to form a marketing organization to promote the wine category. We'll cover all of these issues in the rest of this report.

## Changes in alcoholic beverage per capita consumption

While wine's share among all alcoholic beverages had been growing at the expense of beer up until 2019, spirits slowly and consistently have been growing and taking share from both the beer and wine category since 2008 (see figure 3). One of the reasons that wine is losing share has to do with consumer change and the wine industry's inability to recognize or adapt. We've seen this story before with the beer category and should learn a lesson from their experience.

After a strong 20-year run of growth starting in 1961, the beer industry began to see reversals in volume sales as the target generation (those who came of age during WWII) got older. Spirits and beer drinkers to a large extent, this generation tended to be frugal and practical, often buying alcohol based on the cost per unit of ethanol. But when the mature generation aged and became less relevant as beer consumers, they gave way to boomers, who didn't have the same values.

The large breweries sowed the seeds of their own struggles when they focused too much on scale and increased efficiencies throughout the 1970s. Once they recognized that the consumer base had changed, they tinkered with product formulas and began an intense marketing and



Figure 4: **Change in per capita alcohol consumption in US**

Source: National Institute on Alcohol Abuse and Alcoholism, Surveillance Report #113
*SVB estimate

advertising campaign employing famous sports figures.[17] The industry was reduced to only a few major producers, and the consolidation led to an increasingly blander, mass-produced product.

The new boomer beer consumer was more quality-focused and health-conscious. The beer industry's answer to health concerns was to mass-produce lite beer.[18] The product missed the mark, however, and Illegal home brewing emerged as a consumer solution. By 1978, the movement became so popular that Congress ended the federal restriction on home brewing, leaving large brewers with new competition.[19]

Starting in 1981, beer hit its high point in sales, at which time total volume began to turn negative (see figure 4). But like premium wine in the US, craft beer emerged as a meaningful growth segment, gaining cult-level popularity in the mid-1990s with younger boomer consumers.

Gen X maintained interest in craft beer and propelled its growth through the 2000s, when millennials started adopting the product as their own. Today, craft beer and imports have each grown significantly, with craft beer

now responsible for 12.7 percent of the US beer market by volume and more than 23 percent of the market by revenue.

After failing to convince consumers to like their product, the large producers went through a period of purchasing and trying to scale craft acquisitions. It's been a moderately successful approach in muting the otherwise painful volume declines in total beer sales, but there have also been some colossal failures.[20]

The lesson in this is that consolidation may give the acquirer more pricing power, but it doesn't necessarily meet the consumer's needs. And while it may be difficult and expensive to alter a large plant to produce smaller runs with more consumer appeal, not doing that means producers will continue to lose consumers until the plant and equipment don't fit any demand at all.

Beer is in a mature industry, and for whatever reason, it's common for large industry leaders to compete for share when growth stops or declines rather that bringing new consumers into the category through cooperative promotion.[21]

Marketing should have been a key component for the beer industry when reacting to consumer changes in the 1970s. While industry leaders did spend massive amounts on national advertising, they competed against each other instead of working on delivering better quality to the consumer and developing an industry organization that could have promoted brand beer and lifted the boat for the industry.

Competing for declining share makes even less sense when marketing includes negative advertising about someone or some practice within the industry, which casts a negative pall on the whole category. That's still taking place in the beer industry; in Super Bowl LIII, Bud Light (Anheuser-Busch) cast shade on Miller Lite and Coors Light for using corn syrup in the brewing process.[22, 23]

Similarly, there's a trending fight in the wine industry today over the words "natural" and "clean."[24] A narrow group of wineries is claiming to be natural or clean and implying that their practices are superior to the rest of the industry. And as in the beer industry, large producers are still pushing scale and probing for the right combination of volume and price.

The beer companies needed to cooperate with each other to grow their consumer share of the alcoholic beverage market, and they didn't. Wine is positioning itself the same way, with producers ready to fight each other for shrinking consumption.

### The decline of entry-level wine

High-production, volume-based wines have been the entry point for new consumers discovering wine for at least the last 50 years. But those entry-level wines have been showing softness for years, since their heyday between the 1960s and 1980s.

Those production wines were popular with the mature generation, who lived through the Great Depression. Early experiences of deprivation made that generation frugal consumers who often bought alcohol on an ethanol-per-dollar basis. Larger producers found a way to make a product that fit their values and pocketbooks, and these businesses thrived.[25]



Figure 5: **US table wine consumption by volume**

Sources: Wine Institute, Gomberg-Fredrikson
*SVB estimate



Figure 6: **Annual change in share (value) by price point**

Source: Nielsen

But as those mature consumers gave way to the young boomers who were reaching legal drinking age in the 1970s and 1980s, lower-priced wines started a long slow decline. Why? Because boomers were not frugal at all. They rejected their parents' advice about being thrifty and living within their means. Boomers just wanted more than their parents and competed with their next-door neighbors for displays of wealth and success.[26]

Boomers had materialistic ambitions; borrowed on credit; were conspicuous consumers; and drank better, showier and higher-priced wines.[27] Domestic premium wines and some imports fit their lifestyle and expanding pocketbooks. The economic excess of the 1990s further expanded their capacity to buy those wines.[28] With the growth and evolution of premium wine, from 1994 to 2017 we witnessed a run of growing volumes of wine sold (see figure 5), at increasingly higher prices, at the expense of lower-priced wines.

Figure 6 is a year-by-year presentation of the off-premise share of wine by price point from 2013 to 2021. It shows a consistent year-over-year decline in each of the first three column sets.

The price point that separated wine with declining share from wine with growing share had been rising for decades but hovered around $10 for much of the 2010s. Starting in 2018, that dividing line again shifted higher, to $11. That is noticeable in the chart in the fourth column set, which displays the $9–$11.99 price range. The progressive decline in volume of cheaper wine is a data point that begs diagnosis.

We've been talking about this issue for close to a decade in this report and in speeches. Just as the mature generation had different values than their children (and the boomer's taste for jug wine never materialized), the children of the boomers are now entering their prime consumer spending years and have different values than their parents — values more closely aligned with those of their grandparents.



Figure 7: **What would you bring to share at a party?**

Source: The Harris Poll.
Survey conducted online by The Harris Poll on behalf of the Wine Executive Exchange, November 9-11, 2021, among 1,949 US adults ages 21+.
"RTD" means ready to drink.

Today, wine isn't the next generation's preferred alcoholic beverage. The traditional on-ramp for wine consumers has been the lower-priced and higher-volume wines, but they continue to decline in popularity — and when the numbers are all in, we may well find that the reopening created acceleration in the move away from those wines.

Figure 7 is one data point among several that point out the industry's overdependence on the retiring boomer. While the good news is that the boomer consumer is still buying, the bad news is that we still aren't connecting with newer consumers' values. The inability to react to the declining volume of entry-level wines will only mean that fewer consumers will prefer wine as their alcoholic beverage of choice over time.

As of this writing, December 2021 sales are very good for the premium wine segment but soft for entry-level, lower-priced wine.

## Off-premise (grocery) sales

Nielsen's on-premise scan data is widely picked up by the press and has historically been used by many as a proxy for sales growth. That has worked in the past, as the movement of sales between channels has been historically small for any given year.

But in March 2020, there was an explosion of alcohol sales in the grocery channel as shelter-in-place orders were being issued. Wine alone spiked 68.6 percent in grocery as panic buying for staples took over.[29]

Nielsen reported this growth as pantry stuffing or pantry loading, but the press more often reported the explosive growth as increased drinking.[30] Anti-alcohol researchers applied the adage "never let a good crisis go to waste" and produced new science referencing the press reports, concluding that consumers were binge drinking. Their stories often cited relaxed alcohol laws that permitted home delivery as one of the contributing factors.[31, 32] But by the end of 2020, total wine sales by volume came in close to zero growth.



Figure 8: **Weekly off-premise volume and value changes vs. prior year**

Source: Nielsen

Figure 8 is perhaps the best visual representation of the shift in wine purchase patterns in the US over the past two years. The chart can be divided into three segments.

The first segment represents the pre-COVID period in 2020 (i.e., the first two months of the year). We were coming off a year that suffered from acute oversupply of wine. Volume changes exceeded value changes at that point, implying that the off-premise channel was discounting overall, which is what normally occurs when there is too much of a product.

The second chart segment begins with the lockdown and spike in purchases due to pantry loading at the end of March 2020. At that point in time, merchants quickly reduced promotional programming and raised prices, with value changes exceeding volume changes.[33] This second segment also includes the trial reopening in May 2020, which slowed off-premise sales as purchases moved to other channels. Finally, the second segment in this chart includes the disappointing holiday sales in December 2020 due to another spike in infections and concludes

in March 2021, a full year after the original shelter-in-place orders. The third segment of the chart coincides with the vaccination rollout and the relaxing of business restrictions.

Last year in this report, we forecast a timeline for 2021 business reopening that turned out to be surprisingly close to reality. Our forecast also predicted that as COVID restrictions were relaxed, we would see a partial reversion of sales back toward the previously closed tasting rooms and restaurants, generally at the expense of a bloated grocery channel.[34]

In March 2021, 12 months from the huge spike in grocery sales caused by shelter-at-home orders, total off-premise sales began to revert to the pre-pandemic mean. Consumers had more options for buying wine than in grocery stores, and panic buying had ended. The price increases caused by the lockdowns then gave way to price reductions in off-premise as wine started selling again in restaurants and other service venues that had had their business operations restricted in 2020.



Figure 9A: **2020 winery sales channels**

Figure 9B: **2021 winery sales channels**

Tasting room    Wine club    Mailing list/subscriptions    Exports    Other    Phone    Online
Wholesale—on-premise    Wholesale—off-premise

Source: SVB Annual Winery Conditions Survey

## On-premise (restaurant) sales

Over the past decade, the amount of sales directed to restaurants by the average winery has declined, finally hitting a bottom in 2020, when closed and restricted restaurant operations had premium wineries shifting sales into other channels.

In the fall of 2020, Silicon Valley Bank survey respondents reported that 18.4 percent of their sales came through wholesale off-premise, and 10.8 percent wholesale on-premise (see figure 9A). Because of reopening in 2021, those figures nearly flipped, with wholesale off-premise representing 10.6 percent of an average winery's sales, and wholesale on-premise representing 19.2 percent of an average winery's sales (see figure 9B). The remaining channels for the premium wineries remained mostly static, though the strength of online sales results was a bit of a surprise.



Figure 10: **New US COVID cases vs. seated diners in restaurants**

Sources: Open Table, Our World in Data

In 2020, the restaurant industry experienced its worst year since the Great Depression (and perhaps the worst year ever, considering that during the Great Depression people could still go inside a restaurant).

The story of wine sales in restaurants over the COVID period is the exact opposite of sales in the grocery and drugstore channel, except that restaurant sales came in multiple waves, with business opportunity inversely related to the growth in new COVID cases (see figure 10).

Following the early shelter-in-place orders in 2020, restaurants and bars across the country started to close, and fearful consumers stayed away from restaurants. For about a month, OpenTable reported that there wasn't a single seated diner in US restaurants.

Restaurants scrambling to survive turned to at-home delivery of food and alcohol where allowed, but on-premise wine sales had almost no pulse. While the larger chain restaurants were able to raise money in public debt

markets during the early phases of the pandemic, the small independent restaurants weren't as lucky and resorted to survival strategies, including selling off their wine cellars.[35]

New COVID cases stabilized by June 2020, and with summer coming, regional health orders were relaxed, even allowing for restricted inside operations in some areas. For cash-strapped restaurateurs, though, the purchase of wine was limited to a narrow list of choices.

That phase of business normalization lasted only until the fall, when the Delta variant emerged and case rates spiked to 250,000 per week by December 2020, leading to another round of business restrictions and closures. The 2020 holiday season was ruined. The number of seated diners on Christmas was down 85 percent from 2019.



Figure 11: **Growth rate of alcohol depletions on-premise**

Source: SipSource

Many restaurants didn't survive 2020. *Nation's Restaurant News* determined that more than 10 percent of restaurants permanently closed.[36] SipSource also reported that 10.7 percent of on-premise accounts had shuttered, the majority of which were smaller independents, which are typically a target for smaller premium wineries.

Figure 12: **Sales of wine in restaurants**

| Restaurant Statistics | |
| --- | --- |
| 2019 sales | $864.3B |
| 2020 sales | $659.0B |
| 2021 sales | $789.0B |
| 2019–2020 change | -23.80% |
| 2020–2021 change | 19.70% |
| 2019–2021 change | -8.70% |

Source: QSR Magazine

On a trailing 12-month basis, alcohol depletions to restaurants bottomed in March 2021, with restaurant wine sales off 51.7 percent from the prior year. While sales turned up from that point, growth was still negative compared to the prior year (see figure 11).

By the fall of last year, restaurants were approaching positive total year-over-year wine sales, with December 2021 showing dramatic improvement on a percentage basis, but it should be noted that the growth rate in December 2021 was based off the disappointing holiday season of 2020.

While 2021 same-store restaurant industry sales exceed 2019 levels, total restaurant industry sales were still down over 2019 by 8.7 percent (see figure 12). Given that, it's difficult to expect growth in on-premise wine sales over that two-year period. While we will end the year higher in the December 2021 period, there was never a path to recover the sales lost due to restricted business conditions earlier in the year — even with one-time restocking.



Figure 13: **Consumer price of wine in grocery stores vs. restaurants and bars**

— Wine at grocery stores
— Wine at bars and restaurants

Index (2003 = 100)

Source: US Bureau of Labor Statistics, Consumer Price Index



The loss in share to spirits in the on-premise channel is particularly concerning because that loss of share has nothing to do with reopening or health orders.

Figure 13 shows how the consumers' cost of wine has changed whether they're drinking at home or in bars and restaurants.

While consumer prices for wine stabilized in grocery stores in 2009, price continued to accelerate in restaurants.[37] The consumer has noticed that widening gap and doesn't want to pay the markup.

According to Nielsen calculations, the restaurant industry's average cost for alcohol is about $1.02 for a 12-ounce serving of beer, $0.88 for a 1.45-ounce serving of spirits and $1.51 for a 5-ounce pour of wine. That makes the cost of wine 72 percent more expensive compared to spirits.[38]

Today, phones and phone apps allow for the quick comparison of wine prices, and frugal, digitally native young consumers have no problem pulling out their phones at the restaurant table.

An ongoing factor impacting total wine sales in restaurants is customer traffic. While same-store sales were 6 percent higher in October, traffic was down 6.4 percent.[39] One other factor is restaurant costs. Inflation is driving food costs

higher, the shortage of hospitality staff is driving wages higher and increasing costs in wine production are being passed on to the restaurant, which in turn passes along its rising costs to customers. The result is higher average checks. Restaurants are reformatting menus to hold prices to something more reasonable, and wineries are discovering that selling to restaurants is much more price-sensitive than it used to be.

Some consumers have established new behaviors, opting more often for takeout and delivery, both for convenience and safety. Some have suggested that staffing issues, which have led to degraded restaurant experiences, may also play a role in reduced traffic. Whatever the cause, takeout may be a solution for restaurant revenues, but it does not improve on-premise sales for wine.

A perfect storm of challenges — price increases, the uneven exchange of older wine-loving consumers for younger spirits-loving consumers, reduced space on beverage lists, added competition from seltzers and RTDs, the growing gap between the price in grocery stores and the marked-up price in restaurants, and spoilage — is making spirits an increasingly preferred choice over wine in restaurants, particularly for the large swath of frugal consumers under 40.

The loss in share to spirits in the on-premise channel is particularly concerning because that loss of share has nothing to do with reopening or health orders. New consumer behaviors and changing industry practices are the root causes, and they will make growth of wine in the segment difficult in the coming years.

The percentage of an average winery's sales dedicated to the restaurant channel in 2021 is probably unsustainably high, given that the restocking at restaurants during reopening was a one-time event, that wine is continuing to lose market share to spirits and that same-store sales have already exceeded pre-COVID sales.

We anticipate 2022 on-premise sales to drop back to 15 percent or 16 percent of an average premium winery's sales in a fully open business environment.

### Post-COVID restaurant changes

Unlike 20 years ago, when pairing food and wine was as common as pairing fries with ketchup, consumers today are pairing spirits, cocktails, beer and non-alcoholic options with their meals.[40] Unlike spirits, though, wine has a rapid spoilage factor after opening. That's a cost borne by restaurants in recovery mode and contributes to the overall cost of wine for diners, helping to make wine a much more expensive beverage per serving than spirits.

It is widely believed that restaurant owners who were forced to sell off their wine cellars to generate cash will be more selective about carrying large stocks of expensive bottles of wine going forward and may be reluctant to buy any wine that doesn't produce a near-term return.

For many restaurateurs, sales of classic and recognizable wines that have a more predictable turn rate will be the focus. Another emphasis will be unique and imported wines with an affordable price, targeting younger consumers.[41]

In casual restaurants, the amount of ink dedicated to wine has been on a downward trend at least since the Great Recession ended, having been replaced with a beverage list that includes beer, spirits and, more recently, RTDs, spiked seltzers and ciders. Each of those beverages is a substitute for wine. But the changes aren't limited to casual restaurants. In high-end restaurants, the leatherbound book has been replaced by a two-sided page of wine selections or, in some cases, by a curated daily "micro list."[42]

The space for wine on the beverage lists shrank at a faster pace during the reopening given the financial realities restaurants faced. But it's not so much the amount of space dedicated to wine that's a concern, but what it represents — the continuation of a longer-term trend in the way restaurateurs react to what the consumer wants. Their message is that diners want less wine than before, and there is no sign of that view changing.

Unless some solution is found, there is every reason to believe wine will continue to lose share to spirits and other beverages in the on-premise channel.

### Premium winery sales channel shifts

Most wineries in the US fall into the premium category. Most are small, and all have been on a journey over the past 20 years to adapt to business conditions and establish reliable sales channels.

The sales model during the late 1980s and early 1990s was simple: The winery makes the wine, and the distributor sells the wine. Restaurant sales in that period represented about 30 percent of an average premium winery's sales. The remaining sales were largely wholesale and on- and off-premise, with some over-the-counter sales and some rudimentary direct sales via snail mail and phone, then email once email became widely available in 1997.[43]

Tasting rooms were not profit centers, and wine clubs were rare during the early '90s.[44, 45] But later in the decade, hundreds of wineries started up in the US, each expecting the distributor to place their wine.

By the mid-1990s, there were about 2,000 wineries in the US and 3,000 distributors, more than one distributor per winery.[46] Today, there are about 11,000 wineries and 600 distributors, or about 0.05 distributors per winery.[47, 48] The number of wineries has grown while the number of distributors consolidated.

After the tech recession temporarily slowed consumer purchases of wine, distributors looked at their stuffed warehouses and concluded that they had too many winery customers and too many brands to represent and service properly.[49] They began to cull the smaller operators in favor of larger producers, leaving many small premium wineries fending for themselves.

Sales strategies and channels during the 2000s were in transition as premium wineries came to grips with the changes in distribution and began adapting and seeking alternatives. Fortunately, on May 16, 2005, the Granholm vs. Heald case was favorably decided for the wine industry by the Supreme Court. That provided the legal pathway for wineries to skip the wholesaler and ship wine directly to the consumer.[50]

Thirteen states had reciprocal shipping agreements prior to the Granholm decision, but the rest of the states had to approve their own regulations before shipping direct was possible. Initially, compliance was a painful process involving paper forms, mail and faxes. Online solutions started to be available only in the latter part of the 2000s, creating the foundation for DTC sales.



Figure 14: **Wineries' DTC shipment values**

Note: Shipments only. Carryout not included.
Source: Wines Vines Analytics

Around 2010, premium wineries started focusing their attention more heavily on wine club and DTC channels in reaction to continuing distributor consolidation, and that effort has paid off.

Today, DTC sales represent about 10 percent of total wine industry sales in the US and about 65 percent of the average winery's total revenue in 2021.[51] Through all of the channel shifting during this COVID crisis, DTC sales have continued strong, with 2021 sales exceeding every monthly benchmark from 2020 (see figure 14).

### Digital and online sales

In 2020, total digital sales in the US were up a staggering 31.73 percent, to $760 billion, on a seasonally adjusted basis. Many Americans were stuck at home, making shopping online a necessity. COVID advanced the previous rate of growth in e-commerce by perhaps a decade.

According to US Census Bureau estimates, in the third quarter of this year e-commerce increased 6.6 percent over the third quarter of 2020.[52] Full-year e-commerce retail sales in 2021 should end up 25 percent higher than the

record sales in 2020. That reflects a massive difference in the way consumers are continuing to shop (see figure 15). For wineries, the news is similar.

After July 2020, when reopening began in the US, we commented that online sales for wineries were continuing at a higher pace than previous years. We also predicted that "online sales will see a permanent positive gain at the expense of wholesale. We won't unwind online sales back to 2 percent of total winery sales."[53]

While that view turned out to be accurate, the surprise piece of sales channel data this year was that online sales from wineries only moved down from 9.8 percent of total sales in 2020 to 9.1 percent of sales in 2021. With reopening, there was a distinct possibility that online sales could drop a bit further, to the range of 4 percent to 6 percent of an average winery's sales.

That tells us that internet sales from wineries have thus far proven resilient during reopening. We may be looking at a much more robust shift in consumer buying preference than we expected.



Figure 15: **Total e-commerce sales in US**

Source: US Census Bureau, retail trade
*SVB estimate

While it may be difficult to predict precisely how much consumers will gravitate to internet sales from wineries, one thing is easy to say: Large numbers of consumers will incrementally grow in their desire to shop online due to behaviors learned during COVID. That is especially true of boomers, who were the cohort with the highest growth in internet transactions during 2020.

The amount of wine delivered through the three-tier system[54] to e-commerce retailers looks similar to the national e-commerce trends, but with seasonality. The

pattern of wine delivered to online merchants through the three-tier system had three peaks: in early April/May 2020, just past the first shelter-in-place orders, and in December of 2020 and 2021 (see figure 16). Total holiday wine sales in all channels during 2020 were disappointing because renewed lockdowns restricted celebrations, but online sales behaved differently. Peak e-commerce buying in December 2020 offered a small offset to the lower holiday sales in other channels.



Figure 16: **US wine delivered to online merchants through three-tier system**

Source: Nielsen



Figure 17: **DTC channel movement in 2021**

Source: Commerce7

The takeaway is that wine consumers might not have gone to holiday parties in 2020, but they purchased wine for delivery to their homes, and they did it online.

While wine e-commerce sales were 12 percent lower than peak fourth-quarter sales in 2020 through the three-tier system, overall e-commerce sales in 2021 were still 146 percent higher than pre-pandemic numbers — perhaps the most important thing to note. It's more evidence that consumers are still evolving the way they purchase wine, and e-commerce is a critical part of sales.

Premium wineries with tasting rooms provide a slightly different view of 2021 because wineries have clubs, do carry-out point-of-sale (POS) transactions and collect tasting fees in addition to pure web sales.

Figure 17 shows how reopening starting in the early part of 2021 improved opportunity for POS sales and web sales, both of which showed a consistent growth rate through the year. POS sales reflected the gradual but strong increase in customer traffic, growing by about 275 percent from the early part of the year to the end of the year. E-commerce sales rose by about 20 percent from the start to the end of the year, and club sales continued their healthy growth rate during this period, with fall club releases doing particularly well.

The growth opportunity for tomorrow isn't going to come by waiting the pandemic out and hoping we return to pre-pandemic business conditions, switching to by-appointment tastings, planning club events, refining your hospitality training or, for that matter, delivering better hospitality. Those are good ideas for most wineries to consider, but the best solution for almost all wineries is increased attention to and investment in the multitude of digital opportunities in data, streaming and e-commerce. Examples include:

- Getting digital exposure to new consumers who live elsewhere and don't know you.

- Finding ways to encourage those consumers to join your wine club via digital means instead of insisting that the only method for club growth is tasting room visitation.

- Building your brand regionally by offering experiences away from the winery, including a digital component. Zoom is just one tool for that.

- Investing in understanding your existing consumer data.



Figure 18: **Which digital tools do you employ?**

Source: SVB 2021 Direct-to-Consumer Survey



Figure 19: **Planned digital investments for 2021**

Source: SVB 2021 Direct-to-Consumer Survey

E-commerce is much broader than having a shopping cart on your site or sending an email with a URL and a discount offer. Among other things, it includes using data to market to potential club members, using digital means to market and drive consumers to your site, connecting with buyers and lost buyers, personalizing web visits to the winery and employing automation or AI to enhance the consumer experience and improve your chances to sell what a consumer is likely to value.

With that in mind, if you're a winery owner, some of the questions to ask your team are: How will you reach the consumers who are working from home and eating all their meals at home with family? How will you connect with them over their dinner table? How will you use platforms like Zoom to reach customers and prospective customers and at the same time grow sales and new club members? How will you rethink differences between local club members who can visit the winery and those who might come to Wine Country once in four years?

The overwhelming majority of wineries now acknowledge that they use social media, and the increasing use of other digital tools offers some hope that as an industry, we are finally moving forward and are recognizing the importance of digital marketing for online sales (see figure 18).

With needed investment by premium wineries in digital and online sales, there is a chance that online sales could become an important growth channel for wineries with still-emerging capabilities.

If you were the beneficiary of higher online sales over the past two years but that growth has largely come from the consumer finding you versus any change in your strategy, this is a time when you absolutely must factor e-commerce more forcefully into your winery's sales strategy and harvest the consumer who will permanently shift a portion of their wine acquisition to online purchasing. If you don't invest, those sales will go to another winery.

When asked where they'd make digital investments in 2021, most wineries in our survey said they would be increasing their digital marketing budgets — most likely reflecting the overwhelming use of social media (see figure 19). But the 25 percent who said they planned to hire a dedicated employee to help with digital sales and outreach gives us hope that wineries see sales possibilities and plan on focusing someone on the opportunity.



# 5 Premium winery business performance

Each year in the SVB Annual Winery Conditions Survey, we ask the general question "How was your year?" (see figure 20).

2020 was a difficult year for the smaller premium wineries in the US. Not only did they lose their ability to sell in restaurants and tasting rooms due to COVID restrictions, but many also had smoke and fire issues to deal with during harvest. It was a year we'd all like to forget, but we never will.



Figure 20: **How was your year?**

Source: SVB Annual Winery Conditions Surveys

Forty-three percent of SVB survey respondents said 2020 was either their most difficult year in history or one of them, and the average age of the wineries in the survey is over 20 years, so that was a bad year!

But in 2021, the story was substantially different. With restaurants and tasting rooms reopening, and with lessons learned when restricted business conditions drove innovation and evolution, 24 percent of respondents said 2021 was one of their better years, and a full 29 percent said the year was their best in history! So that was a very strong year!

Some might suggest the positive responses in 2021 were rose-colored and influenced by the external improvement in business conditions. While that's a possibility, it's difficult to ignore the nearly 30 percent of wineries that said it was their best year ever, because their history extends beyond the multiyear COVID period back into what we used to think of as normal business conditions.

While surveys have their own bias, financial statements are an even better indicator of industry performance. When we look at sales growth metrics, claims that it was the best year ever appear credible.

Silicon Valley Bank has a database of reviewed and audited financial statements extending back to the 1990s. Each year, there are greater numbers of financial statements in the system, but the database of audited and reviewed statements typically comes from 100 to 150 separate wineries, meaning that while the wineries in the database may change, the sheer number of records leads to statistically significant benchmarks.

Reviewing these statements yields a few things worth noting (see figure 21). Premium winery sales growth can have a large beta in recessions, with dramatic swings down when business conditions are difficult, and then equally dramatic swings up when conditions recover. But another point that's hard to miss is the trendline of sales growth, which has been on a downward trajectory since 2000, when the sales growth for that year was 28 percent! That kind of growth was the story of the middle to late 1990s, when wine demand was very hot and we couldn't put sticks in the ground fast enough to increase grape supply. Of course, that led to a grape bubble and removals, but that's agriculture. I think most people would be happy to have the problem of 28 percent growth.

Figure 21: **Sales growth rate for premium wineries**



Source: SVB Peer Group Database

Figure 22: **Average case price and average cases sold**



Source: SVB Peer Group Database
*Estimate

The anomaly in the general trend is obviously 2021, with growth at 21 percent. That's the highest growth rate since 2007. Maybe the wine industry as a whole didn't participate in the reopening party, but the premium wineries got the invitation.

Figure 22 shows average case price and average cases sold for a premium winery. While we don't define who fits into the description of premium wineries, the chart with average cases sold and case price is a good approximation of the way we view the term. Note that average cases sold are a blend of DTC and three-tier sales, generally consistent with the Winery Sales Channels 2021 chart (see figure 9B).

During the pandemic, nothing looked like normal for premium wineries. In 2020, average cases sold in our database of premium wineries increased 6.3 percent, from 38,700 cases to 41,100 cases, while the average price per case dropped 8 percent, from $262 per case to $241 per case. Premium wineries found themselves without restaurant or tasting room sales.

With less access to the off-premise channels where wine was being sold during lockdowns, premium wineries decided that the best approach would be to discount wine and/or give away free shipping to incentivize sales. More cases were sold in 2020 to make up for lost revenue per case, so total sales growth for 2020 was essentially flat at minus 0.6 percent (see figure 23).

Profitability was surprisingly strong in 2020 due to staff reductions in customer-facing jobs from COVID, reduced harvest costs and winemaking costs due to fires and smoke, and lower overhead allocations. In addition, many wineries availed themselves of Paycheck Protection Program loans in 2020, which were forgiven both in 2020 and 2021.[55]

2021 was once again the opposite of 2020 in terms of business conditions and results. As businesses and tasting rooms reopened, wineries were coming off a year with small crop sizes, so they stopped discounting and refocused on the tasting room and higher-end restaurants, which were restocking. With more wineries moving toward seated tastings and reservations in 2021, the average check per customer increased. Average cases sold for the average winery decreased as part of a strategy by many to stretch out vintages to cover the short 2020 year.



Figure 23: **Premium winery income statement averages**

| | Dec 2013 | Dec 2014 | Dec 2015 | Dec 2016 | Dec 2017 | Dec 2018 | Dec 2019 | Dec 2020 | Sep 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **Gross margin** | 53.4% | 54.8% | 56.8% | 56.9% | 57.4% | 58.5% | 57.4% | 57.1% | 59.0% | 56.7% |
| **Sales growth** | 7.7% | 9.2% | 11.9% | 8.8% | 9.6% | 3.1% | 5.3% | 5.6% | -0.6% | 21.0% |
| **Pretax profit** | 6.9% | 6.6% | 8.0% | 9.6% | 10.2% | 9.9% | 8.3% | 5.0% | 7.4% | 19.1% |

Source: SVB Peer Group Database



# 6

# Demographics and marketing

The US wine industry isn't doing a good enough job of marketing and selling its product, often remaining wedded to successful strategies from the past while the culture, country, business environment and consumer have radically evolved. It's flat-out not good enough, and the overall industry results show it.

CONTENTS | 1 | 2 | 3 | 4 | 5 | **6 DEMOGRAPHICS AND MARKETING** | 7 | 8 | 9 | 10 | 11

There are any number of charts that demonstrate our failure to market to young consumers. As mentioned earlier, The Harris Poll asked the simple question, "If you were invited to a party and asked to bring an alcoholic beverage to share, what would that beverage be?" (see figure 7). This gives us an understanding of which alcoholic beverages consumers prefer.

While wine scored highly across the age categories, it was heavily preferred by those over 65, 49 percent of whom would bring wine; in the rest of the age groups over 34, wine scored 20 percent lower. The cohort aged 21 to 34 were the least likely to favor wine. That's clearly indicative that wine sales are overly dependent on older age groups.

The poll's warning is that wine isn't at the forefront of many consumers' minds when they think of an alcoholic beverage. Unless the industry does more to attract consumers younger than 65, wine consumption might drop by 20 percent when boomers sunset. Many will quibble with that statement, but I encourage the quibblers to come up with their own positive projection from the data.[56]

A second analysis comparing the share of the population to the share of wine consumption yields similar results (see figure 24). Since wine consumption skews to college-educated and wealthier homes, we would expect to see the 21- to 34-year-old group not yet punching their statistical weight as wine consumers.[57] But by the time people reach their middle 30s, the consumption measures should improve.

Since the greatest spending years for consumers fall between 35 and 55, in the highlighted segment of figure 24 we should see consumption rates greater than each group's share of population size. For many retail goods, there would be a bell-shaped lifetime consumption curve, but wine has had a U-shaped curve and for at least the past 20 years. The industry has explained this away by arguing that younger consumers will come around when they age. Will they? What is the magical year when a consumer decides to be a wine consumer? Or is it that purchase decisions and loyalty have little to do with age?



Figure 24: **Wine consumption rates compared to share of adult population per age group**

■ Share of adult (21+) population    ■ Share of wine consumers

| Ages | Share of adult (21+) population | Share of wine consumers |
|---|---|---|
| 21–34 | 25.2% | 19.8% |
| 35–44 | 17.2% | 15.5% |
| 45–54 | 17.0% | 16.6% |
| 55–64 | 17.5% | 20.1% |
| 65+ | 22.3% | 27.2% |

Source: Nielsen Homescan, 52 weeks ending December 26, 2020



Figure 25: **Wine club composition by age cohort**

Source: SVB State of the Wine Industry Reports

Silicon Valley Bank runs two industry surveys each year: the Annual Direct to Consumer Survey and the Annual Winery Conditions Survey. In these, we ask wineries for information about the ages of their club members, and figure 25 collects those answers over the last eight years, covering millions of customers at more established premium wineries.

With figure 25 showing a growth in millennials' participation in wine clubs over the last two years, it appears that during the pandemic more millennials were either engaging digitally in Zoom tastings or out visiting wineries and joining clubs in person. This might be due to two factors: that other entertainment options were closed and that younger people were less susceptible to COVID than boomers. While the increase in millennial consumption is good, boomers are still the largest consumers by almost two-to-one over millennials.

With less than a single percentage point separating boomers' consumption share from that of Gen X this year, boomers can't be considered the dominant group anymore, even though they still have 70 percent of the disposable income and more than 50 percent of wealth in the US.

In the *Annual State of the Wine Industry Report 2016*, we predicted that boomers would cede their top spot to the Gen X cohort in 2021. As expected, they are

exhibiting changing spending patterns due to age, health and retirement concerns.[58] But while the pandemic has convinced some boomers to take early retirement, the good news for the wine industry in the near term is that many will continue to work past normal retirement and keep buying wine.

Another view of alcohol consumption comes from the Consumer Expenditure Survey, which tracks the alcohol spend of different age bands. Using that data, figure 26 allows us to see, for instance, how the youngest consumer's behavior changes as time passes. Interestingly, this chart shows a drop in per capita spending in 2020 across all age groups. But there was a limited amount of restaurant sales of wine, and those sales were heavily marked up, which boosted the dollar total of wine sales in 2020.



## Boomers can't be considered the dominant group anymore.



Figure 26: **Annual per capita spending on alcohol by age group**

Legal–25 — 25–34 — 35–44 — 45–54 — 55–64 — 65–74 — Trendline (Legal–25) — Trendline (65–74)

Source: US Bureau of Labor Statistics, Consumer Expenditure Survey

What stands out is that the highest spenders per capita are all in the 35 to 55 age group. That is consistent with other data in this report. But higher spending patterns in the 35- to 55-year-old category reinforce the fact that we are losing share to other alcohol categories, since this chart represents all alcohol sales and that age bracket isn't where our customer resides.

Another concerning data point is the youngest cohort. Historically, that age range spent about the same on alcohol as other cohorts. But starting in 2003, this group began spending increasingly less per capita up to the present. We know a large part of the reason behind that is due to the cumulative impact of negative health messaging originating from the World Health Organization and other anti-alcohol groups. That topic will be covered elsewhere in this report.

The wine industry competes with other beverages across categories today (see figure 27). Fifty-three percent of the spending on alcohol comes from consumers who drink through all categories. And this cross-consumption has been increasing over time, as beverage alcohol has continued to produce better products at higher prices. The resulting shift away from "category consumers" to "alcohol consumers" has been a part of the declining growth rate of wine.



Figure 27: **Competition is beer and spirits**

Beer — Wine — Spirits

Exclusively wine
14% of people/
4% of $

Wine and beer
18% of people/
14% of $

Exclusively beer
18% of people/
8% of $

Wine/beer/spirits
28% of people/
53% of $

Wine and spirits
8% of people/
7% of $

Beer and spirits
10% of people/
11% of $

Exclusively spirits
3% of people/
3% of $

Source: NielsenIQ Homescan Panel,
Total US: Annual 2020/Off-Premise
Wine includes still and sparkling; beer includes FMB and cider.



## What will the average wine consumer look like with the boomer in full retirement?

At this point, those who consider themselves exclusive wine drinkers only represent 4 percent of the dollars spent. Those who consider themselves wine and beer drinkers, though, represent 14 percent of dollars spent, the highest amount for any combination of two categories. Wine maintains a strong presence in the alcohol market, but without evolving the marketing message and attracting more consumers beyond the 0.6 percent population growth in the US, we will likely enter an extended period of negative volume growth and less-negative revenue growth.

The issue of greatest concern for the wine business today continues to be the lagging participation in the wine category by the large millennial generation. In just eight more years, the last boomer will pass age 66 and be eligible for full Social Security benefits.[59] What will the average wine consumer look like with the boomer in full retirement?

Consumers younger than 40 have different values, are more health-conscious, have lower discretionary income and wealth and are more ethnically diverse than previous generations. While the wine industry is taking a more passive approach to attracting the young consumer, the luxury market has gone all-in, adapting product offerings for younger tastes, spending on digital communication paired with engagement strategies and evolving distribution channels at the same time. The comparison with the wine business is stark: About 20 percent of millennials consume wine, yet two-thirds more — 33 percent — consume luxury goods.

The millennials' potential to replace retiring boomers as wine consumers has been a delayed promise because of several factors, including their early preference for craft beer and spirits, questions surrounding the health of alcohol consumption and the fact that it takes longer to establish careers, families and wealth than it did in prior generations.

One other difference is the racial composition of the generations. While only 28 percent of the boomer population is non-white, 45 percent of the millennial population — and almost half of Gen Z — is non-white (see figure 28).[60]



Figure 28: **Percent of non-white consumers by age cohort**

Sources: Chris Bitter, Vintage Economics; US Census Bureau



Figure 29: **Wine consumption rates compared to share of adult population by ethnicity**

Source: Nielsen Homescan 2020

While today 67 percent of wine consumers are white and 33 percent are other ethnicities (see figure 29), in 2045, according to the Brookings Institute, the US population will have roughly even numbers of white and non-white people.[61] This only reinforces the point that the wine community must adapt to the needs of a more varied consumer base in order to grow into the future.

### Millennials versus boomers

When hitting their spending years, status-seeking boomers loved to display their wealth and success prominently. They were the generation that premiumized wine in America. Getting information about special soils, harvest dates, pH, the winemaker or a wine score allowed those consumers to indirectly reference the price of a bottle to their friends without coming right out and shouting it to everyone.[62]

The younger wine consumers now, having lived through the Great Recession and a pandemic, aren't destined to be consumers who will show off their wealth. They too will work for a better lifestyle but are defining that in different ways, including a more balanced work/life schedule. They also want to know that those who have wealth are contributing to the world in some way, and instead of bragging about the price of a bottle, they would rather have a cocktail and talk to friends about the good work that a brand and its owners are doing to make the world better.

In addition to sustainability, health and environmental issues, today social justice, equity and diversity concerns are driving younger consumers to place unprecedented pressure on companies to adopt these issues into their brand platforms. A brand's social values are increasingly connected to a consumer's decision to purchase particular products, including wine.

Future success in marketing to millennials depends on recognizing the things that are important to them, which are distinct from what's important to the boomers (see figure 30). That's not to imply that wineries need to run from the boomer consumer or change their core brand or make a traditional label into something edgy. But the industry must evolve and leverage the new consumer's values when marketing wine.

For some, that might mean taking a different approach to a second label. While second brands have often been a mirror of the top brand but at a lower price, perhaps they can become an on-ramp for new consumers by reflecting those consumers' values and tastes, while the expensive top brand continues to be marketed as usual.

During my last speech in front of a live audience in March 2020, I ended with the following statement: "Wine. It's the beverage young consumers want. They just don't know it."[63]

Figure 30: **Generational differences**

| Value | Boomers | Millennials | Action |
|---|---|---|---|
| Support group | Family | Friends | Drive club socialization |
| Choice in food | Don't eat if it's bad for you | Only eat if it's good for you | List ingredients, calories; show how it's "better for you" |
| Business | Capitalism is the path to individual wealth | Wealth comes with social responsibility | Define your contribution to social values |
| Diversity | Civil Rights Movement drove change | Social and ethnic diversity drives change | Diversify in staffing, advertising and tasting room |
| Landfills and waste | Disposable culture | Green, reuse and repurpose culture | Lower carbon footprint with better packaging and sustainability strategies |
| Spending | Conspicuously | On important things | Improve wine value by selling on important personal values |
| Fun | Work before fun | With everything! | Embed into events, tasting room, marketing and communications |

Source: SVB

The strange reality is that it would be easy to start talking about wine in an evolved way and to reference the many things that are already a part of what we do to produce wine and that would resonate with younger consumers, yet as an industry we are not doing it.

Many in the wine business use sustainable farming practices and take great care in their winemaking by recycling water, avoiding the use of glyphosate, building and retrofitting with LEED Certification in mind and being good stewards of their land. Some use biodynamic and organic[64] farming techniques, but little of that shows up in marketing a bottle of wine today, and none of it appears in terminology and graphics the young consumer expects.

Millennials appreciate locally sourced foods and plant-based products. What is our industry if not locally sourced and plant-based? We just aren't transparent enough to let them see how our existing winery values already mirror theirs.

Eating healthy is a critical value of young consumers, and there is ample evidence that as boomers age, they are taking their cues from young people and adopting the millennial's health-conscious diets and consumption patterns. In years past, out of all alcoholic beverages wine had the most scientific evidence to show that it was part of a healthy diet and lifestyle.[65] Today, health touchpoints show on non-wine packaging in the form of indicators such as "clean," "natural" and "non-GMO."

Calories matter too. Look at snack foods today, and you will see that they often come in 100-calorie packages. No doubt that's because young consumers are conscious about their health, and weight is a factor in living a healthy life. That concern likely helps to make a vodka brand (Tito's) the largest-selling brand of spirits today.

What is the lowest-calorie mixed drink at a bar? Vodka and soda. How many calories are in a vodka soda? Sixty. How many calories are in a glass of wine? You don't really know, do you? Even most of us in the wine industry don't know how many calories are in a 5-ounce glass of wine. We lack the transparency our consumers are demanding when we refuse to put calories on the label, and that is a huge marketing miss.

If we really want to reach the millennial, we need to move away from lifestyles of the rich and famous and add cause-based marketing to our outreach. We need to hire more people in tasting rooms with tattoos and with different ethnicities. We need to promote our efforts at being carbon-neutral and our support for social justice.[66] We don't need to be cheap. We can be a luxury product or a mass-produced wine, but we have to direct companies and brands toward the younger consumer's values.

By looking at how other beverages — particularly spirits but also soda, energy drinks, hard seltzers, RTDs and sports drinks — are marketed successfully, winemakers can repurpose those ideas for their own benefit.



# 7 | Harvest and grape and wine supply

CONTENTS | 1 | 2 | 3 | 4 | 5 | 6 | **7 HARVEST AND GRAPE AND WINE SUPPLY** | 8 | 9 | 10 | 11



Figure 31: **California crush of wine grapes vs. consumption of California table wine**

■ California crush of wine varieties only        ■ California total table wine consumption

Sources: Wine Institute, California Department of Food and Agriculture, SVB
*SVB estimate

### With two consecutive bad yields in California, shouldn't grape and bulk prices rise?

The question in the subhead is one we should all be asking ourselves. We have long known that prices of grapes react to changes in the volume of yield from growers and to changes in demand from wineries. So with supply on a roller coaster after two very small crops in a row (see figure 31), prices must be going up for grapes and bulk wine in California, right? Surprisingly, the answer is no. Prices are generally not rising as of this writing, in December 2021.

That says something about what wineries have in tank and what they need. Consumer demand is flat at best by volume. The fact that there has been no price movement in grapes after two short crops can only mean that wineries think they have enough already and they see no need to buy more for now. The industry isn't predicting growth in consumption.[67]

How did we get to this position in supply? If the data leads you to conclude that there are too many acres planted, then sadly, you might be right. Jeff Bitter, president of Allied Grape Growers — and a person who understands vineyards and math — has been calling for acreage removals since 2020. The short crop combined with no price movement on supply probably does mean we still have too many gross acres planted, and in California, a normal yield of 4 million tons is not welcome. With current demand, we would be oversupplied again.



The fact that there has been no price movement in grapes after two short crops can only mean that wineries think they have enough already.



Figure 32: **California bulk wine inventory**

Source: Ciatti
*SVB estimate



Figure 33: **Monthly changes in California bulk wine inventory**

Source: Ciatti

## Volatile harvest swings for the past several years

After several years of good-sized harvests and flattening consumption starting in 2015, a supply bubble began to form. That bubble got popped in 2019, after the record 2018 wine grape crop in California came in (see figure 32).[68] With nothing changing on the demand side and a normal-sized 2019 crop delivered, the industry hit a point of acute oversupply.

In January 2020, with our best interpretation of available information, we said, "We are at a position of oversupply across the entire supply chain. That extends through retail and every growing region in California at every price point."[69] We said it would take three to six years to correct. By April 2020, that was no longer true.

Circumstances changed on the demand side in March 2020, and they changed on the supply side in August. Less than one year from our forecast of acute excess supply, we were balanced across most regions and varietals. How could we move from acute oversupply to balance in months? The unpredictable struck: COVID, then fires.

The supply situation changed almost overnight in March 2020, when the shelter-in-place orders from COVID began to take effect and panic buying set in. The larger producers that purchase a lot of fruit in the Central Valley weren't prepared for the high volumes demanded. Even though they started out the year oversupplied, by June they had worked through their oversupply in cellar. By July, those wineries started to buy down excess bulk wine to match off-premise demand, cleaning out the remaining 2018 supply (see figure 33).

As hard as it was to believe, the high-volume end of the market was close to being in balance before summer was over. But the North Coast had significant tons of fruit without contracts headed into harvest. And with wineries just starting to reopen to limited numbers of visitors, the problem of excess supply would not improve just from tourism and tasting room activity buying down wine inventory.

Then came August 16 and the never-before-seen dry lightning storms that spread wildfires across Central California into Southern Oregon in several large fire complexes, burning 4 million acres in California and over 1 million in Oregon, leaving cities in the West under unhealthy air conditions for weeks on end.

The losses of grapes due to smoke taint for the 2020 season could not be accurately counted but undoubtedly were in the hundreds of thousands of tons. If there was any silver lining to the fires, grape supplies in the North Coast of California and Oregon were able to come into balance from this tragedy.

Fortunately, the 2021 harvest year was nothing like the last several unless you were in the Sierra Foothills of California and had to deal with fires and months of smoke. Otherwise, California and Oregon came in with balanced supply, and most cited generally good growing conditions through the year with few heat events. Washington is still a little long on fruit with some acres needing removal.

Harvest came off with a few hitches in some cases, where whites and reds ripened together and where labor was in short supply, but overall it was a relief from what the industry has experienced over the past several years. We are predicting the 2021 California harvest will come in light at 3.6 million tons.

## Impacts from disasters

These are some of the most difficult business conditions outside of Prohibition the wine industry has faced. The impacts from fire, flood and pestilence have been almost biblical in tenor, and they keep presenting themselves in different ways. For example, drought weakens trees, allowing bark beetles to kill the trees and add fuel for fires. It also led to highly unusual dry lightning storms in California and Oregon in 2020, which were the match that lit record fires. And it's lowering underground water tables and causing regional restrictions and bans on some water use. But 2021 brought in a new problem: record low soil moisture.

This phenomenon explains why the California harvest was light when the growing season was almost ideal for most regions in the West.

Drought in California has consistently been an issue, but today the extended years of drought have caused soil moisture to fall to levels that impact yields. This hasn't impacted everyone equally because some growers have access to water. But in 2021, California water managers made unprecedented cuts to allocations, shutting down access to some water sources for growers.[70] Other growers ran out of water in holding ponds while some lost their wells.



Figure 34: **What growers plan to do to mitigate drought in 2022**
*(Respondents could select multiple answers.)*

Source: SVB Annual Winery Conditions Survey

When water is in short supply, mature vines will protect themselves by producing lower yields, and farmers will take other actions to reduce water loss (see figure 34). While the San Joaquin Valley has dealt with restrictive water allocations for some time, the circle is expanding. This isn't a short-term problem.

The mountains and drainage basins in the West, including the Sierra Nevadas and Colorado River Basin, are dealing with warmer storms that bring less snow. In 2021, the April snowpack in California measured in respectably at 59 percent of normal, but of the runoff that followed, only 20 percent made it to the streams and lakes while the rest soaked into the dry soils or evaporated.[71]

In prior drought years, when we hit points of low soil moisture, growers could irrigate and get a full yield. With this current drought, as of early December 2021, the reservoirs were 35.7 percent full in California. While Seattle and Portland had heavy rain in the fall of 2021, California had one promising early storm in mid-October, followed by several more in December. But for California to restore reservoir levels, abnormally high levels of rain would have to fall well into 2022.



For California to restore reservoir levels, abnormally high levels of rain would have to fall well into 2022.



Figure 35: **How concerned are you about water availability?**

Very concerned; potential for serious shortages **43%**

Concerned, but we should have enough water **51%**

Neither concerned nor unconcerned **4%**

Confident; we have abundant water sources **2%**

Source: SVB Annual Winery Conditions Survey

We asked the wine community if they felt impacted by the current drought. Only 2 percent said they were confident they had abundant water sources, while 43 percent said they were very concerned about the potential for serious shortages (see figure 35).

Paso Robles, which has consistently faced difficult water situations, is at the top on the list reporting drought impact, with almost 90 percent of wineries saying the drought has affected them (see figure 36). Even regions that normally have adequate water, such as Lodi and Northern Oregon, had 60 percent or more of their wineries reporting impact. The only region not suffering from the drought was Virginia, though that region has its own weather issues.



Figure 36: **Is your winery impacted by the drought?**

■ Yes    ■ No

| Region | Yes |
|---|---|
| Paso Robles | 89.66% |
| Napa County | 81.68% |
| Sonoma County | 80.81% |
| Santa Cruz and Monterey | 78.57% |
| Santa Barbara | 71.79% |
| Lodi | 68.75% |
| Northern Oregon | 64.41% |
| Sierra Foothills | 55.00% |
| Other | 40.23% |
| Washington | 30.77% |
| Virginia | 0% |

Source: SVB Annual Winery Conditions Survey

> ## Eight percent of the wine industry was unable to obtain insurance in 2021, and another 27 percent said they couldn't obtain sufficient coverage.

Another critical issue related to climate change is the cost to obtain insurance.[72] Given the billions lost to wildfires over the past several years in the West, insurance companies have been applying new risk mitigation measures and using technology to update wildfire risk maps. The new risk definitions incorporate a number of variables, such as past fires, elevation and the amount of vegetation available.[73]

Over 70 percent of those surveyed this year said their insurance costs increased (see figure 37). Eight percent of respondents were unable to obtain insurance in 2021, and another 27 percent said they couldn't obtain sufficient coverage. This situation puts winery owners in a position to lose everything and impacts their ability to get loans to run their business. California's FAIR Plan is a last-resort option for wineries but limits maximum coverage to $8.4 million, which is nearly double the prior policy limits but still insufficient for many.[74]

COVID has had many impacts on winery operations, most of which are obvious, such as the lockdowns that have been covered elsewhere in this report. One less obvious issue for consumers has been the disruption of supply chains.

The record backup at the ports has gotten extensive news coverage.[75] The shift in consumer spending from services (which were closed) to goods is partly to blame for the port crisis. That has been compounded by many other factors, such as aging infrastructure at the ports, shortages of truck drivers, shortages of containers, port closures from COVID lockdowns around the globe and — most recently — the lack of empty containers because they are stuck and stacked in ports. With buyers unable to get goods, the price of those goods has gone up.



Figure 37: **Wineries' property insurance coverage in 2021**

Source: SVB Annual Winery Conditions Survey



Figure 38: **Which supplies have been difficult to source in 2021?**
*(Respondents could select multiple answers.)*

Source: SVB Annual Winery Conditions Survey

The wine industry has suffered its own issues with supply chains, some of which are tied to trucking shortages and the transportation needed to get wine supply to market. The cost of all items used in production has gone up, and in some cases the availability of manufacturing materials has caused production breaks and slowdowns. Consider the issue you would face if you needed a heavy machine part from an Italian supplier today. You couldn't get it by ship in a predictable amount of time. If you needed it delivered in a certain time window, your only option would be to send it by costly airfreight.

Leading the list of materials in short supply is glass (see figure 38). Seventy-six percent of respondents said they had issues getting sufficient supplies of the right glass on time for production. In some cases, the inability to bottle wine before harvest created additional production problems at the winery.

Glass availability has been impacted by a number of things, including positive COVID cases in factories, a furnace being taken offline in the spring of 2021, a fire in a glass factory in Argentina, an overdependence on foreign glass makers, a shortage of boxes for shipping glass and all the transportation issues previously noted.

But the story with the supply chain doesn't end with glass. Smaller wineries have less negotiating power and have been suffering production holdups. Their frequently cited issues include the inability to source bottling supplies, cardboard, equipment and labels. While a smaller number said they had issues with barrels, that problem would probably have been more widespread were it not for leftover barrels from the small 2020 vintage. Only 7 percent of survey respondents said they had no problems, and 40 percent believed the supply chain issues won't be resolved until the second half of 2022.



# 8 | Packaging and varietals

Alternative packaging is continuing to evolve.

CONTENTS | 1 | 2 | 3 | 4 | 5 | 6 | 7 | **8 PACKAGING AND VARIETALS** | 9 | 10 | 11

Over the past year, the growth rate of the traditional 750-milliliter bottle format has dropped 3.6 percent, while the larger packaging of 1 liter and above fell between 4.6 percent and 12.1 percent (see figure 39). That's a contrast from 2020, when large formats were flying off the shelves, driven by consumers making sure they had their wine while sheltering at home. That trend is now reversing. The smaller sizes were gaining in popularity pre-COVID, and there is every reason to expect they will resume that growth in a post-COVID world.

The year-over-year growth rate of varietals isn't delivering good news. In 2020, there were seven varietals that showed positive growth rates. This year, all major varietals in wine had negative growth rates in depletions, with the exception of sparkling, specialty (such as fruit-infused wines) and prosecco, with the latter leading growth at 15.1 percent. The worst-performing varietals were merlot, white moscato and sangria (see figure 40).

There hasn't been much movement in the order of consumer preference for varietals. The unfortunate story here is that the four most popular varietals by share are all trending solidly negative in growth.



> This year, all major varietals in wine had negative growth rates in depletions, with the exception of sparkling, specialty (such as fruit-infused wines) and prosecco.



Figure 39: **Growth and market share of formats**

Source: SipSource, October 2021

Figure 40: **Varietal growth and share of market**

Source: SipSource, October 2021





# 9 | Cumulative negative health messaging

"Our country has deliberately
undertaken a great social
and economic experiment,
noble in motive and far-
reaching in purpose."

—Herbert Hoover addressing the topic of Prohibition
at the Republican National Convention, 1928

CONTENTS | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | **9 CUMULATIVE NEGATIVE HEALTH MESSAGING** | 10 | 11

Let's just agree that the Prohibition experiment was a failure. Let's further acknowledge that moderate wine consumption is under attack, no matter what the science says about improved mortality and morbidity rates.

### Neo-prohibition — the start

Starting in the early 1980s, a group of loosely related private and public advocacy organizations, special interest groups and governmental agencies organically aligned with the goal of reducing or eliminating the harmful effects of alcohol consumption in the US.

Like the Prohibition movement earlier in the 20th century, neo-prohibition included diverse groups, such as religious organizations that saw drinking alcohol as sinful, activist organizations whose primary goal was eliminating deaths from drunk driving,[76] health organizations funded by special interests and armed with studies about the negative impact of consuming alcohol on productivity and health, and the US government, which was enacting policy.

Beginning in 1982, Congress developed a series of grant programs to encourage states to enact stronger impaired-driving laws and lower per se blood alcohol limits. By the mid-1980s, cultural engineering of the messaging was enhanced when some of the neo-prohibitionist organizations effectively characterized wine and other alcoholic beverages in popular culture as another gateway drug, linking alcohol to unrelated drug addictions and related pests plaguing society.

The growing clamor culminated with the Anti–Drug Abuse Act of 1988,[77] which included mandatory government health warnings about alcohol and the addition of a government warning on alcohol beverage labels.

On March 3, 1988, President Clinton, through the National Highway Traffic Safety Administration (NHTSA), introduced an administrative order for, and penalties against, any state not adopting a 0.08 maximum per se standard for drunk driving.[78]

The anti-alcohol momentum was confronted on November 17, 1991, when 20 million viewers in the US heard the *CBS 60 Minutes* broadcast on the French Paradox, which suggested that wine consumption had health benefits.[79] It immediately caused a spike in red wine consumption.



## With the positive medical reports, per capita wine consumption soared starting in 1994.

That was followed in the mid-1990s with widespread public acceptance of the Mediterranean diet[80] and later punctuated by the publicized work of Dr. Arthur L. Klatsky, a Kaiser Permanente cardiologist who separated the discussion of moderate and heavy consumption and showed the health benefits of moderate alcohol consumption over both heavy consumption and, surprisingly, non-consumption.[81] Subsequent work proved that there were lower morbidity rates associated with moderate consumption.

With the positive medical reports, per capita wine consumption soared starting in 1994, when baby boomers hit their consuming stride, which coincided with their prime retail spending years. The consumption of spirits showed some modest positive change shortly thereafter due to both Dr. Klatsky's findings and the premiumization trend, which the spirits industry joined after seeing the success in the wine business.

The cumulative weight of the studies proving that moderate wine consumption had positive health benefits redirected the conversation away from health as part of the rationale for anti-alcohol messaging. Once the blood alcohol level was lowered nationwide and the drunk driving component of the movement won a victory, the debate settled into the background for a decade as the wine industry basked in the glow of increasing sales, but the anti-alcohol movement never stopped fighting the war.

## Modern-day prohibition

Since the French Paradox story was carried on *60 Minutes*, numerous anti-alcohol groups have expended considerable time and money to produce alternative research that calls into question or counters the original research findings.[82] Most conclude that the research is controversial without calling the science wrong.

With alcohol studies coming to different conclusions and causing confusion, and with a refresh of the government's Dietary Guidelines for Americans under discussion, in December 2003 the National Institute on Alcohol Abuse and Alcoholism (NIAAA) funded a study to review the empirical work done and "assess the strength of the evidence related to health risks and potential benefits of moderate alcohol consumption."[83]

The conclusion of the report was that "moderate levels of alcohol consumption do not increase risk for heart failure/myocardial infarction or stroke, and in fact provide protective effects." Nonetheless, additional government and privately funded anti-alcohol studies have continued and have gained significant traction in the past decade by instead changing the focus to cancer and all-risk mortality.

Europe is ahead of the US in directing consumer sentiment away from alcohol consumption. In 2018, the UK's Chief Medical Officer, Sally Davies, told a British television interviewer, "There is no safe level of drinking." Even more surprising was the statement by the French health minister, Agnès Buzyn, who said that wine was bad for people.[84] The cumulative weight of the world messaging and of anti-alcohol studies has been effective[85] and has once again emboldened US regulators to promote additional restrictions on alcohol consumption.

Quietly, in January 2018, the US Department of Health and Human Services (HHS) deleted the dietary guidelines that said moderate drinking could lower the risk of heart disease,[86] ignoring their own prior findings by the NIAAA.

In July 2020, as everyone was busy dealing with a pandemic and recession, a handpicked panel of scientists with an anti-alcohol bias recommended to the USDA and HHS that the USDA's dietary guidelines for alcohol consumption be reduced from two drinks per day for a man to one drink per day, the same as the guideline for women.[87]

The panel also de-emphasized prior discussion about safe or healthy levels of drinking, repeating the same statements made in Europe that there was no safe level of alcohol to consume, wording that came from the World Health Organization.[88] Public comment was rushed and closed on August 13, leaving only about a month for public comment — in the middle of a pandemic.

While those who devised the prior guidelines focused on total mortality and decided that there were benefits from moderate consumption, this panel concluded that "because alcohol is not a component of USDA food pattern guidance, its added energy is discretionary and should be considered in the present context of high and increasing obesity prevalence." The panel then contemplated the relationship between alcohol consumption and "all-cause mortality," thereby including obesity, cancers and any other illness in the measurements. It's another attempt to move the goalposts — even if science shows that people live longer lives by consuming wine moderately.

We have returned to the neo-prohibition era in this debate. Alcohol consumption is being equated to opioid addiction again.[89] Ultimately, the USDA rejected the latest panel's efforts to amend dietary guidelines,[90] but in recent years the government has issued new directives from the US Preventive Services Task Force recommending that all primary care physicians routinely ask about, and counsel patients on, unhealthy levels of alcohol consumption.[91]

The youngest consumers are health-focused, which explains the explosive growth in health beverages in the US.[92] Compared to the boomers, who ate "if it wasn't bad for you," the current generation wants to consume things that are "good for you."[93] With today's messaging, young consumers are consuming less alcohol than prior generations.[94]

If we don't do anything to offer a counter argument, within the decade we should expect to see cancer warnings on wine bottles, no matter what the science proves. This type of labeling was adopted as law in Ireland in 2018 and in the Yukon Territories in 2020 and is being pursued in numerous other countries.[95, 96, 97]

> "
> ### With today's messaging, young consumers are consuming less alcohol than prior generations.

Prior to March 2020, the US wine business was clearly hitting a ceiling in its ability to grow, largely due to fundamental challenges the industry hadn't fully accepted or yet addressed, such as the neo-prohibition movement. We can't correct what we don't identify or acknowledge.

The growth rate of off-premise wine sales turned negative starting in 2017. But in March 2020, using just the grocery channel, that rate turned decisively positive, and news reports and anti-alcohol groups — linking surveys to consumption volumes and citing Nielsen data — concluded that consumers sheltering at home were binge drinking.[98] None of that was true, as the researchers would have known if they'd factored in the loss of sales from closed restaurants and other venues, as well as all the lost family occasions, such as Easter, graduation, New Year's and weddings.

The reality is that consumers didn't buy more wine during the lockdowns, and restaurants ordered more from the spirits category than the wine category during the business restart in 2021. While premium wineries had a very strong year, that success was built on pent-up demand for experiences and on white-tablecloth restaurants restocking. Some of that is non-repeatable. Even the fine wine category had seen sales growth rates move from north of 20 percent in the early 2000s to 5 percent before the pandemic.

The anti-alcohol lobby continues to push an agenda, supported by science, that starts by concluding that all alcohol consumption is bad and then backs into the research. The cumulative negative health message is eroding public faith in the science that proved moderate wine consumption was healthy.

With continuing attacks on moderate consumption, we can count on new adverse legislation. Eliminating advertising is one stated goal that's high on the list for the World Health Organization, as its website notes. Without the wine industry showing up to push back on false science (that, for example, "proves" an equivalence between smoking and drinking), we will also have enhanced cancer warnings on labels soon.[99] When will the wine industry show up to help promote well-researched, positive science on moderate consumption?



> **When will the wine industry show up to help promote well-researched, positive science on moderate consumption?**



# 10

# What do we do about declining demand?

CONTENTS | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | **10** WHAT DO WE DO ABOUT DECLINING DEMAND? | 11

## The beginning of a change in how we do things

If you've read this report in past years, you know that I started calling out the issue of decreasing growth rates in the wine category in 2017. I identified the main issue as boomers not being replaced by millennial consumers in equal numbers, but there are several other factors in play that I've discussed since then:

- Boomers retiring and aging

- All other cohorts showing less interest in wine

- Specifically, the lack of adoption of wine by the large millennial generation

- Alcoholic beverage consumers (including boomers) increasingly drinking across categories

- The industry's inaction that allowed the "better for you" health message that wine owned in the '90s and '00s to vanish from the consumer's mind

- Neo-prohibitionists increasingly winning a war on legislation and anti-alcohol messaging

- The industry's failure to evolve marketing that resonates with the values of younger people

- The lack of a cost-effective on-ramp for young consumers to discover and enjoy wine

- The higher per-serving expense of wine compared to other alcoholic beverages

- Successful marketing to younger audiences by competing beverages, particularly the spirits industry

- The excessive markups on wine in restaurants, which has had a negative impact on wine-by-the-glass programs

- The lowest level of spending on alcohol by the youngest drinkers since 1984

- The industry's slowness in adopting digital sales tools and consumer/data analytics

That's a lot. What do we do about this situation?

I started talking about the need for a USDA Marketing Order in 2011 during a speaking engagement in Fresno.[100] I've brought the topic up several times in public discussions since, but there was no leadership or momentum in the industry to take it on and there were significant doubters who thought it was a bad idea (see "Objections" below). My hope was that someone would pick up the gauntlet and do something. But seeing no takers, I went to Plan B.

In 2019, Danny Brager, head of Brager Beverage Alcohol Consulting, and I presented our views to an audience of about 35 CXO-level leaders, including representatives from many of the larger wineries as well as executive directors of major industry support organizations and nonprofits. Mary Jo Dale, CEO of Customer Vineyard, led the event and discussion in a large room at a Napa hotel. We hoped to engage the attendees in a dialogue that either would convince Danny and me that we were missing something and overreacting or would encourage the group to acknowledge a demand problem that needed to be addressed as an industry.

## Agreeing on a path

When Danny and I finished, I was surprised — maybe shocked — at the unanimity in the room and the widespread acknowledgment that, indeed, the wine industry had an issue that required attention.

Since that meeting, we've added Dale Stratton, president of the Wine Market Council, to the founding advisory board, which includes me, Danny Brager and Mary Jo Dale, each of whom has donated their time while maintaining full-time jobs. We've all had numerous individual and group discussions with industry leaders to elicit responses, hear objections and define consensus around a strategy. We received unanimous consent that we should move forward to the next step and produce a feasibility study.

Money was raised from industry vendors to pay for a Request for Proposals (RFP). The goals of the project were developed, and the RFP was sent to a half-dozen firms for the project.[101] With most bids coming in around seven figures, which was out of our range, we settled on a lower-cost workable solution and engaged the UC Berkeley Hass School of Business, putting their MBA candidates to work in their capstone coursework under the guidance of senior executives from McKinsey & Company.

With about three months of exhaustive work interviewing industry leaders and government officials, the team from Berkeley arrived at a consensus. They presented several options to our group and recommended the industry apply for and develop a marketing program by means of a National Research and Promotions Order, a type of Marketing Order administered by the USDA.

With COVID slowing the process, the advisory board met for almost a year with the original CXOs, in addition to a few important individuals who were added based on the feasibility study recommendations. Subsequent to the presentation, we ran a poll to double-check if the group still believed we were moving in a direction they supported, and a second poll asking if the National Research and Promotions Order was the right path. We had nearly unanimous votes in the affirmative, so we are moving forward.

### Beginning to make WineRAMP a reality

The solution has been tentatively named WineRAMP (the Wine Research and Marketing Project). It will help us to work together to build "brand wine" in the US marketplace and promote the positive attributes of wine to current and new legal consumers. It's not a new or risky idea. There is a long list of other agriculturally based products in the US successfully promoting themselves through National Research and Promotions (R&P) programs. Based on expert independent audits, these organizations have delivered an industry return more than 10x for every $1 invested.

It's important to note that the USDA provides some legal protection for marketing campaigns and research promoted via an R&P program. For instance, since the USDA dietary guidelines state that two glasses of wine for men and one glass for women are acceptable in a healthy diet, we can make that claim without concern about legal liability. But the program also gives us the broader ability to promote the positive research that has been done by the scientific community for decades.

Finally, an R&P program can invest in and support the work of existing wine industry associations. The idea isn't to compete with other wine organizations. It's to succeed together and not duplicate effort.

Now, a little over two years since beginning this journey, I am happy to say that funding has been secured from some of the largest wineries in the group, some large distributors, importers, a few smaller wineries, vendors and Silicon Valley Bank. Those funds will be used to pay for the first year of the two years it will take to develop the formal objectives, hire a small staff of two that can focus on the project, define the articles and the voting structure, determine the manner in which all wineries will pay for the organization and gather at least the 50 percent vote needed from the nation's wineries to establish the organization under the USDA charter.[102]

### Objections

There are always objections when you have a large audience to please, such as the US wine industry, and you try to change the status quo. We've heard many objections, such as: "We don't need another tax," "we can't afford it," "we've tried it before and it failed," "there is only so much industry support money that can be spread around" and "this is duplicative of other efforts underway in our region." And then, there is the "hope" strategy: We can just wait and hope for millennials to come around. That's less expensive — or is it?

### *We need to wait for the millennial to get older.*

That's an objection I've gotten for over a decade as I've pointed out the lack of adoption by younger audiences. In that time, wine has gone from growth rates of 6 percent to 4 percent, and now we're at 0 percent plus or minus, and even worse performance on volume to the point that we're pulling acres out of the ground in the Central Coast and Fresno. But the "hopers" correctly point out that millennials haven't reached the age of boomers when they switched to wine, as if age alone can explain their hesitance.

The facts are that the median age for boomers was 38 when wine turned positive in 1994, and the median age of millennials is only 34 now. That's the model some people apply when they argue that we should just be patient. In four more years, the young people will begin to flock to wine because "they always do" when they get older. But that's not the way consumer demand works. It's not based on age, and markets don't operate in a vacuum.

CONTENTS | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | **10** WHAT DO WE DO ABOUT DECLINING DEMAND? | 11

> ## It was wine's reputation for being cool and better for you that pushed sales higher for 25 years.

People consume things based on need, style, values, outside influences, cost of substitutes, discretionary income, the type of good and much more. Marketing also plays a role. Age, though, is not one of the primary factors.

Here's more proof: The mature generation never adopted wine. They didn't evolve to like wine in their 30s. If they consumed wine, it was in gallon jugs; generally, they identified as spirits and beer consumers. The next generation, baby boomers, weren't frugal like their parents but gross users of debt. Boomers didn't follow their parents' tastes in cars, clothes or wine either. And they came of age just as wine got a big boost from scientific research and media coverage.

Back in 1975, US wine won the Paris Tastings, proving we could produce world-class wine. The press covered it with zeal.[103] Then in the 1990s, while neo-prohibition was taking a toll on wine consumption, the French Paradox, the Mediterranean diet and the work of Arthur Klatsky came to the forefront of publicity about health and wine consumption. You can't ignore the tremendous lift in wine sales from the positive PR those events spawned at the time.

Wine achieved the highest quality of the major alcoholic beverage categories in the 1990s, and consumers believed it was the best for you, if you chose to drink. Beer was mass-produced and of average quality, and spirits were still largely selling based on their bang for the buck (ethanol per dollar). Premium wine was far less expensive in the mid-'90s even on an inflation-adjusted basis, with most Napa cabernets selling for less than $20 per bottle.

That's why boomers became wine drinkers during the 1990s. It had nothing to do with their age. It was wine's reputation for being cool and better for you that pushed sales higher for 25 years.

Today, all alcohol is premiumized, and premium is the only segment with consistent growth for 20 years. Alcoholic beverage consumers largely drink across categories — even boomers. Wine is twice as expensive per serving as spirits in stores and has been extensively overpriced in restaurants, which ends up putting lesser wines into the restaurant to compete with craft cocktails, and it's not working.

Young consumers are more frugal today and financially disadvantaged compared to boomers. They have been pushed to spirits because of the perceived price/quality relationship versus wine. And yes, wine is confusing. With spirits, how many varietals or regions do you need to know?

We aren't hitting the mark on anything millennials value, and yet despite all the evidence, we continue to market the same way we did for boomers. "Don't fix what isn't broke" is another objection I get from the small group of the uninformed, the uninterested or the adequately successful and self-interested.

So the question becomes: What is the economic or social event that will cause millennials now established in their careers, buying homes and starting families, to turn to wine? The answer isn't age. And if we keep assuming it is, boomers will sunset, and consumers who are not wine lovers will replace the boomers. If that's true, wine could drop 20 percent in volume in the next decade before leveling out. That's the calculus.

> ##  What is the economic or social event that will cause millennials now established in their careers, buying homes and starting families, to turn to wine?

### The other objections

*We can't afford it.*

Would you pay someone a dollar if they had some magic and could sell your wine for $10 more a bottle? The independent audits done on organizations in existing R&P programs show a tenfold return on investment on average.

*We tried a Marketing Order before, and it failed.*

That's a true statement. There were a few reasons that the last USDA Marketing Order ended, chief among them a lack of industry alignment when market conditions began to feel better, but the core issue was a voting structure that gave too much power to too few wineries.

That said, I would argue that the last USDA Marketing Order was successful. At the time, wine was served only for special occasions. A campaign was developed using the tagline "Wine. What are you saving it for?" and that campaign helped grow the category.[104]

The obvious answer is that we need to learn from past mistakes and develop a more equitable and inclusive voting structure. We realize that full industry consensus is impossible but are working toward that goal.



We need to learn from past mistakes and develop a more equitable and inclusive voting structure. We realize that full industry consensus is impossible but are working toward that goal.

*There is only so much industry support money that can be spread around.*

If the R&P Order is successful, as similar orders have been in other industries, we will have more money to spread around. Apart from that, the rules of the order allow for WineRAMP to invest in and work directly with other wine organizations on research and joint marketing campaigns.

*This is too West Coast–focused.*

This is a national order, so the goal isn't to promote only wine from California, the West or any state. While there is no rule that disallows marketing for a specific region, the intent of this is to promote wine as a category and change the value proposition for younger consumers so that wine has a cool factor. With the psychic benefit reinforced, younger consumers should then be willing to pay more and try more wine.

*This will duplicate what is already being done in our region/state.*

It's important to note that there is no one taking on national marketing for wine and unifying our voice as an industry, but this is still an objection we have to address in formation. There are some well-run state and regional marketing organizations, and we don't need to duplicate what they are doing. That would be a bad investment.

I would only say that this is about promoting the entire category and giving younger consumers a reason to adopt wine as a beverage of choice. That should support and add to the efforts of any state or regional marketing organization.



### Final thoughts

We don't have all the answers, and getting this organization up and smoothly running isn't by any means a certainty.

When we began this journey, I gave it a 1 percent chance of success. Today, with two years of work behind us, and an amazing level of consensus from iconic industry supporters, I'd give it more than a 50 percent chance of success. That's significant progress!

We know there will be surprises along the way as well, and we'll address those head-on. Inevitably, we will only succeed by working collaboratively to get broad-based industry support from big and small wineries, growers, distributors, retailers, importers and vendor partners. There is a lot of work ahead of us.[105]

**Please visit WineRAMP.org to learn more about this endeavor and lend your support.**

## Endnotes

1 Esther Mobley, "California Wine Companies Are Doing What Hasn't Been Done in 20 Years: Go on the Stock Market," *San Francisco Chronicle*, February 19, 2021.

2 US GDP in 1984 was 7.24 percent.

3 The wealth effect is a behavioral economic theory that, at its simplest, suggests a consumer is more likely to spend on discretionary items when their wealth and/or stock portfolio increases in value. Even if their assets were not converted to cash, the theory goes that they feel more wealthy, secure and confident in their ability to meet their fixed costs, so they spend more.

4 The median baby boomer hit normal retirement age in the US during 2021.

5 US Census Bureau Population Estimates, 2019.

6 Rita R. Robinson, "Put a Cancer Warning on Alcohol, Consumer and Public Health Groups Urge," November 7, 2020.

7 Consumer Federation of America, "Consumer, Public Health Groups Petition for Cancer Warning on Alcohol," October 21, 2020.

8 Rob McMillan, "Get Ready for Cancer Warnings on Wine Labels," *SVB on Wine*, September 11, 2019.

9 "Channel shifting" means that large volumes of a product (wine, in this case) have changed to a different sales channel — wine that used to be sold through restaurants is now being sold through grocery stores, for example.

10 I realize that "channel un-shifting" isn't the best use of the English language, but it's a useful way to present the fact that 2020 was an abnormal sales year, and 2021 will be yet another abnormal year as sales revert back to something approximating what we were used to in January 2020.

11 The Gomberg-Fredrickson report uses tax data to report trends. COVID and the work-from-home trend have slowed the government reporting that could be used for analysis. As of this writing in late November 2021, the TTB (Alcohol and Tobacco Tax and Trade Bureau) had issued June data.

12 Our analysis is one of the best available.

13 "Top-Level Forecasts," *2021 SVB State of the Wine Industry Report*, page 9.

14 Rob McMillan, "Predicting Higher Demand for Wine in 2021," *SVB on Wine*, January 18, 2021.

15 US Bureau of Economic Analysis, "Personal Savings Rate." See 2020 to the present.

16 Depletions in this context are removals of wine or spirits from the wholesaler's inventory. It doesn't mean the inventory is sold to a consumer, but it's a good early indicator of retail sales.

17 "Tastes Great vs. Less Filling Softball Game Commercial," YouTube, 1983.

18 "The Story of 'Tastes Great, Less Filling,'" YouTube, 1987.

19 John Harry, "Jimmy Carter: American Homebrew Hero?," National Museum of American History blog, September 30, 2019.

20 Mike Pomranz, "Ballast Point Was Once Valued at $1 Billion. It Just Sold for a 'Surprisingly Low' Amount," *Food & Wine*, December 9, 2019.

21 Matt Palmquist, "What Can the Cola Wars Teach Us about Brand Loyalty?," *Business + Strategy*, August 25, 2016.

22 Mike Pomranz, "Yes, Beer Companies Are Still Fighting About that Corn Syrup Super Bowl Commercial in Court," *Food & Wine*, May 4, 2020.

23 "Bud Light Super Bowl 2019 TV Commercial, 'Special Delivery,'" iSpot.TV, February 3, 2019.

24 Alder Yarrow, "'Clean Wine' Is a Commercial Scam," *Vinography*, July 15, 2020.

25 I can't skip through the decline of lower-priced wine without mentioning one obvious exception: the marketing success of Charles Shaw wine in the early 2000s. Karen Frazier, "History of Charles Shaw Winery," LoveToKnow.com.

26 While this AT&T commercial didn't include a boomer actor, it perfectly describes the desires of the never-satiated boomer consumer: "It's Not Complicated," YouTube, 2013.

27 Boomers entered their earning years with a federal tax deduction for consumer interest. That meant the 20 percent APR you paid on your credit card debt was at least partially underwritten by the federal government, so you really weren't paying 20 percent and could afford to buy even more! That deduction was removed as part of the Reagan Tax Reform Act of 1986, but it taught consumers to be debtors and spenders. Julia Kagan, "Tax Reform Act of 1986," Investopedia, updated July 31, 2020.

28 Between 1993 and 2000, the US exhibited the best economic performance of the past three decades. In 2000, the US economic expansion surpassed in length the expansion of the 1960s, and thus became the longest economic expansion on record. Jeffrey Frankel and Peter R. Orszag, *Retrospective on American Economic Policy in the 1990s*, Brookings Institute, November 2, 2001.

29 That is the answer to a parlor game question for your next party: What do wine and toilet paper have in common? Answer: Both were hoarded during the early phases of the pandemic.

30 Lucy Handley, "The Booze Boom: Here's What We Drank at Home During Lockdown," CNBC, May 26, 2020.

31 Michael S. Pollard, Joan S. Tucker and Harold D. Green Jr., "Changes in Adult Alcohol Use and Consequences During the COVID-19 Pandemic in the U.S.," JAMA Network Open, September 29, 2020; and "Rebalancing the 'COVID-19 Effect' on Alcohol Sales," NielsenIQ, May 7, 2020.

32 Elyse R. Grossman, Sara E. Benjamin-Neelon and Susan Sonnenschein, "Alcohol Consumption During the COVID-19 Pandemic: A Cross-Sectional Survey of U.S. Adults," *International Journal of Environmental Research and Public Health*, December 9, 2020.

33 It's interesting to note that wine was still in acute oversupply when shelter-in-place orders were issued, yet discounting was pulled back in the grocery channel and prices increased. That's not typical economic theory, but fear-based purchasing isn't rational.

34 "Top-Level Forecasts," *2021 SVB State of the Wine Industry Report*, page 9.

35 Wellsley Kesel, "The Saddest Restaurant Closures in Your State," *Eat This, Not That!*, November 10, 2020.

36 Bret Thorn, "Datassential: More Than 10 Percent of U.S. Restaurants Have Closed Permanently," *Nation's Restaurant News*, March 29, 2021.

37 This dataset from the Bureau of Labor Statistics only extends to 2015. I've contacted the BLS to see if they can update the information, but so far have not gotten a response. While the current data would be very interesting, it doesn't diminish the importance of the information presented.

38 Email from Danny Brager, head of Brager Beverage Alcohol Consulting.

39 Black Box Intelligence, press release, November 11, 2021.

40 Colleen Graham, "How to Pair Cocktails and Food," *The Spruce Eats*, March 17, 2021.

41 David Williams, "How Do You Spot a Hipster Wine?," *The Guardian*, February 19, 2017.

42 Elin McCoy, "The Restaurant Wine List Is Dead. Long Live the Wine List," Bloomberg, January 16, 2019.

43 Hotmail was the first free web-based email service. It was launched on July 4, 1996. According to the United Nations/ITU, by 2006, 10 years after email became accessible to the general public, there were 1.1 billion email accounts in use worldwide.

44 In the 1980s and early 1990s, tasting rooms were viewed more as support for distributor sales, and tasting room fees were free or negligible. Wineries were just offering samples. The early thinking was that if tourists came to Wine Country, they would know what to buy in the grocery store when they went home.

45 Part of the reason wine clubs weren't popular in the early 1990s related to the cost of postage and the lack of good mailing lists. Wineries didn't collect names, and direct sales were viewed as too expensive compared to three-tier sales. Further, the demand for premium wine spiked in 1994, and for a period of six years selling wine was as easy as answering the phone; distributors were begging small wineries for product. That all changed with the wide adoption of free email combined with the tech recession, when supply caught up with demand.

46 Estimates from the TTB and the Wine Institute.

47 SVB estimates of total wine distributors from multiple sources. Getting a concrete number for wholesalers is a difficult task. The Wine & Spirits Wholesalers of America reports that it represents over 3,000 locations run by 370 members. Wines Vines Analytics estimates that there are 1,200 distributors in the US. The TTB lists 31,053 distributors by location as of September 2021; however, there is no indication of how many owners this represents, and that number also includes beer distributors. To determine how many wine distributors exist would require eliminating all the beer distributors, then looking up the owner for each of the remaining wholesalers, and when finished, it would still be imprecise. If anyone would like to take that task on, please contact me.

48 Wines Vines Analytics believes that there are about 11,000 physical wineries in the US. The TTB lists 16,397 wineries with an active permit in the US as of September 2021. Not all of those are bonded, and not all have a physical location. While every winery used to be required to have a bond, in 2015 the Obama Administration signed the Consolidated Appropriations Act so that small wineries could operate without one. That makes it increasingly difficult to determine with precision how many physical wineries exist.

49  The tech recession, or the dotcom bubble, was a short period in the early 2000s when speculative excesses within internet companies drove investments and valuations higher, then led these tech stocks to crash between 2001 and 2002.

50  Justice Kennedy, *Granholm v. Heald* (03-1116) 544 U.S. 460, May 16, 2005.

51  Silicon Valley Bank, *Direct-to-Consumer Wine Survey Report*, 2021.

52  US Census Bureau, "Quarterly Retail E-Commerce Sales," 3rd Quarter 2021, November 18, 2021.

53  Silicon Valley Bank, *2021 SVB State of the Wine Industry Report*, January 2021, page 23.

54  "Three-tier sales" refers to the system in which producers or importers sell to wholesalers, who then sell to retailers, who sell to consumers. In *Granholm v. Heald*, the U.S. Supreme Court determined that states couldn't allow direct shipment of wine to consumers within their own states while applying different laws for out-of-state licensees.

55  The Paycheck Protection Program (PPP) was a novel forgivable loan program for small business funded by the federal government and administered jointly by the US Treasury and the US Small Business Administration. The goals of the program were to keep businesses going during the lockdown and to enable them to pay employees they would otherwise have to lay off. The thinking at the early stages of the pandemic was that the virus might be under control by early summer 2020, so the PPP was a short-term means for businesses to remain viable and restart quickly once reopening took place. In theory, the program was brilliant, but execution was fraught with problems including poor communication, insufficient infrastructure and fraud.

56  Yes, quibbler is a real word. So stop quibbling over a forecast that's still 15 years out and focus on the point. There is nothing in that chart that will lead someone to say wine sales are going to be up and to the right.

57  Dr. Chris Bitter, *Demographics and Wine*, Vintage Economics, November 2021.

58  Forty-two percent of boomers had no retirement savings as of 2018. Baby boomers began reaching age 65 in 2011 — 26 million so far, and another 50 million will turn 65 over the next 10 years. Twenty-six percent expect to work past age 70.

59  I performed a search to determine if Las Vegas posted odds on the chances of receiving full Social Security benefits. Las Vegas will allow you to bet on almost anything. Since they aren't making book on that one bet, I can only presume bookies don't see Social Security as a good bet.

60  Chart courtesy of Dr. Chris Bitter, Vintage Economics, 2021.

61  William H. Frey, "The US Will Become 'Minority White' in 2045, Census Projects," Brookings, March 14, 2018.

62  I'm sure I was one of the consumers, as a younger boomer, who just came right out and told the table how much the wine that I brought to the party cost. "Hey, everyone, this wine is incredible. I spent my whole bonus on this $11 beauty."

63  March 2020 was my last speech on a stage. I've had many video-based speeches and a few speaking opportunities where organizers tried a hybrid approach since then. But as of this writing, with the Omicron outbreak beginning to surface at the beginning of December 2021, I still have no speaking engagements planned for a live audience. I miss those days!

64  Unlike with other products, the use of the term "organic" has mixed consumer responses when it comes to wine. But the natural wine movement is an outflow of the concept. Finding the right tone with the terms "organic" and "natural" isn't black and white but invites exploration. My suggestion is to use your wine club to get answers. Tell them you're thinking of a change and ask them what they think. They will appreciate that you consider their advice useful, and that engagement by itself is positive.

65  US Department of Agriculture and US Department of Health and Human Services, *Dietary Guidelines for Americans, 2020–2025*, 9th edition, December 2020.

66  Promotion of social justice by companies is controversial. Many believe that a business should focus on profitability. While I agree with that, I believe diversity in hiring, for example, is something that will drive profitability in an increasingly diverse population. Either way, marketing to their values, not your own, may help attract young consumers.

67  Yes, I know that that's all conjecture and there are plenty of examples of grape prices going up, but my conjecture is experienced. There are always exceptions at the margin, though.

68  This was covered in detail in the *SVB 2020 Annual State of the Wine Industry Report*.

69 I have a highly scientific supply gauge that helps detect supply excesses called the Gonzalez Indicator. It came about because of a pit stop I made at a gas station in the remote rural town of Gonzales, California, in the spring of 2019. Among the Slim Jims, Budweiser and candy on display were several cases of luxury wine between $75 and $110. Finding luxury wine in the last place you expect — at the bottom of a distributor's placement list — is a great indicator the channel is overstuffed.

70 Matthew Renda, "California Water Managers Vote to Cut Off Farmers as Statewide Drought Intensifies," Courthouse News Service, June 15, 2021.

71 Kurtis Alexander, "Snowpack in California's Sierra Nevada Could Disappear in Just 25 Years," The San Francisco Chronicle, November 29, 2021.

72 Matthew Lavietes, "Western U.S. Wildfires Cost Insurers up to $13 Billion in 2020," Reuters, December 15, 2020.

73 Lisa Pickoff-White, "Map: Do You Live in a High-Risk Fire Zone?," KQED, May 10, 2021.

74 California Department of Insurance, "Commissioner Lara Announces Comprehensive Solution to Growing Agricultural and Commercial Insurance Needs," press release, October 12, 2021.

75 Lisa Baertlein, "As Port of Los Angeles Import Backups Ease, Empty Containers Pile Up," Reuters, November 16, 2021.

76 Mothers Against Drunk Driving (MADD) and Students Against Destructive Decisions (SADD).

77 The Alcoholic Beverage Labeling Act (ABLA) of the Anti–Drug Abuse Act of 1988, H.R. 5210, is a US federal law requiring that (among other provisions) the labels of alcoholic beverages carry a government warning.

78 National Highway Traffic Safety Administration, "Introduction," which discusses President Clinton's call for a nationwide 0.08 maximum standard for drunk driving.

79 Morley Safer, "The French Paradox" (video), 60 Minutes, November 17, 1991.

80 Mediterranean diet.

81 Arthur L. Klatsky, M.D., "Moderate Drinking and Reduced Risk of Heart Disease," Alcohol Research and Health, Volume 23, Number 1, 1999.

82 J. Ferrières, "The French Paradox: Lessons for Other Countries," Heart (Journal of the British Cardiovascular Society), Volume 90, Issue 1, 2004.

83 State of the Science Report on the Effects of Moderate Drinking, National Institute on Alcohol Abuse and Alcoholism, December 19, 2003.

84 James McAuley, "Wine Is Bad for You, France's Health Minister Warns. It's Not Going Down Well," Miami Herald, March 6, 2018.

85 Michael Greger, M.D., "What About the French Paradox?," NutritionFacts.org, May 22, 2018.

86 Justin Scheck and Tripp Mickle, "With Moderate Drinking Under Fire, Alcohol Companies Go on Offensive," The Wall Street Journal, November 29, 2018.

87 Anahad O'Connor, "Should We Be Drinking Less?," New York Times, July 10, 2020.

88 Caroline Paulus, "The Federal Government Is Coming for Your Moderate Bourbon Habit," The Bourbon Review, August 11, 2020.

89 Kelly Wynne, "Alcohol Is Killing More People Per Year Than the Opioid Crisis, and Most Deaths Are Young Women," Newsweek, November 17, 2018.

90 Helena Bottemiller-Evich, "Trump Administration Rejects Stricter Advice on Alcohol, Added Sugars," Politico, December 29, 2020.

91 US Preventive Services Task Force, "Screening and Behavioral Counseling Interventions to Reduce Unhealthy Alcohol Use in Adolescents and Adults," JAMA, November 13, 2018.

92 Emma Liem Beckett, "Consumers Are Demanding More From Their Beverage Experiences," Food Dive, January 22, 2018.

93 Imagine consumers wanting to consume food and beverages that are good for you! According to multiple studies, moderate alcohol consumption is good for you, but that's not part of a balanced message being delivered.

94 Joel Achenbach, "Teenagers and College-Age People Drink Less While This Group Pours Another Round," The Washington Post, April 16, 2018.

95 Jessica Fu, "Less Than Half of Americans Know That Alcohol Is a Carcinogen. Big Booze Wants to Keep It That Way," The Counter, December 1, 2020.

96 Ewan Somerville, "Calls for Cancer Warnings on Alcohol Amid Lockdown Drinking Surge," LBC News, November 18, 2020.

97  Robert Preidt, "When Booze Labels Carry Health Warnings, Drinking Declines: Study," *U.S. News & World Report*, May 4, 2020.

98  Alyssa Lukpat, "Coronavirus Stress, Isolation and Free Time: People Are Drinking More Amid Pandemic, Study Says," *Raleigh News & Observer*, July 16, 2020.

99  Rob McMillan, "The Real Threat to Wine Sales Is Being Ignored," *SVB on Wine*, August 10, 2020.

100  Rob McMillan, "Is California Wine at a Pricing Inflection Point?," *SVB on Wine*, July 29, 2012.

101  Special thanks to Vinventions and Cork Supply, who together funded the early costs and the feasibility study. What they have quietly done for the industry deserves your thanks and business if you're a winery.

102  While the organization can be approved with a 50.1 percent affirmative vote, we want to have as many wineries as possible understand the return on their investment and be part of the solution.

103  The Paris Tastings were held in Paris in May 1976. It was a blind tasting between American and French wine, with French judges. American wines won the tastings in the white category and red category and by average score. It was the first time the world discovered that wines could be made in the US that could rival the best international wines, which until that time was almost a heretical thought.

104  Jeremy Hay, "Wine Market Council – 5-Year Goal: Boosting Consumption to New Highs," *Wine Business Monthly*, January 2002. In addition to this article, this is information that I have received from many sources, combined with research I've done over time. I wasn't in the industry when the original USDA Marketing Order was approved, and we all know messages can get garbled over time. But this is what I've pulled out of research and discussions over the past 30 years in the industry.

105  Final endnote: Some have asked me what the four of us on the Advisory Council get out of this effort. How do we benefit? A few have even asked if this is something I'd run in retirement. I assure you I will not seek, and I will not accept, the nomination to be president of WineRAMP (a little LBJ humor for those old enough to remember that speech). The truth is, none of us have designs on serving with this proposed organization other than in an advisory or board capacity.

This material, including without limitation to the statistical information herein, is provided for informational purposes only. The material is based in part on information from third-party sources that we believe to be reliable but which has not been independently verified by us, and, as such, we do not represent the information is accurate or complete. The information should not be viewed as tax, accounting, investment, legal or other advice, nor is it to be relied on in making an investment or other decision. You should obtain relevant and specific professional advice before making any investment decision. Nothing relating to the material should be construed as a solicitation, offer or recommendation to acquire or dispose of any investment, or to engage in any other transaction.

The views expressed in this report are solely those of the author and do not necessarily reflect the views of SVB Financial Group, Silicon Valley Bank, or any of its affiliates.

Silicon Valley Bank is not selling or distributing wine or wine-related products. Silicon Valley Bank provides banking and financial services, along with industry insights to Vineyards and Wineries. Silicon Valley Bank is not responsible for (or a participant in) the sales of any wineries' products in any fashion or manner and makes no representations that any promotion or sales of alcoholic beverages will or will not be conducted in a lawful manner. Further, Silicon Valley Bank disclaims any responsibility or warranty for any products sold by wineries or other wine industry service providers. All non-SVB named companies listed throughout this document, as represented with the various statistical, thoughts, analysis and insights shared in this document, are independent third parties and are not affiliated with SVB Financial Group.

©2022 SVB Financial Group. All Rights Reserved. SVB, SVB FINANCIAL GROUP, SILICON VALLEY BANK, MAKE NEXT HAPPEN NOW, and the chevron device are registered trademarks of SVB Financial Group, used under license. Silicon Valley Bank is a member of the FDIC and of the Federal Reserve System. Silicon Valley Bank is the California bank subsidiary of SVB Financial Group (Nasdaq: SIVB).



# Environmental, Social and Governance Report 2022

A Review of Our Corporate
Responsibility Practices



SVB ESG REPORT

# Table of Contents

## 01

The Financial Partner of the
Innovation Economy                06

## 02

Living Our Values: Our ESG
Strategy and Goals                10

## 03

Engaging and Empowering Employees    15

## 04

Building a Culture of Diversity,
Equity and Inclusion at SVB       19

## 05

Championing Inclusion in
the Innovation Economy            24

## 06

Supporting Communities
Where We Live and Work            28

## 07

Advancing the Transition to a
Sustainable, Low-Carbon World     34

## 08

Practicing Responsible
Corporate Governance              39

Conclusion                        48

Contact Us                        50

Appendix                          51



SVB ESG REPORT

# About This Report

The information and data included within this report reflect fiscal year ended December 31, 2021, unless otherwise noted.

Our ESG reporting is aligned with our long-standing commitment to transparency and accountability, and is designed to provide our stakeholders with meaningful ESG data and descriptive goals that are significant to our business. Our ESG disclosures are informed by, and updated to reflect, our business strategy, stakeholder feedback, evolving best practices and industry-leading ESG frameworks, standards and guidelines. We reference and report our information based on several disclosure frameworks, including the Sustainability Accounting Standards Board (SASB) Commercial Bank Sector Standard and the World Economic Forum's (WEF) Stakeholder Capitalism Metrics, in addition to separately responding to the Financial Stability Board's Task Force on Climate-Related Financial Disclosures (TCFD) and CDP. Where the report references specific metrics, they are denoted at the bottom of the relevant page. The environmental data in this report has been verified by Lloyd's Register Quality Assurance (LRQA).

Thank you for your interest in our ESG programs and practices. We are pleased to share how our long-standing commitment to innovation, combined with our deep experience supporting investors and evolving technology companies, enables us to contribute to a more just and sustainable world through our own business and the work of our clients.

Please share questions and comments about this report by contacting us at: **ESG@svb.com**







SVB ESG REPORT

# A Message from Our CEO

At SVB, enabling economic opportunity and innovation for positive change is the hallmark of our business. We have succeeded by being the best financial partner to visionary innovators, investors and influencers bringing solutions to build a better world. As we — and our partners in the innovation economy — invest in what's next, we believe we have a responsibility to help produce more benefits for more people and to pursue a just, fair and sustainable world. Our 2022 ESG report lays out our strategies and initiatives to accomplish that by addressing the issues that are important to SVB, our employees, clients and stakeholders.

## Investing in people

With nearly 7,000 employees around the world, SVB is committed to giving more people with diverse backgrounds and perspectives the opportunity to thrive, both at SVB and in the larger innovation sector. At the heart of this commitment is our effort to foster a more inclusive culture — one that demonstrates the value we place on respect, belonging and equal access to opportunity at SVB. We are committed to increasing racial, ethnic and gender representation. In the broader innovation economy, we are focused on breaking down systemic barriers to entry and success by investing in opportunities that ensure more founders and investors with a range of experiences and ideas are represented in our ecosystem and can access the funding and support they need to realize their dreams.

To better serve our clients with expanded capabilities, we added to our team in 2021 with the acquisition of Boston Private, a leading provider of wealth management, trust and banking services. Based on this growth, we are also able to expand our services to reach more low- and moderate-income communities. Last year, we also added a technology practice to SVB Securities, expanding our team of experts and building on our investment bank's success in the healthcare sector.



## Financing solutions for a healthier planet

We believe that the transition to a low-carbon world will hinge on innovation across the full spectrum of climate-related activities and industries. Building on nearly 40 years of partnership with entrepreneurs and more than a decade of innovation supported by our Project Finance and Climate Technology & Sustainability teams, SVB has committed to provide at least $5 billion in loans, investments and other financing by 2027 to support companies advancing sustainability technologies. Internally, SVB has set a goal to be carbon neutral by 2025, which will include use of 100% renewable energy.

## Supporting our communities and amplifying the efforts of our employees

Throughout our history, we have supported communities where we live and work, and we have recently expanded those commitments. In 2021, we unveiled our five-year $11.2 billion Community Benefits Plan, which provides investments to expand our financing of affordable housing, address the financial needs of low- and moderate-income people, and support small businesses, entrepreneurship and economic development. In addition, we are collaborating with our community partners to drive greater support for their programs and goals, while working with our employees to increase the impact of their giving and volunteering efforts. I am particularly grateful for SVB employees who generously volunteer their time and skills to support our giving goals as a member of the Pledge 1% movement.

## Living our corporate values

Our values guide everything we do. We start with empathy, take responsibility, speak and act with integrity, embrace diverse perspectives, and keep learning and improving. These values inform our business decisions, determine how we support and reward our employees, shape our relationships with our clients and communities, and help drive our progress toward our ESG priorities.

SVB's long history of serving and championing the innovation economy has accustomed us to seizing opportunities and adapting to new conditions in a fast-changing world. We encourage you to follow our ESG progress as we take on the challenges and support the principles that we and our stakeholders value in the pursuit of innovation for a better world.

**Greg Becker**
President and CEO
SVB



## 01

SVB ESG REPORT

# The Financial Partner of the Innovation Economy

ABOUT SVB | ESG GOALS | TALENT | DEI AT SVB | ECONOMIC IMPACT | CITIZENSHIP | CLIMATE AND ENVIRONMENT | GOVERNANCE

# 2021 ESG Highlights



## Environmental



## Social



## Governance

| Environmental | Social | Governance |
| --- | --- | --- |
| **4,643,500**<br>Tons of annual $CO_2$ avoided across 18 deals completed by SVB's Project Finance team | **6**<br>Employee Resource Groups established, fueling a culture of belonging | **45%**<br>Of our Board of Directors are women, including our new Chair as of 4/21/2022 |
| **52%**<br>Reduction in GHG emissions from 2019 baseline in alignment with our Carbon-Neutral Operations goal | **$18 Million**<br>Donated approximately $18 million to charitable causes in 2021, surpassing our annual Pledge 1% goal | **Outstanding**<br>Received our first ever Outstanding rating for our 2018-2020 CRA Strategic Plan |
| **$5 Billion**<br>Sustainable Finance Commitment by 2027 | **6,058**<br>Lives reached through events and mentorships via our Access to Innovation program | **4**<br>Disclosed against 4 ESG disclosure frameworks: CDP, SASB, TCFD and WEF |
| **TCFD**<br>Published our first TCFD Report in 2021 | **$11.2 Billion**<br>Established 2022-2026 Community Benefits Plan | **OKR**<br>Instituted OKR measurement system, enabling efficient review of results versus goals |

# About SVB

SVB is the financial partner of the innovation economy, helping individuals, investors and the world's most innovative companies achieve their ambitious goals. Together SVB's businesses — Silicon Valley Bank, SVB Capital, SVB Private and SVB Securities — offer services dynamic and fast-growing clients require as they scale, including commercial banking, venture investing, wealth management and investment banking. Headquartered in Santa Clara, California, SVB operates in centers of innovation around the world. Learn more at **svb.com/global**.

## Our Company

**We serve our clients' needs through four businesses**



## Where innovations can be found

**Global locations**

● SVB's offices

**International Offices**
US | UK | Canada | China | Denmark | India | Ireland | Germany | Israel

Business development offices: Shanghai, Beijing, Dublin, Vancouver and Montreal.

Representative offices: Copenhagen, Hong Kong and Tel Aviv.
Lending branches: Frankfurt and Toronto.

SVB's joint venture bank, SPD Silicon Valley Bank: Shanghai, Beijing and Shenzhen.

**Deep sector expertise**



CLEANTECH AND SUSTAINABILITY

HARDWARE AND FRONTIER TECH

PREMIUM WINE

CONSUMER INTERNET

FINTECH

PRIVATE EQUITY AND VENTURE CAPITAL

LIFE SCIENCE AND HEALTHCARE

ENTERPRISE SOFTWARE

## 2021 Company Snapshot



**Global Business Stats**

**6,500+**
employees

**56**
offices in
9 countries

**14**th
largest
US bank

**Financial Highlights**
**For year-end 2021**

**$211.5B**
total assets

**$399B**
deposits and client
investment funds

**$66.3B**
total gross loans

**Core Business Highlights**

SVB Capital
opens doors to
innovation

**$7.3B**
in assets under
management

SVB Private
supports individuals
and families

**$19.6B**
in assets under
management

SVB Securities
investment
banking

**$538M**
in revenue*

**Core Business Highlights**

We work with:
- Nearly half of all US venture-backed technology and healthcare companies
- 55% of US venture-backed technology and healthcare companies that conducted IPOs in 2021

**Highlights and Recognitions**

SVB was recognized in 2021 for growth and sustainability efforts:

America's Most Responsible Companies
**NEWSWEEK**

Best Banks in America (#9)
**FORBES**

Best Regional Banks (#1)
**BANK DIRECTOR**

Fastest-Growing Companies
**FORTUNE**

Inclusion in the
**BLOOMBERG GENDER-EQUALITY INDEX**

Inclusion in the
**GOLDMAN SACHS JUST U.S. LARGE CAP EQUITY ETF**

Member of
**PLEDGE 1%**

*Consists of investment banking revenue and commissions. This is a non-GAAP financial measure.
All data is as of year-end 2021.



## 02

SVB ESG REPORT

# Living Our Values: Our ESG Strategy and Goals

# Living Our Values: Our ESG Strategy and Goals

## Our Values

 We start with empathy for others

 We speak and act with integrity

 We embrace diverse perspectives

 We take responsibility

 We keep learning and improving

## Living Our Values

SVB's values guide our actions. We help investors and promising companies innovate, thrive and create jobs; provide a culture where our employees can learn and grow; and, together with our clients and employees, build a more equitable and sustainable world. Five core values define our culture and serve as a foundation for conducting business and guiding our ESG program.

## Our ESG Strategy and Goals

We are working holistically across SVB and with our stakeholders to continue to enhance our ESG initiatives, leveraging our deep relationships with investors and innovation companies, as well as our capabilities, resources and networks, to drive the most impact. We identified the most relevant ESG priorities based on our purpose and strategy, stakeholder feedback, ESG reporting frameworks and standards, and industry best practices. The results of our assessment informed our approach to address critical, long-term needs for our business and stakeholders. We grouped these ESG priorities into six strategic initiatives to focus our ESG efforts:

### Strategic Initiatives

**Engaging and Empowering Employees:** Our people are key to our success, and we invest to support their growth and well-being.

**Building a Culture of Diversity, Equity and Inclusion at SVB:** We embrace diverse perspectives and foster a culture of belonging.

**Championing Inclusion in the Innovation Economy:** We are committed to advancing inclusion and opportunity in the innovation economy.

**Supporting Communities Where We Live and Work:** We invest in and give back to the community to help those in need.

**Advancing the Transition to a Sustainable, Low-Carbon World:** We support companies driving positive environmental change while reducing our own carbon footprint.

**Practicing Responsible Corporate Governance:** We uphold ethical standards and act with transparency and accountability.



Supporting our employees, operating as a champion of innovation and giving back to our communities have consistently been core to our business. Our ESG goals are an extension of these objectives, and we set targets to make a meaningful difference while holding ourselves accountable to our stakeholders in a transparent manner.

| Strategic Initiative | Goal | Target |
|---|---|---|
| Engaging and Empowering Employees | SVB employees to participate in diversity, equity and inclusion education | 100% by 2023 |
| Building a Culture of Diversity, Equity and Inclusion at SVB | Increase women in senior leadership roles globally | 43% total by 2025 |
| | Increase Black/African American representation in US senior leadership roles | 5% total by 2025 |
| | Increase Hispanic/Latinx representation in US senior leadership roles | 6% total by 2025 |
| | Increase total cumulative spend with diverse suppliers | 8% total by 2026 |
| Championing Inclusion in the Innovation Economy | Reach underrepresented individuals in the innovation economy with access to information, education and opportunities through our Access to Innovation program | 10,000 individuals annually |
| Supporting Communities Where We Live and Work | Small business loans of $1 million or less, as defined by the Community Reinvestment Act (CRA) | $5 billion total by 2026 |
| | CRA community development loans and investments | $4.8 billion total by 2026 |
| | Charitable contributions in CRA coverage areas | $75 million total by 2026 |
| | Residential mortgages to low- and moderate-income (LMI) borrowers and in LMI census tracts | $1.3 billion total by 2026 |
| Advancing the Transition to a Sustainable, Low-Carbon World | Increase loans, investments and other financing to support companies working to accelerate the transition to a more sustainable, low-carbon world | $5 billion total by 2027 |
| | Carbon-neutral operations | 100% by 2025 |
| | Renewable electricity use | 100% by 2025 |
| Practicing Responsible Corporate Governance | SVB employees to complete annual compliance training | 100% annually |
| | Disclose against ESG frameworks | At least 3 annually |



Our ESG program governance is aligned with our overall approach to strong corporate governance. Our ESG governance practices include board oversight, program management, involvement across our business units, and a commitment to transparency and accountability.

## ESG Governance Structure

| Board of Directors | Our Board of Directors has adopted clear corporate governance policies and is committed to providing oversight of our corporate governance process. The corporate governance guidelines, established by the Board of Directors, provide the framework for the governance of SVB, including oversight of ESG, and are reviewed annually. |
|---|---|

Our Board Committees have various governance roles:

- In 2022, our Governance Committee changed its name to the **Governance and Corporate Responsibility Committee** and expanded its oversight of the ESG strategy and program. The committee's oversight now includes environmental sustainability, climate change and the company's external DEI initiatives (e.g., through our supply chain), as well as Board diversity. The committee also oversees our philanthropic strategy and advocacy activities.
- Our **Compensation and Human Capital Committee** oversees our human capital, including internal, employee-related DEI efforts.
- Our **Audit Committee** oversees our regulatory disclosures on ESG, such as on human capital.

With respect to the membership of SVB's Board of Directors, the primary areas of experience, qualifications and attributes we typically seek include, but are not limited to, the following areas related to ESG:

- Experience in public company governance, including corporate governance best practices and policies and managing relations with, and reporting to, key stakeholders.
- Knowledge of, or experience with, key risk oversight and risk management functions to help oversee the dynamic risks we face.
- Experience in managing DEI-related activities within a broader talent strategy.

| CEO | Our CEO oversees SVB's ESG strategy and program across businesses and functions. The CEO reviews and approves our ESG goals, commitments and budgets, and their alignment with our corporate strategy and objectives, and SVB's Sustainable Finance Commitment, providing relevant updates in company communications to internal and external stakeholders. |
|---|---|



| | |
|---|---|
| **Executive Committee** | Our Executive Committee (EC) oversees the integration of ESG strategy into our business and functions. Certain EC members have ESG leadership roles. Our Chief Marketing and Strategy Officer is the executive sponsor for ESG, responsible for championing and guiding our strategy and program. Our Chief Risk Officer is responsible for embedding ESG into our risk framework. Our SVB business leaders are responsible for implementing commercial strategies to advance our Sustainable Finance Commitment. |
| **ESG Program Office** | Our ESG Program Office develops SVB's ESG strategy, road map, goals, policies, key performance indicators, budget and measurement. It is responsible for cross-functional collaboration, execution, coordination, reporting and communication. The Program Office is led by our Head of Corporate Social Responsibility, along with an ESG Director and a Climate Risk and Strategy Director. |
| **ESG Advisory Committee** | Our ESG Advisory Committee comprises SVB senior leaders from across the organization. It provides input and strategic direction to the ESG Program Office and ESG Working Groups, and ensures business or function accountability for program execution, as well as strategy and goal alignment. |
| **ESG Working Groups** | Cross-functional working groups execute specific ESG initiatives:<br><br>• **Sustainable Finance Working Group:** Develops strategy and monitors progress against SVB's Sustainable Finance Climate Commitment<br>• **Investments Working Group:** Reviews updates from our businesses on sustainability and investing-related initiatives and client engagement, and discusses opportunities to collaborate and share best practices<br>• **Climate Risk Working Group:** Recommends, monitors and supports implementation of climate risks and opportunities<br>• **Operational Climate Working Group:** Monitors and supports implementation of operational greenhouse gas reduction initiatives<br>• **ESG Communications and Disclosures Working Group:** Recommends ESG disclosure strategy and writes and gathers approvals for ESG disclosures<br>• **Risk Working Group:** Develops, monitors and supports implementation of ESG risk strategy and policy<br>• **DEI Governance Working Group:** Oversees and manages DEI disclosures and response to related external inquiries and requirements<br>• **Green Team:** Focuses on internal sustainability interests and activities, led by employee volunteers |



# 03

SVB ESG REPORT

# Engaging and Empowering Employees

# Engaging and Empowering Employees

> "Engaged employees do their best work on behalf of our clients. We place a high value on understanding what we are doing well and what we could do better to ensure SVB is a place where our employees can perform at their best and bring their whole selves to work every day.

**Chris Edmonds-Waters**
Chief Human Resources Officer

## Creating a Community of Engaged and Inspired Employees

By listening to our employees and investing in their professional development and well-being, we support their dedication to helping our clients succeed and delivering great outcomes for our shareholders and communities. SVB fosters a culture of respect, equity and belonging led by our corporate SVB Values. We offer holistic benefits to support the mental, physical and financial well-being of our employees and their families. We also offer learning and development opportunities to help our employees realize their potential and achieve their personal career goals for long-term success. Our comprehensive suite of employee benefits helps us attract and retain the talent we need to grow our business and help fuel the innovation economy.

More information about life at SVB can be found on our **Careers** website or on our Instagram channel **@siliconvalleybank** #lifeatsvb.

## Listening to Our Employees

We encourage regular and transparent feedback. Twice a year we survey all employees regarding happiness, retention and inclusion at SVB. We share the findings with all employees and take action in areas needing improvement. By leveraging technology, we deliver regular, targeted guidance to our managers based on their team's survey feedback. This helps managers make incremental improvements throughout the year.

## How We Listen

We listened to our employees when creating the Connected Workplace, our flexible working model that provides employees with options to shape the way they work. In the Connected Workplace we embrace the best of remote and in-person collaboration, with most employees managing their day-to-day work from home and using our offices to collaborate and connect with our clients, our business and, most importantly, each other.

## Talent Attraction, Retention and Promotion

**Professional Development**

SVB's Value to keep learning and improving underpins our approach to the professional development of our employees. SVB's Associate Development Program (ADP) gives entry-level associates advanced, hands-on training in areas such as credit risk assessment, loan portfolio management and client relationship skills. Twice a year, we select more than 30 recent college graduates and working professionals (with up to two years' experience) to join a cohort. Each cohort completes 10 weeks of intensive training, followed by 8-18 months of direct team rotational support, with each rotation lasting six months and associates typically completing three rotations during their journey in the ADP program. Our Palo Alto/San Francisco, New York City and Newton, Massachusetts locations are regional hubs for this premier entry-level development opportunity, allowing the associates to work closely with SVB professionals supporting our clients.

Our Global Learning Delivery Center (GLDC) provides the learning management delivery framework to support SVB's strategic direction globally. GLDC drives commitment to learning objectives by serving as the core growth engine for SVB's business landscape to develop our talent. From LinkedIn Learning and degreed courses to formal leadership development programs, our learning and talent development offerings are expanding to equip our employees with the skills and knowledge they need today and tomorrow.

For employees seeking development through formal education programs, SVB offers Education Assistance, which includes reimbursement for tuition, fees and textbooks required to earn a certification, designation or degree relevant to their career path at SVB.



## Mental well-being

At SVB, your mental health is considered just as important as your physical health — and we provide access to a wide variety of training, coaching and counseling options to support you when you need it.



## Physical well-being

No matter which location you call home, we provide benefits, support and resources to help you stay active, healthy and connected.



## Financial well-being

Wherever you are in your financial journey, in addition to our robust compensation packages and retirement plans, we have targeted resources to help you along the way.

## Benefits

Supporting our employees with comprehensive and competitive benefits helps us attract and retain the best talent in the industry. We continuously seek new ways to support our employees, and added several new benefits to our package in 2021:

- **Mental well-being:** We introduced a service called Modern Health to provide our employees and their families with a new way to receive free, confidential mental health support during the uncertain times of the COVID-19 pandemic. We also increased the benefits offered through our Employee Assistance Program, which offers counseling on a variety of topics for our employees. All regular full- and part-time employees, their spouses (legal or common law) and dependent children (to age 26) are eligible for this program.

- **Physical well-being:** We expanded our health insurance to offer SVB employees an additional medical plan option at a lower monthly contribution. This new plan provides comprehensive medical and pharmacy coverage, uses the same robust provider network as other plans and allows employees to set aside pretax funds to pay for healthcare expenses via a Health Savings Account.

- **Financial well-being:** We also added an ESG Index Fund to our 401(k) and Deferred Compensation Plan so employees have additional investment opportunities that may align with their personal financial objectives and priorities. The Index excludes companies that do not meet the United Nations Global Compact principles and certain diversity standards.

SVB offers competitive benefits in all our international locations. For a full list of our benefits by region, please visit our **Global Careers** webpage.



# 04

SVB ESG REPORT

# Building a Culture of Diversity, Equity and Inclusion at SVB

# Building a Culture of Diversity, Equity and Inclusion at SVB

## Diversity, Equity and Inclusion Statement

**Inclusion Ignites Innovation**

We are intentionally and strategically working for a world where every client and employee has the opportunity to bring their bold ideas to life. We also know that diverse perspectives and inclusive environments ignite new ideas to power innovation. That is why we're building a culture of belonging with a global workforce that celebrates greater dimensions of diversity and reflects the markets we strive to serve.

## Overview

Guided by our first Chief Diversity, Equity and Inclusion Officer (CDEIO) who has more than 20 years of experience, 2021 was a foundational year, setting the stage for all we will accomplish over the coming years. We created a diversity, equity and inclusion framework that enabled us to build on past progress, capitalize on our unique strengths and acknowledge that we're on a continuous journey of learning and improving. We are laser-focused on fostering an employee-centric culture that is reinforced by our core values.

**Our DEI work is categorized into three pillars:**







**Talent**
We will ensure equitable access and opportunity to increase the diversity of our global workforce

**Inclusion**
We will deliver a connected workplace where employees feel valued and are part of something greater, wherever they are

**Ecosystem**
We will harness the power of innovation to deliver transformative results to employees, shareholders and partners

> 
>
> 2021 was a transformative year for diversity, equity and inclusion at SVB. We made many strides by building a strong foundation; and we look forward to another great year of furthering our journey to create, nurture and sustain a global, inclusive culture — where different perspectives drive innovation.
>
> **Angela Lovelace**
> Chief Diversity, Equity and Inclusion Officer

## 2021 Highlights

 Hired a team to form an Office of Inclusive Excellence

 Launched our first six Employee Resource Groups

 Designed an internal diversity dashboard

 Ensured hiring leaders are exposed to a range of diverse candidates

 Launched our first Inclusion Index

 Introduced Conversation Circles, Real Talk gatherings and Next Now

 Published our second annual UK Gender Pay Gap Report

Our CDEIO sits within Human Resources and partners with the CEO and Executive Committee to support and execute the DEI strategy. Our CDEIO also briefs management on various talent initiatives and key workforce metrics. We understand that systemic change requires a major commitment and we're in the early stages of a transformational journey to ultimately enable equitable access and opportunity within the SVB global workforce and the larger innovation ecosystem. We support these efforts with a Code of Conduct based on respect.

For additional information on how we are implementing our DEI strategy, please see our **DEI Overview**.

## 2021 Highlights

- Hired a team of subject matter experts to form an Office of Inclusive Excellence that leads collaboration, designs practical solution-based outcomes and provides tools, research and advisory services across SVB's workforce.

- Launched our first six Employee Resource Groups (ERGs). We were strategic in our approach to ensure every group had the resources to accomplish their mission and allow ERG leaders to be recognized for their contributions.

- Designed an internal diversity dashboard to glean insights about our representation metrics and track employee life cycle trends, including employee mobility by gender, race and ethnicity. We also publicly disclosed our 2020 and 2021 EEO-1 workforce demographics to promote transparency.

- Implemented a diverse candidate slate mandate for US senior leader roles to ensure hiring leaders were exposed to a range of diverse candidates during the interview process.

- Launched our first Inclusion Index to understand how our employees currently experience SVB, and identified opportunities to strengthen our culture of inclusion, with the goal of enabling everyone to feel valued as a contributor at SVB.

- Introduced Conversation Circles, Real Talk gatherings and Next Now thought leadership sessions to encourage employee awareness and discussion on contemporary societal topics.

- Published our second annual **UK Gender Pay Gap Report**, and launched employee DEI learning paths, leadership development and strategic partnerships to support our strategy and achieve long-term aspirations.

## Metrics

**Gender (Global)**    **Race & Ethnicity (US)**

Total Workforce



Senior Leadership



Board



- Women
- Men

- White
- Asian
- Hispanic/Latinx
- Black/African American
- Two or more races
- Native Hawaiian/Other Pacific Islander
- American Indian/Alaska Native
- Not disclosed

**See our 2021 EEO-1 report (US only) ›**

We report demographic metrics using racial categories defined by the US Equal Employment Opportunity Commission. Race and ethnicity figures represent US employees only, as regulatory requirements governing data collection and privacy preclude comprehensive data collection in our international offices. We are exploring how we can effectively track and share data on our global workforce. Senior leadership includes anyone in the following job levels: Executive Committee (includes our executive officers) and leaders from certain top levels of SVB's two highest bands of management. Categories with less than 1% representation do not appear in the graphs. Not disclosed represents individuals who chose not to disclose gender, race and ethnicity data. All data is as of 12/31/2021. Board data is as of 4/22/2022. Note: Refer to our **Diversity, equity & inclusion webpage** for more information, including our DEI report, UK Gender Pay Gap Report and EEO-1 data.

## Attracting Talent

Our employees are what make SVB successful, and if we don't have the best talent, we will not win in the marketplace. We understand there is continuous opportunity for improvement with regard to women and racial and ethnic populations in the workplace. We saw incremental progress in 2021 and acknowledge there's much more work to be done.

- Women represent **46%** of our global workforce, an increase of 1 percentage point since 2020.

- Black/African American employees represent **5%** of our US workforce, up 1 percentage point since 2020.

- Hispanic/Latinx employees represent **9%** of our US workforce, up 1 percentage point since 2020.

- Two or more races, Native Hawaiian/Other Pacific Islander and American Indian/Alaska Native employees, represent **4%** of our US workforce, and this percentage has remained flat since 2020.

- Asian representation, which includes several ethnic groups, represent **23%** of our US workforce, down 2 percentage points compared to 2020.

Attracting the best talent in the market will not happen without accelerated commitments. There is a clear opportunity to improve representation across all levels, especially for women, Black/African American and Hispanic/Latinx individuals in senior leadership. We are prioritizing these efforts and introduced goals earlier this year to strengthen hiring and amplify talent development initiatives to create paths to senior leadership. Please see **page 12** for more information on our goals. (To align with government reporting requirements, the data uses gender categories of male and female. SVB recognizes that this does not reflect all genders including people identifying as trans and non-binary.).

## Promoting an Inclusive Workplace

In 2021, we introduced the Inclusion Index, comprised of six questions to measure employee sentiment, as part of our semiannual employee happiness and retention survey. We also stay regularly informed by listening to employee sentiment shared at our quarterly DEI town halls, Real Talk conversations and other informal feedback loops. We successfully launched our first six Employee Resource Groups to raise the visibility of our diverse workforce and offer formal and informal development opportunities. In addition, we launched a learning journey series of courses focused on allyship.

We embrace and support diverse families globally, no matter how our employees choose to define family. We offer our inclusive family-building benefit for every path to parenthood, including for single parents by choice, LGBTQ+ individuals and couples, and those choosing to preserve their fertility. Our benefits offer adoption and surrogacy services, among other family benefits, and cover transgender reassignment surgery.

We are committed to providing human resource policies that are relevant, beneficial and reflective of our values. Our Code of Conduct, which is an extension of our values, provides a set of principles guiding professional and personal conduct for our employees as they engage with each other and interact with our clients and communities. Embedded in our Code are Anti-Discrimination and Sexual Harassment policies that express our zero tolerance for discriminatory or harassing behavior in our workplaces or while conducting business.

## Moving Forward

In 2022, we are positioned to further build on our foundation. In the first half of the year, we partnered with a premier consulting firm to measure how our employees individually experience belonging, measure the maturity of our talent pipeline, and measure our DEI infrastructure and initiatives. We facilitated focus groups in the US and international regions and captured the perspectives and experiences of more than 1,900 employees across SVB.

From our assessment, we learned our employees see and appreciate our commitment to DEI, and opportunities exist to increase representation for women and historically underrepresented groups in senior leadership in order to create a level playing field for all.

Our talent programs and initiatives will continue to evolve to address:

- Leadership accountability with a DEI lens in everyday behaviors, operations, recruiting and retention efforts
- Retention of women and diverse talent in the workforce
- Equitable access to growth opportunities for all remote teammates (or employees)

Lastly, we will continue to routinely seek action on employee feedback as a key mechanism for measuring overall sentiment as we build on our DEI foundation.

## Supplier Diversity

The value provided by our vendors has a direct impact on our business, which is why we consider the quality, experience, capability, local community commitment, prices and relationship of each vendor. As part of creating a more diverse, equitable and inclusive environment at SVB, we work closely with our vendors to expand our use of suppliers to include underrepresented racial and ethnic groups, women, veterans, people with disabilities and the LGBTQ+ community. By 2026, we will expand our corporate supplier annual spend with businesses owned by members of underserved communities to at least 8%.

Going forward, we will continue to build and optimize our partnerships with diverse organizations.



## 05

SVB ESG REPORT

# Championing Inclusion in the Innovation Economy

ABOUT SVB | ESG GOALS | TALENT | DEI AT SVB | ECONOMIC IMPACT | CITIZENSHIP | CLIMATE AND ENVIRONMENT | GOVERNANCE



Including a fuller spectrum of perspectives drives innovation. We launched Access to Innovation to boldly build an inclusive ecosystem — one that welcomes and celebrates all participants.

**Courtney Karnes**
Managing Director of
Access to Innovation

# Championing Inclusion in the Innovation Economy

Advancing women, Black and Latinx individuals to positions of influence in the innovation economy.

## Access to Innovation

Access to Innovation is SVB's signature program designed to deliver on our commitment to advance inclusion and opportunity in the innovation economy, particularly for women, Black and Latinx individuals.



Increase
**REPRESENTATION**
in the innovation economy



Increase
**FUNDING**
in the innovation economy

We aim to harness SVB's resources, experience and connections to address key barriers that prevent underrepresented groups from achieving positions of influence in the innovation sector, including access to information, capital and networks. We develop strategic partnerships — such as with Venture Forward, the nonprofit arm of the National Venture Capital Association focused on increasing diverse representation in the industry — and leverage our expertise to develop tools, programming and career experiences. The goal is to increase the pipeline of diverse talent for our client companies, from entry level to board member. We aim to reach 10,000 individuals annually with access to information, education and career opportunities. In 2021, we reached 6,058 lives through events and mentorship.



**Taking Action:**

**Talent**

Increase the pipeline of diverse talent for our clients with powerful partnerships

**Founders**

Connect underrepresented groups to SVB's vast network within the innovation economy

**Funders**

Unlock greater access to capital, professional relationships and career opportunities

## Select Access to Innovation Programs

### SVB Fellows Program

In 2021, we launched our SVB Fellows Program, our initiative focused on supporting efforts to build a more diverse, equitable and inclusive innovation economy. The program is designed for Black, Latinx and women professionals looking to launch a career in venture capital. The fellowship program, created to address historically low diversity in the venture capital ecosystem, will connect talented, emerging professionals with entry-level positions at top venture capital firms. Fellowships last one to two years and are salaried with benefits or include a stipend to cover benefits.

SVB plans to support 20 fellows throughout 2022, identified in partnership with the Black Venture Capital Consortium (BVCC) on a rolling basis. Candidates are professionals who had previously participated in BVCC's career development programming. As the program expands, SVB will leverage additional recruitment channels to identify Latinx and women fellows.



### Expanding Opportunities for Women

SVB is a founding partner and investor in theBoardlist, which primarily connects women with global board opportunities. SVB is also a founding partner of All Raise, which aims to double the percentage of women in venture capital partner roles over the next decade and increase funding for female founders to 25% of total venture capital investment in five years. For the last 20 years, SVB has been a partner of Astia, which works to increase investment in women-led startups.

### Opening Doors for Emerging Talent

SVB partners with several organizations such as Career Ready in the UK, Year Up and ProMazo that help young people unlock their potential and prepare for a successful career. For example, Year Up encourages young adults ages 18 to 24 to reach their potential through an intensive one-year program that includes hands-on skills development, coursework eligible for college credit, a corporate internship and support for transitioning to a job in technology and other sectors. Since 2017, SVB has hosted close to 90 young professionals for six-month internships. We seek to help them identify long-term career opportunities with SVB or our client or partner companies once their internships conclude.

### Term Sheet DEI Statement

In 2021, our commercial banking team began including the SVB Global Commitment to Diversity, Equity and Inclusion in debt term sheets in order to raise awareness of our goal to create a more diverse innovation economy and increase awareness of Access to Innovation resources for clients.

For more information on how SVB helps build partnerships and champions inclusion in the innovation economy, please visit our **Access to Innovation** webpage.



## 06

SVB ESG REPORT

# Supporting Communities Where We Live and Work

> "
> Strong communities
> serve us all with greater
> economic and social
> stability. We are proud
> to be in a position
> to contribute to the
> health and well-being
> of our communities.
>
> **Craig Robinson**
> Head of Corporate Social
> Responsibility

# Supporting Communities Where We Live and Work

## Community Benefits Plan

As a leader in the innovation economy, we strive to use our resources, voice and influence to help build strong communities and contribute to economic and social progress where we live and work. In 2021, we announced our $11.2 billion Community Benefits Plan that builds on our long-standing commitment to support small businesses, finance affordable housing, reinvest in low- and moderate-income communities in Massachusetts and California, and support charitable causes via philanthropy and volunteering. The commitment will take place over a five-year period from January 2022 through December 2026.

## $11.2 billion  Community Benefits Plan

### 2022-2026

A five-year plan to expand commitments to small businesses, increasing access to the innovation economy and investing in underserved communities in Massachusetts and California



**$5.0 billion**

in small business loans of $1 million or less



**$4.8 billion**

in CRA community development loans and investments



**$75 million**

in charitable contributions in CRA coverage areas



**$1.3 billion**

in residential mortgages to LMI borrowers and in LMI census tracts



> "Our place and success in the innovation economy have fueled our expanding and increasing community development programs that help the most vulnerable populations in our communities access safe and affordable housing.

**Fiona Hsu**
Head of Community
Development Finance

## Community Reinvestment Act

In 2021, we received our first "Outstanding" Community Reinvestment Act (CRA) rating for our 2018-2020 CRA Strategic Plan. We released a 2021-2023 CRA Strategic Plan, and then replaced it with our new 2022-2024 CRA Strategic Plan following the completion of our acquisition of Boston Private Bank and Trust Company. The plan covers new and expanded assessment areas: San Francisco Bay Area Assessment Area, Greater Los Angeles Assessment Area and Greater Boston Assessment Area.

The CRA requires the Board of Governors of the Federal Reserve System and the other federal bank regulatory agencies to encourage banks to help meet the credit needs of the entire community in which they conduct business while also operating in a financially safe and sound manner. For more information on our new plan, please see our **Community Reinvestment Act Strategic Plan: 2022-2024.**

## Affordable Housing

Affordable housing is essential for healthy communities. The rapid escalation of housing costs makes solving the affordability crisis in urban areas a critical issue. This is particularly true for several cities where SVB operates, notably the three assessment areas covered in our new CRA Strategic Plan, where access to affordable housing for low- and moderate-income families is a top priority. SVB is a longtime financier of affordable housing through an assortment of loans and investments, including supporting projects eligible for Low-Income Housing Tax Credits and providing grants and loans to affordable housing providers.

Between 2002 and 2021, SVB's Community Development Finance division has committed approximately $1.1 billion in investments and almost $1.6 billion in loans to help build or rehabilitate close to 10,000 affordable housing units in the San Francisco Bay Area. These homes are designed for low- and moderate-income seniors, veterans, working families, people with disabilities and those who are chronically homeless. As SVB continues to grow, we look forward to continuing to support affordable housing.



## Expanding Our Impact

We consider it our responsibility to give back by investing in people and organizations that promote strong communities. Our multipronged approach engages SVB employees, clients and community partners to more effectively address community needs. In recent years, we have invited our clients, partners and networks to participate in fundraising and volunteer opportunities, thereby increasing our overall impact.

We also support our employees who actively engage with charitable organizations by donating their time, expertise or funds. Many employees participate in SVB in the Community programs that fund various activities and organizations, some of which are highlighted in this section. We are particularly grateful for SVB employees who generously volunteer their time and skills to support our giving goals as a member of the Pledge 1% movement.



CRA: Community Reinvestment Act        ERGs: Employee Resource Groups
CBP: Community Benefits Plan            BUs: Business Units

## Special Programs

**Tech Gives Back**

Tech Gives Back (TGB) is an annual week of community service hosted by SVB that engages our employees, clients and partners around the world to give back to the communities where they live and work. In 2021, we virtually celebrated TGB by offering global volunteer and fundraising opportunities with a diverse collection of nonprofits and our employees and clients completed more than 700 volunteer hours.

**Pledge 1%**

We surpassed our annual goal of giving 1% of our net income to charitable causes in 2021 by donating approximately $18 million via our various philanthropic programs. We also aspire to donate 1% of FTE time for volunteering and introduced a new benefit to provide one volunteer day to each employee annually.

In order to leverage the success of the innovation economy for the greater good, we donate to Founders' Pledge, which helps turn innovation economy success into contributions for the greater good.

Beginning in 2022, we will fund some of our charitable giving with a portion of income SVB gains from warrants when certain corporate clients are acquired or go public.

**Employee Matching**

SVB's Matching Program supports employees' personal philanthropy by matching their individual donations to eligible nonprofit organizations. Each calendar year, every employee has a total of $2,000 in matching funds available in addition to up to $1,000 in Volunteer Rewards, based on $25 per hour of volunteer time, that can be donated to a nonprofit organization. SVB employees may also make grant requests to the SVB Foundation. Grants are considered for nonprofit organizations where SVB employees volunteer.

## Select Community Partners and Programs

- **Supporting Youth Business:** Businesses United in Investing, Lending and Development (BUILD) has incubated more than 550 youth businesses and partnered with numerous schools across the US. SVB has given BUILD more than $800,000, and our employees volunteer as BUILD board members, mentors and panel judges.

- **Helping Everyone Achieve Their Goals:** Best Buddies International is dedicated to ending the social, physical and economic isolation of the 200 million people in the world with intellectual and developmental disabilities. SVB partners with our clients to raise funds for the organization and has employed participants in the Best Buddies jobs program over the past 13 years. Since 2004, SVB has raised over $7.1 million for Best Buddies International through events, including Best Buddies Challenge cycling events at Hearst Castle, California; Hyannis Port, Massachusetts; and Washington, DC, as well as Best Buddies Friendship Walks in the San Francisco Bay Area, Arizona and Washington, DC.

- **Promoting Financial Literacy:** We designed our financial literacy program, United and Counting, to teach primarily low- and moderate-income students key financial literacy skills. We offer the courses online to reach more students and increase the program's impact. Over the past three years, we have supported programs focused on financial education for grades 4-6, venture entrepreneurial exploration for grades 7-10 and financial literacy for high school. The three programs reach thousands of students annually:

  - **2019:** 2,155 active students representing over 6,000 cumulative learning hours

  - **2020:** 1,993 students representing over 5,000 cumulative learning hours

  - **2021:** 4,915 students representing over 10,000 cumulative learning hours



- **Launching a Full-Ride University Scholarship Program:** In 2021, we launched a $5 million needs-based University Scholarship Program and have funded approximately half to date. In total, SVB will provide 25 full-ride scholarships and SVB internships to students at four US-based universities: Arizona State University, Florida A&M University, Tulane University and Xavier University of Louisiana. Our scholarship program was funded by a portion of the net income SVB earned by participating in the Small Business Administration's Paycheck Protection Program (PPP) during the COVID-19 pandemic.

## COVID-19 Response and Community Support

Carrying over from 2020 and throughout 2021, SVB committed funding to support global, national and local COVID-19 relief activities focused on four areas: health, food security, shelter and small business relief. We donated a total of $20 million in net PPP fees earned in 2020 in part for continued COVID-19-related relief.

## Support for India

Responding to the COVID-19 crisis in India, we increased support for our employees in need of medical care and equipment. In 2021, SVB and its employees made donations exceeding $535,000 to causes supporting healthcare needs, including the installation of oxygen plants, ventilators, lab equipment, dialysis centers and oxygen concentrators in hospitals in the Bangalore region.



## 07

SVB ESG REPORT

# Advancing the Transition to a Sustainable, Low-Carbon World



# TCFD Summary

As we continue to feel the evolving impact of climate change, we are more deeply integrating climate risks and opportunities into our business to support clients and drive our own decision-making. Rapid decarbonization of the economy will require innovative technology and new business models in every sector. For more details, please see our full TCFD report **here**.

## Advancing the Transition to a Sustainable, Low-Carbon World

SVB recognizes the significant societal, ecological and economic threats of climate change. Given the work we do to support the innovation economy, we see our clients tackling the climate crisis in numerous ways through their innovations and investments. We enable entrepreneurs with inventions and new businesses that reduce greenhouse gas (GHG) emissions and take seriously the responsibility to reduce our own.

Through our Climate Technology & Sustainability and Project Finance teams, SVB finances businesses that are developing sustainable technologies to increase the efficient management and consumption of energy, food, clean water and other resources. To capture and accelerate this opportunity, we are deepening the integration of climate risks and opportunities into our governance structures, business strategy, risk management and public reporting.

To align with our objectives and industry best practices, we commit to disclosing and continuing to evolve our climate strategy in line with the recommendations of the Financial Stability Board's Task Force on Climate-Related Financial Disclosures (TCFD).

| TCFD Disclosure | Summary |
| --- | --- |
| Governance | In 2022, our Governance Committee changed its name to the Governance and Corporate Responsibility Committee and expanded its oversight of the ESG strategy and program. The committee's oversight now includes environmental sustainability, climate change and the company's external diversity, equity and inclusion initiatives (e.g., through our supply chain), as well as board diversity |
| | Executive Committee, chaired by SVB President and CEO Greg Becker, is responsible for the oversight of our ESG program and providing insight on ESG risks and opportunities related to SVB's business |
| | Chief Marketing and Strategy Officer is designated as the ESG Executive Sponsor, including responsibility for climate strategy |
| | Business unit leaders of the Climate Technology & Sustainability team and the Project Finance team, who ultimately report to the President of Silicon Valley Bank through the Head of Technology and Healthcare Banking, are responsible for growing our climate finance business |

| TCFD Disclosure | Summary |
|---|---|
| Governance continued | Established ESG Program Office, reporting to the Head of Corporate Social Responsibility, to coordinate ESG working groups, strategy and implementation enterprise-wide, including hiring a Director of Climate Risk and Strategy to facilitate our climate strategy |
| | Our cross-functional, senior management-level ESG Advisory Committee helps guide our enterprise-wide ESG program, including climate strategy |
| | Various cross-functional working groups develop and implement climate strategy. This includes our Climate Risk Working Group, Sustainable Finance Working Group, ESG Communications and Disclosures Working Group, Investments Working Group and Operational Climate Working Group |
| Strategy | As part of our $5 billion Sustainable Finance Commitment, we continue to actively pursue climate-driven opportunities through our Climate Technology & Sustainability and Project Finance business lines, which focus on disruptive technologies that support the transition to a low-carbon economy, including renewable energy project finance |
| Risk management | SVB joined the Risk Management Association's Climate Risk Consortium in 2022. As a member of the group, we are committed to: <br><br> 1. developing standards and recommendations for governance, disclosure and risk management principles <br><br> 2. sharing experiences with peers <br><br> 3. helping to move the banking industry forward on the topic of climate change risk |
| | Our Enterprise Risk Management (ERM) framework serves as our approach to identify, assess and manage risks our business is likely to experience as a result of climate change |
| | Through our ERM framework, business risk teams affected by acute physical risks, such as wildfire, have been able to respond during crises to rapidly identify and manage assets at risk |
| | We use business continuity plans to address physical climate risks to SVB's operations |
| | We continue to monitor emerging regulatory and industry developments globally |
| | To assess strategic resilience to climate change, we began a pilot scenario assessment of the risk of wildfire to our California-based mortgage and wine portfolios in 2021 |

| TCFD Disclosure | Summary |
|---|---|
| Metrics and targets | We committed to provide at least $5 billion in loans, investments and other financing by 2027 to support client companies focused on climate tech and sustainability solutions |
| | We set a goal for SVB to achieve carbon-neutral operations by 2025 |
| | In 2021, SVB's Project Finance team completed 18 renewable-energy deals that will collectively avoid more than 4.5 million tons of $CO_2$ |
| | We revised our 2019 and 2020 GHG emissions inventory to reflect the 2021 acquisition of Boston Private |
| | SVB received limited assurance of 2019-2021 GHG emissions inventories |
| | Please see our "Greenhouse Gas Emissions & Energy Usage" section for additional details |

## Sustainable Finance Commitment

For SVB, working with climate tech clients is deeply integrated into our long-term business strategy to support emerging technologies that aim to tackle large challenges.

The most effective way for SVB to address climate change is to support our clients that are advancing climate and sustainability solutions. SVB has committed to provide at least $5 billion in loans, investments and other financing by 2027 to support client companies focused on climate tech and sustainability solutions.

Among the sectors we are targeting, we expect to include the following and may adjust the terminology as our reporting develops:

| | |
|---|---|
| Circular economy | Sustainable agriculture and alternative foods |
| Climate resilience | Sustainable transportation |
| Energy efficiency and demand management | Technology solutions that mitigate GHG emissions |
| Green buildings | Waste management and pollution control |
| Renewable energy and energy storage | Water technology |
| Grid infrastructure | |

# Climate Tech Report

US venture investments in climate tech companies hit

## $56 billion in 2021,

representing an 80% increase year over year.

Please read our second **Future of Climate Tech Report** for more information. The report maps out the sectors that have potential for the greatest impact to address climate change in the shortest amount of time.



## Greenhouse Gas Emissions and Energy Usage

The following inventory of our 2021 GHG emissions and energy usage was conducted according to the guidelines of the Greenhouse Gas Protocol and reported to CDP.

| GHG Emissions | 2019 (mt of $CO_2e$*) | 2020 (mt of $CO_2e$*) | 2021 (mt of $CO_2e$*) |
|---|---|---|---|
| **Scope 1** | 673 | 575 | 306 |
| **Scope 2 –** Location-Based | 8,833 | 6,755 | 5,749 |
| **Scope 2 –** Market-Based | 8,712 | 6,781 | 5,581 |
| **Scope 3** | | | |
| 3. FERA** | 1,472 | 1,579 | 1,428 |
| 6. Business Travel | 14,001 | 2,692 | 1,065 |
| 7. Commuting | 8,171 | 4,760 | 7,270 |
| 8. Upstream Leased Assets | 692 | 525 | 585 |
| **Total** (Location-Based) | **33,842** | **16,886** | **16,403** |
| **Total** (Market-Based) | **33,721** | **16,912** | **16,235** |

*mt of $CO_2e$: Metric tons of carbon dioxide equivalent
**FERA: Fuel- and Energy-Related Activities

| Energy Usage | 2019 | 2020 | 2021 |
|---|---|---|---|
| MWh* from renewable sources | 0 | 67 | 263 |
| MWh* from non-renewable sources | 26,904 | 25,593 | 21,594 |
| **Total** (renewable and non-renewable) MWh* | **26,904** | **25,660** | **21,857** |

*MWh: Megawatt hour

Please see our Independent Assurance Statement from LRQA for our 2019, 2020 and 2021 inventories **here**.



## 08

SVB ESG REPORT

# Practicing Responsible Corporate Governance

# Practicing Responsible Corporate Governance

> ❝
>
> Our strong board oversight enables us to pursue ambitious goals as we serve the world's most innovative companies and investors.
>
> **Greg Becker**
> President and CEO

## Introduction

Strong corporate governance is essential for public trust, how we manage our business and ultimately our success. Governance is also critical to live our values, including speaking and acting with integrity. We are committed to upholding the highest ethical standards across all business operations to support responsible growth and enable us to help innovators, enterprises and investors move their bold ideas forward. Documents related to our corporate governance practices, including our **Corporate Governance Guidelines** and **2022 Proxy Statement**, are available on our website. We have systems and processes to ensure regulatory compliance across our operations and jurisdictions where we operate.

## Board of Directors

Our Board of Directors provides oversight of our corporate governance, advises on our strategy and maintains six committees to oversee key areas of our business. Information about our Board members, charters, membership on Board committees and qualifications for Board membership is available in the Corporate Governance section of our website and in our annual Proxy Statement. In 2022, we updated the names and responsibilities of a number of Board committees. Click on any of the links below to learn more about our key corporate governance practices.

- **Audit Committee Charter**
- **Compensation & Human Capital Committee Charter**
- **Finance Committee Charter**
- **Governance and Corporate Responsibility Committee Charter**
- **Risk Committee Charter**
- **Technology Committee Charter**
- **Code of Conduct**



> It's an exciting moment in SVB's history and a great opportunity to continue to share my tech and finance experience with board colleagues and SVB leaders, and together launch the next chapter.

**Kay Matthews**
Chair of the Board

## Board Diversity

The SVB Board of Directors values well-rounded representation and business acumen that, taken together, reflect a balanced mix of skills, experience, backgrounds and attributes applicable to SVB's business, strategy and stakeholder interests. The Board takes a multidimensional approach to diversity and considers a variety of skills and attributes:

- Industry experience, particularly in banking and our clients' industries
- Functional, technical or other professional expertise
- Gender, age or racial/ethnic diversity
- Other important attributes, such as veteran status and geographical diversity





In 2021, the Governance and Corporate Responsibility Committee maintained its focus and emphasis on board diversity to achieve the optimal balance for our Board, including by working with its outside director search firm to include diverse candidates for consideration, and will continue to focus on board diversity into the future. In 2022, we announced Kay Matthews as our new Board chair. She is the first woman to hold the position.

## Executive Committee

**Strong, seasoned management team**
Diverse experience and skills to help direct our growth

**14 years**
average tenure at SVB



**Dan Beck**
Chief Financial Officer
5 years at SVB



**Greg Becker**
President and CEO
29 years at SVB



**Marc Cadieux**
Chief Credit Officer
29 years at SVB



**John China**
President SVB Capital
26 years at SVB



**Phil Cox**
Chief Operations Officer
12 years at SVB



**Anthony DeChellis**
CEO SVB Private
1 year at SVB



**Mike Descheneaux**
President Silicon Valley Bank
16 years at SVB



**Michelle Draper**
Chief Marketing & Strategy Officer
9 years at SVB



**Chris Edmonds-Waters**
Chief Human Resources Officer
18 years at SVB



**Jeffrey Leerink**
CEO SVB Securities
3 years at SVB



**John Peters**
Chief Auditor
15 years at SVB



**Michael Zuckert**
General Counsel
8 years at SVB

## Executive Compensation

In designing our CEO 2021 compensation structure, we continued to emphasize long-term, performance-based pay; 87% of the CEO's total target pay is at risk and subject to company/individual performance. In fiscal year 2021, we experienced unprecedented growth of loans, client funds, core fees and SVB Leerink (now SVB Securities) revenue, and overall strong financial performance. SVB increased its human capital, with attention to growing key talent and working in a hybrid environment. We also deepened the scope of existing business units, with a conscious focus on maintaining the company's commitment to engaging our people, advancing our values and culture, including DEI, and scaling our infrastructure, all as we continued to navigate the challenges presented by the pandemic. For additional information on CEO and Executive Compensation, please see our **2022 Proxy Statement**.

# Enterprise Risk Management

Effective risk management is key to our success. Our Enterprise Risk Management (ERM) team is responsible for developing standards and guidelines to support programs that manage our risks, and helps us earn the trust of our stakeholders. As SVB grows, we continue to enhance our ERM approach to comply with new and applicable regulations and adopt appropriate strategies to ensure that our risk management function is fit for the current and future environment.

SVB is committed to maintaining and enhancing an ERM framework that is commensurate with our growing size and complexity. Our framework includes establishing the governance and standards for risk management programs that assist us with the identification and management of key risk types across the organization. We integrate ESG risks (including climate) into our Strategic Risk program.





## Ethical Conduct

At SVB, we harness our collective power to deliver on our commitments to our clients, the communities we serve and our fellow employees. Our Code of Conduct is an extension of our values. It provides a set of ethical principles to guide our professional conduct. We have processes in place for employees to follow if they suspect a conduct violation. Employees can report the conduct to their immediate supervisor, group manager or any people manager, Human Resources Business Partner, the Employee Relations team, the Chief Human Resources Officer, the General Counsel or any member of the Legal team, or any member of the Executive Committee. Employees can also make anonymous and confidential reports of unethical conduct online. We have a strict no retaliation policy. You can find a copy of our Code of Conduct **here**.

## Anti-Money Laundering

At SVB, we are committed to following all laws and regulations pertaining to anti-money laundering. Our Bank Secrecy Act/Anti-Money Laundering (BSA/AML) program, which includes our BSA/AML Policy, is designed to ensure that we do not serve as a conduit for money laundering, terrorist financing or other financial crimes. Our BSA/AML program is developed, maintained and implemented by our BSA/AML Officer under the oversight of our Board of Directors and senior management.

We implement internal controls designed to provide reasonable assurance of compliance with all BSA/AML regulatory requirements. We also require our Internal Audit department or an independent third party to review our compliance with BSA/AML regulations and our BSA/AML Policy on an annual basis. In addition, we require all employees, senior management and the Board of Directors to receive appropriate BSA/AML training, consisting of new-hire training, annual training and supplemental training designed for functional responsibilities.

## Anti-Bribery and Corruption

Our Anti-Bribery and Corruption (ABC) Compliance Policy, which is designed to ensure compliance with anti-bribery and corruption laws and regulations in the areas where we operate, is part of our commitment to acting with integrity. All employees must adhere to our ABC Compliance Policy and the related sections of our Code of Conduct. We require all employees and senior management to receive ABC compliance training upon hire and annually. In 2021, 100% of SVB employees were assigned and completed our ABC course.

## Public Policy and Political Contributions

SVB participates in the political and public policy process, specifically in areas that affect the innovation economy and the banking industry. It is important that we engage with legislators and policymakers, where appropriate, and support initiatives to advocate constructively for the long-term interests of SVB and our key constituents. We focus our activities in the US and international locations where SVB has offices.

We conduct any political activity in compliance with applicable laws and regulations and as further described in our **Statement of Political Activity**. Our political activities are managed by the Office of Government Affairs, headed by SVB's General Counsel. The function includes advocacy planning and activities, administering the SVB Political Action Committee, complying with applicable laws and establishing appropriate policies and processes to address relevant areas, including reporting, disclosures and internal approvals of political contributions (to the extent that there are any and as permitted by law).

The Governance and Corporate Responsibility Committee of the Board of Directors oversees and periodically reviews SVB's political activities, including political contributions, on at least an annual basis. The Board and its Governance and Corporate Responsibility Committee recognize

the importance of appropriate governance and risk management of our corporate political activities, and they review our activities for alignment with SVB's business strategy, reputation and mission, as well as for compliance with applicable laws and regulations. The Governance and Corporate Responsibility Committee also reviews and approves our Statement of Political Activity.

Our **Code of Conduct** provides guidelines on employees' personal political activities and political contributions funded by SVB and SVB Capital.

## Responsible Sales Practices

At SVB, our clients are at the center of everything we do, and we emphasize the importance of great client service, striving to not only meet our clients' needs but truly help them succeed. We believe that responsible and ethical business practices, including our sales practices, allow us to serve our clients with both empathy and integrity. Operating with these core values allows our clients to put their trust in us.

## Responsible Marketing and Privacy

Consistent with our core values, we work to maintain transparent communication with our clients and potential clients. We market our products in a responsible manner through clear and consistent dialogue with our clients and partners. Our marketing materials must adhere to our compliance guidance and disclosure requirements that are found in our Marketing Materials & Client Communications Policy.

We maintain our stakeholders' privacy through our marketing policies and procedures. We do not collect the identities of any person on our public website or social media channels unless an individual specifically signs up for an SVB offer or directly contacts us. Additionally, we do not share mailing lists or individual email tracking information with third parties, except as permitted or if required by law. More information about our privacy practices is available **here**.

## Unfair, Deceptive, or Abusive Acts or Practices Policy

Our Unfair, Deceptive, or Abusive Acts or Practices Policy (UDAAP), a framework we use to meet regulatory expectations, guides our approach to ethical sales practices. We train employees annually to ensure that our team members have the awareness, skills and knowledge to perform activities in a manner that supports compliance with UDAAP standards and requirements.

## Fair Lending

SVB is committed to a policy and practice of fair lending. To that end, we take responsibility for treating clients fairly and consistently based on their financial standing in accordance with the Equal Credit Opportunity Act, the Fair Housing Act and other applicable state and local laws. Our compliance with these principles and consumer protections and policies is supported by our Compliance and Fair Lending Programs, which are regularly examined by the Federal Reserve Bank of San Francisco, the Consumer Financial Protection Bureau and the California Department of Financial Protection and Innovation.

## Wealth Advisory Practices

SVB offers wealth advisory services to complement our private banking offerings. Our Registered Investment Adviser (RIA) business, which is regulated and examined by the US Securities and Exchange Commission, delivers those services and has a fiduciary responsibility to provide independent, unbiased advice that is in the best interests of our clients and helps them achieve their goals. The RIA business:

- Sells advice, not products

- Has an open-source platform to give clients a wide range of investment options

- Focuses on client outcomes, not commissions

Through SVB Private, our wealth advisory team provides holistic advice that goes beyond an investment portfolio and aims to consider all aspects of our clients' financial lives.

## Client Feedback

Listening to client feedback is critical to our success and is a practice in which we invest to ensure that we are able to fulfill our mission to help increase the probability of our clients' success.

We have a sophisticated Voice of the Customer program that systematically monitors client sentiment and clients' perceptions of SVB. It provides input and feedback that help us learn about and improve on the experience we offer our clients when they work with us.

The program comprises two main types of studies:

- The relationship study gives an opportunity to every client in our Commercial Bank and our Private Bank to give us quantitative satisfaction scores and provide feedback on our strengths and opportunities for improvement. This data collection is performed throughout the year on a continuous basis. We use the feedback from this study to prioritize investments that improve the client experience, including the development of new products and services. Additionally, we have a "close the loop" practice, where our Relationship Managers reach out to clients who are dissatisfied with SVB, attempting to resolve any outstanding client issues.

- Touch-point studies monitor client feedback at specific points of interaction, for example, when contacting our service center or transacting online. The feedback we collect from these studies is used to continuously improve the products and services we provide.

This program, together with ad hoc client research and a strong client-centric culture, ensures that SVB is continuously improving our clients' experience, which is one of our top strategic priorities across the enterprise.

## Cybersecurity and Privacy

SVB is committed to respecting the right to data security and privacy. Maintaining the confidentiality, integrity and availability of our Information Systems is critical for the successful operation of the business, and is necessary to provide reliable communications and data exchange within the organization and to clients, business partners, vendors and service providers. We are committed to protecting and enhancing the security and privacy of our systems, networks and general technology environment. We aim to create a high level of awareness of security and privacy best practices among all employees through consistent communication and annual training.

## Cybersecurity

The Board of Directors is actively engaged in oversight of our cybersecurity practices. Our recently formed Technology Committee has primary oversight of the overall role of technology in executing the corporate strategy, our significant technology investments and programs, and our technology and operational performance. The Technology Committee receives management updates on at least a quarterly basis and in coordination with the Risk Committee, and oversees operational risk exposures related to technology, including cybersecurity risks, information security, fraud, data protection and privacy, and business continuity and resilience, among other topics. The Technology Committee also reviews and approves, as necessary and appropriate, the company's policies related to cybersecurity, information security and data privacy risk management.

We conduct annual third-party security assessments to assess our controls, governance and preparedness for cybersecurity threats. Additionally, the Cybersecurity Office reviews and updates relevant security policies annually to ensure they are aligned with industry best practices and all relevant laws and regulations. Continually strengthening and testing our security preparedness allows us to better partner with our clients and stakeholders in the innovation economy.

## Privacy

A top priority for SVB is maintaining the trust our clients and employees have in our data practices. We strive to continually demonstrate SVB's commitment to global privacy compliance and the highest ethical standards related to the collection, use, sharing and retention of personal information.

As a global firm, we are taking a global approach to privacy protection for our clients and employees. In all jurisdictions where we operate, we aim to go beyond regulatory compliance by providing our clients and employees rights and control over their personal data. Under the direction of our Chief Privacy Officer, we design our products and services according to the principle of Privacy by Design, ensuring ethical and compliant data collection, use, sharing and retention practices through technologies that focus on embedding privacy protections from the start.

SVB continues to make investments in our Global Privacy Office by focusing on key functions surrounding privacy operations, privacy engineering and privacy governance. A multiyear strategy has been developed with detailed Objectives and Key Results, which will help ensure we can measure our progress across privacy pillars such as transparency, choice, data collection, appropriate use and sharing, international transfer, incident management and accountability.

For more information on our privacy practices, please visit our **Privacy Notice** webpage.



# 09

SVB ESG REPORT

# Conclusion

# Conclusion

Thank you for your interest in our ESG programs and practices. We will continue to share how our long-standing commitment to innovation, combined with our deep experience supporting investors and evolving technology companies, enables us to contribute to a more just and sustainable world through our own business and the work of our clients.

Please share questions and comments about this report by contacting us at: **ESG@svb.com**

  







# Contact Us

Reach our ESG Program Office at **ESG@svb.com**
Reach our Investor Relations team at **IR@svb.com**

## Disclaimer

This material, including without limitation to the statistical information herein, is provided for informational purposes only. The material is based in part on information from third-party sources that we believe to be reliable but which have not been independently verified by us, and for this reason we do not represent that the information is accurate or complete. The information should not be viewed as tax, investment, legal or other advice, nor is it to be relied on in making an investment or other decision. You should obtain relevant and specific professional advice before making any investment decision.

Nothing relating to the material should be construed as a solicitation, offer or recommendation to acquire or dispose of any investment or to engage in any other transaction. Client companies or individuals named in this report, along with any other non-SVB named organizations or individuals, are independent third parties and are not affiliated with SVB Financial Group.

This report contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, including but not limited to SVB's efforts, commitments, goals and objectives in relation to ESG. These forward-looking statements are subject to numerous assumptions, risks and uncertainties, which change over time, and could cause actual results and events to materially differ from such forward-looking statements. Among those risks and uncertainties are risks related to SVB's business, including those described in SVB's reports filed with the U.S. Securities and Exchange Commission, as well as unexpected delays or expenses associated with executing against SVB's ESG goals and commitments. Forward-looking statements speak only as of the date they are made and we assume no duty to update forward-looking statements.



**10**

SVB ESG REPORT

# Appendix

ABOUT SVB | ESG GOALS | TALENT | DEI AT SVB | ECONOMIC IMPACT | CITIZENSHIP | CLIMATE AND ENVIRONMENT | GOVERNANCE

## Sustainability Accounting Standards Board (SASB) Index

SVB is committed to providing investors and other stakeholders with meaningful data on our environmental, social and governance (ESG) performance, underscoring our long-standing pledge of transparency and accountability. We aim to enable relevant comparisons of our ESG performance with peer companies. This is our second disclosure in accordance with SASB. We are using SASB's Commercial Bank Standards, Version 2018-10, which are most applicable to our core operations. Unless otherwise specified, the data and descriptions are current as of year-end 2021.

There are two key contextual issues to take into account when reviewing our SASB disclosure. First, our client base includes startups, some of which are considered small businesses under Small Business Administration guidelines. Small business lending is at the core of SVB's business strategy, but the definition of "small business" varies. For Financial Inclusion and Capacity Building metrics, we use the US Community Reinvestment Act definition of small business, which covers businesses with less than $1 million in gross annual revenues.

| Section | Disclosure | Response |
|---|---|---|
| Data security | (1) Number of data breaches, (2) percentage involving personally identifiable information (PII), (3) number of account holders affected | Consistent with SEC guidance, we disclose any material cybersecurity incidents and risks in our public filings. We currently do not have any material data breaches to report. |
| | Description of approach to identifying and addressing data security risks | Please see the "Cybersecurity" section of our Proxy and the "Cybersecurity" section of our 2022 ESG Report for more information. |
| Financial inclusion and capacity building | (1) Number and (2) amount of loans outstanding qualified to programs designed to promote small business and community development | 2021 Small Business[1]: 5,014 loans totaling $266,775,000<br><br>2021 Community Development[2]: 15 loans totaling $348,285,000<br><br>2021 Community Development Investments[3]: $335,224,575 |

| Section | Disclosure | Response |
|---|---|---|
| Financial inclusion and capacity building | (1) Number and (2) amount of past due and nonaccrual loans qualified to programs designed to promote small business and community development | SVB does not disclose the number and amount of past due and nonaccrual loans for small business lending or community development. We report early-stage client figures, which consist of pre-revenue, development-stage companies and companies that are in the early phases of commercialization, with revenues of up to $5 million. Early-stage companies are typically engaged primarily in research and development activities and may have brought only a few products or services to market, if any. Due to their size, early-stage companies mostly closely resemble small business-related metrics for these purposes.<br><br>To see our total nonaccrual loans, including "Early stage," please see **page 142** of our 2021 Form 10-K. |
| | Number of no-cost retail checking accounts provided to previously unbanked or underbanked customers | SVB partners closely with those in the communities where we work and operate. SVB's Board of Directors and management recognize that the economic health and quality of life of all residents in its Community Reinvestment Act assessment area contribute to SVB's and its clients' success. For more information on SVB's community development strategy, please see our **2022-2024 Community Reinvestment Act Strategic Plan** on the Federal Reserve's website. |
| | Number of participants in financial literacy initiatives for unbanked, underbanked or underserved customers[4] | SVB's financial literacy program, United and Counting, is designed to teach students financial literacy skills, including principles of saving, banking, credit card use, financing higher education and other relevant topics. United and Counting is an online course offered in schools that serve primarily low- and moderate-income students. Over the past three years, we have supported programs focused on financial education for grades 4-6, venture entrepreneurial exploration for grades 7-10 and financial literacy for high school. Please find annual impact below:<br><br>• 2019: 2,155 active students representing over 6,000 cumulative learning hours<br>• 2020: 1,993 students representing over 5,000 cumulative learning hours<br>• 2021: 4,915 students representing over 10,000 cumulative learning hours |

| Section | Disclosure | Response |
|---|---|---|
| Incorporation of environmental, social and governance factors in credit analysis | Commercial and industrial credit exposure, by industry | Please view SVB's latest Form 10-K for more information on our composition of loans at amortized cost basis broken out by risk-based segment. SVB's 2021 year-end data can be found on **page 135** of our 2021 Form 10-K.<br><br>Please also refer to our **TCFD report**. |
| | Description of approach to incorporation of environmental, social and governance (ESG) factors in credit analysis | Please view "**Identifying Environmental, Social & Governance (ESG) Opportunities & Risks at Silicon Valley Bank**." Please also refer to **page 23** of our TCFD report. |
| Business ethics | Total amount of monetary losses as a result of legal proceedings associated with fraud, insider trading, anti-trust, anti-competitive behavior, market manipulation, malpractice or other related financial industry laws or regulation | Based upon information available to us, our review of lawsuits and claims filed or pending against us to date and consultation with our outside legal counsel, we have not recognized a material liability for any such matters.<br><br>For more information on SVB's material legal proceedings, please view **page 179** of our 2021 Form 10-K. |
| | Description of whistleblower policies and procedures | For more information on our whistleblower policies and procedures, please view **page 9** of our SVBFG Code of Conduct. |
| Systemic risk management | Global Systemically Important Bank (G-SIB) score, by category | Global Systemically Important Banks (G-SIBs) are generally defined as financial institutions that could cause a financial crisis should they fail. Due to our size, SVB does not qualify as determined by the Financial Stability Board in consultation with national regulators.<br><br>For more information, please view the Financial Stability Board's 2021 list of globally systemically important banks. |
| | Description of approach to incorporation of results of mandatory and voluntary stress tests into capital adequacy planning, long-term corporate strategy and other business activities | For more information on our approach to stress testing, please view pages 11, 12, 28, 29, and 85-88 of our **2021 Form 10-K**. |

| Section | Disclosure | Response |
|---|---|---|
| Activity metrics | (1) Number and (2) value of checking and savings accounts by segment: (a) personal and (b) small business | SVB generally does not break out small business deposits by segment. We report early-stage client figures, which consist of pre-revenue, development-stage companies and companies that are in the early phases of commercialization, with revenues of up to $5 million. Early-stage companies are typically engaged primarily in research and development activities and may have brought only a few products or services to market, if any. Due to their size, early-stage companies mostly closely resemble small business-related metrics for these purposes.<br><br>For more information on all of our deposits, including early stage, please view the "Deposits" section on **page 81** of our 2021 Form 10-K. Please see **page 63** of our 2021 Form 10-K for SVB Private Bank total average deposits. |
| | (1) Number and (2) value of loans by segment: (a) personal, (b) small business and (c) corporate | a) Personal: Please see **page 135** of 2021 Form 10-K for more information on Private Bank loans.<br><br>b) Small Business[1]: 5,014 loans totaling $266,775,000<br><br>c) Corporate: Please see **page 135** of our 2021 Form 10-K for more information on our corporate loans. |

1    We use the US Community Reinvestment Act definition of small business, which covers businesses with less than $1 million in gross annual revenues. These loans have original amounts of $1 million or less and typically are either secured by non-farm or non-residential real estate or are classified as commercial and industrial loans.

2    Affordable housing (including multifamily rental housing) for low- or moderate-income individuals; community services targeted to low- or moderate-income individuals; activities that promote economic development by financing businesses or farms that meet the size eligibility standards of the Small Business Administration's Development Company or Small Business Investment Company programs (13 CFR 121.301) or have gross annual revenues of $1 million or less; or activities that revitalize or stabilize low- or moderate-income geographies.

3    Low-income housing tax credit funds that support affordable housing in the San Francisco Bay Area and California.

4    United and Counting is provided by SVB's partnership with Everfi.

# World Economic Forum Index

SVB is committed to providing our stakeholders with meaningful data on our environmental, social and governance (ESG) performance, underscoring our long-standing pledge of transparency and accountability. We aim to enable relevant comparisons of our ESG performance with peer companies. This is our second disclosure in alignment with the Stakeholder Capitalism Metrics (SCM) published by the International Business Council of the World Economic Forum. Unless otherwise specified, the data and descriptions are current as of year-end 2021.

For this report, there are some SCM metrics that we are not including. In some cases, the SCM metric would require a new disclosure, and we are working through our disclosure governance process to evaluate best practice disclosure standards and new metrics for future release. In other cases, the metric is not relevant given the mission of our business, which we have noted with an explanation.

| Principles of Governance | | |
| --- | --- | --- |
| **Section** | **Disclosure** | **Response** |
| Governance purpose | **Setting purpose:** The company's stated purpose, as the expression of the means by which a business proposes solutions to economic, environmental and social issues. Corporate purpose should create value for all stakeholders, including shareholders. | SVB is the financial partner of the innovation economy, helping individuals, investors and the world's most innovative companies achieve their ambitious goals. SVB's businesses — Silicon Valley Bank, SVB Capital, SVB Private and SVB Securities — together offer the services that dynamic and fast-growing clients require as they grow, including commercial banking, venture investing, wealth management and investment banking. Headquartered in Santa Clara, California, SVB operates in centers of innovation around the world. Learn more at **svb.com/global**. |

## Principles of Governance (cont.)

| Section | Disclosure | Response |
|---------|-----------|----------|
| Quality of governing body | **Governance body composition:**<br><br>Composition of the highest governance body and its committees by: competencies relating to economic, environmental and social topics; executive or non-executive; independence; tenure on the governance body; number of each individual's other significant positions and commitments and the nature of the commitments; gender; membership of under-represented social groups; and stakeholder representation. | Please see the "**Director Nominees, Selection, Composition and Other Information**" and "Biographies of Director Nominees" sections of our 2022 Proxy Statement for more information on the composition of our highest governance body, our Board of Directors. There is additional information on Board diversity metrics on our **Diversity, equity & inclusion** webpage.<br><br>With respect to the membership of SVB's Board of Directors, the primary areas of experience, qualifications and attributes we typically seek include, but are not limited to, the following areas related to ESG:<br><br>• Experience in public company governance, including corporate governance best practices and policies and managing relations with key stakeholders<br>• Knowledge of or experience with key risk oversight and risk management functions to help oversee the dynamic risks we face |
| Stakeholder engagement | **Material issues impacting stakeholders:**<br><br>A list of the topics that are material to key stakeholders and the company, how the topics were identified and how the stakeholders were engaged. | For more information on the ESG topics we prioritize, please see the "**Our ESG Strategy**" section of our ESG report. |

## Principles of Governance (cont.)

| Section | Disclosure | Response |
|---|---|---|
| Ethical behavior | **Anti-corruption:**<br><br>1) Total percentage of governance body members, employees and business partners who have received training on the organization's anti-corruption policies and procedures, broken down by region.<br><br>2) (a) Total number and nature of incidents of corruption confirmed during the current year, but related to previous years; and (b) Total number and nature of incidents of corruption confirmed during the current year and related to this year.<br><br>3) Discussion of initiatives and stakeholder engagement to improve the broader operating environment and culture in order to combat corruption. | 1) In 2021, 100% of SVB employees were assigned and completed our Anti-Bribery and Corruption (ABC) course.<br><br>2) Based upon information available to us, our review of lawsuits and claims filed or pending against us to date and consultation with our outside legal counsel, we have not recognized a material liability for any such matters, nor do we currently expect that these matters will result in a material liability to the company. Please see the "**Legal Matters**" section of our 2021 Form 10-K for more information on material legal and regulatory proceedings.<br><br>3) For more information on our anti-corruption procedures, please see the "**Anti-Money Laundering, Sanctions and Anti-Corruption Regulations**" section of our 2021 Form 10-K, our **Code of Conduct** and the "**Ethical Conduct**" section of our ESG report. |
|  | **Integrating risk and opportunity into business process:**<br><br>Company risk factor and opportunity disclosures that clearly identify the principal material risks and opportunities facing the company specifically (as opposed to generic sector risks), the company's appetite in respect to these risks, how these risks and opportunities have moved over time and the response to those changes. These opportunities and risks should integrate material economic, environmental and social issues, including climate change and data stewardship. | Please see the "**Enterprise Risk Management**" section of our ESG report and "**Climate Risks and Opportunities Affecting SVB over the Short, Medium and Long Term**" section of our TCFD report for more information on integrating risk and opportunities into our business processes.<br><br>Additionally, please see the Risk Factors listed in our 2021 Form 10-K starting on **page 17**, our **Identifying ESG Opportunities and Risks** document and **slide 25** of our Q4 2021 Financial highlights deck. |

| Planet | | |
| --- | --- | --- |
| **Section** | **Disclosure** | **Response** |
| Climate change | **Greenhouse gas (GHG) emissions**<br><br>For all relevant greenhouse gases (e.g., carbon dioxide, methane, nitrous oxide, F-gases, etc.), report in metric tonnes of carbon dioxide equivalent (tCO2e) GHG Protocol Scope 1 and Scope 2 emissions. Estimate and report material upstream and downstream (GHG Protocol Scope 3) emissions where appropriate. | Our 2021 GHG emissions was conducted according to the guidelines of the Greenhouse Gas Protocol and reported to CDP. It is publicly available on our **ESG Reporting** webpage. |
| | **TCFD implementation**<br><br>Fully implement the recommendations of the Task Force on Climate-Related Financial Disclosures (TCFD). If necessary, disclose a timeline of at most three years for full implementation. Disclose whether you have set, or have committed to set, GHG emissions targets that are in line with the goals of the Paris Agreement — to limit global warming to well below 2°C above preindustrial levels and pursue efforts to limit warming to 1.5°C — and to achieve net-zero emissions before 2050. | We are guided by the recommendations of the Task Force on Climate-Related Financial Disclosures (TCFD) as we enhance our management of climate risks and opportunities, and we disclosed in line with the TCFD's recommendations in 2021. To see the report, **click here**.<br><br>In January of 2022, SVB committed to reducing its own emissions and is taking steps to achieve carbon-neutral operations, including business travel, and 100% renewable electricity by 2025. For more information, please see the "**Advancing the Transition to a Sustainable, Low-Carbon Economy**" section of our ESG report. |
| Nature loss | **Land use and ecological sensitivity**<br><br>Report the number and area (in hectares) of sites owned, leased or managed in or adjacent to protected areas and/or key biodiversity areas (KBA). | We currently do not track our adjacency to key biodiversity areas. Our locations are in major metropolitan and suburban areas. For more information on SVB's locations, please see **SVB.com/locations**. |

## Planet (cont.)

| Section | Disclosure | Response |
|---------|------------|----------|
| Freshwater availability | **Water consumption and withdrawal in water-stressed areas**<br><br>Report for operations where material: megalitres of water withdrawn, megalitres of water consumed and the percentage of each in regions with high or extremely high baseline water stress, according to WRI Aqueduct water risk atlas tool. Estimate and report the same information for the full value chain (upstream and downstream) where appropriate. | We currently do not track our water usage. The nature of our operations does not rely on water consumption; however, we do adhere to all applicable water policies and regulations. |

## People

| Section | Disclosure | Response |
|---------|------------|----------|
| Dignity and equality | **Diversity and inclusion (%)**<br>Percentage of employees per employee category, by age group, gender and other indicators of diversity (e.g., ethnicity). | An inclusive workplace expands opportunities for everyone. SVB benefits from a diverse workforce and aims to continue to increase diverse representation at all levels of the company. To see a full breakdown of our workforce demographics, please visit our **Diversity, equity & inclusion** webpage. |
|  | **Pay equality (%)**<br>Ratio of the basic salary and remuneration for each employee category by significant locations of operation for priority areas of equality: women to men, minor to major ethnic groups, and other relevant equality areas. | Since 2018, SVB has engaged an external expert to complete an annual fair-pay analysis to ensure that all employees are paid fairly and there are no discrepancies across gender and race. In the handful of instances where we could not explain minor differences in compensation, we adjusted salaries as part of the review process. We publicly disclose our SVB UK Gender Pay Gap Report on our **UK webpage**. It is important to realize that these figures capture the whole workforce and do not compare men and women performing the same roles. |

| People (cont.) | | |
|---|---|---|
| **Section** | **Disclosure** | **Response** |
| Dignity and equality | **Wage level (%)**<br><br>a) Ratios of standard entry-level wage by gender compared to local minimum wage.<br><br>b) Ratio of the annual total compensation of the CEO to the median of the annual total compensation of all its employees, except the CEO. | a) We are working through our reporting governance process to evaluate best practice disclosure standards as this metric would require a new disclosure.<br><br>b) In 2021, the ratio of the annual total compensation of our CEO to the median of the annual total compensation of all employees was 79 to 1. For more information, please see the "**CEO Pay Ratio**" section of our 2022 Proxy Statement. |
| | **Risk for incidents of child, forced or compulsory labor**<br><br>An explanation of the operations and suppliers considered to have significant risk for incidents of child, forced or compulsory labor. Such risks could emerge in relation to: a) type of operation (such as manufacturing plant) and type of supplier; and b) countries or geographic areas with operations and suppliers considered at risk. | To us, doing the right thing goes beyond following laws, regulations and checklists. It's about the integrity, respect and well-being of ourselves and others that extends throughout our operations, including our supply chain. We set forth the principles we expect our vendors to follow in our **Supplier Code of Conduct**, which includes our expectations for vendors related to labor and human rights.<br><br>Please refer to our **Anti-slavery and Human Trafficking Transparency Statement** for more information on our approach to human rights in the United Kingdom. |
| Health and well-being | **Health and safety (%)**<br>The number and rate of fatalities as a result of work-related injury; high-consequence work-related injuries (excluding fatalities); recordable work-related injuries; main types of work-related injury; and the number of hours worked. An explanation of how the organization facilitates workers' access to non-occupational medical and healthcare services, and the scope of access provided for employees and workers. | We are committed to providing a safe and healthy workplace for all SVB employees. Protection of employees from workplace injury or occupational disease is a continuing company objective and SVB makes every effort to provide a safe and healthy work environment. However, we do not publicly disclose our health and safety data as we do not consider this topic to be material to our industry.<br><br>For more information on workers' access to non-occupational medical and healthcare services, please see our **Global Careers** page. |

## People (cont.)

| Section | Disclosure | Response |
|---------|-----------|----------|
| Skills for the future | **Training provided (#, $)** <br><br> Average number of hours of training per person that the organization's employees have undertaken during the reporting period, by gender and employee category (total number of hours of training provided to employees divided by the number of employees). Average training and development expenditure per full-time employee (total cost of training provided to employees divided by the number of employees). | We are working through our reporting governance process to evaluate best practice disclosure standards as this metric would require a new disclosure. <br><br> However, SVB provides numerous resources to our employees to receive training across a broad range of topics. While we require employees to receive training on topics related to regulatory compliance, we also offer employees optional, on-demand, live and online training so they can develop their professional and personal skills. As an example, we incorporate DEI content into our overall learning experiences for employees. DEI courses range from raising awareness of unconscious bias to building inclusive leadership. <br><br> We also offer our employees a number of professional development opportunities, including: an education reimbursement program, Leadership and Associate Development Programs, membership in professional development organizations and ongoing coaching as part of the performance review process. |

## Prosperity

| Section | Disclosure | Response |
|---|---|---|
| Employment and wealth generation | **Absolute number and rate of employment**<br><br>1. Total number and rate of new employee hires during the reporting period, by age group, gender, other indicators of diversity and region.<br><br>2. Total number and rate of employee turnover during the reporting period, by age group, gender, other indicators of diversity and region. | 1. In 2021, our full-time equivalent employees grew by just over 47% to 6,567 full-time equivalent employees. To learn more about our workforce demographics, please visit our **Diversity, equity & inclusion** webpage.<br><br>2. We are working through our reporting governance process to evaluate best practice disclosure standards as this metric would require a new disclosure. |
| | **Economic contribution**<br><br>1. Direct economic value generated and distributed (EVG&D), on an accruals basis, covering the basic components for the organization's global operations, ideally split out by:<br>a. Revenues<br>b. Operating costs<br>c. Employee wages and benefits<br>d. Payments to providers of capital<br>e. Payments to government<br>f. Community investment<br><br>2. Financial assistance received from the government: total monetary value of financial assistance received by the organization from any government during the reporting period. | 1.<br>a. $5,917 million in total revenue<br>b. $3,070 million in noninterest expense<br>c. $2,015 million in total compensation and benefits<br>d. We do not currently pay cash dividends on our common stock. We have not paid any cash dividends since 1992. In 2021, we did pay $63 million in preferred stock dividends and $48 million interest expense on borrowings.<br>e. In 2021, cash paid during the period for income taxes totaled $739 million.<br>f. In 2021, we donated nearly $18 million to nonprofit causes. You can find additional information on community and small business investment in our **SASB response**.<br><br>2. Please see **pages 161 and 162** of our 2021 Form 10-K for more information on our effective tax rate and deferred tax assets and liabilities. |

## Prosperity (cont.)

| Section | Disclosure | Response |
|---|---|---|
| Employment and wealth generation | **Financial investment contribution**<br><br>1. Total capital expenditures (CapEx) minus depreciation, supported by narrative to describe the company's investment strategy.<br><br>2. Share buybacks plus dividend payments, supported by narrative to describe the company's strategy for return of capital to shareholders. | 1. SVB does not report "Total capital expenditures." However, we do break down our Noninterest expense, including "Premises and equipment" which totaled $178 million. See **page 59** of our 2021 Form 10-K.<br><br>2. We do not pay a dividend on our common stock. We only pay dividends on our preferred stock, which totaled $63 million in 2021. See **page 99** of our 2021 Form 10-K for more information.<br><br>For additional information, please see the Consolidated Statements of Stockholders' Equity on **page 101** of our 2021 Form 10-K. |
| Innovation of better products and services | **Total R&D expenses ($)**<br><br>Total costs related to research and development. | We continue to invest in our strategic priorities, which are included in part of our total noninterest expense, to drive future growth and scalability. We prioritize enhancing our client experience, improving employee enablement, driving revenue growth and enhancing risk management. These categories, which we describe in more detail on **slide 14** of our Q4 2021 Financial Highlights presentation, broadly define how SVB thinks of research and development. This includes taking advantage of opportunities to develop new or strengthen existing products and services. These opportunities span across our business units and strategic priorities. As an example, climate-related opportunities have influenced our strategy for over a dozen years. SVB has identified opportunities in response to climate over the short, medium and long terms. In 2022, in light of the growth in climate-related opportunities, SVB committed to provide at least $5 billion in loans, investments and other financing by 2027 to support sustainability efforts. Additionally, our dedicated Innovation team develops new products and services for our clients. |

## Prosperity (cont.)

| Section | Disclosure | Response |
|---|---|---|
| Community and social vitality | **Total tax paid**<br><br>The total global tax borne by the company, including corporate income taxes, property taxes, non-creditable VAT and other sales taxes, employer-paid payroll taxes and other taxes that constitute costs to the company, by category of taxes. | In 2021, our income tax expense totaled $651 million. Please see the "Income Taxes" section of our 2021 Form 10-K, starting on **page 161**. |



SVB Financial Group (SVB) (Nasdaq: SIVB) is the holding company for all business units and groups. © 2022 SVB Financial Group. All rights reserved. SVB, SVB FINANCIAL GROUP, SILICON VALLEY BANK, SVB SECURITIES, SVB PRIVATE, SVB CAPITAL and the chevron device are trademarks of SVB Financial Group, used under license. Silicon Valley Bank is a member of the FDIC and the Federal Reserve System. Silicon Valley Bank is the California bank subsidiary of SVB Financial Group.